## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY
Miami, FL[1]

                Plaintiff,

     v.

JAMES RISEN, an individual,
c/o <u>The New York Times</u>
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

              and

HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

              and

HMH HOLDINGS, INC.
222 Berkeley Street
Boston, Massachusetts 02116

              Defendants.

Civil Action No. _____

## <u>COMPLAINT</u>

    Plaintiff Dennis L. Montgomery, by counsel, sues the Defendants, acting in concert,

jointly and severally, in this civil action for Common Law Defamation *Per Se* (libel and slander),

General Defamation (libel and slander), Defamation by Implication (libel and slander),

Intentional Infliction of Emotional Distress, Tortious Interference with Prospective Advantage,

and Assault, as a result of Defendants causing actual damages, compensatory damages, and

---

[1]    Plaintiff's street address is not listed for security reasons.

giving rise to punitive damages as well, including continuing and aggravated harm to the Plaintiff's professional, business and personal reputation and livelihood.  As grounds therefore, Plaintiff alleges as follows:

I.      **JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000. Also, the Causes of Action arose in this district.

2.      Venue is proper for Defendants pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(e).

3.      The Causes of Action and the injuries were caused to the Plaintiff by the Defendants' defamation and other tortious conduct in this district, Florida in general, nationwide, and internationally.

4.      In addition, some of the most recent commercial opportunities for the Plaintiff's work were contracts and projects made available through military bases and Government facilities in Florida.

5.      The State of Florida is the third (3rd) largest state by population within the entire United States such that a huge and substantial portion of the nationwide harm has occurred in Florida.

II.     **THE PARTIES**

6.      Dennis L. Montgomery is a natural person, an individual, and a citizen of the United States.  He is a citizen of Florida, which as set forth above, is where much of this work has taken place and will continue to take place.

7.     James Risen is a natural person who is a Pulitzer Prize-winning journalist for <u>The New York Times</u>, previously for <u>The Los Angeles Times</u>. He has written or co-written many articles concerning U.S. Government ("Government") activities and is the author or co-author of two books about the National Security Agency ("NSA") and the Central Intelligence Agency ("CIA").

8.     Defendant Houghton Mifflin Harcourt Publishing Company is the publisher of Risen's Book, "<u>Pay Any Price: Greed, Power and Endless War</u>" and is located in Boston, Massachusetts.

9.     Defendant HMH Holdings, Inc. is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

10.     With regard to each of the allegations in this complaint, all of the Defendants have acted in concert, jointly and severally, thus giving rise to joint and several liability for each of them. Thus, when a tortious act is attributed (and pled as) to Defendant Risen, it also applies to the other two defendants, Houghton Mifflin Harcourt Publishing Company and HMH Holdings, Inc.

11.     All of the allegations of this Complaint refer or relate to the tortious, illegal conduct of each and every named Defendant, who acted individually and in concert, jointly and severally, to severely damage Plaintiff Montgomery.

III.    **FACTS COMMON TO ALL COUNTS**

12.     Plaintiff Montgomery sues for harm and thus damages in this district, Florida in general, nationwide and internationally to himself as an individual, which damages include financial harm to his business reputation as an individual and his business and professional opportunities as an individual, intentional infliction of emotional distress, and assault for placing

Plaintiff Montgomery in immediate fear of bodily harm, injury, and death, by terrorists who have sworn to attack those assisting the U.S. military and Government.

13.     Plaintiff Montgomery sues for harm to his financial interests as an individual owner, investor, partner, shareholder and/or employee of companies impacted by these events, which has resulted in financial harm to Plaintiff Montgomery as an individual through the loss of value of his ownership interests in those companies as a result of Defendants' defamation and other tortious conduct.

14.     Plaintiff Montgomery sues for harm to his financial interests as an individual in the intellectual property of computer software, computer software techniques and encoding and decryption technologies which he developed and which have been harmed by Defendants' defamation and other tortious conduct, as well as other harm and thus damages to be uncovered during discovery.

### Dennis Montgomery Not a Public Figure

15.     Plaintiff Montgomery is a private citizen and at all material times acted individually and in business.

16.     Plaintiff Montgomery has not sought any form of publicity, public note or prominence outside of implementing his own business affairs in private transactions.

17.     Plaintiff Montgomery has not sought or held any public office or Government position within the Government.

18.     Plaintiff Montgomery thus is not a public figure based on facts, including his work for the Government, which was secret, while he in effect worked undercover for the Government outside of the public eye.

19.     Plaintiff Montgomery has not sought or acquired any position of public power or influence which would give him the ability to protect himself apart from the courts within the meaning of *New York Times v. Sullivan*, 376 U.S. 254 (1964).

20.     Plaintiff Montgomery is not a public figure within the meaning of *New York Times v. Sullivan,* 376 U.S. 254 (1964) or its progeny.

**Defamation of Plaintiff Dennis Montgomery by Defendant James Risen in Recent Bestselling Book**

21.     On October 14, 2014,[2] the publishing 'house' of Defendant Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, whose parent is Defendant HMH Holdings, Inc., published a book titled "Pay Any Price:  Greed, Power and Endless War" (referred to as "the Book" or "Book" below) by author Defendant James Risen, Copyright (c) 2014 by Defendant James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).  This publication dated October 14, 2014, was the first publication of the Book in this district, Florida in general, domestically, and worldwide, in any language and the first printing run of the Book.  The Book was physically printed in the United States.

22.     On information and belief, the Book Pay Any Price was sold starting in October 2014, in mainstream bookstores throughout this district, Florida in general, the United States as a whole, internationally, and on the Internet.

23.     A complete copy of Chapter 2 of Pay Any Price is attached for the Court as Exhibit A.

---

[2]     A book's official publication date is somewhat artificial for marketing, and books are often available and being promoted a week or two ahead of the official publication date.  In part, this is due to the task of distributing books to bookstores and on the Internet all across the nation by the official date of publication.

24.     Chapter 2 of the Book <u>Pay Any Price</u> is devoted to the Plaintiff Montgomery –
though curiously not to Warren Trepp, Montgomery's much more politically connected business
partner, after whom their company eTreppid was named.

25.     The Book could have been written and still be complete by omitting Plaintiff
Montgomery entirely from the Book.  Plaintiff Montgomery is not necessary to the theme or
message of the Book, but indeed the reports about Plaintiff Montgomery actually conflict with
the Book overall.

26.     The Book was rated as #18 in the greatest quantity of sales nationwide on <u>The</u>
<u>New York Times'</u> list rating the nation's bestselling books for the week of November 9 to 16,
2014, and #20 in quantity of sales nationwide for the week of October 26 to November 9, 2014.

27.     The Book was rated as #11 in the greatest quantity of sales nationwide on <u>The</u>
<u>Los Angeles Times'</u> list rating the nation's bestselling books as of November 2, 2014, and #17 in
quantity of sales nationwide as of November 16, 2014.

28.     The Book is listed on <u>The New York Times'</u> list of the 100 most notable books
published in the year 2014.

29.     Apart from the Book itself, Defendant Risen also engaged in a flurry of radio and
television news interviews and talk show interviews in and around September 2014 and October
2014, associated with the "roll out" of his Book in which Defendant Risen made further
defamatory factual publications of and concerning Plaintiff Montgomery, in addition to the
words and content of the Book itself.  In these interviews, Defendant Risen and the other
Defendants repeated the false and misleading statements from the Book itself, and also added to
those claims and even at times falsely and misleadingly contradicted the defamatory claims of
his own Book.

30.     Many of Defendant Risen's and the other Defendants' libelous and slanderous statements were made during written news and talk show interviews during September 2014, October 2014, and November, 2014, some spoken, some in print and elsewhere, surrounding the publication of his Book rather than in the Book itself.

31.     Counsel for Plaintiff Montgomery served a demand for a retraction upon Jon Stewart and "The Daily Show" airing on November 6, 2014 on the Comedy Central nationwide television network after Defendant Risen's television interview on "The Daily Show."  Stewart and the "The Daily Show" production did not air a correction or retraction, but later removed the interview from its website. However, the publication is still out on - and being published on - the Internet and other media sites.

32.     Plaintiff Montgomery also sent two demand letters to the Defendant publishers pursuant to Florida Statute § 770.02. One was served on January 14, 2015 and the other was served on February 13, 2015. Defendants responded on January 20, 2014, refusing to retract the false information and pay damages. (Composite Exhibit B). To date, Defendants' have not responded to Plaintiff Montgomery's letter of February 13, 2015. These are incorporated herein by reference.

33.     Defendants' defamation that Plaintiff Montgomery convinced the Government of false terror threats is false and misleading including but not limited to the fact that Plaintiff Montgomery never offered any interpretation of the hidden data he uncovered, even when pressured to give his conjecture about what the hidden data was, meant, or referred to.  Plaintiff Montgomery left it up to intelligence experts of the Government to analyze and determine what the hidden data and clues that he found actually meant.

34.     Defendants' defamation of Plaintiff Montgomery is false and misleading, including but not limited to the fact that Plaintiff Montgomery and his partners turned down other contracts of equal or greater profitability with private companies, but were urged by Government officials to help the Government for national defense instead.

35.     Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government to make money out of greed is false and misleading, including but not limited to the fact that Plaintiff Montgomery was only a minority stockholder who did not receive any distribution of company profits.  Warren Trepp was the President and CEO and controlled all shareholder activities and financial decisions in the company, eTreppid.  Plaintiff Montgomery owned no stock in Edra Blixseth's later company BLIXWARE.

36.     Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government is false and misleading including but not limited to the fact that the Government conducted its own independent tests of Plaintiff Montgomery's software and confirmed its effectiveness and reliability.

37.     Defendants' publications that Plaintiff Montgomery defrauded the Government are false and misleading including but not limited to the fact that the Government has continued to use Plaintiff Montgomery's software and technology.

38.     Defendant Risen and the other Defendants have misrepresented the truthful story of these events by faulting the wrong parties and thus defaming Plaintiff Montgomery.

39.     Defendants' defamation of Plaintiff Montgomery is false and malicious, including but not limited to the fact that Defendant Risen's Government sources would bear the blame and legal consequences if they did not portray Plaintiff Montgomery as at fault.

40.     In the alternative, Defendants, all of them, jointly and severally, manufactured the alleged facts pled in this Complaint and did not have confidential sources in Government.

41.     Despite being a Pulitzer Prize-winning author, Defendant Risen has previously been alleged to engage in a pattern and practice of defaming individuals for profit. As one example revealed on Defendant Risen's Wikipedia page, specifically, Wen Ho Lee co-wrote a book called <u>My Country Versus Me</u> in which he described Defendant Risen as a "hatchet job on me, and a sloppy one at that." <u>The New York Times</u> and <u>The Los Angeles Times</u> jointly decided to settle the case brought by Wen Ho Lee on behalf of Defendant Risen and agreed to pay damages to settle the lawsuit.

### Use of False And Misleading Classified Information by Defendants or Failure to Fact Check

42.     Thus, either the Defendants, all of them, had in their possession classified national security and intelligence information from the Government and details of confidential private conversations and events within the Government (and falsified that information) or Defendants made up the entire defamatory story about Plaintiff Montgomery for sensationalism and thus just to sell more books and reap huge profits.

43.     Defendants Houghton Mifflin Harcourt Publishing Company ("Houghton Mifflin") and its parent, HMH Holdings, Inc., were required to fulfill their legal and ethical responsibilities before publishing a book of this nature and especially a book containing Chapter 2 and related passages which singles out a private citizen for intense defamation, to "fact check" and review the evidence for defamatory factual recitations made in the Book concerning Plaintiff Montgomery before publication.

44.     Houghton Mifflin and HMH Holdings, Inc. were required to ensure that the author, Defendant Risen, had sufficient factual basis for the Book's statements and claims about Plaintiff Montgomery.

45.     Here, however, even if true, the substance of the Book's published criticisms and descriptions of Plaintiff Montgomery would have required Defendant Risen to admittedly base his Book on information from the Government which is classified or secret or otherwise legally restricted on the grounds of national security or intelligence sources and methods.

46.     In the Book's preliminary pages, Defendant Risen writes and Defendants Houghton Mifflin and HMH Holdings, Inc. published and admitted the following:

### A NOTE ON SOURCES

> "Many people have criticized the use of anonymous sources.  Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them.  This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity."

47.     Thus, Defendants admit that the Book is based upon inside, Governmental classified information, however false and misleading, from "many current and former government officials…"

48.     Among other occasions, Defendant Risen described in The New York Times telephone[3] interview posted on October 24, 2014, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"**, that he was alerted about Plaintiff Montgomery by sources within the CIA.

---

[3]     Accessible at: http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/

49.     Thus, the substance of the Book's false and misleading publications about

Plaintiff Montgomery, if true or otherwise, would have required Defendants Houghton Mifflin

and HMH Holdings, Inc. to review information from the Government which is classified or

secret or otherwise legally restricted on the grounds of national security or intelligence sources

and methods. Since this would be illegal, one can only conclude that Defendants fabricated the

defamatory publications as alleged herein.

50.     Defendant Risen and the other Defendants' defamatory and false and misleading

factual assertions, descriptions, and reports in Chapter 2 of the Book Pay Any Price concerning

Plaintiff Montgomery relate in specific detail conversations, incidents, events, decisions, etc.,

that Defendant Risen could not possibly know without receiving information from the

Government that is classified, secret, or legally restricted.

51.     For example, the Book related and published conversations within the Oval Office

of The White House with President George W. Bush and his foreign policy team and the national

command authority of the United States, communications between the intelligence services of

France and the United States, deliberations within the CIA and NSA, and so on and so forth.

52.     Plaintiff Montgomery developed various software including software that

successfully decoded hidden messages from broadcast video.[4]

53.     However, as to why the Bush Administration cancelled flights from Europe and

ordered potential shoot-downs (see below), including the full range of their information, only the

---

[4]     Plaintiff Montgomery's company began originally developing software to colorize black-and-white movies, which requires an extraordinarily sophisticated ability to recognize specific objects and shapes – such as faces, individual parts of clothing, etc., as they are moving in three dimensional perspective and changing distances (affecting size in relation to other objects in the view) and to follow and track every object requiring a slightly different shade of color, brightness, including as impacted by shadows, etc.

Government intelligence officials themselves and the President of the United States at the time know why they did what they did.

54.     Defendants Risen, Houghton Mifflin, and HMH Holdings, Inc., were used as tools by the CIA, NSA, and other Government agencies and their affiliates to maliciously destroy Plaintiff Montgomery because he came forward as a whistleblower in an attempt to reveal their unconstitutional and illegal actions in spying on all American citizens, regardless of whether there was probable cause that they were communicating with and/or aiding and abetting terrorists and/or committing crimes.

## **Actual Malice and Punitive Damages:  Defendant James Risen is an Expert in Journalism**

55.     Actual malice can be found if Defendants published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

56.     Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquires were made after the editors knew or should have known that the published accounts were untrue.

57.     Actual malice can also be proved by circumstantial evidence. Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

58.     In his interview posted on October 24, 2014, called  "titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price:**  This week, James Risen and Lucy Worsley," **Defendant Risen admits that ….**

12

**" . . . it is very difficult to tell what is actually true."**[5]

59.     Defendant Risen is a Pulitzer Prize-winning investigative reporter for <u>The New York Times</u>, and accordingly trained, experienced, and disciplined in journalistic standards and ethics.

60.     Regarding Defendant Risen's status as an expert in accurate and reliable reporting as a journalist, <u>Newsweek</u> praises Defendant Risen on October 20, 2014, by claiming

> "At long last we can retire Bob Woodward and Carl Bernstein as the icons of investigative reporting. With his second book probing the dark tunnels of the so-called war on terror, James Risen has established himself as the finest national security reporter of this generation, a field crowded with first-rank talent at *The Washington Post*, *Wall Street Journal*, Associated Press, Reuters, McClatchy Newspapers and the *New York Times*, his employer and sometimes bane."[6]

61.     As "the finest national security reporter of this generation" according to <u>Newsweek</u>, Defendant Risen should have understood what Dan Aykroyd's character (Naval Intelligence Captain Raymond Thurman)  in the movie <u>Pearl Harbor</u> explains to Admiral Chester Nimitz:

> **Admiral Chester W. Nimitz**:   So, sir, you would have us mobilize the entire fleet, at the cost of millions of dollars, based on this 'spine-tingling' feeling of yours?
>
> **Captain Raymond Thurman**:   No, sir. I understand my job is to gather and interpret material. Making difficult

---

[5]     ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book and publishing a podcast interview of James Risen with Lousia Worsley **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** accessible at that website address.

[6]     **"Hustlers, Con Men & Dupes Cashing in on the War on Terror,"by Jeff Stein**, <u>Time Magazine</u>, October 20, 2014, http://www.newsweek.com/hustlers-con-men-dupes-cashing-war-terror-278503.   Risen did not make any new statements in the <u>Newsweek</u> article and apparently was not interviewed for the article.  However, <u>Newsweek</u> did republish the libel from Risen's Book.

decisions based on incomplete information from my
limited decoding ability is your job, sir.[7]

62.     Yet, Defendant Risen and the other Defendants defame a private citizen, Plaintiff

Montgomery, as responsible for the alleged decision of President George W. Bush's to ban many

incoming international flights around Christmas 2003 from entering U.S. airspace and to

(allegedly) nearly order the U.S. Air Force to shoot down around ten civilian aircraft over the

Atlantic Ocean as a result of Plaintiff Montgomery's claimed fraud and hoax.  Defendant Risen

portrays this as Plaintiff Montgomery's fault, not Bush's, assuming there is any truth at all to this

false and misleading account.

63.     At a time when the Government was encouraging people to: " . . . If you see

something, say something,"[8] Plaintiff Montgomery said something about what he saw,

innocently, diligently, legally and appropriately.

64.     The thesis of Defendant Risen's and the other Defendants' Book is that the war on

terror is illegitimate and unnecessary, motivated by personal greed, irrational paranoia, or

politics, and that the French government is wise and smart while our Government is stupid,

foolish, greedy, incompetent and criminally-minded.

65.     That is, Defendant Risen and the other Defendants' Book is not a neutral report,

in which errors could be classified as simply inadvertent.  The Book is an intentional, politically-

driven, falsified, and misleading attack on U.S. foreign, military, and intelligence policies in the

"war on terror" against Islamic terrorism, meant to mock and ridicule a strong national defense.

---

[7]     "Pearl Harbor" (2001) (Touchstone Pictures and Jerry Bruckheimer Films)
[8]     http://www.dhs.gov/if-you-see-something-say-something%E2%84%A2 .  In fact, the
DHS encourages partners, announcing "If you are interested in establishing a partnership with
DHS and the "If You See Something, Say Something™" Campaign, please email
seesay@hq.dhs.gov."  DHS has set up a special email address seesay@hq.dhs.gov to promote
this concept of vigilance.

Plaintiff Montgomery is illegally used as a whipping boy by Defendants in this regard to sensationalize and sell more books for a great profit.

66.     Defendant Risen sets out to discredit what he calls "The Endless War" as being motivated by corruption, greed, personal profit, and irrational paranoia.

67.     Yet curiously Defendant Risen goes very far out of his way to gratuitously and irrelevantly defame Plaintiff Montgomery as the villain and Government officials as Plaintiff Montgomery's unsuspecting victims, in conflict with the theme of his Book.  Defendant Risen also deliberately looks past Warren Trepp, the owner of eTreppid, to oddly single out and blame only Plaintiff Montgomery.

68.     That is, Defendant Risen and the other Defendants' defamation of Plaintiff Montgomery contradicts and undermines his own thesis in the Book Pay Any Price, curiously shifting the blame from Government officials to a lone private citizen, whom he falsely and misleadingly portrays as having no intelligence or defense background.

69.     Defendant Risen ignores evidence that should have warned him and the other Defendants that their false and misleading publications are wrong into yet another example that Plaintiff Montgomery kept defrauding the Government.

70.     The Government repeatedly rehiring Plaintiff Montgomery should have warned Defendant Risen that there is more than meets the eye to this falsified and misleading story, yet instead Risen portrays this as Plaintiff Montgomery defrauding it, the Government.

71.     More than the average lay person, Defendant Risen knows or should know the unreliability of some sources and the information they provide and the motivations of sources.

72.     A central claim of Defendant Risen's and the Defendants' defamation of Plaintiff Montgomery is that the stupid, foolish, Government was defrauded by Plaintiff Montgomery's

hoax until a private French firm opened its eyes and Government officials were tutored by the French to discover enlightenment.

73.     But in fact, Defendant Risen actually knew or should have known in advance of the Book's publication that France was an opponent of the Bush Administration's foreign policies in the relevant time period after Christmas 2003 and would neither have been trusted by the Government with such secrets nor believed.  Certainly, a private French firm would not have been so trusted.

74.     France at the time was actively involved in opposing the Bush Administration's foreign policy.[9]

75.     In particular, France's animosity toward U.S. foreign, military, and intelligence policies were driven by France's extensive commercial interests with the Middle East, such that a private French high-tech firm would be the least likely source to be believed by U.S. Government officials.

76.     In fact, so disgusted with France's opposition to U.S. foreign, military, and intelligence policies was President Bush's political party that the name of "French fries" was

---

[9]     See, "**France raises terror war concerns**," <u>CNN</u>, February 7, 2002, ("A senior French government minister has attacked the U.S. approach to fighting terrorism as "simplistic.") http://www.cnn.com/2002/WORLD/europe/02/07/france.bush/  and "**France and allies rally against war,**" <u>BBC News,</u>  March 5, 2003, http://news.bbc.co.uk/2/hi/middle_east/2821145.stm and "**Israeli Analysts: France Ignored Islamic Terror Directed at Jewish Targets:  'Didn't want to deal with Islamic terror for political reasons,**'" <u>Washington Free Beacon</u>, January 12, 2015 ("Columnist Alex Fishman, who writes on security issues for the Tel Aviv daily, Yediot Achronot, said that French intelligence agencies "just didn't want to deal with Islamic terror for political reasons, both because of France's involvement in the Arab world and because 10 percent of its residents are Moslem. The French security services insisted on not touching Islamic terror professionally") http://freebeacon.com/national-security/israeli-analysts-france-ignored-islamic-terror-directed-at-jewish-targets/   With France as an outspoken opponent to President Bush's war on terror policies, perceived as driven by France's lucrative business opportunities in the Middle East, it is highly improbable that the CIA would share sensitive, classified information with France at that period in time.

changed to "Freedom Fries" in the cafeterias and restaurants in the Republican-controlled U.S.

House of Representatives, as CNN reported on March 12, 2003.[10]  CNN reported:  "But House

Majority Leader Tom DeLay, R-Texas, said he didn't think Congress needed to take any formal

steps to signal its disapproval of France. 'I don't think we have to retaliate against France,' he

said. '***They have isolated themselves. They have resigned from any responsibility for the war***

***on terror.***'" (Emphasis added.)

77.     Thus Defendant Risen actually knew or should have known, as a Pulitzer Prize-

winning expert reporter on national security, the war on terror, and foreign, military, and

intelligence policies, that it was nearly impossible for the claim to be true that Plaintiff

Montgomery pulled off a hoax against the Government until a private French high-tech firm

blew the whistle on Plaintiff Montgomery's fraud using highly-classified intelligence.

78.     With regard to Defendant Risen's reporting about a Christmas 2003 alert

concerning possible terrorism involving airliners, Defendant Risen actually knows and should

have known that the French government does not have the authority to demand an explanation

from the CIA.[11]

79.     Defendant Risen also knows and should have known that the Bush Administration

would never have believed France's analysis as being unbiased and trustworthy, rather than

politicized manipulation.

---

[10]     "**House cafeterias change names for 'french' fries and 'french' toast**," By Sean
Loughlin, CNN, March 12, 2003.  http://www.cnn.com/2003/ALLPOLITICS/03/11/sprj.irq.fries/
[11]     Defendant Risen himself is under a court order in another case to divulge his sources as a
journalist, which Risen has refused to comply with.  Risen knows that even journalists often do
not reveal their sources.  See http://dissenter.firedoglake.com/2014/10/30/in-leak-prosecution-
attorneys-demand-to-know-if-government-has-agreement-with-reporter-james-risen/

80.     Moreover, Defendant Risen repeatedly complains and admits in his Book and in interviews that <u>The New York Times</u> refused to publish many of his articles written on these topics.

81.     Thus, Risen has actual knowledge that experienced and well-established news sources such as <u>The New York Times</u> had serious doubts about the truthfulness of Defendant Risen's reporting on these and related topics, such that <u>The New York Times</u> refused to run many of Risen's filed reports, despite his Pulitzer Prize background. If anyone or entity was motivated by greed, it was not Plaintiff Montgomery but Defendants Risen, Houghton Mifflin, and HMH Holdings, Inc., who fabricated false and misleading information and then published it for financial gain.

82.     Defendants' acts were willful malicious, deliberate, or were done with reckless indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions, as well as encourage terrorists and others to threaten Plaintiff Montgomery with severe bodily injury or death; in effect causing a Fatwah to be placed on Plaintiff Montgomery's head and on his family.

IV.     **<u>CAUSES OF ACTION</u>**

### <u>FIRST CAUSE OF ACTION</u>
#### *Common Law Defamation "Per Se"*

83.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

84.     The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed the Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false.

85.     Defendants together and each of them acting in concert, jointly and severally, and individually, made false statements that are Defamation *Per Se*, accusing Plaintiff of fraud, crime, scams, and being a con-artist.

86.     Among other accusations, Defendants state that Plaintiff Montgomery defrauded CIA Director George Tenet with regard to contracts with the Government, which published and accused Plaintiff Montgomery of having committed crimes under the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and also common law and statutory fraud.  This is Libel *Per Se.*

87.     Defendants, together and each of them acting in concert, jointly and severally, and individually, knew that their public statements about the Plaintiff would cause severe damage to the reputation, business opportunities, social relationships, and the career of Plaintiff Montgomery.

88.     A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

89.     A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc*., 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

90.     For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

91.     Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

92.     **First, on Page 32 of the Book, the Defendants published:**[12]

> "Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

93.     As Libel *Per Se*, Defendants published about Plaintiff's actions and work that "many current and former U.S. officials and others familiar with the case now believe was one of

---

[12]     Note that several statements may qualify under different theories, but are presented in full for proper context.  Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that

it nearly convinced the Bush administration to order fighter jets to start shooting down

commercial airliners filled with passengers over the Atlantic."

94.     As Libel *Per Se*, Defendants published about the Plaintiff that "once the fever

broke and government officials realized that they had been taken in by a grand illusion, they did

absolutely nothing about it …"

95.     ***Second***, on Page 32 of the Book, the Defendants published:

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition
> have been married to unlimited rivers of cash to create a climate in
> which someone who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

96.     As Libel *Per Se*, Defendants published that out of "greed" Plaintiff Montgomery

"create[d] a rogue intelligence operation with little or no adult supervision" which was "crazy"

and that he was "someone who has been accused of being a con artist."

97.     ***Third***, on Page 33 of the Book, the Defendants published:

> "A former medical technician, a self-styled computer software
> expert with no experience whatsoever in national security affairs,
> Dennis Montgomery almost singlehandedly prompted President
> Bush to ground a series of international commercial flights based
> on what now appears to have been an elaborate hoax. Even after it
> appeared that Montgomery had pulled off a scheme of amazing
> scope, he still had die-hard supporters in the government who
> steadfastly refused to believe the evidence suggesting that
> Montgomery was a fake, and who rejected the notion that the
> super-secret computer software that he foisted on the Pentagon and
> CIA was anything other than America's salvation."

98.     As Libel *Per Se*, Defendants published that Plaintiff's work "now appears to have

been an elaborate hoax."

99.     As Libel *Per Se*, Defendants published that "die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Plaintiff Montgomery was a fake."

100.     As Libel *Per Se*, Defendants published "that he foisted on the Pentagon and CIA" super-secret computer software.

101.     As Libel *Per Se*, Defendants published with reckless disregard for the lives of thousands of airplane passengers on approximately ten civilian aircraft, that Plaintiff Montgomery nearly caused Government policy to shoot down those airplanes causing certain death, despite being a private citizen, rather than looking to Government officials as responsible for the decisions.

102.     ***Fourth*, on Page 34 of the Book, the Defendants published:**

> "Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas."

103.     As Libel *Per Se*, Defendants published about the Plaintiff that he was an "incorrigible gambler," meaning in effect that Plaintiff Montgomery was a gambling addict who was "playing blackjack on a nightly basis." Historically, gambling, and in particular an uncontrollable gambling addiction, is a loathsome social status.

104.     As Libel *Per Se*, Defendants published about the Plaintiff that he bounced more than $1 million in bad checks.

105.     ***Fifth,* on Page 36 of the Book, the Defendants published:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

106.    As Libel *Per Se*, Defendants published about the Plaintiff that the Plaintiff's

lawyer "concluded that Montgomery was a fraud."

107.    ***Sixth,*** **on Page 37 of the Book, the Defendants published:**

> "By the spring and summer of 2003, eTreppid was awarded contracts
> by both the air force and U.S. Special Operations Command.
> Montgomery was able to win over the government in part by offering
> field tests of his technology — tests that former employees say were
> fixed to impress visiting officials. Warren Trepp later told the FBI
> that he eventually learned that Montgomery had no real computer
> software programming skills, according to court documents that
> include his statements to the FBI. Trepp also described to federal
> investigators how eTreppid employees had confided to him that
> Montgomery had asked them to help him falsify tests of his object
> recognition software when Pentagon officials came to visit. Trepp
> said that on one occasion, Montgomery told two eTreppid employees
> to go into an empty office and push a button on a computer when they
> heard a beep on a cell phone. Meanwhile, Montgomery carried a toy
> bazooka into a field outside eTreppid. He was demonstrating to a
> group of visiting U.S. military officials that his technology could
> recognize the bazooka from a great distance."

108.    As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud

including defrauding the Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

109.    ***Seventh,*** **on Page 37 of the Book, the Defendants published:**

> "After he was in place in the field, he used a hidden cell phone to
> buzz the cell phone of one the eTreppid employees, who then pushed
> a key on a computer keyboard, which in turn flashed an image of a
> bazooka on another screen prominently displayed in front of the
> military officers standing in another room, according to court
> documents. The military officers were convinced that Montgomery's
> computer software had amazingly detected and recognized the
> bazooka in Montgomery's hands. (Montgomery insists that the
> eTreppid employees lied when they claimed that he had asked them to
> fix the tests, and also says that the air force issued a report showing
> that it had verified the tests.)"

110.     As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud

including defrauding the Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

111.     ***Eighth,*** **on Page 40 of the Book, the Defendants published:**

> "Montgomery brilliantly played on the CIA's technical insecurities
> as well as the agency's woeful lack of understanding about al
> Qaeda and Islamic terrorism. He was able to convince the CIA that
> he had developed a secret new technology that enabled him to
> decipher al Qaeda codes embedded in the network banner
> displayed on the broadcasts of Al Jazeera, the Qatar-based news
> network. Montgomery sold the CIA on the fantasy that al Qaeda
> was using the broadcasts to digitally transmit its plans for future
> terrorist attacks. And only he had the technology to decode those
> messages, thus saving America from another devastating attack.
> The CIA— more credulous than Hollywood or Las Vegas— fell
> for Montgomery's claims. In short, he convinced CIA officials that
> he could detect terrorist threats by watching television."

112.     As Libel *Per Se*, Defendants published about the Plaintiff that "Montgomery sold

the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for

future terrorist attacks."

113.     As Libel *Per Se*, Defendants published about the Plaintiff that he defrauded the

CIA.

114.     ***Ninth,*** **on Page 42 of the Book, the Defendants published:**

> "A CIA official defensively pointed out that the agency did not
> actually have a contract with eTreppid at the time Montgomery was
> providing data from the Al Jazeera videotapes. While they were
> working closely together during the final months of 2003, the CIA
> had not yet started paying Montgomery, the official said. The
> agency never finalized a contract with him because agency staff
> eventually realized they had been conned, according to this official.
> But that does not diminish the fact that for a few crucial months, the
> CIA took Montgomery and his technology very seriously."

115.    As Libel *Per Se*, Defendants published about the Plaintiff that "agency staff

eventually realized they had been conned, according to this official."

116.    ***Tenth,*** **on Page 46 of the Book, the Defendants published:**

> "It did not take long for the French firm to conclude that the whole
> thing was a hoax.  The French company said that there were simply
> not enough pixels in the broadcasts to contain hidden bar codes or
> unseen numbers.  The firm reported back to the French government
> that the supposed intelligence was a fabrication."

117.    As Libel *Per Se*, Defendants published about the Plaintiff that "the whole thing"

(Plaintiff Montgomery's work) "was a hoax" and a "fabrication."

118.    ***Eleventh,*** **on Page 46 of the Book, the Defendants published:**

> "The CIA never investigated the apparent hoax nor examined how it
> had been handled inside the agency. No one involved in promoting
> Montgomery, in vouching for his information to the president, or in
> proposing to shoot down planes based on his claims ever faced any
> consequences."

119.    As Libel *Per Se*, Defendants published about the Plaintiff that his work was a

hoax.

120.    ***Twelfth,*** **on Page 47 of the Book, the Defendants published:**

> "At the time of the Christmas 2003 scare, John Brennan was head of
> the newly created Terrorist Threat Integration Center and in charge of
> distributing terrorism-related intelligence throughout the government.
> That meant that Brennan's office was responsible for circulating
> Montgomery's fabricated intelligence to officials in the highest
> reaches of the Bush administration. But Brennan was never
> admonished for his role in the affair. After Barack Obama became
> president, Brennan was named to be his top counterterrorism advisor
> in the White House. He later became CIA director."

121.    As Libel *Per Se*, Defendants published about the Plaintiff that "That meant that

Brennan's office was responsible for circulating Plaintiff Montgomery's fabricated intelligence

to officials in the highest reaches of the Bush administration."

122.     As Libel *Per Se*, Defendants published about the Plaintiff that "Brennan was

never admonished for his role in the affair," to suggest that Brennan should have been

admonished for his involvement with Plaintiff Montgomery's work with the Government.

123.     **Thirteenth, on Page 50 of the Book, the Defendants published:**

> "Edra Blixseth was Dennis Montgomery's latest mark. After being
> introduced to him by a former Microsoft executive and then hearing
> Montgomery explain his software, she agreed in 2006 to bankroll
> Montgomery to launch a new company, to be called Blxware.
> Montgomery needed new government contracts for Blxware, and
> Edra Blixseth had the money and contacts to try to make it happen."

124.     As Libel *Per Se*, Defendants published about the Plaintiff that "Edra Blixseth was

Dennis Montgomery's latest mark," clearly publishing that Plaintiff Montgomery is a con man.

125.     **Fourteenth,** on November 6, 2014, Defendant Risen appeared as an interview

guest on "The Daily Show with Jon Stewart," by Comedy Central, and was interviewed by Jon

Stewart. The television interview was taped at The Daily Show's studio 11th Avenue between

51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time in this

district, Florida in general, nationwide across the United States, internationally, and through

cable television, satellite television, and on YouTube and other Internet sites, on "The Comedy

Central" channel.

126.     On November 13, 2014, Plaintiff Montgomery's undersigned counsel sent a letter

to Mr. Stewart requesting that he allow Mr. Montgomery to appear on his show to correct the

false and misleading publications of Defendants. Mr. Stewart declined to extend this courtesy.

127.     Defendant Risen stated in said television interview for his statements to be

broadcast on television and widely broadcast elsewhere that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had

the super-secret technology to read Al Jazeera news broadcasts and decipher Al Qaeda codes inside the [interrupted by Jon Stewart]

[Jon Stewart]  An Enigma machine for Al Qaeda...?

[Defendant Risen] Right.  And he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock---  or blow up….

President Bush was so convinced of this that they grounded flights all over the world at Christmas 2003 based on this guy's intelligence or supposed intelligence.  It took the French intelligence service, which had gotten very mad because they grounded flights from Paris to Los Angeles.  And they demanded that the CIA tell them where they were getting this information.   And so they finally [non-verbal interruption].  They finally got the information.   The French told them this is a hoax.  This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack about to happen.   You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

128.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock -- or blow up [something] …."

129.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "The French told them this is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting

more contracts after that."  The statement that "the CIA agreed with them" is Risen's assertion

about Plaintiff Montgomery's work that "this is a hoax.  This is a fabrication."

130.    As Libel *Per Se*, Defendant Risen published about the Plaintiff that "they covered

the whole thing up, and refused to ever talk about it," as a way of saying that the CIA had been

conned because the CIA was not openly discussing in public national security activities.

131.    ***Fifteenth,*** on October 13, 2014, Defendant James Risen gave a television

interview[13] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting

System (PBS).   In that interview, Defendant James Risen made the following statements for

broadcast on television, and Judy Woodruff repeated many points from James Risen's Book

which Risen agreed with and endorsed.  Much of the interview involved other chapters not

relevant here.

> JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write
> about millions of dollars spent on programs that were completely
> fraudulent.  One was run by a man named Dennis Montgomery.  He
> was a, He was a .... I guess he had worked in computer software...
> but he was a GAMBLER![14]
>
> JAMES RISEN:  Right.
>
> JUDY WOODRUFF:  And he sold the CIA and the Pentagon on
> technology that turned out to be not at all what he said it was.
>
> JAMES RISEN:   It is difficult to tell in some of these cases who is
> scamming who.  If you talk to Montgomery, he argues that the CIA
> wanted him to do what he was doing.  And so its a fascinating
> dynamic that's developed in the war on terror, between people who
> recognize the opportunities for this gold rush and the agencies which
> are... who have so much money to spend now, they're getting so much
> more money than they ever had before, that in some cases they don't
> know what to do with.

---

[13]    http://www.pbs.org/newshour/bb/costs-security-price-high/

[14]    Emphasis, by exclamation in tone of voice, the in original conversation.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:   Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:   Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:   Right.  Right

JUDY WOODRUFF: ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him and tested it.  So it's this very complicated story about a man recognizing an opportunity who had never been involved in national security before and the CIA and the military all just hungry for whoever could come with the latest idea.

132.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Defendant Risen confirms by saying, "Right." (Where the discussion is about "the next chapter," that chapter is exclusively about Plaintiff Montgomery alone.).

133.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

134.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "There were cases in which people said that he was fooling the military and the CIA about his operations and how . . . what kind of techniques and technologies he had."

135.     ***Sixteenth,*** on October 24, 2014, Defendant Risen gave an audio interview with Lucy Worsley published on <u>The New York Times</u> website, titled **"Inside <u>The New York Times</u> Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [15] In this interview "**Inside <u>The New York Times</u> Book Review**," with Pamela Paul, October 24, 2014, Defendant Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the government's war on terror.  We'll talk to  James Risen, author of Pay Any Price:  Greed, Power, and Endless War.
>
> JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.
>
> PAMELA PAUL:   What is the British fascination with murder? Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.
>
> LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.
>
> PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.
>
> James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.
>
> JAMES RISEN:   Hi, thanks for having me.

---

[15]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth.  And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times.  He's one of the most fascinating characters in the war on terror.  He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts.  And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack.

And the CIA took this so seriously that they grounded, that the Bush
Administration grounded a bunch of international flights in Christmas
2003 based on what this guy was telling them.  And when they
realized it was a hoax, they covered the whole thing up and never did
anything about it.  So I had done a story for the Times with....  about
that and then expanded on that and got a lot more information for the
book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we
wrote about it.  But I had also, even before he was written about by
other people, I had heard from people in the CIA that there was this
crazy operation that nobody wanted to talk about, that they were all
embarrassed by.  To me that, it was like a case study in just how crazy
the war on terror has become. And the only thing that makes sense
about why it's gotten so crazy, is I think we kind of have deregulated
national security and we took all, you know, Cheney said we're going
to take the gloves off.  And that means we deregulated national
security at the same time we poured hundreds of billions of dollars
into counter-terrorism.  And so it's had enormous unintended
consequences from what is essentially a national security crisis that is
kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of
national security on other topics not relevant here.]

136.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other

Defendants, published about the Plaintiff that "And when they [the CIA] realized it was a hoax,

they covered the whole thing up and never did anything about it."

137.     ***Seventeenth,*** Defendant Risen sat for a nationwide television news interview on

the television show ***DEMOCRACY NOW!*** A Daily Independent Global News Hour, with Amy

Goodman & Juan González, at 207 W. 25th Street, Floor 11, New York, NY 10001 on October

14, 2014.  On this nationwide television news broadcast, the conversation turned to:

AMY GOODMAN**:** Dennis Montgomery?

JAMES RISEN**:** Dennis Montgomery is a fascinating character,
who—he was a computer software person, self-styled expert, who
developed what he said was special technology that would allow him

to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

AMY GOODMAN**:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

JAMES RISEN: Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

AMY GOODMAN: How much did the Government give to Dennis Montgomery?

JAMES RISEN: Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

AMY GOODMAN: I mean, it had very real effects, aside from spending all that money.

JAMES RISEN: Yeah.

AMY GOODMAN: For example, planes being sent back.

JAMES RISEN: Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

AMY GOODMAN: Because they could be used, as with September 11th, as weapons?

JAMES RISEN: Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

AMY GOODMAN: And it was only the French government who then did a study?

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

138.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

139.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "How much did the Government give to Dennis Montgomery?" Risen answered in reply: "Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

140.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

141.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

142.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that he should be in jail, publishing that Plaintiff Montgomery committed a crime.

143.   *Eighteenth*, Defendant James Risen gave an interview with "**Conversations with Great Minds**" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014.[16]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well.  One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video.  And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas 2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.
>
> THOM HARTMAN:   Whoa.
>
> JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up

---

[16]      https://www.youtube.com/watch?v=jc_8f4Pp9Zc

and never went public with it  and just tried to act like it never
happened.

THOM HARTMAN:   Well we know how aggressively this and
particularly the Obama Administration right now has gone after
whistleblowers and reporters.  You would think they would also go
after people who had scammed the CIA.  If one of us walked in off the
street and said to the CIA, hey have I got a deal for you, and it was just
a total lie, and they gave us millions of dollars, which they gave to
Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from
the military... and the Pentagon.  And he was continuing, he continued
to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

144.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other

Defendants, published about the Plaintiff that "the CIA later was convinced by French

intelligence that this was all a fabrication and that this kind of technology didn't exist."

145.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other

Defendants, published about the Plaintiff that he belongs in prison, responding to the question

"You would think they would also go after people who had scammed the CIA.  If one of us

walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total

lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he

would end up in prison," by Risen answering in reply:  "Well, no, he ended up getting more

contracts from the military... and the Pentagon.  And he was continuing, he continued to operate

for several years.  It's really a remarkable story."

### SECOND CAUSE OF ACTION
*Common Law General Defamation*

146.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

147.    The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

148.    To establish General Defamation, a plaintiff need only show: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

149.    Pleading in the alternative to the First Cause of Action, Plaintiff re-alleges each of the statements alleged under the First Cause of Action, *supra*, as Defamation *Per Se*, and here alleges that each of those statements are also General Defamation under Florida law.

150.    Plaintiff Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Eighteenth" under the First Cause of Action above do not constitute as Defamation *Per Se*, than in the alternative the Plaintiff claims here that any and all such statements not qualifying as Defamation *Per Se* constitute General Defamation against the Plaintiff.

151.    Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Eighteenth" above.

152.    In addition, Defendants also made other defamatory statements that are also General Defamation.

153.    ***Nineteenth,*** **on Page 49 of the Book, the Defendants published:**

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret

38

Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

154.    As General Defamation, Defendants published about the Plaintiff that Montgomery had stolen valuable software – yet Defendants also assert that the software "wasn't real."  That is, Defendants simultaneously accuse Plaintiff Montgomery of profiting from defrauding the Government with Plaintiff Montgomery's software, yet allege that the software actually belonged to Warren Trepp and never belonged to Plaintiff Montgomery (that Montgomery later stole it), but also allege that the software was worthless, yet the FBI energetically investigated the alleged theft of software that was worth nothing.  The Defendants randomly construct every possible way to defame the Plaintiff, no matter how inconsistent, including with the FBI investigating the theft of a worthless item.

### THIRD CAUSE OF ACTION
*Common Law Defamation By Implication*

155.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

156.    The Defendants – all of the Defendants – together and each of them individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

157.    For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

158.    Pleading in the alternative, Plaintiff re-alleges that each of the statements alleged under the First and Second Causes of Action, *supra*, are in the alternative also Defamation by Implication under Florida law.

159.    Plaintiff thus alleges here that if the Court finds that any of the statements labeled "First" through "Nineteenth" above do not constitute Defamation *Per Se* or General Defamation, then in the alternative the Plaintiff re-alleges here that any and all such statements not constituting as Defamation *Per Se* or General Defamation are Defamation by Implication against the Plaintiff.

160.    Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Nineteenth" above.

161.    Across the many examples of libelous statements from the Book or slanderous interviews, Defendants published that the Plaintiff deceived the Government as to the meaning, purpose, or interpretation of hidden data and clues that Plaintiff Montgomery uncovered, publishing that Plaintiff Montgomery defrauded and conned the Government.

162.    Thus, Defendants libel and slander Plaintiff Montgomery by implication that he defrauded and scammed the Government concerning the meaning of the information Plaintiff Montgomery uncovered, publishing that Plaintiff Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

163.    Across the many examples of defamatory statements from the Book or slanderous interviews, Defendants published that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Defendants would have no way of knowing about) were a result of Plaintiff Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

164.    Across the many examples of defamatory statements from the Book or interviews, Defendants published that Plaintiff Montgomery should be indicted and convicted of crimes and sentenced to prison for his actions.

165.    Among the other statements, in particular, the **Second** example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

166.    Thus, as Defamation by Implication, Defendants published that Plaintiff Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

167.    Among the other statements, in particular, in the **Eleventh** example of defamation**, on Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency."

168.    Here, as Defamation by Implication, even if it is true (which it is not) that "The CIA never investigated" what Defendants describe as an "apparent hoax," the implication is that Plaintiff Montgomery perpetrated a hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

169.    Similarly, in the **Sixteenth** example of slander from an interview, Defendant Risen publishes that:

> "It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was

becoming an endless war in which we had a new mercenary class of
people who were taking advantage of the war on terror,"

publishing that Plaintiff Montgomery's work is fraudulent in being merely an effort to get cash.

170.    Among the other statements, in particular, the **Nineteenth** example of defamation*,*

**on Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

171.    As Defamation by Implication, Defendants published that the Plaintiff stole

valuable software yet at the same time the software that the Plaintiff used to provide services to

the Government was in fact worthless.

172.    In addition, Defendants also made and published other defamatory statements that

are also Defamation by Implication under Florida law.

173.    ***Twentieth,*** **on the Preface Page of the Book, the Defendants publish:**

> "I've come back," he repeated.  "I was the King of Kafiristan – me
> and Dravot – crowned Kings we was!  In this office we settled it –
> you setting there and giving us the books.  I am Peachey – Peachey
> Taliaferro Carnehan – and you've been setting here ever since –
> Oh, Lord!"

> I was more than a little astonished and expressed my feelings
> accordingly.

> "It's true," said Carnehan, with a dry cackle, nursing his fee, which
> were wrapped in rags.  "True as gospel.  Kings we were, with
> crowns upon our head – me and Dravot – poor Dan – oh, poor,
> poor Dan, that would never take advice, not though I begged of
> him!"

>        -- Rudyard Kipling, *The Man Who Would be King.*

174.     As Defamation by Implication, Defendants published that Plaintiff Montgomery (along with others addressed in the Book) is a fraud and/or con man as in *The Man Who Would be King*.

175.     ***Twenty-first,*** **in the Prologue on Page xiv of the Book, the Defendants publish:**

> "The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment.  These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

176.     As Defamation by Implication, Defendants state "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Plaintiff Montgomery's profits were <u>contingent</u> upon results, such that Plaintiff Montgomery would make greater profits by providing false results at that.

177.     ***Twenty-second,*** **in the Prologue on Page xv of the Book, the Defendants published:**

> "Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

> "Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

178.    Thus, as Defamation by Implication, Defendants published that Plaintiff

Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at

any cost.

179.    ***Twenty-third,*** **in the Prologue on Page xvii of the Book, the Defendants**

**published:**

> "Washington's global war on terror is now in its second decade,
> thanks to the bipartisan veneer it has gained under Bush and Obama.
> It shows no signs of slowing down, hustlers and freebooters continue
> to take full advantage, and the war's unintended consequences
> continue to pile up.  All too often, things are not what they seem."

180.    As Defamation by Implication, Defendants published that Plaintiff Montgomery –

one of the key objects of the Book – is a "hustler" and a "freebooter."

181.    ***Twenty-fourth,*** **Part 1 of the Book,** including but not limited to Chapter 2 which

is focused entirely on Plaintiff Montgomery, the Defendants have labeled "Part 1: Greed."

182.    Thus, by placing the chapter focused on Plaintiff Montgomery under a label for

the section of the Book of "Greed," Defendants defame the Plaintiff by implication as being

motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the

Chapter 2.

183.    ***Twenty-fifth,*** the Defendants have labeled Chapter 2 of the Book which is

focused entirely on Plaintiff Montgomery:  "Chapter 2: The Emperor of the War on Terror."

184.    By naming the chapter focused on Plaintiff Montgomery "The Emperor of the

War on Terror," Defendants defame the Plaintiff by implication as being the mastermind of the

fraud that Risen seeks to portray the war on terror to be.

185.    ***Twenty-Sixth,*** **on Page 40 of the Book, the Defendants published:**

> "The CIA's Science and Technology Directorate, which had
> largely been stuck on the sidelines of the war on terror, saw in
> Dennis Montgomery an opportunity to get in the game.  The
> directorate had played an important role in the Cold War, but in the
> first few years of the war on terror, it was struggling to determine
> how technology could be leveraged against groups of terrorists
> who were trying to stay off the grid."

186.     As Defamation by Implication, again, Defendant Risen falsely and misleadingly

published statements which blamed Plaintiff Montgomery for the decisions of government

officials and published that Plaintiff Montgomery defrauded the Government.

187.     ***Twenty-Seventh,* on Page 42 of the Book, the Defendants published:**

> "Montgomery was telling the CIA exactly what it wanted to hear.  At
> the time, the Bush Administration was obsessed with Al Jazeera, not
> only because of the networks' unrelenting criticism of the invasion of
> Iraq, but also because it had become Osama Bin Laden's favorite
> outlet for broadcasting his videotaped messages to the world."

188.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

189.     ***Twenty-Eighth,* on Page 42 of the Book, the Defendants published:**

> "What remains unclear is how Montgomery was able to convince all
> of them that he had developed secret software that could decode Al
> Qaeda's invisible messages.  While he had gotten by a few credulous
> military officers who came to view his demonstrations, he apparently
> found it just as easy to persuade the CIA as well."

190.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

conned the Government with a hoax.  That is, it would be clear "how Montgomery was able to

convince all of them" if Plaintiff Montgomery's work and technology are legitimate.

191.     ***Twenty-Ninth,* on Page 46 of the Book, the Defendants published:**

> "Finally the French brought an end to it.  Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode.  They
> began demanding answers from the Americans.  The French

applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology.  The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense."

192.    As Defamation by Implication, if not explicit, the passage published that Plaintiff

Montgomery is a fraud and that his work is a scam and a hoax.

193.    ***Thirtieth,*** **on Page 52 of the Book, the Defendants publish:**

"Montgomery continued to get defense contracts even during the Obama administration.  In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration.  Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and said he had heard from 'various federal agencies thanking us' for the support Montgomery and his company provided during Obama's inauguration.  The threat, however, later proved to be a hoax."

194.    As Defamation by Implication, Defendants published that Plaintiff Montgomery's

ability to continue to receive contracts is due to Plaintiff Montgomery's ability to defraud the

Government (and stupidity of government officials) rather than an endorsement of the legitimacy

of Plaintiff Montgomery's work.

195.    ***Thirty-First,*** **on Page 31 of the Book, the Defendants published:**

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

196.     As Defamation by Implication, Defendants published that the Plaintiff engaged in

fraud to convince a few government bureaucrats that he had a magic formula as an easy path to

riches.

197.     ***Thirty-Second,*** **on Page 33 of the Book, the Defendants published:**

> "Montgomery's story demonstrates how hundreds of billions of
> dollars poured into the war on terror went to waste. With all rules
> discarded and no one watching the bottom line, government officials
> simply threw money at contractors who claimed to offer an edge
> against the new enemies. And the officials almost never checked back
> to make sure that what they were buying from contractors actually did
> any good— or that the contractors themselves weren't crooks. A 2011
> study by the Pentagon found that during the ten years after 9/ 11, the
> Defense Department had given more than $ 400 billion to contractors
> who had previously been sanctioned in cases involving $ 1 million or
> more in fraud."

198.     As Defamation by Implication, Defendants published that the money provided to

Plaintiff Montgomery (among others) went to "waste."

199.     ***Thirty-Third,*** **on Page 33 of the Book, the Defendants published:**

> "The Montgomery episode teaches one other lesson, too: the chance
> to gain promotions and greater bureaucratic power through access to
> and control over secret information can mean that there is no
> incentive for government officials to question the validity of that
> secret information. Being part of a charmed inner circle holds a
> seductive power that is difficult to resist."

200.     As Defamation by Implication, Defendants published that Plaintiff Montgomery's

work was fraudulent.

201.     ***Thirty-Fourth,*** **on Page 33 of the Book, the Defendants published:**

> "How his technology worked was a secret. Dennis Montgomery's
> computer code became the great treasure behind eTreppid
> Technologies, the company he and Trepp founded. Later, many of
> those around Montgomery began to suspect the reason why
> Montgomery had to guard his technological innovations so
> carefully. They came to believe that at least some of the
> technology didn't really exist."

202.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

committed fraud.

203.     ***Thirty-Fifth,* on Page 35 of the Book, the Defendants published:**

> "Montgomery was on the lookout for somebody to bankroll him,
> and had put out the word to his friends at the casinos that he
> frequented the most. A year later, Montgomery and Trepp were in
> business together. Trepp was one of the first, but hardly the last, to
> be beguiled by Montgomery's claims that he had achieved
> breakthroughs in computer technology of historic significance."

204.     As Defamation by Implication, Defendants published that Plaintiff Montgomery

"beguiled" Warren Trepp by committing fraud.

205.     ***Thirty-Sixth,* on Page 39 of the Book, the Defendants published:**

> "For a few months in late 2003, the technology from Dennis
> Montgomery and eTreppid so enraptured certain key government
> officials that it was considered the most important and most sensitive
> counterterrorism intelligence that the Central Intelligence Agency had
> to offer President Bush. Senior officials at the CIA's Directorate of
> Science and Technology began to accept and vouch for Montgomery
> to officials at the highest levels of the government. Montgomery's
> claims grew ever more expansive, but that only solidified his position
> inside the national security arena. His technology became too
> impossible to disbelieve."

206.     As Defamation by Implication, the Defendants published that Plaintiff

Montgomery committed fraud and is a con man.

207.     ***Thirty-Seventh,* on Page 40 of the Book, the Defendants published:**

> "Montgomery persuaded the spy agency that his special computer
> technology could detect hidden bar codes broadcast on Al Jazeera,
> which had been embedded into the video feed by al Qaeda. Allegedly,
> al Qaeda was using that secret method to send messages to its terrorist
> operatives around the world about plans for new attacks. Montgomery
> convinced the CIA that his technology had uncovered a series of
> hidden letters and numbers that appeared to be coded messages about
> specific airline flights that the terrorists were targeting.

208.     As Defamation by Implication, the Defendants published that Plaintiff convinced the CIA of claims that are not (were not) true.

209.     ***Thirty-Eighth,*** **on Page 42 of the Book, the Defendants published:**

> "Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

210.     As Defamation by Implication, the Defendants published that Plaintiff convinced President Bush and the national command authority of conclusions drawn from Plaintiff Montgomery's work.

211.     ***Thirty-Ninth,*** **on Page 42 of the Book, the Defendants published:**

> "One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

212.     As Defamation by Implication, the Defendants published that Plaintiff convinced President Bush and the national command authority of conclusions drawn from Plaintiff Montgomery's work.

213.     ***Fortieth,*** **on Page 47 of the Book, the Defendants published:**

> "Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

214.      As Defamation by Implication, Defendants published that Plaintiff continued to

defraud, con, and scam the government, rather than concluding that the Government recognized

the legitimacy of Plaintiff Montgomery's work.

215.      ***Forty-First,* on Page 48 of the Book, the Defendants published:**

> "He successfully infused a sense of mystery around himself. He was
> like the Wizard of Oz, but now people were beginning to try to
> examine the man behind the curtain."

216.      As Defamation by Implication, Defendants published that the Plaintiff engaged in

fraud and a hoax by keeping details mysterious, including the mystery was caused by Plaintiff

Montgomery rather than by Warren Trepp or the Government.

217.      ***Forty-Second,* on Page 48 of the Book, the Defendants published:**

> "The technology didn't meet the requirements for us," said a Special
> Operations Command spokesman drily. Still, there is no evidence that
> officials at Special Operations Command ever talked with their
> counterparts at the CIA to check up on Montgomery before awarding
> him a contract. Special Operations Command paid a total of $ 9.6
> million to eTreppid under its contract with the firm."

218.      As Defamation by Implication, the Defendants published that Plaintiff

Montgomery again repeated his fraud and hoax against a new government agency.

219.      ***Forty-Third,* on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**the Defendants published:**

> **CHAPTER 3**:   The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of
> the new kind of counterterrorism entrepreneur who prospered in the
> shadows of 9/11.  But he was hardly alone in recognizing the lucrative
> business opportunities that the war on terror has presented.  In fact, as
> trillions of dollars have poured into the nation's new homeland
> security-industrial complex, the corporate leaders at its vanguard can
> rightly be considered the true winners of the war on terror."

220.       As Defamation by Implication, Defendants published that Plaintiff engaged in fraud and a hoax motivated by greed.

221.       **As additional instances of Defendants' defamation of Plaintiff Montgomery,** on information and belief, Plaintiff alleges that Defendant Risen has spoken on these topics on radio and on television in additional interviews about the Book and Plaintiff Montgomery since the publication of the Book in October 2014, which the Plaintiff is continuing to investigate.

222.       **As additional instances of Defendants' defamation of Plaintiff Montgomery,** on information and belief, discovery during this litigation will disclose additional instances of Defendants having defamed Plaintiff Montgomery since October 2014.

223.       **As additional instances of Defendants' defamation of Plaintiff Montgomery,** Defendants' defamation of Plaintiff Montgomery has been and is being republished through book reviews and commentary since October 2014, and such republication of the defamation is widespread and continuing on radio, television, written publications, and proliferating daily on the Internet in this district, Florida in general, nationally, and internationally.

### FOURTH CAUSE OF ACTION
*Common Law Intentional Infliction of Emotional Distress*

224.       Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

225.       Defendants' knowing and intentional publication of the harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress.

226.       Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff.

227.    Defendants' actions were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

## FIFTH CAUSE OF ACTION
### *Common Law Tortious Interference with Prospective Advantage*

228.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

229.    Defendants understood that Plaintiff was pursuing the future full value of his software, intellectual property and software technology and techniques and was over time negotiating to make further licenses and sales of the intellectual property.

230.    Defendants were aware that their publication of false and misleading statements about Plaintiff Montgomery harmed Plaintiff Montgomery's career and livelihood and his ability to earn a living, including the opportunity to sell his professional services and software.

231.    Defendants' defamation disparaged Plaintiff's intellectual property and software so as to render it commercially worthless, by claiming that it did not work.

232.    Defendants acted knowingly, willfully and with reckless and negligent disregard of the harm that their publication of their false statements would cause to Plaintiff Montgomery's livelihood, career, and ability to earn a living, including his opportunity to enter into contracts for the sale of his services and/or intellectual property.

233.    Defendants acted with the intentional malicious purpose of defaming Plaintiff Montgomery as a way to smear aspects of U.S. foreign, military, and intelligence polices with which they disagree in pursuit of their ideological and political agenda.

## SIXTH CAUSE OF ACTION
### *Common Law Assault (Apprehension)*

234.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

235.    Plaintiff Montgomery was in-effect working undercover and in secret for the CIA, NSA, and other agencies of the Government on classified programs of counter-terrorism and national security.

236.    Defendants' especially high profile publications of the defamatory factual statements have placed Plaintiff Montgomery's life at risk by revealing and disclosing him to public notice by Al Qaeda and its successors such as the Islamic State (I.S.I.S.), as well as other terrorists and terrorist groups, in Florida, domestically and internationally.

237.    ISIS has openly pledged to kill members of the U.S. military and persons who are associated with the U.S. military and their families and those assisting the U.S. military and Government, particularly in counter-terrorism efforts against Islamic Jihad organizations and terrorists.

238.    Defendants have subjected Plaintiff Montgomery to what is in effect a Fatwah, which is an open call that any and all militant Jihadi Muslims should kill Plaintiff Montgomery.

239.    Defendants have placed Plaintiff Montgomery in immediate fear of bodily harm, injury, and death to him and his family members.

240.    Defendants' tortious actions alleged herein were furthered and aided and abetted by the CIA and the NSA, who want to destroy Plaintiff Montgomery to prevent him from disclosing as a whistleblower the full extent of their unconstitutional and illegal Government surveillance on American citizens to the Congress, the Inspector General, and to the courts, specifically in cases styled *Klayman v. Obama*, No. 13-851, 13-881, 14-92 (D.D.C.); *Klayman v. Obama*, No. 14-5004, 14-5005, 14-5016, 14-5017 (D.C. Cir.).

## DAMAGES WITH REGARD TO ALL COUNTS

241.     As a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants, Plaintiff Montgomery demands judgment be entered against Defendants each and every one of them, jointly and severally, including an award of compensatory and actual damages in an amount to be determined at trial, as pled below, punitive damages, reasonable attorneys fees, pre-judgment interest, post-interest and costs, and such other relief as the Court may deem just and proper.

242.     As a result of Defendants' actions, Plaintiff Montgomery suffered significant personal harm, including to his business and professional endeavors and prospects, career, and finances.

243.     As just one example, Plaintiff Montgomery negotiated for the sale of his technology to the Government for the price of $100 million.

244.     Plaintiff Montgomery was able to obtain a Top Secret clearance in less than a year in 2003.  He passed all of the security issues that were involved in obtaining that level of clearance. His clearance allowed him to courier top-secret material worldwide.  In 2007, the Plaintiff entered The White House and the Pentagon with full access to Top Secret material. As of 2010, the Plaintiff still held that clearance level, and to the best of his knowledge still does.

245.     As a result of his security clearances, the Plaintiff would be employable in high-paying jobs but for the defamation of his character and other tortious actions by the Defendants.

246.     Plaintiff Montgomery has been harmed by the loss of the economic value of his intellectual property, and the value of licensing the intellectual property and/or providing services based upon or incorporating his intellectual property.

247.     Defendants' conduct was unreasonable and outrageous and exceeds the bounds tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference or negligence, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life, so as to also justify the award of punitive and exemplary damages.

248.     On information and belief, at least the Defendant Houghton Mifflin Harcourt Co., as a publicly traded corporation, was required to publicly disclose the Plaintiff's threatened lawsuit on reports filed with the Securities and Exchange Commission.  A liability or contingent liability, including threatened litigation must be reported under Item 103 "Legal Proceedings," in Management's Discussion and Analysis (MD&A) -- Item 303, and/or in Item 503(c) "Risk Factors."

249.     This information was required on Defendant's regularly scheduled SEC Form 10-Q (quarterly report) and/or SEC Form 10-K (annual report) but also on SEC Form 8-K triggered (within four days) by certain events, because "Form 8-K is the 'current 'report' companies must file with the SEC to announce major events that shareholders should know about."  http://www.sec.gov/answers/form8k.htm.

250.     Defendant's SEC Form 10-Q for the fourth quarter of 2014 was due on February 10, 2015, but is not publicly on file.  Defendant's quarterly SEC Form 10-Q filed on November 6, 2014, covered the period ended September 30, 2014.

251.     In the most recent exchange of correspondence, on January 20, 2015, Houghton Mifflin's Associate General Counsel David Eber replied to Larry Klayman's January 14, 2015, litigation demand concerning Defendants' defamation of Plaintiff Montgomery, copied by Ebers to General Counsel William Bayers, and refused to take any corrective action.

252.     In addition, on information and belief, the Defendant was required to disclose the litigation as non-public information prior to engaging in trades.  On January 31, 2015, and February 17, 2015, General Counsel William Frederick Bayers reported the sales of HMHC stock on SEC Form 4.

## PRAYER FOR RELIEF

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, each and every one of them, acting in concert, jointly and severally, for compensatory and actual damages in excess of $120 million U.S. Dollars resulting from their financial, reputational, emotional and professional injury to Plaintiff, as well as equitable relief as may be appropriate, and such other relief the Court may deem just and proper.  Plaintiff further prays for an award of punitive damages in an amount in excess of $350,000,000.00 U.S. Dollars, to punish Defendants for their outrageous, deceitful, unprecedented, vicious and malicious conduct toward Plaintiff Montgomery designed so Defendants can reap huge profits for their defamatory works. Defendants' actions have left Plaintiff in ruins. According to Bloomberg Business, the market capitalization of Houghton Mifflin Harcourt is $2.8 Billion U.S Dollars. Large punitive damages will deter Defendants from committing such egregious acts in the future against Plaintiff Montgomery and others similarly situated.

## JURY DEMAND

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: February 24, 2015                              Respectfully submitted,

                                                     */s/ Larry Klayman*
                                                     Larry Klayman, Esq.
                                                     Klayman Law Firm
                                                     FL Bar No. 246220
                                                     7050 W Palmetto Park Rd.
                                                     Suite 15-287

Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

Exhibit A

# PAY ANY PRICE

## GREED, POWER, AND ENDLESS WAR

# JAMES RISEN

Author of *STATE OF WAR*

much Iraqi
the Ameri-

matter, the
cash in Leb-
use no one
ed with the

nker is one
rules and
nlikely that
Most of the
d to still be
iting to be

as a fitting
It certainly
lventure in
Hussein in
2003 when

## 2



# THE EMPEROR OF THE
# WAR ON TERROR

Greed and power, when combined, can be devastating. In the case of the missing cash of Baghdad, greed tempted Americans and Iraqis alike, while the power of the Coalition Provisional Authority to make fast, sweeping decisions with little oversight allowed that greed to grow unchecked. Billions of dollars disappeared as a result.

Throughout the war on terror, greed and power have flourished just as readily back home in the United States, where the government's surging counterterrorism spending created a new national security gold rush. The post-9/11 panic led Congress to throw cash at the FBI, CIA, and Pentagon faster than they were able to spend it. Soon, a counterterrorism bubble, like a financial bubble, grew in Washington, and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks — or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so.

Consider the example of Dennis Montgomery. He provides the

GREED

perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process.

★

Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

★

A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what

*The Emperor of the War on Terror*

now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good—or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/11, the Defense Department had given more than $400 billion to contractors who had previously been sanctioned in cases involving $1 million or more in fraud.

The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist.

Montgomery strongly denies that he peddled fraudulent technology. He insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees. He claims that he was following direct orders from both the NSA and the CIA, and says that the CIA, NSA, and U.S. military took his technology so seriously that it was used to help in the targeting of Predator strikes and other raids. Montgomery adds that he is limited in what he can say about his software and business dealings with the CIA and Pentagon without the approval of the Justice Department. The fact that the government is blocking public disclosure of the details of its relationship with him, he adds, shows that his work was considered

GREED

serious and important. "Do you really think," he asked, "the govern-
ment invoked the state secrets privilege just from being embarrassed
or conned?"



The strange tale of Dennis Montgomery and his self-proclaimed plan
to win the war on terror begins, appropriately enough, inside the El
Dorado Casino in downtown Reno.

Montgomery was an overweight, middle-aged, incorrigible gam-
bler, a man who liked to play long odds because he was convinced that
he could out-think the house. He once boasted to a business partner
that he had a system for counting an eight-deck blackjack shoe, quite
a difficult feat for even the best card sharks, and he regularly tested
his theories at the El Dorado and the Peppermill Casino in Reno. He
usually came up short but that didn't stop him from playing blackjack
on a nightly basis, racking up unwieldy debts that eventually led to his
2010 arrest for bouncing more than $1 million in bad checks at Cae-
sar's Palace in Las Vegas.

Gambling is how he met his first backer, Warren Trepp. Trepp got
rich in the biggest casino of them all, Wall Street. He had been Mi-
chael Milken's right-hand man in the heyday of Milken's famous Bev-
erly Hills trading desk during the "greed is good" era of insider trading
in the 1980s. When a hungry federal prosecutor named Rudolph Gi-
uliani went after Milken for insider trading, he tried to get Trepp to
roll over on his boss. Trepp refused, even in the face of a threat that
he would be charged himself if he failed to cooperate. Milken went
to jail, but Giuliani never could nail Trepp. Instead of facing crimi-
nal charges, Trepp became the subject of a marathon investigation
by the Securities and Exchange Commission (SEC), which tried to im-
pose civil sanctions for Trepp's alleged part in Milken's insider-trad-
ing bonanza. It took nearly a decade, but Trepp finally beat the feds.
In 1997, the SEC's case against him was dismissed. He walked away
from the Milken years with a fortune.

Warren Trepp may have been able to defeat Rudy Giuliani and a

34

*The Emperor of the War on Terror*

l, "the govern-
g embarrassed

ɔclaimed plan
inside the El

rrigible gam-
ɔnvinced that
iness partner
ɔk shoe, quite
ɔularly tested
i in Reno. He
ing blackjack
ally led to his
ɔecks at Cae-

p. Trepp got
ad been Mi-
famous Bev-
ɔider trading
Rudolph Gi-
get Trepp to
threat that
Milken went
ɔcing crimi-
ɔvestigation
tried to im-
ɔsider-trad-
at the feds.
ɔlked away

liani and a

whole legion of federal investigators, but he couldn't outwit Dennis Montgomery.

By the late 1990s, Trepp was living in Incline Village, a wealthy enclave on the Nevada side of Lake Tahoe, where he was shaking off his past and trying to remake himself into a respected philanthropist, theater angel, and canny private investor. And then he met Montgomery.

Trepp was introduced to Montgomery by a casino host at the El Dorado in 1997. Montgomery was on the lookout for somebody to bankroll him, and had put out the word to his friends at the casinos that he frequented the most. A year later, Montgomery and Trepp were in business together. Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance. The two founded a company together and tried to find buyers for Montgomery's alleged miracle software.

Montgomery convinced Trepp that he had achieved a series of major technological advances in computer software that could be worth millions. One was the development of software that he argued provided a new method of video compression, allowing for greater video storage and transmission than was ever available before. Another innovation was stunningly detailed video facial recognition. But the most dazzling claim of all involved software that Montgomery said could identify objects and anomalies embedded in video with unprecedented detail. He claimed that his technology could even find and identify objects hidden inside videotape that were not visible to the naked eye.

How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of those around Montgomery began to suspect the reason why Montgomery had to guard his technological innovations so carefully. They came to believe that at least some of the technology didn't really exist.

★

35

GREED

To commercialize his technology, Montgomery first tried to convince Hollywood that he had developed a new and efficient means of colorizing old movies. His object identification software, he claimed, could speed the process of deciding where and how to colorize each frame of film. Warren Trepp later told a court that Montgomery had given him a demonstration of his software's ability to identify patterns and images in a video of the 1939 black-and-white classic *Gunga Din*.

But after failing to strike it big in Hollywood, Montgomery and Trepp shifted their focus to the casino industry in Reno and Las Vegas. Montgomery later bragged that he had developed pattern recognition software specifically for casinos that could help identify cheaters. He even claimed he had technology that could identify high-value chips inside piles of chips on gaming tables, to detect when dealers tried to steal from the casinos by slipping valuable chips to friends. Montgomery also said he had developed video compression software that would allow casinos to more easily store thousands of hours of surveillance tapes, rather than erase all of their old footage.

But his technology was never a big hit with the casino industry, either. So Montgomery turned to Washington. There, Montgomery finally succeeded in his new search for clients through a series of coincidences and chance encounters, along with strong political and financial connections that helped to smooth the way. And it all started, like so many other things in his life, in a casino.

In 2002, Warren Trepp arranged for the MGM Grand Casino to take a look at Montgomery's technology. An air force colonel who had heard about Montgomery's work decided to come and see it as well. Impressed, he helped Montgomery and eTreppid land a contract with the air force.

Michael Flynn, Montgomery's former lawyer—who later concluded that Montgomery was a fraud—said that Montgomery had told him that Montgomery had won over the visiting air force officer, who became convinced that Montgomery's object recognition and video compression technologies could help the air force's Predator drone program. The CIA and air force were flying Predator drones over Afghanistan at the time, and they were sending back thousands of hours of video that needed to be analyzed and stored. Just like

y first tried to convince
fficient means of color-
ware, he claimed, could
o colorize each frame of
tgomery had given him
ntify patterns and im-
ssic *Gunga Din*.
ood, Montgomery and
y in Reno and Las Ve-
leveloped pattern rec-
at could help identify
at could identify high-
ables, to detect when
ping valuable chips to
ed video compression
ily store thousands of
l of their old footage.
n the casino industry,
. There, Montgomery
hrough a series of co-
trong political and fi-
way. And it all started,

GM Grand Casino to
force colonel who had
ne and see it as well.
d land a contract with

ver—who later con-
at Montgomery had
isiting air force offi-
s object recognition
the air force's Preda-
ying Predator drones
ding back thousands
nd stored. Just like

Las Vegas casinos, the air force needed a way to maintain the massive piles of video generated by its own version of the eye in the sky. Montgomery's object recognition technology could provide new ways for the air force to track suspected terrorists with the Predator. Montgomery claimed that his facial recognition software was so good that he could identify individual faces from the video camera flying on a Predator high above the mountains of southern Afghanistan.

By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology—tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance.

After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)

Montgomery had a lot of support when it came to dealing with the

GREED

government. Through Warren Trepp, he had excellent political connections, and in Washington that can take you a very long way.

To help eTreppid get more government business, Trepp brought in Letitia White, a Washington lobbyist with ties to congressional Republicans. She was particularly close with her former boss, California congressman Jerry Lewis. He, in turn, was chairman of the powerful House Defense Appropriations Subcommittee (he later became chairman of the full appropriations committee) and so was able to steer billions of dollars in spending to programs he favored throughout the Pentagon. Letitia White, who had been one of Lewis's closest aides, had left to go to work with the Washington lobbying firm of Copeland Lowery, where she specialized in arranging custom-built earmarks in the defense and intelligence budgets for her clients.

The connections among Lewis, White, and Copeland Lowery later became the subject of a long-running criminal investigation by the Justice Department. The U.S. attorney in Los Angeles probed whether Lewis had steered huge amounts of money to Copeland Lowery's clients in return for large campaign donations from the lobbying firm and from the defense contractors that were its clients. The investigation of Jerry Lewis was ongoing when the U.S. attorney handling the case, Carol Lam, was fired by the Bush administration in 2007, making her one of eight U.S. attorneys pushed aside by the Bush White House in a famously controversial, possibly political decision. The investigation into Lewis and his ties to Copeland Lowery was eventually dropped, but the lobbying firm broke up under the pressure, and Letitia White moved to a new firm. In 2009, Citizens for Responsibility and Ethics in Washington (CREW) named Lewis one of the fifteen most corrupt members of Congress.

But Trepp wasn't finished after hiring White. He convinced another heavyweight Nevada investor, Wayne Prim, to put money into eTreppid. In September 2003, Prim hosted a dinner that brought together Trepp, Montgomery, and Rep. Jim Gibbons of Nevada, a former airline pilot and rising star among congressional Republicans. Gibbons, an influential member of the House Intelligence Committee, almost certainly played a critical role in helping Montgomery to gain access to the Central Intelligence Agency.

*The Emperor of the War on Terror*

Gibbons did not need much coaxing to try to assist eTreppid. Not only was the company based in his home state, but both Prim and Warren Trepp were longtime campaign contributors. After the dinner at Prim's house, Gibbons went to work immediately opening doors in Washington for eTreppid. Flynn said that Montgomery later told him that Gibbons quickly arranged to meet with Porter Goss, then the chairman of the House Intelligence Committee, to discuss eTreppid and Montgomery's technology.

By the fall of 2003, Dennis Montgomery had made a series of impressive moves to gain access to the black budget of the government's national security apparatus. He had the backing of two wealthy investors, had one of the nation's most influential lobbyists scouring the federal budget for earmarks on his behalf, and had the support of a key member of the CIA's oversight committee. After obtaining a series of small contracts with the air force and the Special Operations Command, Montgomery was ready for the big time.

★

For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve.

Montgomery's big moment came at Christmas 2003, a strange time of angst in the American national security apparatus. It was two years after the 9/11 attacks, and the war in Iraq was getting worse. Iraq was turning into a new breeding ground for terrorism, and Osama bin Laden was still on the loose, regularly thumbing his nose at the Americans by issuing videotaped threats of further terrorist strikes. The CIA, still stumbling in the aftermath of the two greatest

39

GREED

intelligence failures in its history—missing 9/11 and getting it wrong on Iraq's supposed weapons of mass destruction—was desperate for success, a quick win with which to answer its critics.

The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was still struggling to determine how technology could be leveraged against small groups of terrorists who were trying to stay off the grid.

Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA—more credulous than Hollywood or Las Vegas—fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.

By late 2003, CIA officials began to flock to eTreppid's offices in Reno to see Montgomery's amazing software. Michael Flynn, Montgomery's former lawyer, said that Montgomery had dealings with or knew the identities of at least sixteen different CIA officials. These people now joined the senior military officers who had frequented the company since the previous spring, when it first began to work on the Predator program.

Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series

*The Emperor of the War on Terror*

1 and getting it wrong
m — was desperate for
itics.
ate, which had largely
, saw in Dennis Mont-
directorate had played
st few years of the war
w technology could be
ho were trying to stay

IA's technical insecu-
nderstanding about al
nvince the CIA that he
abled him to decipher
nner displayed on the
s network. Montgom-
as using the broadcasts
rist attacks. And only
ges, thus saving Amer-
— more credulous than
y's claims. In short, he
orist threats by watch-

to eTreppid's offices in
Michael Flynn, Mont-
y had dealings with or
nt CIA officials. These
ho had frequented the
st began to work on the

at his special computer
oadcast on Al Jazeera,
by al Qaeda. Allegedly,
messages to its terror-
or new attacks. Mont-
had uncovered a series

of hidden letters and numbers that appeared to be coded messages
about specific airline flights that the terrorists were targeting.

Montgomery insists that he did not come up with the idea of an-
alyzing Al Jazeera videotapes — he says that the CIA came to him in
late 2003 and asked him to do it. CIA officials brought Montgomery
two different versions of al Qaeda videotapes, he claims. They gave
him original al Qaeda videotapes obtained independently by the CIA,
and then also gave him recordings of the same videotapes recorded as
they had been broadcast on Al Jazeera. The CIA wanted him to com-
pare the two, he claims.

But even if it wasn't Montgomery's idea, he ran with it as fast as he
could. He told the CIA that he had found that the versions of the tapes
broadcast on Al Jazeera had hidden letters and numbers embedded in
them. He says that he found that each bin Laden video broadcast on
al Jazeera had patterns and objects embedded in the network's own
banner displayed with the video recordings.

Montgomery let the CIA draw its own conclusions based on the in-
formation he gave them. After he reported to the CIA that he had de-
tected a series of hidden letters and numbers, he left it up to the CIA
to conclude that those numbers and letters referred to specific airline
flights. He insists that he did not offer the CIA his own conclusions
about what the data meant.

By the middle of December 2003, Montgomery reported to the
CIA that he had discovered certain combinations of letters and num-
bers. For example, coded messages that included the letters "AF" fol-
lowed by a series of numbers, or the letters "AA" and "UA" and two
or three digits, kept repeating. In other instances, he told the agency
that he had found a series of numbers that looked like coordinates for
the longitude and latitude of specific locations.

The CIA made the inevitable connections. "They would jump at
conclusions," says Montgomery. "There would be things like C4, C4,
and they would say that's explosives. They jumped to conclusions." He
added that he "never suggested it was airplanes or a threat."

Montgomery's data triggered panic at the CIA and the White
House — and urgent demands that Montgomery produce more. On
Christmas Eve, CIA officials showed up at Montgomery's house in

41

GREED

Reno and told him that he had to go back to his office to keep digging through incoming videotapes and Al Jazeera broadcasts throughout the holidays, Montgomery recalled.

Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush administration was obsessed with Al Jazeera, not only because of the network's unrelenting criticism of the invasion of Iraq, but also because it had become Osama bin Laden's favorite outlet for broadcasting his videotaped messages to the world. Each time bin Laden released a new video, the American media immediately turned to the CIA for a quick response and analysis of whether the recording was genuine and where and when it had been taped. Each new broadcast on Al Jazeera forced the CIA to scramble to stay one step ahead of Western reporters baying for answers. At first, when bin Laden released videotapes filmed outdoors in what appeared to be the mountainous terrain of northwestern Pakistan, the CIA even tried to conduct a geological analysis of the rocky outcroppings that served as the backdrop for the video, to try to figure out where bin Laden was. His broadcast statements prompted the CIA to look for new methods of analyzing the news network, and also led some American officials to suspect that there was a covert relationship between Al Jazeera and al Qaeda.

Former senior CIA officials say that officials from the CIA's Science and Technology Directorate, including the directorate's chief, Donald Kerr, believed Montgomery's claims about al Qaeda codes. They also convinced CIA director George Tenet to take the technology and intelligence flowing from Montgomery's software seriously. As a result, in December 2003, Tenet rushed directly to President Bush when information provided by Montgomery and his software purported to show that a series of flights from France, Britain, and Mexico to the United States around Christmas were being targeted by al Qaeda. The data strongly suggested that the terrorist group was planning to crash the planes at specific coordinates.

Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers on both sides of the Atlantic, while further stoking public fears of an-

42

*The Emperor of the War on Terror*

: to his office to keep digging
eera broadcasts throughout

ly what it wanted to hear. At
sessed with Al Jazeera, not
: criticism of the invasion of
na bin Laden's favorite out-
ges to the world. Each time
erican media immediately
nd analysis of whether the
en it had been taped. Each
IA to scramble to stay one
answers. At first, when bin
in what appeared to be the
istan, the CIA even tried to
utcroppings that served as
out where bin Laden was.
A to look for new methods
d some American officials
nship between Al Jazeera

ials from the CIA's Science
Directorate's chief, Donald
al Qaeda codes. They also
the technology and intel-
e seriously. As a result, in
esident Bush when infor-
ftware purported to show
and Mexico to the United
ed by al Qaeda. The data
was planning to crash the

esident Bush ordered the
scheduled to fly into the
or thousands of travelers
toking public fears of an-

other spectacular al Qaeda attack just two years after the 9/11 attacks
on New York and Washington.

★

Years later, several former CIA officials who eventually pieced to-
gether what had happened in those frenzied days became highly crit-
ical of how Montgomery's information was handled by Tenet and
other senior CIA managers. The critics came to believe that top of-
ficials in the CIA's Science and Technology Directorate became fierce
advocates for Montgomery's information because they were eager to
play a more prominent role in the Bush administration's war on ter-
ror. The scientists were tired of being shunted aside, and Montgom-
ery gave them what they wanted: technology that could prove their
worth. "They wanted in," said one former senior CIA official, "they
wanted to be part of the game."

But former CIA officials blame Tenet even more; the CIA direc-
tor enabled the overeager scientists. He allowed them to circumvent
the CIA's normal reporting and vetting channels, and rushed the raw
material fed to the agency by Montgomery directly to the president.
Bush himself had no way of vetting the material he was being handed
by the CIA. "Tenet made George Bush the case officer on this," said
one former senior CIA official. "The president was deciding how this
was being handled."

One former senior CIA official said that for two or three months
in late 2003 and early 2004, the intelligence from Montgomery was
treated like it was the most valuable counterterrorism material at the
CIA. Special briefings were given almost daily on the intelligence, but
only a handful of CIA officials were told where the intelligence was
coming from. "They treated this like the most important, most sensi-
tive compartmented material they had on terrorism," said one former
CIA official.

Officially, the CIA still refuses to discuss any details of the epi-
sode. One CIA official offered a qualified defense of Tenet's handling
of Montgomery's information, saying that the decision to share the
threat information with President Bush was debated and approved by

43

GREED

the administration's so-called principals committee, made up of Vice President Dick Cheney, the secretaries of state and defense, and other members of the cabinet. Only after the principals agreed did Tenet take the intelligence in to Bush. In other words, Tenet wasn't the only one who appears to have been hoodwinked. Dennis Montgomery's information received the stamp of approval by the entire upper echelon of the Bush administration.

★

What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well.

A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously.

Montgomery was able to succeed with the CIA in part because senior agency officials considered his technology so important that they turned the knowledge of its existence into a highly compartmented secret. Few at the CIA knew any more than that there was a new intelligence source providing highly sensitive information about al Qaeda's plans for its future terrorist strikes. In other words, the CIA officials working with Montgomery—people who had already bought into Montgomery—controlled who else was told about the man and his technology. By limiting access to the information, they enhanced their own standing within the CIA; they were the high priests in on the agency's biggest secret. There would be no second-guessing.

The fact that Montgomery and eTreppid had such powerful con-

44

*The Emperor of the War on Terror*

nections in Washington also reduced the incentives for anyone at the CIA to speak up. Raising questions about Dennis Montgomery would almost certainly lead to a grilling in front of the House Intelligence Committee and Jim Gibbons. It might also incur the wrath of Jerry Lewis and the Defense Appropriations Subcommittee, which, along with the House intelligence panel, controlled the intelligence budget.

★

For those few allowed into the CIA's charmed circle of secret knowledge, Montgomery seemed to be providing powerful and frightening information.

The string of numbers flowing inexorably from Dennis Montgomery's computers prompted President Bush to act. One set of flights he ordered grounded were Air France flights from Paris to Los Angeles. French security detained seven men at Charles de Gaulle Airport in Paris for questioning, but then released them after no further evidence of a pending attack was uncovered. Christmas 2003 came and went with no attacks. But that did not make the White House any more skeptical of Dennis Montgomery.

One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence. The former CIA official said that during the meeting, Frances Townsend—then a counterterrorism official on the National Security Council—discussed with an NSC lawyer the fact that the president had the legal authority to shoot down planes believed to be terrorist threats, and that it might be time to exercise that authority. "I couldn't believe they were talking about it," the former senior CIA official said. "I thought this was crazy."

Townsend denied ever having such a discussion. The former CIA official repeated his version of events after being told of her denial.

★

GREED

Finally, the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense.

It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication.

At first, CIA officials were taken aback by the French company's findings and did not want to believe that they had been fooled. Montgomery says that CIA officials continued to work with him for months after Christmas 2003, and that CIA personnel were still showing up at his offices in Nevada until late 2004.

Once the CIA officials finally accepted the truth, however, and agreed with the French findings, George Tenet and others at the CIA who had been Montgomery's advocates tried to forget all about him. They never talked about the operation again. Within the CIA, it was as if Dennis Montgomery had never existed.

The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences. Donald Kerr, the head of the CIA's Science and Technology Directorate at the time, was never held to account for the role the CIA's technical experts played in advocating for Montgomery. Instead, Kerr kept getting promoted. He received several other senior assignments in the intelligence community, and was eventually

named deputy direc[
to requests for com[

At the time of th[
of the newly created
of distributing terr[
ment. That meant [
ing Montgomery's [
reaches of the Busl[
ished for his role in[
Brennan was name[
White House. He la[

In 2013, while [
Brennan to run th[
can who was vice [
submitted a writter[
gence community's[
denied that he had[
nology, and insiste[
was merely a recipi[
had been passed [
Montgomery's dat[
not to know what[
pid, "other than it[
information."

There was no f[
body was blamed,"[
got promoted."

Even more stu[
2003 terrorist thr[
ment contracts aw[
Montgomery's pro[
variations of his te[
The secrecy that s[
CIA officials were [
about their experi[

*The Emperor of the War on Terror*

named deputy director of national intelligence. Kerr did not respond to requests for comment.

At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director.

In 2013, while the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a written question to Brennan about his role in the intelligence community's dealings with Montgomery. In response, Brennan denied that he had been an advocate for Montgomery and his technology, and insisted that the Terrorism Threat Integration Center was merely a recipient of Montgomery's information and data, which had been passed on by the CIA. He said that the center included Montgomery's data "in analytic products as appropriate." He claimed not to know what had become of the CIA's program with eTreppid, "other than it was determined not to be a source of accurate information."

There was no further inquiry on the matter from Congress. "Nobody was blamed," complains one former CIA official. "Instead, they got promoted."

Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department

47

GREED

officials apparently did not realize that his technology was considered suspect at CIA headquarters.

In February 2004, just two months after the Christmas 2003 airplane scare, eTreppid was awarded a new contract with Special Operations Command. The contract was for both data compression and "automatic target recognition software," Montgomery's purported technology to recognize the faces of people on the ground filmed in videos on Predator drones. Special Operations Command gave eTreppid access to video feeds from Predator drones controlled from Nellis Air Force Base in Nevada. It is not certain how long officials there tested Montgomery's facial recognition technology before realizing that eTreppid had no secret formula for identifying terrorists from Predator drone video feeds. But eventually, Special Operations Command also began to see through Montgomery.

"The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $9.6 million to eTreppid under its contract with the firm.

★

By late 2005, Dennis Montgomery was in trouble. Employees at eTreppid were becoming more openly skeptical of Montgomery and trying to get access to his secret technology to see if it really existed. For years, Montgomery had somehow managed to hide the truth about his secret work for the government from the small number of employees he had hired. He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain.

Sloan Venables, hired by Montgomery to be eTreppid's director of research and development, later told the FBI that another employee, Patty Gray, began to suspect that Montgomery "was doing something other than what he was actually telling people he was doing." Venables added in his statement to the FBI that he knew that "Montgom-

*The Emperor of the War on Terror*

ery promised products to customers that had not been completed or even assigned to programmers."

At the same time, Montgomery was arguing with Warren Trepp over money; Montgomery needed cash and claimed that Trepp had shortchanged him on his share of the revenue from eTreppid's contracts. In December 2005, Montgomery asked Trepp for a personal loan of $275,000, on top of the $1.375 million Trepp had already loaned him since 1999, according to court documents. This was too much for Trepp, who finally became fed up with Montgomery.

But Montgomery moved first. Over the Christmas holidays, Montgomery allegedly went into eTreppid's offices and deleted all of the computer files containing his source code and software development data, according to court documents. He broke with Trepp, left eTreppid, and began looking for new backers. Trepp soon discovered that Montgomery had asked yet another casino host at the El Dorado if he knew of any wealthy gamblers who would be willing to invest $5 to $10 million in a new business he was about to launch. Trepp later told the FBI that on his way out the door at eTreppid, Montgomery screamed at one employee, "You're an asshole and I will see you again!"

Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real. Yet they doggedly kept probing Montgomery's theft of secret technology, and even raided Montgomery's home searching for the computer codes, all the while largely ignoring the evidence that he had perpetrated a hoax.

After their partnership broke up, Montgomery and Trepp remained locked in a series of nasty and lingering legal battles. The worst involved Montgomery's allegations that Jim Gibbons, the Nevada Republican congressman whom he had met at Wayne Prim's house, had received bribes from Warren Trepp in return for helping eTreppid to obtain defense contracts. Montgomery's accusations were explosive because they became public just as Gibbons was be-

GREED

ing elected governor of Nevada. They helped to trigger a federal cor-
ruption investigation, but the inquiry was eventually shelved amid
questions about whether e-mails that Montgomery claimed showed
that Gibbons had accepted money and a Caribbean cruise in exchange
for help in winning contracts for eTreppid—and thus supposedly pro-
vided evidence of bribery—may have been forgeries. Dennis Mont-
gomery was widely suspected of having fabricated the e-mails in an
effort to damage both Trepp and Gibbons.

In 2008, Abbe Lowell, the Washington attorney representing Gib-
bons, announced that Gibbons had been cleared of wrongdoing and
that prosecutors had told him that he would not be charged in the
corruption investigation. Lowell said, "It should be crystal clear that
the only persons who should be investigated or charged are those who
made false allegations of wrongdoing and who tried to fuel this inves-
tigation for their own private purposes," according to an account of
his statement in the Associated Press. Gibbons added that "today, I
am exceedingly pleased that the FBI and the Justice Department have
vindicated me from the allegations and claims of Mr. Montgomery."

★

Montgomery was able to recover from his battle with Trepp once he
landed another wealthy patron, Edra Blixseth, the wife of billionaire
Tim Blixseth. Tim Blixseth had made his fortune in timber land swaps
in the Pacific Northwest, and then turned his focus to developing a
mountain resort for the uber-rich in Montana called the Yellowstone
Club. Set in the Rocky Mountains not far north of Yellowstone Na-
tional Park, the 13,600-acre club was said to be the only private ski
resort in the world. It attracted jet-setters who were willing to pay to
avoid mixing with the rabble at public ski resorts.

Developing the Yellowstone Club helped to secure for Tim Blix-
seth the ultimate status symbol—a spot on the Forbes 400. Tim and
Edra enjoyed all of the perks of the super-rich—among many other
things, they owned a private jet, a yacht, and a massive estate in Ran-
cho Mirage, California, called Porcupine Creek, which came with its
own private golf course. Their wealth and ownership of the Yellow-

*The Emperor of the War on Terror*

stone Club also meant that the Blixseths were networking with some of the most famous and powerful people in the world, from Bill Gates to Jack Kemp to Benjamin Netanyahu.

Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware. Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen. Jack Kemp, the former congressman and onetime Republican vice presidential candidate, was a member of the Yellowstone Club, and in 2006 he helped to arrange a White House meeting for Montgomery to push his technology. Thanks to Kemp, Montgomery met with Samantha Ravich, a national security aide to Vice President Dick Cheney, who was an old friend of Kemp. Montgomery explained his technology to Ravich and then tried to convince her that Cheney should support his bid for more government funding. But unlike other officials who had dealt with Montgomery in the past, Ravich demanded proof. She told Montgomery that she could not do anything for him unless some technical experts in the government vouched for his technology. He was never able to get anyone from the Pentagon to call Ravich on his behalf, and so she dropped the matter. She said in an interview that she never tried to help him obtain any new government business.

Montgomery also sought to convince Israeli officials to use his technology, but, like Samantha Ravich, the Israelis were unimpressed and rejected his offer. Still, Montgomery continued to find ways to get Pentagon contracts. He says that his technology was often used to provide targeting information in raids in Iraq and Afghanistan, and that he was given access to the Predator Operations Center at Nellis Air Force Base—a sign that his work was playing a role in Predator strikes. "Months of testing and validation at Nellis," as well as at other bases, "confirmed the value of the technology," insists Montgomery.

Edra Blixseth refused a request for an interview.

★

GREED

Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and his technology, e-mailed Montgomery and said he had heard from "various federal agencies thanking us" for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax.

★

Inevitably, Montgomery had a falling out with Edra Blixseth. He then turned to Tim Blixseth to invest and back his operation. By then, Tim and Edra Blixseth were going through an extremely bitter divorce, and Montgomery became caught up in their legal battles. Mysteriously, government lawyers sometimes sought to intervene in their court cases, with vague references to the need to keep classified information stemming from Montgomery's work with the intelligence community out of the public record.

When Montgomery approached him, Tim Blixseth had no intention of giving money to Montgomery, his ex-wife's erstwhile partner. Blixseth was interested in finding out what Montgomery was really doing, however, and so he played along when Montgomery called desperate for money. At one point, Montgomery's wife even called Blixseth to plead for help with bail after Montgomery was arrested for passing bad checks at Caesar's Palace in Las Vegas. (Eventually, Montgomery was forced into personal bankruptcy proceedings.) Blixseth refused to help but kept talking to Montgomery.

In 2010, Blixseth finally went to see Montgomery's latest computer software operation, hidden away in a nondescript warehouse near Palm Springs. Blixseth says that throughout the darkened office, Montgomery had mounted at least eight large-screen televisions, all tuned to Al Jazeera and all tied in to a computer in the middle of the room.

Dennis Montg
ing technology to
given up on his se
Blixseth took in tl
his Al Jazeera dat

In fact, Mont
wavering. He clai
network broadca
Olympics in the s

Today, Dennis M
that his technolc
tive and valuable
NSA contractor E
domestic surveill
me that he could
that he had been
top U.S. intellige
erations.

But Montgom
his assertions.*

* Eric Lichtblau and
Aram Roston also wr

*The Emperor of the War on Terror*

Dennis Montgomery was once again using his top-secret decoding technology to scour Al Jazeera broadcasts. Montgomery had not given up on his secret project, despite being abandoned by the CIA. As Blixseth took in the bizarre scene, Montgomery proudly told him that his Al Jazeera data was all being fed "straight to the Pentagon."

In fact, Montgomery says that his focus on Al Jazeera was unwavering. He claims that he recorded every minute of Al Jazeera's network broadcast nonstop from February 2004 until the London Olympics in the summer of 2012. "That's over 8 billion frames."

★

Today, Dennis Montgomery continues to argue that he is not a fraud, that his technology is genuine, and that he performed highly sensitive and valuable work for the CIA and the Pentagon. After former NSA contractor Edward Snowden leaked documents about the NSA's domestic surveillance operations in 2013, Montgomery suggested to me that he could provide the documents that would prove not only that he had been telling the truth, but that he had also been used by top U.S. intelligence officials in highly questionable intelligence operations.

But Montgomery has never provided the documents to back up his assertions.*

---

\* Eric Lichtblau and James Risen reported about Montgomery for the *New York Times.* Aram Roston also wrote an excellent story about Montgomery for *Playboy* magazine.

Exhibit B

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 URGENT

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

**Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.**

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

1

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic terrorism in recent months and the even heightening risks this presents to the this nation and the free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:    Dennis Montgomery
        James Risen



**David Eber**
Vice President
Associate General Counsel

**Houghton Mifflin Harcourt**

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC  20006-1811
leklayman@gmail.com

       **Re:  *Pay any Price*, by James Risen**

Dear Mr. Klayman:

     We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at Houghton Mifflin Harcourt Publishing Company ("HMH").

     We deny your allegations that *Pay any Price* contains defamatory statements concerning your client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and vetting the book.  We also decline your invitation to meet to discuss HMH's manuscript review processes.

                 Sincerely,

                 David Eber

cc:    William Bayers
        James Risen

# Klayman Law Firm

---

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ⊗   Telephone: (310) 595-0800 ⊗   leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:   **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price:  Greed, Power and Endless War" authored by James Risen.

This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price:  Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

Retraction Letter
February 13, 2015
Page | 2

The publication dated October 14, 2014, was the first publication of the book worldwide in any language and the first printing run of the book.  The book was physically printed in the United States of America.  We understand that copies of the Book were distributed to bookstores and/or the public up to a week or two earlier than the designated date of publication (a book's designated publication date being primarily of marketing significance, not necessarily the earliest date of a book's release).

Apart from the book itself, James Risen on behalf of himself and the publisher also engaged in a flurry of news interviews and talk show interviews starting in September, and continuing until the present time, associated with the publication 'roll out' of his book in which Risen made further statements in addition to the words of the book itself and repeated claims from the book itself.

Many of Risen's libelous and slanderous statements were made during written news and talk show interviews in September 2014, October 2014, and November, 2014, and since then, some spoken, some in print, surrounding the publication of his book rather than in the book itself.

Your defamatory statements against Dennis Montgomery are exceedingly numerous, extensive, detailed, and often each defamatory in numerous respects.  Many statements each include multiple and overlapping topics of defamation against Dennis Montgomery.

As a result, we have attached as "Attachment A" to this letter a 28-page restatement, summary, and analysis of at least 43 examples of defamatory statements.  We expect that James Risen also made other statements during additional radio, television, and print interviews about the Book.

You are now on notice that this article resulted in severe damage to Mr. Montgomery personally and in his trade and profession, for which you all will be held to legally account for.

We demand that you issue a retraction immediately. In your previous letter of January 20, 2015, you denied that any defamatory statements were made.  We strongly suggest that you reconsider.  Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:  Dennis Montgomery

**ATTACHMENT A**

**LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS**

**DEFAMATION *PER SE***

1.      The following statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887), such that a judge will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933). [1]

2.      **First, on Page 32 of the Book, Risen writes:** [2]

> "Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

3.      As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue intelligence operation with little or no adult supervision and that he was "someone who has been accused of being a con artist."

---

[1]      Examples of defamation *per se* include those that hurt one's profession, business or trade; falsely state that a person has a socially unacceptable illness or disease;  or falsely state that a person has been involved in some kind of criminal activity.  *Lawnwood Medical Center Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).

[2]      Note that several statements may qualify under different theories, but are presented in full for proper context.  Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

4.      **Second, on Page 32 of the Book, the Risen writes:**

"Whatever else he was, Dennis Montgomery was a man who
understood how best to profit from America's decade of fear. He saw
the post-9/11 age for what it was, a time to make money. Montgomery
was the maestro behind what many current and former U.S. officials
and others familiar with the case now believe was one of the most
elaborate and dangerous hoaxes in American history, a ruse that was so
successful that it nearly convinced the Bush administration to order
fighter jets to start shooting down commercial airliners filled with
passengers over the Atlantic. Once it was over, once the fever broke
and government officials realized that they had been taken in by a
grand illusion, they did absolutely nothing about it**.** The Central
Intelligence Agency buried the whole insane episode and acted like it
had never happened. The Pentagon just kept working with
Montgomery. Justice Department lawyers fanned out across the country
to try to block any information about Montgomery and his schemes
from becoming public, invoking the state secrets privilege in public, a
series of civil lawsuits involving Montgomery.  It was as if everyone in
Washington was afraid to admit that the Emperor of the War on Terror
had no clothes."

5.      As libel *per se*, Risen asserted Montgomery's work "many current and former

U.S. officials and others familiar with the case now believe was one of the most elaborate and

dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the

Bush administration to order fighter jets to start shooting down commercial airliners filled with

passengers over the Atlantic."

6.      As libel *per se*, Risen asserted about the Montgomery that "once the fever broke

and government officials realized that they had been taken in by a grand illusion, they did

absolutely nothing about it …"

7.      **Third, on Page 33 of the Book, Risen writes:**

"A former medical technician, a self-styled computer software
expert with no experience whatsoever in national security affairs,
Dennis Montgomery almost singlehandedly prompted President
Bush to ground a series of international commercial flights based
on what now appears to have been an elaborate hoax. Even after it
appeared that Montgomery had pulled off a scheme of amazing

2

> scope, he still had die-hard supporters in the government who
> steadfastly refused to believe the evidence suggesting that
> Montgomery was a fake, and who rejected the notion that the
> super-secret computer software that he foisted on the Pentagon and
> CIA was anything other than America's salvation."

8.     As libel *per se*, Risen asserted that Montgomery's work "now appears to have

been an elaborate hoax."

9.     As libel *per se*, Risen asserted that "die-hard supporters in the government who

steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10.    As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA"

super-secret computer software.

11.    **Fourth, on Page 34 of the Book, the Risen writes:**

> "Montgomery was an overweight, middle-aged, incorrigible gambler,
> a man who liked to play long odds because he was convinced that he
> could out-think the house. He once boasted to a business partner that
> he had a system for counting an eight-deck blackjack shoe, quite a
> difficult feat for even the best card sharks, and he regularly tested his
> theories at the El Dorado and the Peppermill Casino in Reno. He
> usually came up short but that didn't stop him from playing blackjack
> on a nightly basis, racking up unwieldy debts that eventually led to his
> 2010 arrest for bouncing more than $ 1 million in bad checks at
> Caesar's Palace in Las Vegas."

12.    As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible

gambler," meaning in effect that Montgomery was a gambling addict who was "playing

blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable

gambling addict is a loathsome social status.

13.    *Fifth,* **on Page 36 of the Book, Risen writes:**

> "Michael Flynn, Montgomery's former lawyer— who later
> concluded that Montgomery was a fraud."

14.   As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer "concluded that Montgomery was a fraud."

15.   ***Sixth,* on Page 37 of the Book, Risen writes:**

> *"*By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology —tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance."

16.   As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

17.   ***Seventh,* on Page 37 of the Book, Risen writes:**

> "After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

18.     As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

19.     **Eighth,** **on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

20.     As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

21.     As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22.     **Ninth,** **on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

23.     As libel *per se*, Risen asserted about Montgomery that "agency staff eventually realized they had been conned, according to this official."

24. ***Tenth,*** **on Page 46 of the Book, the Risen writes:**

"It did not take long for the French firm to conclude that the whole thing was a hoax.  The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers.  The firm reported back to the French government that the supposed intelligence was a fabrication."

25.   As libel *per se*, Risen asserted about Montgomery that "the whole thing"

(Montgomery's work) "was a hoax" and a "fabrication."

26. ***Eleventh,*** **on Page 46 of the Book, the Risen writes:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27.   As libel *per se*, Risen asserted about Montgomery that his work was a hoax.

28. ***Twelfth,*** **on Page 47 of the Book, the Risen writes:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29.   As libel *per se*, Risen asserted about Montgomery that "That meant that

Brennan's office was responsible for circulating Montgomery's fabricated intelligence to

officials in the highest reaches of the Bush administration."

30. ***Thirteenth,*** **on Page 50 of the Book, Risen writes:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

> Montgomery needed new government contracts for Blxware, and
> Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis

Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in

BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     ***Fourteenth,*** on November 6, 2014, James Risen appeared as an interview guest

on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart.

Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue

between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time

nationwide across the United States of America through cable television and satellite television

on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast

on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had
> the super-secret technology to read Al Jazeera news broadcasts and
> decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that
> he could read numbers and letters hidden in the Al Jazeera broadcasts
> that corresponded with flights that Al Qaeda was going to shoot down,
> knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all
> over the world at Christmas 2003 based on this guy's intelligence or
> supposed intelligence.  It took the French intelligence service, who had
> gotten very mad because they grounded flights from Paris to Los
> Angeles.  And they demanded that the CIA tell them where they were
> getting this information.    And so they finally [non-verbal

interruption].  They finally got the information.   The French told them
this is a hoax.  This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing
up, and refused to ever talk about it.  And Montgomery kept getting
more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack
about to happen.   You really have to be a pretty sophisticated
consumer of intelligence after several years to begin to realize what's
real and what's not really a credible threat.

35.     As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in

2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that

corresponded with flights that Al Qaeda was going to shoot down, knock---  or blow up….

36.     As libel *per se*, Risen asserted about Montgomery that "The French told them this

is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the

whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts

after that."  The statement that "the CIA agreed with them" is Risen's assertion about

Montgomery's work that "this is a hoax.  This is a fabrication."

37.     As libel *per se*, Risen asserted about Montgomery that "they covered the whole

thing up, and refused to ever talk about it,"  as a way of saying that the CIA had been conned.

38.     ***Fifteenth,*** on October 13, 2014, James Risen gave a television interview [3] with

Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS).   In

that interview, James Risen made the following statements for broadcast on television, and Judy

Woodruff repeated many points from James Risen's book which Risen agreed with and

endorsed.  Much of the interview involved other chapters not relevant here.

---

[3]       http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:   Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:   Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]     Emphasis, by exclamation in tone of voice, the in original conversation.

> and tested it.  So it's this very complicated story about a man
> recognizing an opportunity who had never been involved in national
> security before and the CIA and the military all just hungry for
> whoever could come with the latest idea.

39.     As libel *per se*, Risen asserted about Montgomery that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.     As libel *per se*, Risen asserted about Montgomery that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right.  Right."

41.     As libel *per se*, Risen asserted about Montgomery that "There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had."

42.     ***Sixteenth,*** on October 24, 2014, James Risen gave an audio interview with Lucy Worsley published on the New York Times website, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [5]  In this interview  "**Inside The New York Times Book Review**," with Pamela Paul, October 24, 2014, James Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the
> government's war on terror.  We'll talk to  James Risen, author of Pay
> Any Price:  Greed, Power, and Endless War.

---

[5]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, New York Times, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL:   What is the British fascination with murder? Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth.  And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times.  He's one of the most fascinating characters in the war on terror.  He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts.  And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them.  And when they realized it was a hoax, they covered the whole thing up and never did anything about it.  So I had done a story for the Times with....  about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it.  But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by.  To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off.  And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism.  And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43.     As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44.     The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45.     ***Seventeenth,*** James Risen sat for a nationwide television news interview on the television show ***DEMOCRACY NOW!*** A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014.  On this nationwide television news broadcast, the conversation turned to:

> **AMY GOODMAN:** Dennis Montgomery?

> **JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

> **AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

> **JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

13

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

**JAMES RISEN:** Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

**AMY GOODMAN:** Then Dennis Montgomery, revealed as a con man—

**JAMES RISEN:** Yeah, yeah.

**AMY GOODMAN:** —in jail for that?

**JAMES RISEN:** Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

**AMY GOODMAN:** We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

    [break]

46.    As libel *per se*, Risen asserted about Montgomery that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

47.    As libel *per se*, Risen asserted about Montgomery when asked "How much did the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

48.     As libel *per se*, Risen asserted about Montgomery that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49.     As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50.     As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51.     ***Eighteenth***, James Risen gave an interview with "Conversations with Great Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well.  One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video.  And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]        https://www.youtube.com/watch?v=jc_8f4Pp9Zc

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:   Whoa.

JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.     As libel *per se*, Risen asserted about Montgomery that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

53.     As libel *per se*, Risen asserted about Montgomery that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

he ended up getting more contracts from the military... and the Pentagon.  And he was

continuing, he continued to operate for several years.  It's really a remarkable story."

## GENERAL DEFAMATION

54.    In addition, Risen also made additional defamatory statements that are explicit

defamation under Florida law.

55.    ***Nineteenth,*** **on Page 49 of the Book, Risen writes:**

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

56.    As explicit libel, Risen asserted about Montgomery that Montgomery had stolen

valuable software – yet also asserted that the software "wasn't real."

## DEFAMATION BY IMPLICATION UNDER FLORIDA LAW

### Analogous to False Light

57.    For defamation by implication: " . . . [L]iterally true statements can be defamatory

where they create a false impression. This variation is known as defamation by implication and

has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098,

1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are

literally true, but produces a defamatory meaning apparent from a plain reading of the

publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58.    Montgomery thus claims here that if the Court finds that any of the statements

labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

then in the alternative Montgomery claims here that any and all such statements not qualifying as defamation *per se* or general defamation are defamation by implication against Montgomery.

59.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning, purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that Montgomery defrauded and conned the U.S. Government.

60.     In fact, Montgomery refused to speculate as to the interpretation or meaning of the data and analyses he uncovered, even when pressed to state what he thought the data might mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.     Thus, throughout the statements presented herein, Risen libels and slanders Montgomery by implication that Montgomery defrauded and scammed the U.S. Government concerning the meaning of the information Montgomery uncovered, implying that Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

63.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery should be in jail.

64.     Among the other statements, in particular, the ***First*** example of libel***, on Page 32 of the Book,*** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition

> have been married to unlimited rivers of cash to create a climate in
> which someone who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

65.     Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

66.     Among the other statements, in particular, in the ***Eleventh*** example of libel***, on***

**Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how it
> had been handled inside the agency."

67.     Here, as libel by implication, even if it is true that "The CIA never investigated"

what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a

hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68.     Similarly, in the ***Sixteenth*** example of slander from an interview, Risen states that

"It seemed to me that what the war had become in 13 years was a search for cash and a search

for power and status and that it was becoming an endless war in which we had a new mercenary

class of people who were taking advantage of the war on terror," implying that Montgomery's

work is fraudulent in being merely an effort to get cash.

69.     Among the other statements, in particular, the ***Nineteenth*** example of libel***, on***

**Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

70.     As libel by implication, Risen implies that Montgomery stole valuable software

yet at the same time the software was in fact worthless.

71.     In addition, Risen also made additional defamatory statements that are defamation

by implication under Florida law.

72.     ***Twentieth,*** **on the Preface Page of the Book, Risen writes:**

> "I've come back," he repeated.  "I was the King of Kafiristan – me
> and Dravot – crowned Kings we was!  In this office we settled it –
> you setting there and giving us the books.  I am Peachey – Peachey
> Taliaferro Carnehan – and you've been setting here ever since –
> Oh, Lord!"
>
> I was more than a little astonished and expressed my feelings
> accordingly.
>
> "It's true," said Carnehan, with a dry cackle, nursing his fee, which
> were wrapped in rags.  "True as gospel.  Kings we were, with
> crowns upon our head – me and Dravot – poor Dan – oh, poor,
> poor Dan, that would never take advice, not though I begged of
> him!"
>
>       -- Rudyard Kipling, *The Man Who Would be King.*

73. As libel by implication, Risen implies that Montgomery (along with others addressed

in the book) is a fraud and/or con man as in *The Man Who Would be King.*

74. ***Twenty-first,*** **in the Prologue on Page xiv of the Book, Risen writes:**

> "The new homeland security-industrial complex operates differently.
> It is largely made up of a web of intelligence agencies and their
> contractors, companies that mostly provide secret services rather than
> large weapons systems and equipment.  These contractors are hired to
> help Washington determine the scale and scope of the terrorist threat;
> they make no money if they determine that the threat is overblown or,
> God forbid, if the war on terror ever comes to an end."

75.     As libel by implication, Risen states "they make no money if they determine that

the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that

Montgomery's and eTreppid's profits were _contingent_ upon results, and false results at that.

76.     ***Twenty-second,*** **in the Prologue on Page xv of the Book, Risen writes:**

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

77.    Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

78.    **Twenty-third,** **in the Prologue on Page xvii of the Book, Risen writes:**

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up.  All too often, things are not what they seem."

79.    As libel by implication, Risen implies that Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

80.    **Twenty-fourth,** **Part 1 of the Book,** including Chapter 2 which is focused entirely on Dennis Montgomery, Risen have labeled "Part 1:  Greed"

81.    Thus, by placing the chapter focused on Dennis Montgomery under a label for the section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

82. **Twenty-fifth,** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery: "Chapter 2: The Emperor of the War on Terror."

83. By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84. **Twenty-Sixth, on Page 40 of the Book, Risen writes:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85. As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86. **Twenty-Seventh, on Page 42 of the Book, Risen writes:**

> "Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87. As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88. **Twenty-Eighth, on Page 42 of the Book, Risen writes:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government

with a hoax.  It would of course be entirely clear "how Montgomery was able to convince all of

them" if Montgomery's work and technology are legitimate.

90. ***Twenty-Ninth,*** **on Page 46 of the Book, Risen writes:**

> "Finally the French brought an end to it.  Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode.  They
> began demanding answers from the Americans.  The French
> applied so much pressure on Washington that the CIA was finally
> forced to reveal to French intelligence the source of the threat
> information. Once they heard the story of Dennis Montgomery and
> eTreppid, French officials arranged for a French high-tech firm to
> reverse-engineer Montgomery's purported technology.  The
> French wanted to see for themselves whether the claims of hidden
> messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud

and that his work is a scam and a hoax.

92. ***Thirtieth,*** **on Page 52 of the Book, Risen writes:**

> "Montgomery continued to get defense contracts even during the
> Obama administration.  In 2009, Montgomery was awarded another
> air force contract, and later claimed that he had provided the
> government with warning of a threatened Somali terrorist attack
> against President Obama's inauguration.  Joseph Liberatore, an air
> force official who described himself as one of "the believers"  in
> Montgomery and said he had heard from 'various federal agencies
> thanking us' for the support Montgomery and his company provided
> during Obama's inauguration.  The threat, however, later proved to be
> a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive

contracts is due to Montgomery's ability to defraud the government (and stupidity of government

officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. ***Thirty-First,*** **on Page 31 of the Book, Risen writes:**

> "and a new breed of entrepreneur learned that one of the surest and
> easiest paths to riches could be found not in Silicon Valley building
> computers or New York designing clothes but rather in Tysons
> Corner, Virginia, coming up with new ways to predict, analyze, and
> prevent terrorist attacks— or, short of that, at least in convincing a
> few government bureaucrats that you had some magic formula for
> doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a

few government bureaucrats that he had a magic formula as an easy path to riches.

96. ***Thirty-Second,* on Page 33 of the Book, Risen writes:**

> "Montgomery's story demonstrates how hundreds of billions of
> dollars poured into the war on terror went to waste. With all rules
> discarded and no one watching the bottom line, government officials
> simply threw money at contractors who claimed to offer an edge
> against the new enemies. And the officials almost never checked back
> to make sure that what they were buying from contractors actually did
> any good— or that the contractors themselves weren't crooks. A 2011
> study by the Pentagon found that during the ten years after 9/ 11, the
> Defense Department had given more than $ 400 billion to contractors
> who had previously been sanctioned in cases involving $ 1 million or
> more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among

others) went to "waste."

98. ***Thirty-Third,* on Page 33 of the Book, Risen writes:**

> "The Montgomery episode teaches one other lesson, too: the chance
> to gain promotions and greater bureaucratic power through access to
> and control over secret information can mean that there is no
> incentive for government officials to question the validity of that
> secret information. Being part of a charmed inner circle holds a
> seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100.     ***Thirty-Fourth,* on Page 33 of the Book, Risen writes:**

> "How his technology worked was a secret. Dennis Montgomery's
> computer code became the great treasure behind eTreppid
> Technologies, the company he and Trepp founded. Later, many of

those around Montgomery began to suspect the reason why
Montgomery had to guard his technological innovations
so carefully. They came to believe that at least some of the
technology didn't really exist."

101.    As libel by implication, Risen implies that Montgomery committed fraud.

102.    ***Thirty-Fifth,*** **on Page 35 of the Book, Risen writes:**

"Montgomery was on the lookout for somebody to bankroll him,
and had put out the word to his friends at the casinos that he
frequented the most. A year later, Montgomery and Trepp were in
business together. Trepp was one of the first, but hardly the last, to
be beguiled by Montgomery's claims that he had achieved
breakthroughs in computer technology of historic significance."

103.    As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp

by committing fraud.

104.    ***Thirty-Sixth,*** **on Page 39 of the Book, Risen writes:**

"For a few months in late 2003, the technology from Dennis
Montgomery and eTreppid so enraptured certain key government
officials that it was considered the most important and most sensitive
counterterrorism intelligence that the Central Intelligence Agency had
to offer President Bush. Senior officials at the CIA's Directorate of
Science and Technology began to accept and vouch for Montgomery
to officials at the highest levels of the government. Montgomery's
claims grew ever more expansive, but that only solidified his position
inside the national security arena. His technology became too
impossible to disbelieve."

105.    As libel by implication, Risen imply that Montgomery committed fraud and is a

con man.

106.    ***Thirty-Seventh,*** **on Page 40 of the Book, Risen writes:**

 "Montgomery persuaded the spy agency that his special computer
technology could detect hidden bar codes broadcast on Al Jazeera,
which had been embedded into the video feed by al Qaeda. Allegedly,
al Qaeda was using that secret method to send messages to its terrorist
operatives around the world about plans for new attacks. Montgomery
convinced the CIA that his technology had uncovered a series of

26

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.     As libel by implication, Risen imply that Montgomery convinced the CIA of

claims that are not (were not) true.

108.     ***Thirty-Eighth,*** **on Page 42 of the Book, Risen writes:**

"Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

110.     ***Thirty-Ninth,*** **on Page 42 of the Book, Risen writes:**

"One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

112.     ***Fortieth,*** **on Page 47 of the Book, Risen writes:**

"Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113.     As libel by implication, Risen implies that Montgomery continued to defraud,

con, and scam the government, rather than concluding that the U.S. Government recognized the

legitimacy of Montgomery's work.

114.     ***Forty-First,*** **on Page 48 of the Book, Risen writes:**

> "He successfully infused a sense of mystery around himself. He was
> like the Wizard of Oz, but now people were beginning to try to
> examine the man behind the curtain."

115.     As libel by implication, Risen implies that the Montgomery engaged in fraud and

a hoax by keeping details mysterious.

116.     ***Forty-Second,*** **on Page 48 of the Book, Risen writes:**

> "The technology didn't meet the requirements for us," said a Special
> Operations Command spokesman drily. Still, there is no evidence that
> officials at Special Operations Command ever talked with their
> counterparts at the CIA to check up on Montgomery before awarding
> him a contract. Special Operations Command paid a total of $ 9.6
> million to eTreppid under its contract with the firm."

117.     As libel by implication, Risen imply that Montgomery again repeated his fraud

and hoax against a new government agency.

118.     ***Forty-Third,*** **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**Risen writes:**

> **CHAPTER 3**:   The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of
> the new kind of counterterrorism entrepreneur who prospered in the
> shadows of 9/11.  But he was hardly alone in recognizing the lucrative
> business opportunities that the war on terror has presented.  In fact, as
> trillions of dollars have poured into the nation's new homeland
> security-industrial complex, the corporate leaders at its vanguard can
> rightly be considered the true winners of the war on terror."

119.     As libel by implication, Risen implies that Montgomery engaged in fraud and a

hoax motivated by greed.