UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

DENNIS L. MONTGOMERY,

        Plaintiff,

v.                                                          CASE NO. 1:15-cv-20782-JEM

JAMES RISEN, HOUGHTON MIFFLIN
HARCOURT PUBLISHING CO., HMH
HOLDINGS, INC.,

        Defendants.

_____/


**DEFENDANTS' MOTION TO DISMISS OR TRANSFER
FOR LACK OF PERSONAL JURISDICTION OVER RISEN AND
HOUGHTON MIFFLIN HARCOURT COMPANY, DISMISS OR TRANSFER
FOR IMPROPER VENUE, TRANSFER UNDER 28 U.S.C. § 1404(a), OR DISMISS
FOR FAILURE TO STATE A CLAIM AND MEMORANDUM IN SUPPORT**

**HOLLAND & KNIGHT LLP**
Sanford L. Bohrer
  Sandy.Bohrer@hklaw.com
Brian W. Toth
  Brian.Toth@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Tel: (305) 374-8500
Fax: (305) 789-7799

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman (*pro hac* pending)
  laurahandman@dwt.com
Micah J. Ratner (*pro hac* pending)
  micahratner@dwt.com
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C. 20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

*Counsel for Defendants*

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     STATEMENT OF FACTS ............................................................................ 3

        A.      Facts Applicable to Personal Jurisdiction, Improper Venue, and Transfer ........... 3

        B.      Facts Applicable to the Motion to Dismiss for Failure to State a Claim ................ 7

                1.      Reliance on FBI Reports, Court Documents, and Congressional
                        Records for Allegations of Fake Software .................................................. 7

                2.      Reliance on FBI Reports and Court Documents for Allegations of
                        Rigged Demonstrations of Software to U.S. Government Officials......... 10

                3.      Complaint Allegations ............................................................................ 11

III.    ARGUMENT ................................................................................................ 12

        A.      The Court Lacks Personal Jurisdiction Over Risen and HMHC .......................... 12

        B.      The Court Should Dismiss or Transfer for Improper Venue ................................ 17

        C.      The Court Should Transfer Venue Under 28 U.S.C. § 1404(a)............................ 19

        D.      The Court Should Dismiss Under Rule 12(b)(6) Because Plaintiff Fails to
                Plead a Plausible Claim for Defamation or Other Related Torts.......................... 24

                1.      The Fair Report Privilege Protects the Statements at Issue ..................... 25

                2.      Many of the Challenged Statements Are Non-Actionable Opinion
                        and Rhetorical Hyperbole Protected by the First Amendment ................ 27

                3.      The Complaint Should Be Dismissed For Failure to Plausibly Plead
                        Actual Malice or Any Other Applicable Fault.......................................... 29

                4.      Montgomery's Other Tort Claims Fail on the Same Grounds.................. 30

IV.     CONCLUSION.............................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Adelson v. Harris*,
  973 F. Supp. 2d 467, 471 (S.D.N.Y. 2013), *questions certified*, 774 F.3d 803
  (2d Cir. 2014) ......................................................................................................29

*Algodonera De Las Cabezas S.A. v. Am. Suisse Capital, Inc.*,
  432 F.3d 1343 (11th Cir. 2005) .........................................................................19

*Alternate Energy Corp. v. Redstone*,
  328 F. Supp. 2d 1379 (S.D. Fla. 2004) ..........................................................13, 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................24, 29

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*,
  134 S. Ct. 568 (2013) ..........................................................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................24, 29

*Biro v. Condé Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013) ...............................................................29

*Bryant v. Avado Brands Inc.*,
  187 F.3d 1271 (11th Cir. 1999) ...........................................................................7

*Buckley v. New York Times Co.*,
  338 F.2d 470 (5th Cir. 1964) ..............................................................................13

*Busch v. Viacom International Inc.*,
  477 F. Supp. 2d 764 (N.D. Tex. 2007) ...............................................................16

*Calder v. Jones*,
  465 U.S. 783 (1984) ................................................................................13, 14, 15, 17

*Castellanos v. Pfizer, Inc.*,
  2008 WL 2323876 (S.D. Fla. May 29, 2008) .................................................22, 23

*Cellularvision Tech. & Telecomm., L.P. v. Alltel Corp.*,
  508 F. Supp. 2d 1186 (S.D. Fla. 2007) ........................................................19, 20, 21

*Chapin v. Knight-Ridder, Inc.*,
  993 F.2d 1087 (4th Cir. 1993) ............................................................................26

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991)................................................................30

*Coles v. Washington Free Weekly, Inc.*,
    881 F. Supp. 26 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996)..............25, 27

*Crane v. Ariz. Republic*,
    972 F.2d 1511 (9th Cir. 1992) ....................................................26

*Dameron v. Wash. Magazine, Inc.*,
    779 F.2d 736 (D.C. Cir. 1985) ...................................................26

*Delong Equip. Co. v. Washington Mills Abrasive Co.*,
    840 F.2d 843 (11th Cir. 1988) ...................................................17

*In re Dennis & Kathleen Montgomery*,
    No. 10-bk-18510 (Bankr. C.D. Cal.) ..............................................9

*Diario El Pais, S.L. v. Nielsen Co. (US), Inc.*,
    2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008)..........................................30

*Ditton v. Legal Times*,
    947 F. Supp. 227 (E.D. Va. 1996), *aff'd*, 129 F.3d 116 (4th Cir. 1997)................27

*Dorsey v. Nat'l Enquirer, Inc.*,
    973 F.2d 1431 (9th Cir. 1992) ....................................................27

*Dowd v. Calabrese*,
    589 F. Supp. 1206 (D.D.C. 1984) .................................................26

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ...........................................7, 24, 28, 30

*Fetter v. N. Am. Alcohols, Inc.*,
    2007 WL 551512 (E.D. Pa. Feb. 15, 2007) .........................................28

*Forbes v. Lenox Fin. Mortg. LLC*,
    2008 WL 2959727 (S.D. Fla. July 30, 2008).......................................18

*Foretich v. Chung*,
    1995 WL 224558 (D.D.C. Jan. 25, 1995)...........................................25

*Forras v. Rauf*,
    39 F. Supp. 3d 45, 56-57 (D.D.C. Apr. 18, 2014), *appeal pending*,
    No. 14-7070 (D.C. Cir. May 21, 2014)............................................30

*Global Relief Found. Inc. v. N.Y. Times*,
    390 F.3d 973 (7th Cir. 2004) ....................................................26

*Hakky v. Washington Post Co.*,
  2010 WL 2573902 (M.D. Fla. June 24, 2010)......................................................29

*Hargrave v. Washington Post*,
  2009 WL 1312513 (D.D.C. May 12, 2009), *aff'd*, 365 F. App'x 224
  (D.C. Cir. 2010) ....................................................................................................25

*Harper v. Walters*,
  822 F. Supp. 817 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994)..................26

*Heidbrink v. ThinkDirect Mktg. Grp., Inc.*,
  2014 WL 3585698 (M.D. Fla. July 21, 2014) ......................................................13

*Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*,
  669 F. Supp. 2d 1353 (S.D. Fla. 2009) ...................................................17, 18, 19

*Hoechst Celanese Corp. v. Nylon Eng'g Resins, Inc.*,
  896 F. Supp. 1190 (M.D. Fla. 1995).....................................................................16

*Hustler Magazine v. Falwell*,
  485 U.S. 46 (1988)................................................................................................30

*Ins. Co. of N. Am. v. Levin*,
  2011 WL 1398473 (S.D. Fla. Mar. 28, 2011), *report & recommendation
  adopted*, 2011 WL 2610754 (S.D. Fla. July 1, 2011)..........................................22

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)..............................................................................................12

*Jaisinghani v. Capital Cities/ABC, Inc.*,
  973 F. Supp. 1450 (S.D. Fla. 1997), *aff'd*, 149 F.3d 1195 (11th Cir. 1998)....................20, 23

*Jenkins Brick Co. v. Bremer*,
  321 F.3d 1366 (11th Cir. 2003) .....................................................................18, 19

*Jet Charter Serv., Inc. v. Coeck*,
  907 F.2d 1110 (11th Cir. 1990) ............................................................................12

*Keeton v. Hustler Magazine*,
  465 U.S. 770 (1984)..............................................................................................14

*Klayman v. Obama*,
  No. 1:13-cv-00851-RJL, ECF No. 129 (D.D.C. Mar. 20, 2015) ...........................20

*Lavin v. N.Y. News, Inc.*,
  757 F.2d 1416 (3d Cir. 1985)................................................................................26

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
  844 F.2d 955 (2d Cir. 1988)..................................................................................26

*Licciardello v. Lovelady*,
   544 F.3d 1280 (11th Cir. 2008) ........................................................................14

*Lieberman v. Fieger*,
   338 F.3d 1076 (9th Cir. 2003) ..........................................................................28

*Madara v. Hall*,
   916 F.2d 1510 (11th Cir. 1990) ........................................................................15

*Manuel v. Convergys Corp.*,
   430 F.3d 1132 (11th Cir. 2005) ........................................................................22

*Mason v. Smithkline Beecham Clinical Labs.*,
   146 F. Supp. 2d 1355 (S.D. Fla. 2001) ............................................................21

*McFarlane v. Esquire Magazine*,
   74 F.3d 1296 (D.C. Cir. 1996) ....................................................................14, 29

*Medico v. Time, Inc.*,
   643 F.2d 134 (3d Cir. 1981)..............................................................................26

*Metcalf v. KFOR-TV*,
   828 F. Supp. 1515 (W.D. Okla. 1992)...............................................................28

*Meterlogic, Inc. v. Copier Solutions, Inc.*,
   185 F. Supp. 2d 1292 (S.D. Fla. 2002) ..............................................19, 21, 22

*Michel v. NYP Holdings, Inc.*,
   2015 WL 1285309 (S.D. Fla. Mar. 4, 2015)
   (notice of appeal filed Apr. 3, 2015)................................................................23

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990).............................................................................................27

*Moldea v. N.Y. Times Co.*,
   15 F.3d 1137 (D.C. Cir. 1994) ..........................................................................28

*Moldea v. N.Y. Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994) ................................................................27, 28, 30

*N. Atl. Marine, Ltd. v. Sealine Int'l, Ltd.*,
   2007 WL 5298433 (S.D. Fla. Mar. 29, 2007).....................................................7

*Obsidian Fin. Grp., LLC v. Cox*,
   812 F. Supp. 2d 1220 (D. Or. 2011), *aff'd*, 740 F.3d 1284 (9th Cir. 2014)............................28

*Parisi v. Sinclair*,
   845 F. Supp. 2d 215 (D.D.C. 2012) ............................................................29, 30

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*,
    2010 WL 1408391 (M.D. Fla. Apr. 6, 2010),
    *aff'd*, 451 F. App'x 862 (11th Cir. 2012)...........................................................25

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)....................................................................................20

*Poncy v. Johnson & Johnson*,
    414 F. Supp. 551 (S.D. Fla. 1976) ..............................................................21, 22

*Q Int'l Courier, Inc. v. Seagraves*,
    1999 WL 1027034 (D.D.C. Feb. 26, 1999) ..................................................25, 26

*Remick v. Manfredy*,
    238 F.3d 248 (3d Cir. 2001)..........................................................................14

*Revell v. Lidov*,
    317 F.3d 467 (5th Cir. 2002) ......................................................................15, 16

*Reynolds v. Int'l Amateur Athletic Fed'n*,
    23 F.3d 1110 (6th Cir. 1994) .........................................................................17

*Rhodes v. Placer Cnty.*,
    2011 WL 1302240 (E.D. Cal. Mar. 31, 2011) ...................................................28

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012)...........................................................................29

*Sculptchair, Inc. v. Century Arts, Ltd.*,
    94 F.3d 623 (11th Cir. 1996) ........................................................................12

*Serian v. Penguin Grp. (USA), Inc.*,
    2009 WL 2225412 (N.D. W. Va. July 23, 2009)...............................................28

*Spelson v. CBS, Inc.*,
    581 F. Supp. 1195, 1203 (N.D. Ill. 1984), *aff'd*, 757 F.2d 1291 (7th Cir. 1985) ...................29

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)....................................................................................30

*Stern v. News Corp.*,
    2008 WL 10712037 (S.D. Fla. Aug. 26, 2008)..............................................20, 21

*Thomas v. News World Commc'ns*,
    681 F. Supp. 55 (D.D.C. 1988) ......................................................................28

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964) ....................................................................................19

*Wai v. Rainbow Holdings*,
   315 F. Supp. 2d 1261 (S.D. Fla. 2004) ..................................................................17

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014) ...............................................................................16, 17

*Washington v. Smith*,
   80 F.3d 555 (D.C. Cir. 1996) ...........................................................................27

*Weinstein v. Friedman*,
   859 F. Supp. 786 (E.D. Pa. 1994) ....................................................................21

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) .........................................................................28

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) ................................................................25, 26, 27

*Windmere Corp. v. Remington Prods., Inc.*,
   617 F. Supp. 8 (S.D. Fla. 1985) .......................................................................21

*Yohe v. Nugent*,
   321 F.3d 35 (1st Cir. 2003)...........................................................................26, 27

**State Cases**

*Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*,
   57 P.3d 1178 (Wash. Ct. App. 2002), *amended*, 64 P.3d 49
   (Wash. Ct. App. 2003) ...............................................................................25, 27

*Bishop v. Fla. Specialty Paint Co.*,
   389 So. 2d 999 (Fla. 1980).........................................................................22, 23

*Fikes v. Furst*,
   61 P.3d 855 (N.M. Ct. App. 2002).....................................................................28

*Huszar v. Gross*,
   468 So. 2d 512 (Fla. 1st DCA 1985) ..................................................................25

*O'Brien v. Franich*,
   575 P.2d 258 (Wash. App. Ct. 1978)..................................................................26

*Quinn v. Jewel Food Stores, Inc.*,
   276 Ill. App. 3d 861 (Ill. App. Ct. 1995) .............................................................29

*Rojas v. Debevoise & Plimpton*,
   634 N.Y.S.2d 358 (N.Y. Sup. Ct. 1995) ..............................................................28

*Sahara Gaming Corp. v. Culinary Workers Union Local*,
    984 P.2d 164 (Nev. 1999) ...................................................................................25

*Shaw v. Palmer*,
    197 S.W.3d 854 (Tex. Ct. App. 2006) ................................................................28

*Sipple v. Found. for Nat'l Progress*,
    83 Cal. Rptr. 2d 677 (Cal. Ct. App. 1999) .........................................................26

*Solers, Inc. v. Doe*,
    977 A.2d 941 (D.C. 2009) ...................................................................................30

*Stepien v. Franklin*,
    528 N.E.2d 1324 (Ohio Ct. App. 1988) ..............................................................28

*Stewart v. Sun Sentinel Co.*,
    695 So. 2d 360 (Fla. 4th DCA 1997) ..............................................................24, 25

*Yauncey v. Hamilton*,
    786 S.W.2d 854 (Ky. 1989) .................................................................................29

**Federal Statutes**

28 U.S.C.
    § 1391.................................................................................................................18
    § 1391(b)............................................................................................................18
    § 1391(b)(1).......................................................................................................18
    § 1391(b)(2).......................................................................................................18
    § 1391(b)(3).......................................................................................................19
    § 1391(e)............................................................................................................18
    § 1404(a)........................................................................................................1, 19
    § 1406(a)...................................................................................................1, 17, 18

**State Statutes**

Cal. Civ. Code
    § 47(d)...............................................................................................................25
    § 47(e)...............................................................................................................25

D.C. Code §§ 16-5501-5505 ....................................................................................24

Fla. Stat. § 48.193(2)................................................................................................13

**Rules**

Fed. R. Civ. P.
    12(b)(2).........................................................................................................1, 16
    12(b)(3).........................................................................................................1, 17
    12(b)(6)...................................................................................................... *passim*

**Other Authorities**

Restatement (Second) of Conflict of Laws §§ 6, 145-146............................................................23

**MOTION TO DISMISS OR TRANSFER AND REQUEST FOR HEARING**

Defendants James Risen ("Risen"), Houghton Mifflin Harcourt Publishing Co. ("HMH"),

and Houghton Mifflin Harcourt Company ("HMHC"), improperly sued as HMH Holdings, Inc.

(together "HMH Companies"), through undersigned counsel, respectfully move this Court for an

Order: (1) dismissing or transferring this action to the U.S. District Court for the District of

Columbia for lack of personal jurisdiction over Risen and HMHC under Fed. R. Civ. P. 12(b)(2);

(2) dismissing or transferring this action for improper venue under Fed. R. Civ. P. 12(b)(3) and

28 U.S.C. § 1406(a); (3) transferring this action under 28 U.S.C. § 1404(a); or (4) dismissing the

complaint with prejudice under Fed. R. Civ. P. 12(b)(6).[1]  Defendants request a hearing due to

the number of motions, and the complexity and number of issues involved.

## I.      PRELIMINARY STATEMENT

Plaintiff Dennis Montgomery brings this libel action against Pulitzer Prize-winning

author James Risen, who works and lives in the Washington, D.C. ("D.C.") area, and his

publisher HMH, a Massachusetts company headquartered in Boston, arising from statements in

Chapter 2 of his book, *Pay Any Price: Greed, Power, and the Endless War* (the "Book"), that

report allegations that Montgomery perpetrated a fraud on the federal government – allegations

widely published in articles as far back as 2008, that were never the subject of a libel claim until

now.  The Court should dismiss or transfer to the district court in D.C. for the following reasons:

*First*, this Court lacks personal jurisdiction over Risen and HMHC, which is merely a

holding company in Delaware.  Risen is a Maryland resident who works for the *New York Times*

in its D.C. bureau.  Montgomery does not assert general jurisdiction, and none exists here.  The

Court lacks specific jurisdiction over Risen because Risen did not expressly aim the story about

---

[1]  If the Court does not grant the relief above, it should grant the concurrently filed Special
Motion to Dismiss Under the D.C. Anti-SLAPP Statute and Memorandum of Law in Support.

Montgomery at Florida and Florida was not the focal point of the tort nor the brunt of the alleged harm.  Risen did not rely on Florida sources, gather information for the story chapter in Florida, or even reference Florida.  The focal point of the chapter is D.C., where Montgomery's reputation as a government contractor lies, where many of the sources are located, and where Risen gathered documents, interviewed sources, and wrote the chapter.  Nor may Montgomery manufacture jurisdiction based on his own alleged contacts – if any – with Florida.  Montgomery did not reside in Florida at the time the Book was published – it is at best unclear whether he does so now.  His recent filings suggest he lives outside Seattle.

*Second*, the Court should dismiss or transfer for the independent reason that venue is improper here.  Montgomery failed to meet his burden to show proper venue because the bases for venue he alleges – a district where defendants reside and a provision that applies only to federal government – do not apply here.  Since a substantial part of the events giving rise to the claim did not occur in Florida – indeed, no events occurred in Florida – venue is not proper here.

*Third*, the Court may transfer venue for convenience of witnesses and parties.  The chapter focuses on D.C., most of the witnesses and documents are in the D.C. area, and, under Florida choice-of-law principles, D.C. law applies.  Thus, the Court should transfer this action to D.C., where Risen is located.

*Fourth*, if the Court does not dismiss or transfer for the above reasons, Montgomery's Complaint should be dismissed because he fails to state a claim under Rule 12(b)(6):

a)      Montgomery's Complaint is barred by the fair report privilege.  The privilege protects the Chapter, which accurately summarized official documents, including FBI reports, court records, and statements in the Congressional Record – all of which alleged that Montgomery rigged demonstrations and provided bogus software to the federal government.

     b)     Other statements Montgomery challenges are non-actionable expressions of opinion and rhetorical hyperbole, not verifiable statements of fact.  That the hoax Montgomery allegedly perpetuated was "crazy," that he was motivated by "greed" and been accused of being a "con artist," are all subjective opinions protected by the First Amendment.

     c)     The Complaint should also be dismissed because Plaintiff, a limited purpose public figure, has not and cannot plausibly plead adequate facts to support actual malice.

     d)     Montgomery's other tort claims fail for the same reasons as the libel claims.

## II.     STATEMENT OF FACTS

*Pay Any Price* is a nine-chapter book that describes how the war on terror led to waste, fraud, and abuse by U.S. government officials and the contractors who stood to gain from it. Chapter 2 of the Book titled *The Emperor of the War on Terror* (the "Chapter") focuses on how, after the terrorist attacks of September 11, 2001, government officials were willing to accept any intelligence – no matter how suspect – that might prevent the next terrorist attack.  In that context, Risen recounts Montgomery's story retreading ground covered by previous media reports, most notably a 2010 *Playboy Magazine* feature titled *The Man Who Conned the Pentagon* ("Playboy Article"), which revealed the central allegations Montgomery now challenges, and a 2011 *New York Times* article titled, *Hiding Details of Dubious Deal, U.S. Invokes National Security*, which Risen co-authored ("New York Times Article"), attached as Exhibits 1 and 2, respectively, to the Declaration of Laura Handman ("Handman Decl.").

### A.     Facts Applicable to Personal Jurisdiction, Improper Venue, and Transfer

Risen has *no* connections to Florida that would give rise to personal jurisdiction over him.  Risen is not a Florida resident; he is a Maryland resident who works for the New York Times in its D.C. bureau.  (Risen Decl. ¶¶ 2, 3.)  HMH, the publisher of the Book, is incorporated in Massachusetts and has its principal place of business in Boston.  Its parent

company, HMHC improperly sued as HMH Holdings, Inc., is a Delaware company, is merely a

holding company, and is not authorized to do business in Florida.  (Compl. ¶¶ 7-9; Handman

Decl. Ex. 3.)

Risen gathered documents and information, including about Montgomery, while working

in D.C. and Maryland.  (Risen Decl. ¶¶ 2, 8.)   Risen did much of the newsgathering for the

Chapter about Montgomery for his earlier New York Times Article, published February 19,

2011, that he co-authored with Eric Lichtblau, also in the D.C. bureau of the *New York Times*.

(*Id.* ¶ 8.)  For the Chapter, Risen interviewed Montgomery by phone and email apparently while

Montgomery lived in California and/or Washington State ("Washington").  (*Id.* ¶ 6.)

Nothing discussed in the Chapter took place in Florida.  The two businesses with which

Montgomery was involved, eTreppid and Blxware, and which were the subject of Risen's

reporting, were based in Nevada and Washington, respectively.[2]  When Montgomery became

involved with eTreppid, the Book says that Montgomery lived in Nevada.  (Book at 35.)  Key

events discussed in the Chapter took place in Nevada.[3]  At the time Montgomery was involved

with Blxware, the Chapter describes a demonstration of his software at a warehouse in Palm

Springs, California (*id.* at 52).  Government officials mentioned in the Chapter who discussed

and took action based on Montgomery's software, were in the D.C. area at the CIA, Air Force,

the White House, and Congress (*id.* at 39, 51, 52, 53).  The Chapter discusses the high-powered

D.C. lobbyist hired to secure contracts for Montgomery's software (*id.* at 38), the high-powered

---

[2]  eTreppid Technologies, LLC ("eTreppid") was a Nevada corporation headquartered in Reno, http://nvsos.gov/sosentitysearch/CorpDetails.aspx?lx8nvq=9ugC9Jz33%252bzPvBGw4H3zqw%253d%253d&nt7=0).  Blxware, LLC was a Delaware corporation headquartered in Bellevue, Washington (https://delecorp.delaware.gov/tin/controller, last visited Mar. 30, 2015).
[3]  These include: a meeting with CIA officials (*id.* at 40, 41); a meeting with an Air Force colonel (*id.* at 36); a dinner with a member of congress who became governor of Nevada, Jim Gibbons, later cleared of bribery charges pressed by Montgomery (*id.* at 38-39); claims by Montgomery of access to Predator drone information from an Air Force base in Nevada (*id.* at 48, 51); and his arrest for passing bad checks at casinos in Nevada (*id.* at 52).

D.C. lawyer who represented Gibbons (*id.* at 50), and the later litigation between Montgomery and his partners out west.

Risen (and Lichtblau) interviewed key sources – who are also potential witness – located in or near D.C., California, New York, and Washington by phone, email, or in person.  (Risen Decl. ¶ 8.)  Past and current Government witnesses and documents are located in or within a 100-mile radius of D.C., including: current and former CIA officials and CIA press spokespersons, some of whom provided information to Risen showing that Montgomery's software was bogus, and Donald Kerr, then chief of the CIA's Science and Technology Directorate; Joseph Liberatore, an Air Force official, who believed in Montgomery's work; John Brennan, then head of the Terrorist Threat Integration Center, now CIA Director, who passed on Montgomery's intelligence and then concluded it was "inaccurate"; George Tenet, then CIA Director who a CIA source in Chapter 2 says "allowed [scientists] to circumvent the CIA's normal reporting and vetting channels, and rushed the raw material fed to the agency by Montgomery directly to the president"; and Samantha Ravich, then advisor to Vice President Dick Cheney, who pressed Montgomery for proof that his software worked.  (*Id.* ¶ 10.)  Other important witnesses are Michael Flynn, Montgomery's former lawyer, who is located in California, and Tim Blixseth, the ex-husband of Montgomery's former business partner, who is located in Washington.  (*Id.* ¶ 13.)  No one is in Florida.  (*Id.*)

With the possible exception of one contact with a spokesperson at Special Operations Command, Risen did not have any contact with Florida, whether by telephone, written communications, or in person, in either preparing the Chapter or in connection with the interviews he has given to promote the Book.  (*Id.* ¶ 9.)  Neither the Chapter about Montgomery nor the television and radio interviews promoting the Book mention Florida and, indeed, Risen had no reason to believe Montgomery had any connection to Florida.  (*Id.* ¶ 14.)

In fact, the first Risen and HMH heard of any supposed connection with Florida was in the Complaint, filed February 24, 2015, that alleges Montgomery is "a citizen of Florida." (Compl. ¶ 6.)  Montgomery does not allege that he resides or is domiciled in Florida and refuses to disclose his address for "security reasons" (Compl. at 1 n.1), speculating that the Book caused him, "in effect," to be subject to a "fatwah" from "foreign terrorists sworn to attack those assisting the U.S. military and the Government."  (*Id.* ¶ 82.)

Indeed, based on public records, Plaintiff has no indicia of domicile or residency in Florida.  It appears he does not own property, have a driver's license, or pay taxes in Florida, and has not registered to vote in Florida.  (Handman Decl. Ex. 6.)  In fact, it appears that he is still a resident of Washington.  On June 10, 2014, a journalist wrote about meeting Montgomery at his residence in Yarrow Point, Washington.[4]  On February 18, 2015, a Western District of Washington judge issued an order requiring Montgomery and his wife to vacate their property in Yarrow Point by April 1, 2015.[5]  This order suggests that Montgomery actually resided in Washington when he alleged in his Complaint on February 24, 2015 that he was a "citizen of Florida."  (Compl. ¶ 6.)  According to Montgomery's latest filing in this case on March 24, 2015, he is under the care of a doctor in Seattle.  (ECF No. 9-1, at 3.)

Montgomery pleads in support of jurisdiction in Florida that "the most recent commercial opportunities for the Plaintiff's work were contract and projects made available through military bases and Government facilities in Florida (Compl. ¶ 4), but gives no specifics as to who, what or where.  Given Plaintiff's own allegations of ill health and continuing medical treatment in Seattle, it is hard to imagine he currently lives or works in Florida.  (ECF No. 9-1, at 3.)  Finally,

---

[4] (Handman Decl. Ex. 5, Rick Anderson, *Seattleland: Sheriff Joe Arpaio's Yarrow Point Connection*, Seattle Weekly, at 1, June 10, 2014 ("June 2014 Article").)

[5] (Handman Decl. Ex. 6, Order, *Montgomery v. NV Mortg. Inc.*, No. 2:13-cv-00360-RAJ, ECF No. 66, at 2 (W.D. Wash. Feb. 18, 2015).)

Plaintiff asserts that a substantial portion of the harm occurred in Florida, stating that because "Florida is the third (3rd) largest state by population," "a huge and substantial portion of the nationwide harm has occurred in Florida." (*Id.* ¶ 5.)  By that logic, Florida, by virtue of its population, would have jurisdiction over every author whose work enjoyed nationwide distribution.  That is clearly not the law.

**B.       Facts Applicable to the Motion to Dismiss for Failure to State a Claim**

Risen expressly acknowledges in the Chapter that he relied on the Playboy Article and New York Times Article.  (Book at 53.)  These and the other articles – never retracted, much less the subject of a lawsuit – all track what Risen wrote in the Chapter.  What Risen added to the narrative was Montgomery's denials, obtained after interviewing him. (*Id.* at 33-34, 37, 51, 53). As with his New York Times Article and prior media accounts, Risen primarily based the Chapter on court records and other official documents. [6]

**1.       Reliance on FBI Reports, Court Documents, and Congressional Records for Allegations of Fake Software**

The Book refers to FBI interviews of Warren Trepp, Montgomery's partner in the software venture, eTreppid, and its employees.  The Book expressly states that, "according to court documents that include his statements to the FBI," Montgomery's software was fake because "Trepp later told the FBI that he eventually learned that Montgomery had no real computer software pro-

---

[6]  The Court may consider documents subject to judicial notice, such as news articles and court and congressional records, without converting this motion into one for summary judgment.  *N. Atl. Marine, Ltd. v. Sealine Int'l, Ltd.*, 2007 WL 5298433, at *4 (S.D. Fla. Mar. 29, 2007) (Martinez, J.) ("'[t]he Eleventh Circuit has held that, when considering a 12(b)(6) motion to dismiss, a court may take judicial notice of the public record, without converting the motion to one for summary judgment'") (citing *Bryant v. Avado Brands Inc.*, 187 F.3d 1271, 1279-80 (11th Cir. 1999)); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles" on a Rule 12(b)(6) motion).

gramming skills." (Book at 37.)[7] Similarly, the Book accurately quotes statements in FBI reports

in which an eTreppid employee Sloan Venables began to suspect Montgomery's software was fake.

Venables "*told the FBI* that another employee, Patty Gray, began to suspect that Montgomery 'was

doing something other than what he was actually telling people he was doing'" and "added *in his*

*statement to the FBI* that he knew that 'Montgomery promised products to customers that he had

not been completed or even assigned to programmers.'" (Book at 48-49) (emphasis added).

Then, citing court documents, the Book states:  "Over the Christmas holidays [of 2005],

Montgomery allegedly went into eTreppid's offices and deleted all of the computer files

containing his source code and software development data, *according to court documents*."

(Book at 49) (emphasis added).  Later, "*[a]ccording to court documents*, [Trepp] *told the FBI*

that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts" but

"[a]s federal investigators moved in to investigate the alleged theft of the technology, they heard

from Trepp and others that Montgomery's alleged technology wasn't real."  (*Id.*) (emphasis

added).  The Book correctly summarizes FBI reports contained in court records showing that the

technology "wasn't real."  (*Id.*)[8]

The Book also recounts how Montgomery's later benefactor and business partner at

Blxware, Edra Blixseth, was "going through an extremely bitter divorce, and Montgomery

---

[7]  The FBI report contained in court records states, "recently Trepp has found out that
Montgomery's skills may not be what he has purported them to be. Trepp cited a recent Air
Force Office of Special Investigation Inquiry, which determined that Montgomery's
programming skills were not what he alleged." (Handman Decl. Ex. 7, Gov't's Compliance with
Ct. Order, FBI Report, Interview of Warren Trepp, at 4, *In re Search Warrant*, No. 06-cv-263
(D. Nev. Sept. 11, 2006) ("FBI Report"), ECF No. 70-5.)
[8]  An eTreppid employee, "Gray said that on 21 Dec 2005 . . . she told Trepp that she had reason
to believe [Montgomery] had not written significant software for the company."  (FBI Report,
Interview of Gray, at 3, ECF No. 70-8.)  Another employee, "Anderson also informed Trepp that
[Montgomery] was using open source to develop eTreppid Source Code, [Montgomery] was dis-
honest," and that "he had suspicions that [Montgomery] was less technically competent than he
led people to believe."  (FBI Report, Interview of Anderson, at 5-6, ECF No. 70-8.)

became caught up in their legal battles." (Book at 52.) "Mysteriously, government lawyers sometimes sought to intervene in their court cases . . . to keep classified information stemming from Montgomery's work with the intelligence community out of the public records." (*Id.*) In those public court records, Edra's ex-husband, Tim Blixseth, alleged the fraud in an affidavit, stating: "Montgomery and Edra Blixseth have engaged in an extensive scheme to defraud the U.S. Government," a "fraud [that] involves Mr. Montgomery's purported 'noise filtering software technology,' which "does not exist, yet has been used repeatedly by Edra Blixseth and Montgomery to commit financial frauds . . . ."[9] Michael Flynn, Montgomery's former attorney, stated in an affidavit that, "Based upon personal knowledge, and information and belief, Blxware possesses no marketable technology, the technology as represented does not exist[.]"[10]

The Book then recounts that Montgomery's gambling and other debts led to bankruptcy and his arrest for passing bad checks. (Book at 34.) In that bankruptcy proceeding, Flynn told Montgomery in a deposition that "I know you conned me and you conned the U.S. Government. . . . You're a computer hacker and you're a fraud, Mr. Montgomery."[11]

The Book also expressly relies on congressional records to confirm that Montgomery's software was fake. The Book explains that "[a]t the time of the Christmas 2003 scare, John Brennan was the head of the Terrorist Threat Integration Center," which "meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration." (Book at 47.) The Book states that, "[i]n 2013, while the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a

---

[9]  (Handman Decl. Ex. 8, Suppl. Aff. of Timothy L. Blixseth ¶¶ 4, 6, *In re Yellowstone Mountain Club, LLC*, No. 08-61570 (Bankr. Mont. Jan. 17, 2011), ECF No. 2117.)

[10]  (Handman Decl. Ex. 9, Aff. of Michael J. Flynn at 10, *In re Yellowstone Mountain Club, LLC*, No. 09-00014 (Bankr. Mont. Mar. 1, 2006), ECF No. 473-1.)

[11]  (Handman Decl. Ex. 10, Nov. 18, 2010 Dennis L. Montgomery Dep. Tr. at 230, *In re Dennis & Kathleen Montgomery*, No. 10-bk-18510 (Bankr. C.D. Cal.).)

Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a written question to Brennan about his role in the intelligence community's dealings with Montgomery." (*Id.*) Indeed, Senator Chambliss' written question titled "Bogus Intelligence," states that "[m]edia reports indicate that when you led the Terrorist Threat Integration Center (TTIC), you championed a program involving IT contractors in Nevada who claimed to intercept al-Qaida targeting information encrypted in the broadcasts of TV news network Al Jazeera."[12] The written questions confirm in the congressional record that not only "[t]he media" but "*documents we have reviewed show*, that CIA officials derided the contractor's information, but nonetheless, you passed it the White House and alert levels ended up being raised unnecessarily." (*Id.*) (emphasis added). Accurately quoting Brennan's response, the Book states that, "[i]n response": (1) "Brennan denied that he had been an advocate for Montgomery and his technology"; (2) "insisted that the Terrorism Threat Integration Center was merely a recipient of the information and data, which had been passed on by the CIA"; (3) he "included Montgomery's data 'in analytic products'"; and (4) confirmed that Montgomery's purported software "'was determined *not to be a source of accurate information*.'" (Book at 47) (quoting Brennan Response at 9) (emphasis added).

### 2. Reliance on FBI Reports and Court Documents for Allegations of Rigged Demonstrations of Software to U.S. Government Officials

The Book also explicitly relies on court records and FBI reports, in which "Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit." (Book at 37.) Indeed, "Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone." (*Id.*) Then "[a]fter he was in place in the field, he used a

---

[12] (Handman Decl. Ex. 11, Questions for the Record, Mr. John Brennan, Questions from the Vice Chairman, Responses to Post-Hearing Questions, at 9 (2013).

hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key

on a computer keyboard, which in turn flashed an image of a bazooka on another screen

prominently displayed in front of the military officers standing in another room, *according to*

*court documents*." (*Id.*) (emphasis added).  Thus, "[t]he military officers were convinced that

Montgomery's computer software had amazingly detected and recognized the bazooka in

Montgomery's hands." (*Id.*)  The Book includes Montgomery's denials. (*Id*. 15, 37.)  Once

again, the Book accurately describes the FBI report contained in court documents.[13]

### 3.   Complaint Allegations

Montgomery's 56-page, 252-paragraph Complaint boils down to one central allegation:

that Risen and HMH defamed him by publishing that he defrauded the federal government by

peddling bogus software.[14]  In particular, Montgomery takes issue with statements that his soft-

ware, which supposedly decoded hidden Al Qaeda messages in Al Jazeera broadcasts, was a

sham, and that the intelligence he passed on to federal agencies led the White House to raise the

terrorist threat level in late 2003, ground international flights, and consider shooting down

transatlantic flights.[15]  Montgomery also challenges recitation of allegations former eTreppid

employees made in FBI investigative reports that Montgomery rigged demonstrations of his

---

[13] "Trepp recently learned that Montgomery would require eTreppid employees to falsify the results of live demonstrations for its customers.  Jesse Anderson, a programmer for eTreppid, told Trepp that Montgomery would require Anderson and Jim Bauder, another eTreppid employee, to go into an office at eTreppid while Montgomery was out in a nearby field with a toy bazooka to demonstrate eTreppid's recognition software capabilities.  Montgomery instructed Anderson and Bauder to go into a room and wait to hear a noise on their cell phone and then instructed them to press a button on a computer keyboard that would display an image of a bazooka on the computer screen viewed by the customers, including Department of Defense employees.  Trepp advised that the Department of Defense employees were at the demonstration to make a judgment regarding the purchase of this technology."  (FBI Report, Interview of Warren Trepp, at 4, ECF No. 70-5.)

[14] (Compl. ¶¶ 106, 108, 110, 113, 165, 168, 186, 188, 190, 192, 194, 196, 198, 200, 202, 203, 205, 214, 216, 218, 220.)

[15] (*Id.* ¶¶ 93, 98, 101, 112, 115, 117, 119.)

object recognition software.  (Compl. ¶¶ 108, 110.)  He takes issue with the statements that

Montgomery's "lawyer 'concluded that Montgomery was a fraud,'" and "that out of 'greed'

Plaintiff Montgomery 'create[d] a rogue intelligence operation with little or no adult supervision'

which was 'crazy' and that he was 'someone who has been accused of being a con artist.'"  (*Id.*

¶ 96, 106; *see id.* ¶ 178.)

### III.    ARGUMENT

#### A.    The Court Lacks Personal Jurisdiction Over Risen and HMHC

Plaintiff fails to allege, much less demonstrate, facts under which this court could assert

personal jurisdiction over Risen.  The court analyzes whether it has personal jurisdiction over a

nonresident defendant under a two-part test.  *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623,

626 (11th Cir. 1996).  *First*, the court examines Florida's long-arm statute.  *Id.*  *Second*, the court

must determine whether sufficient minimum contacts exist between the defendant and Florida

such that jurisdiction over the defendant comports with "traditional notions of fair play and

substantial justice" under the Due Process Clause.  *Id.* (quoting *Int'l Shoe Co. v. Washington*,

326 U.S. 310, 316 (1945)).  Minimum contacts only exist when: (1) the contacts arise from or

relate to the cause of action; (2) the defendant purposefully avails himself of the privilege of

conducting activities within the forum, thus invoking the benefits and protections of its laws; and

(3) the defendant's contacts within the forum demonstrate that he reasonably anticipated being

hauled into court there.  *Id.* at 631.

The plaintiff bears the initial burden.  If the plaintiff establishes a *prima facie* case of

personal jurisdiction through the allegations of his complaint, the defendant may challenge those

allegations through affidavits, shifting the burden back to the plaintiff to prove jurisdiction.

*Sculptchair*, 94 F.3d at 627 (quoting *Jet Charter Serv., Inc. v. Coeck*, 907 F.2d 1110, 1112 (11th

Cir. 1990)).  If the defendant sustains its burden, the plaintiff must substantiate the jurisdictional

allegations by affidavits or other competent proof, not merely repeat allegations in the complaint.

Here, Montgomery does not allege that general jurisdiction exists over Risen or HMHC

under Fla. Stat. § 48.193(2), but, rather, attempts to assert specific jurisdiction, claiming that:

(1) "[t]he Causes of Action and injuries" occurred in Florida and worldwide; (2) "some of the

most recent commercial opportunities for the Plaintiff's work were contract and projects made

available through military bases and Government facilities in Florida"; (3) "a huge and

substantial portion of the nationwide harm has occurred in Florida"; and (4) he is a "citizen of

Florida."  (Compl. ¶¶ 3-6.)   These allegations are insufficient to establish personal jurisdiction

over Risen or HMHC[16] under due process.

Nationwide circulation of a book and broadcast of interviews are insufficient to confer

personal jurisdiction.  *See Buckley v. New York Times Co.*, 338 F.2d 470, 474 (5th Cir. 1964)

(holding "mere circulation" of national newspaper and "sporadic news gathering by reporters on

special assignment" in the forum do not satisfy due process); *Alternate Energy Corp. v.*

*Redstone*, 328 F. Supp. 2d 1379, 1383 (S.D. Fla. 2004) ("[U]nder *Calder*, the mere fact that

allegedly libelous statements appeared in a publication sold to Florida residents is not sufficient

to give a defendant fair warning that he may be hauled into court here.").

For jurisdiction to exist in Florida, Risen himself must have engaged in intentional conduct

outside of Florida calculated to cause injury to Montgomery in Florida.  In *Calder v. Jones*, a

---

[16] Plaintiff's allegation that HMHC is the parent company and owner of the publisher is
insufficient, as a matter of law to subject HMHC – a Delaware company not authorized to
conduct business in Florida – to personal jurisdiction in Florida.  Indeed, "Florida law is clear
that the relationship of parent-subsidiary alone is insufficient to confer personal jurisdiction over
the foreign parent corporation in the forum in which the subsidiary acts." *Heidbrink v.*
*ThinkDirect Mktg. Grp., Inc.*, 2014 WL 3585698, at *3 (M.D. Fla. July 21, 2014) (collecting
cases).  Plaintiff does not – and could not – allege that facts to pierce the corporate veil to subject
HMHC to jurisdiction in Florida based on HMH's actions.

reporter for the *National Enquirer* and its president and editor argued that California lacked

jurisdiction over them for an article published in California, but prepared in Florida.  The Supreme

Court found that, at the time the article was written and edited, defendants were well aware that

plaintiff, Hollywood star Shirley Jones, resided in California, her career was centered in Holly-

wood, and the *National Enquirer* had a substantial circulation there.  Moreover, in the course of

their newsgathering for the story, they had extensive contact with California.  The Court found that

because the reporter and editor were "primary participants in an alleged wrongdoing intentionally

directed at a California resident, and jurisdiction over them is proper on that basis."  465 U.S. 783,

789 (1984).[17]  As the Eleventh Circuit explained, the "*Calder* effects test for personal jurisdiction"

requires (1) "the commission of an intentional tort," (2) "expressly aimed at a specific individual in

the forum" (3) "whose effects were suffered in the forum."  *Licciardello v. Lovelady*, 544 F.3d

1280, 1288 (11th Cir. 2008).  In *Calder*, "defendants knew that the 'brunt of the harm' . . . would

be suffered in California" and "California was the focal point of the tort" so "jurisdiction was

proper there."  *Id.* at 1285-86.  *Accord Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001).

 Here, in contrast to *Calder*, none of the newsgathering was done in Florida, the "focal

point" of Risen's chapter was Montgomery's alleged fraud on the federal government by selling

bogus terrorist detection software from companies located in Nevada and Washington and in a

warehouse in California.  Risen's references to Montgomery were "expressly aimed" at CIA,

Pentagon and White House officials who were based in the D.C. area.  Nothing in the Chapter

about Montgomery or Risen's remarks on television and radio programs were specifically

directed at Florida and none of Risen's information gathering (with the possible exception of one

---

[17]  The Court must assess Risen's contacts with Florida separately from the publisher and
holding company.  *E.g.*, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996)
("The writer is not the publisher; [the writer's] contacts must be assessed separately.") (citing
*Keeton v. Hustler Magazine*, 465 U.S. 770, 781 n.13 (1984)).

contact with a Special Operations Command spokesperson) was conducted in Florida.  (Risen

Decl.  ¶ 14.)  The "brunt of the harm," if any, would be felt by Montgomery in D.C., where

government intelligence and military officials make contracting decisions, or in Nevada or

California where Montgomery lived and worked when the alleged fraud took place, or

Washington where he lived when the Book was published.  Contrary to Plaintiff's allegation, the

"brunt of the harm" could not occur in Florida and Florida was not the focal point – indeed,

Risen was not aware of the Florida connection Montgomery now claims.  (*Id.* ¶ 7.)

     The facts here have even less connection with the forum jurisdiction than those that have

been found inadequate to satisfy due process in other defamation cases.  For example, in *Madara*

*v. Hall*, 916 F.2d 1510 (11th Cir. 1990), the Eleventh Circuit affirmed dismissal of a defamation

action brought in Florida against singer Daryl Hall for his comments quoted in a nationally

distributed trade publication about working with plaintiff who, Hall said, was "a small-time . . .

guy" and Hall was "bein' *screwed* by him, basically."  *Id*. at 1513.  Hall had performed in

Florida fewer than eight times during the relevant timeframe.  Although his musical recordings

were widely distributed in Florida and he was an investor in several limited partnerships owning

realty in Florida, he had no agents there and did not have an office there.  These facts, coupled

with limited distribution of the trade publication in Florida, persuaded the court that "to subject []

Hall to the jurisdiction of a Florida court in this case would offend due process."  *Id*. at 1519.

     In *Revell v. Lidov*, a professor based in Massachusetts authored an article he posted on a

New York website arguing that plaintiff, a former Associate Director of the FBI residing in

Texas, conspired with senior Reagan administration officials to refuse to stop a terrorist bombing

and to cover up the conspiracy.  317 F.3d 467, 469 (5th Cir. 2002).  Plaintiff sued for libel in

Texas, and the Fifth Circuit affirmed dismissal for lack of personal jurisdiction distinguishing

*Calder*.  It held that the forum was not the "focal point" of the article, where, as here, the author

did not know plaintiff resided in the forum, the article did not mention the forum, and no newsgathering occurred in the forum. *Id.* at 473-75.  Because the article was about the federal government's alleged failure to stop terrorism and its cover up – just as here where the Chapter addresses fraud in federal government contracting concerning terrorism detection and a cover up – "[i]f the article had a geographic focus it was Washington, D.C." *Id.* at 476.

Similarly, in *Busch v. Viacom International Inc.*, a Texas district court found no personal jurisdiction in Texas over Jon Stewart – the host of *The Daily Show* whose interview with Risen in New York is also a claim in this case (Compl. ¶¶ 31, 125-127) – because, as here, "[t]he piece was not directed at viewers of *The Daily Show* in Texas, but was broadcast nationwide." 477 F. Supp. 2d 764, 772-73 (N.D. Tex. 2007).  Residence by the plaintiff in the forum state and circulation of allegedly defamatory statements there were insufficient to confer jurisdiction. *Id.*[18]

Plaintiff also cannot create personal jurisdiction over Risen based on Plaintiff's ***own*** rela-tionships to Florida, which are tenuous at best.  As the Supreme Court recently made clear, "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014).  A defendant's "suit-related conduct" must have a "substantial connection" to the forum; "random, fortuitous, or attenuated contacts" with "persons affiliated with the State" are not sufficient, and a plaintiff's own contacts with the forum "cannot be decisive." *Id.* at 1121-1123.

Here, Plaintiff claims jurisdiction in Florida "because some of the most recent commercial opportunities for the Plaintiff's work were contract and projects made available through military bases and Government facilities in Florida." (Compl. ¶¶ 4.)  Even if these

---

[18]  *See also Redstone*, 328 F. Supp. 2d at 1383 (dismissing under Rule 12(b)(2) when "there is no indication that Defendant 'expressly aimed' its publication at the state of Florida"); *Hoechst Celanese Corp. v. Nylon Eng'g Resins, Inc.*, 896 F. Supp. 1190, 1195 (M.D. Fla. 1995) (dismissing under Rule 12(b)(2) even though libel claim was brought by a company headquartered in Florida arising out of an interview in Ohio that circulated to subscribers here).

allegations were true and the key decision makers were actually in Florida and not in D.C., this is precisely the logic rejected by *Walden* as "impermissibly allow[ing] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* at 1125; *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1118 (6th Cir. 1994) (holding in libel action that no jurisdiction existed over defendant based in England because plaintiffs' Ohio residence was "merely fortuitous" and plaintiffs' action "unilateral"). Rather, personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum." *Walden*, 134 S. Ct. at 1122 (citation omitted). Unlike *Calder*, Risen's suit-related conduct had nothing to do with Florida.

For these reasons, this Court should dismiss the action as to Risen and HMHC for lack of personal jurisdiction in Florida. In the alternative, the Court should transfer this action as to all defendants, so the action may proceed in one court, to the U.S. District Court for the District of Columbia where personal jurisdiction over both defendants would lie.

### B. The Court Should Dismiss or Transfer for Improper Venue

Even if the Court does not dismiss or transfer for lack of personal jurisdiction over Risen and HMHC, it should do so because venue in this District is "improper." 28 U.S.C. § 1406(a); Fed. Civ. P. 12(b)(3). "When a defendant objects to venue under Rule 12(b)(3), the plaintiff bears the burden of showing that the venue selected is proper." *Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1356 (S.D. Fla. 2009). *Accord Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988). The court need not accept plaintiff's allegations in the complaint as true if they are "contradicted by the defendants' affidavits." *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004). "When an allegation is challenged, the court may then examine facts outside of the complaint to determine whether venue is proper." *Hemispherx Biopharma*, 669 F. Supp. 2d at 1356.

"[W]hether venue is 'wrong' or 'improper' – is generally governed by 28 U.S.C. § 1391."

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 577 (2013).

Venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

*Id.* § 1391(b).  "When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b)."  *Atl. Marine Constr.*, 134 S. Ct. at 577.  "[I]f it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a)."  *Id.*  Plaintiff invokes § 1391(b)(1) and (e) (Compl. ¶ 2), but neither applies.  Montgomery does not allege – and cannot allege – that Risen and the HMH Companies reside in Florida under § 1391(b)(1) or that any is a government agency, officer, or employee under § 1391(e).  (Compl. ¶ 8-9); (Risen Decl. ¶¶ 2, 3); (Handman Decl. ¶¶ 3, 4).

Nor could Montgomery plead venue under § 1391(b)(2), which provides venue where "a substantial part of the events or omissions giving rise to the claim occurred."  "Only those acts which were, in and of themselves, 'wrongful' or had a 'close nexus' to the wrong could form the basis of proper venue."  *Forbes v. Lenox Fin. Mortg. LLC*, 2008 WL 2959727, at *3 (S.D. Fla. July 30, 2008) (quoting *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003)); *Hemispherx Biopharma,* 669 F. Supp. 2d at 1357 (same).  The events giving rise to the alleged libel did not take place in Florida and it is not the focal point of the harm.  (*See* III.A *supra*.)  The only connection with Florida is Plaintiff's claim of citizenship – of very recent vintage, if that – and unspecified "commercial opportunities."  (Compl. ¶¶ 4, 6.)  But the venue statute "protect[s] defendants" and thus "require[s] courts to focus on relevant activities of the defendant, not of the

plaintiff." *Jenkins Brick,* 321 F.3d at 1371-72 (11th Cir. 2003); *Hemispherx Biopharma*, 669 F.

Supp. 2d at 1356-57 ("[Plaintiff] focuses largely on its own activities and location, but the proper

focus of the venue inquiry is on the relevant activities of the Defendants.").

     Finally, Montgomery cannot invoke "fallback venue" under § 1391(b)(3), because the

action "may otherwise be brought" in D.C.  *Algodonera De Las Cabezas S.A. v. Am. Suisse*

*Capital, Inc.*, 432 F.3d 1343, 1345 (11th Cir. 2005) ("[V]enue may be predicated on

§ 1391([b])(3) only when neither § 1391([b])(1) or (2) are satisfied.").  Venue in Florida is

improper, so the Court should dismiss or transfer venue to D.C. where venue is proper.

### C.    The Court Should Transfer Venue Under 28 U.S.C. § 1404(a)

     Even if the Court does not dismiss or transfer the action for improper venue, it should still

transfer the action "[f]or the convenience of parties and witnesses, in the interest of justice."

28 U.S.C. § 1404(a).  The purpose of transfer under § 1404(a) "is to prevent the waste 'of time,

energy and money' and 'to protect litigants, witnesses and the public against unnecessary

inconvenience and expense[.]"  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).  Transfer is

within "the broad discretion of the trial court."  *Meterlogic, Inc. v. Copier Solutions, Inc.*, 185

F. Supp. 2d 1292, 1299 (S.D. Fla. 2002).  Courts generally apply a two-part test:  "(1) whether the

action 'might have been brought' in the proposed transferee court and (2) whether various factors

are satisfied so as to determine if a transfer to a more convenient forum is justified."  *Id.* at 1299

(internal quotation marks omitted).

     First, venue is proper in D.C.  (*See* III.B *supra*.)  Second, as explained below, the

interests of justice and the convenience of witnesses and parties strongly support transfer.

*Meterlogic*, 185 F. Supp. 2d at 1300 (listing factors); *see also Cellularvision Tech. & Telecomm.,*

*L.P. v. Alltel Corp.*, 508 F. Supp. 2d 1186, 1189 (S.D. Fla. 2007).  Indeed, none of the crucial

third-party witnesses can be forced to trial in Florida.

**Convenience of the Parties.**  The convenience of the parties weighs strongly in favor of transferring this action to D.C.  Defendants, all located outside Florida, will be inconvenienced by being forced to litigate this case in Florida.  In contrast, despite Montgomery's alleged Florida citizenship (Compl. ¶ 6), he does not allege that he has a Florida residency or domicile, and he refuses to disclose his address in the Complaint.  Indeed, Montgomery resided in Yarrow Point, Washington until at least June 10, 2014 (Handman Decl. Ex. 6, June 10, 2014 Article) and probably as late as April 1, 2015.  (Handman Decl. Ex. 7, W.D. Wash. Order at 2.)  Per his own filings in this case on March 24, 2015, he is ill and under the care of a doctor in Seattle.  (ECF No. 9-1, at 3.)[19]  Thus, Montgomery may not have been a Florida resident when he filed the case and most probably he is not one even now.  When, as here, "a plaintiff has chosen a forum that is not its home forum, only minimal deference is required, and it is considerably easier to satisfy the burden of showing that other considerations make transfer proper." *Cellularvision*, 508 F. Supp. 2d at 1189 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981)).[20]

Even if Montgomery, in fact, has moved to Florida, the Court should still transfer.  Montgomery bears "[t]he burden . . . to demonstrate that he changed his domicile to Florida; the presumption is that it remained in" his previous domicile. *Jaisinghani v. Capital Cities/ABC, Inc.*, 973 F. Supp. 1450, 1454 (S.D. Fla. 1997), *aff'd*, 149 F.3d 1195 (11th Cir. 1998).  In *Stern v. News Corp.*, the Southern District of Florida transferred venue to New York when the plaintiff – a former New York resident also represented by Montgomery's attorney Larry Klayman – moved to Florida only two-and-a-half months before filing his suit in this court against a New

---

[19]  Notably, notwithstanding Montgomery's health issues when he filed this action, he chose not to bring it in Washington.

[20]  On March 20, 2015, Montgomery's counsel, Larry Klayman, asked the federal court in D.C. to take testimony of Montgomery in D.C. *in camera* and *ex parte*.  Handman Decl. Ex. 12, *Klayman v. Obama*, No. 1:13-cv-00851-RJL, ECF No. 129, at 7 n.1 (D.D.C. Mar. 20, 2015). Just as it is convenient for Montgomery to appear in D.C. in that case, when Klayman is the plaintiff, it would be convenient in this case, when Montgomery is the plaintiff.

York-based publisher.  2008 WL 10712037, at *1 (S.D. Fla. Aug. 26, 2008).  In *Stern*, the

defendants, witnesses, and events giving rise to the alleged libel occurred in New York and New

York law applied.  Similarly, here, Risen and many witnesses are in D.C. and D.C. law applies,

and none of the operative facts giving rise to the causes of action occurred in Florida.[21]

      **Convenience of Witnesses, Access to Proof.**  "Important considerations under this

factor are whether these witnesses have actual knowledge about the issues in the case, where

they are located, and whether it will be more convenient for them if the action is in [the

transferor state] or [the transferee state]."  *Cellularvision*, 508 F. Supp. 2d at 1190.  Courts will

consider "both party and nonparty" witnesses.  *Poncy v. Johnson & Johnson*, 414 F. Supp. 551,

554 (S.D. Fla. 1976).  In particular, "[t]he convenience of non-party witnesses is an important

factor in determining whether a transfer should be granted."  *Mason v. Smithkline Beecham*

*Clinical Labs.*, 146 F. Supp. 2d 1355, 1361 (S.D. Fla. 2001).

      The only witness allegedly in Florida is Montgomery himself, if he lives here at all.  In

contrast, many of the other key third-party witnesses who have actual knowledge of the issues

are located in the D.C. area.[22]  (Risen Decl. ¶¶ 10, 11, 12.)  *Meterlogic*, 185 F. Supp. 2d at 1301.

If this action remains in Florida, the parties would not be able to compel any of these third-party

witnesses to attend trial in Florida, including crucial current and former CIA, Pentagon, and

White House witnesses.  "The possibility that a case may be tried where certain crucial witnesses

could not be compelled to attend is an important consideration."  *Poncy*, 414 F. Supp. at 556

---

[21] *See Weinstein v. Friedman*, 859 F. Supp. 786, 789-90 (E.D. Pa. 1994) (transferring libel action to S.D.N.Y. where plaintiff was domiciled in Israel, defendant book publishers and author were located in New York, witnesses were in New York, and the cause of action arose in New York); *Windmere Corp. v. Remington Prods., Inc.*, 617 F. Supp. 8, 10 (S.D. Fla. 1985) ("[W]here the operative facts underlying the cause of action did not occur within the forum chosen by the Plaintiff, the choice of forum is entitled to less consideration.").

[22] Those third-party witnesses who are not in D.C. are either in California, Nevada, or Washington, for whom Florida and D.C. are equally inconvenient.

(citation and quotation marks omitted).  The parties could compel many of the third-party

witnesses to testify in D.C. because they are located within a 100-mile radius of D.C. district

court – as is the Pentagon and CIA.  (Risen Decl. ¶¶ 10, 11, 12.)  *Meterlogic*, 185 F. Supp. 2d at

1301.

      **The Public Interest.**  The public interest also heavily weighs in favor of transfer to the

D.C.  The "public interest factors include: (1) the administrative difficulties flowing from court

congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity

of the forum with the law that will govern the case; and (4) the avoidance of unnecessary

problems of conflicts of law or in the application of foreign law."  *Ins. Co. of N. Am. v. Levin*,

2011 WL 1398473, at *4 (S.D. Fla. Mar. 28, 2011) (citation and quotation marks omitted),

*report & recommendation adopted*, 2011 WL 2610754 (S.D. Fla. July 1, 2011).  *See also*

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

      Choice-of-law factors weigh heavily in favor of transfer.  *See Poncy*, 414 F. Supp. at 556

(holding that New Jersey federal court "is a more appropriate forum than this Court for applying

substantive New Jersey law").  Under Florida's choice-of-law principles, D.C. law applies.  "A

federal district court sitting in diversity applies the choice-of-law rules of the forum state."

*Castellanos v. Pfizer, Inc.*, 2008 WL 2323876, at *3 (S.D. Fla. May 29, 2008).  In tort cases,

Florida courts use the "significant relationship" test, which provides that "[t]he rights and

liabilities of the parties . . . are determined by the local law of the state which . . . has the most

significant relationship to the occurrence and the parties[.]"  *Bishop v. Fla. Specialty Paint Co.*,

389 So. 2d 999, 1001 (Fla. 1980).[23]

---

[23]  Florida courts consider "(a) the place where the injury occurred, (b) the place where the
conduct causing the injury occurred, (c) the domicile, residence, nationality, place of
incorporation and place of business of the parties, and (d) the place where the relationship, if
any, between the parties is centered" and also factor in concerns such as "certainty, predictability

In *Michel v. NYP Holdings, Inc.*, the Southern District of Florida recently applied New York law where an allegedly libelous article was researched, authored, and published in New York about events involving plaintiff that occurred in New York, even though plaintiff was a Florida resident.  2015 WL 1285309, at *3 (S.D. Fla. Mar. 4, 2015) (notice of appeal filed Apr. 3, 2015). Similarly, this action stems from a chapter researched and written in or near D.C., where Risen lives and works.  Whether or not Plaintiff is now domiciled in Florida, he was not there at the time of the events in the Chapter or when the Book was published.  *See Jaisinghani*, 973 F. Supp. at 1454 (holding that California libel law applied because plaintiff never established a domicile in Florida after moving here from California years before).  The events discussed in the Chapter took place in Nevada (*e.g.*, Montgomery lived and worked at eTreppid in Reno and where the CIA and Air Force would visit (Book at 41-42), California (*e.g.*, in 2010 Montgomery was working near Palm Springs (*id.* at 52)), and in or near Washington, D.C. (*e.g.*, where White House officials met with Montgomery and where the CIA, Pentagon, and Congress considered Montgomery's intelligence (*id.* at 41-42, 45)).  Plaintiff claims the Chapter defamed him by reporting he defrauded federal government agencies based in and around D.C.  Whatever harm to his "commercial opportunities," there is no reason to believe those unspecified federal contracting decision-makers are now miraculously in Florida.

In addition, D.C. has a vital interest in adjudicate this libel suit that implicates substantial free speech concerns of an author working within D.C.  A federal court in D.C. would be a more appropriate forum to apply substantive D.C. law, such as the anti-SLAPP statute, which

---

and uniformity of result, and ease in the determination and application of the law to be applied." *Bishop*, 389 So. 2d at 1001 (quoting Restatement (Second) of Conflict of Laws §§ 6, 145-146).

expeditiously disposes of meritless claims like this brought against one speaking on issues of public concern.[24]   Thus, D.C. bears the most significant relationship to this lawsuit.

### D.    The Court Should Dismiss Under Rule 12(b)(6) Because Plaintiff Fails to Plead a Plausible Claim for Defamation or Other Related Torts

If the Court does not dismiss or transfer for the reasons outlined above, it should dismiss under Rule 12(b)(6).  Although a court must take the well-pleaded *factual* allegations as true for a Rule 12(b)(6) motion, legal conclusions "are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).  Under *Twombly* and *Iqbal*, a plaintiff must provide "enough facts to state a claim to relief that is *plausible* on its face," rather than merely possible.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added); *Iqbal*, 556 U.S. at 695-96.  Where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

Modern litigation is cripplingly expensive regardless of the outcome, so courts have stressed that Rule 12(b)(6) weeds out meritless claims.  *Id.* at 546.  Such concerns are especially present in defamation cases, where forcing defendants to incur unnecessary costs defending ultimately meritless suits can chill speech.[25]   Thus, courts routinely dismiss libel claims at the pleading stage before discovery for the deficiencies set forth in this motion.  *See* cases cited at footnotes 27, 36, and 40 *infra*.  Under D.C. law, or any other applicable law, the outcome is the same: Plaintiff's claims fail as a matter of law and should be dismissed under Rule 12(b)(6).

---

[24]   D.C. Code §§ 16-5501-5505.  Other states with a significant relationship to this action, Washington, California, and Nevada, also have anti-SLAPP statutes.  Florida does not.

[25]   *Farah*, 736 F.3d at 534 (recognizing in affirming Rule 12(b)(6) dismissal that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails") (quotation omitted); *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("[P]retrial dispositions are 'especially appropriate' because of the chilling effect [libel] cases have on freedom of speech").

1.      **The Fair Report Privilege Protects the Statements at Issue**

Montgomery's claim should be dismissed under Rule 12(b)(6) because the Chapter is

privileged under the fair report privilege, which protects against defamation suits where – as here

– a publication accurately summarizes court records, congressional records, and government

investigative reports.  The privilege applies as long as "the reports were substantially accurate"

and fair, and "concern a governmental proceeding," even if the underlying information that

ultimately proves to be false.  *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir.

1990).[26]  Whether the fair report privilege protects the publication is a question of law that courts

routinely decide on an initial pre-discovery motion.[27]

Here, the Book serves the critical function that the fair report privilege is designed to

protect: providing "both a fair and accurate accounting of public proceedings as well as informed

commentary"[28] and thus advancing "[t]he purpose of the privilege" by "promot[ing] public

---

[26]  The fair report privilege of other potentially relevant states is similar, as is Florida's.  *Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*, 57 P.3d 1178, 1186 (Wash. Ct. App. 2002), *amended*, 64 P.3d 49 (Wash. Ct. App. 2003); *Sahara Gaming Corp. v. Culinary Workers Union Local*, 984 P.2d 164 (Nev. 1999); Cal. Civ. Code § 47(d), (e); *Stewart*, 695 So. 2d at 362-63.

[27]  *See Hargrave v. Washington Post*, 2009 WL 1312513 (D.D.C. May 12, 2009), *aff'd*, 365 F. App'x 224 (D.C. Cir. 2010) (dismissing libel claim under Rule 12(b)(6) because report of plaintiff's criminal testimony protected by fair report privilege); *Q Int'l Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *4-5 (D.D.C. Feb. 26, 1999) (dismissing libel claim on a pre-discovery motion for summary judgment under fair report privilege); *Foretich v. Chung*, 1995 WL 224558, at *1-2 (D.D.C. Jan. 25, 1995) (dismissing on pre-discovery summary judgment motion libel claim against news anchor for reporting allegations in judicial proceedings); *Huszar v. Gross*, 468 So. 2d 512, 513, 516 (Fla. 1st DCA 1985) (affirming dismissal of libel claim with prejudice because newspaper's statements protected by fair report privilege); *Stewart*, 695 So. 2d at 362-63 (affirming pre-discovery motion to dismiss libel claim or summary judgment where newspaper's statements protected by fair report privilege). *Cf. Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 2010 WL 1408391, at *9-10 (M.D. Fla. Apr. 6, 2010) (dismissing libel claim for failure to plausibly plead facts to overcome common-law qualified privilege), *aff'd*, 451 F. App'x 862, 864 & n.3 (11th Cir. 2012).

[28]  *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 34 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).

scrutiny of governmental affairs."[29]   Indeed, the Book summarizes witness statements made in

FBI investigative reports filed in court proceedings, quotes affidavits and deposition transcripts

and other filed court documents, and discusses the contents of congressional records.  Each of

these official documents, proceedings, or actions plainly fall within the fair report privilege.  *See*

*White*, 909 F.2d at 527 (explaining that privilege "extends broadly to the report 'of any official

proceeding, or any action taken by any officer or agency of the government,'" including not only

government proceedings themselves, but also allegations or findings that prompt such

proceedings) (citation omitted).  Courts routinely hold that reporting on court records, judicial

proceedings, and discovery documents, including affidavits and depositions,[30] law enforcement

investigations and reports,[31] and congressional records and statements,[32] is protected.

Moreover, the Book expressly reports on and refers to the government investigations,

congressional records, and court proceedings.  *See Dameron v. Wash. Magazine, Inc.*, 779 F.2d

736, 739 (D.C. Cir. 1985) (fair report privilege applies where "apparent either from specific attribu-

---

[29]  *Harper v. Walters*, 822 F. Supp. 817, 823 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994).

[30]  *See Q Int'l Courier*, 1999 WL 1027034, at *4 (privilege applies to report on civil complaint); *O'Brien v. Franich*, 575 P.2d 258, 260 (Wash. App. Ct. 1978) (reports on lawsuits covered by fair report privilege); *Lavin v. N.Y. News, Inc.*, 757 F.2d 1416, 1419 (3d Cir. 1985) (reports of affidavits privileged); *Sipple v. Found. for Nat'l Progress*, 83 Cal. Rptr. 2d 677, 687-88 (Cal. Ct. App. 1999) (report on deposition testimony privileged).

[31]  *See Medico v. Time, Inc.*, 643 F.2d 134, 139 (3d Cir. 1981) (fair report privilege applies to report on FBI documents that "express only tentative and preliminary conclusions that the FBI has never adopted as accurate"); *White*, 909 F.2d at 527-28 (privilege applies to report of D.C. administrative committee); *Global Relief Found. Inc. v. N.Y. Times*, 390 F.3d 973 (7th Cir. 2004) (affirming dismissal; privilege applies to report of federal investigation into Islamic charity for possible link to terrorism); *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003) (articles giving "rough-and-ready summary" of official statement by police protected by fair report privilege); *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 960 (2d Cir. 1988) (statement by FBI official about execution of search warrant protected); *Dowd v. Calabrese*, 589 F. Supp. 1206, 1217 (D.D.C. 1984) (report of DOJ investigation protected).

[32]  *Crane v. Ariz. Republic*, 972 F.2d 1511, 1517 (9th Cir. 1992) (secret investigation of House Select Committee on Narcotics Abuse and Control was official proceeding under the privilege); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097 (4th Cir. 1993) ("[A] fair and accurate report of the public remarks of a member of Congress fits within the 'fair report' privilege[.]").

tion or from the overall context that the article is quoting, paraphrasing or otherwise drawing upon official documents or proceedings"); *Ditton v. Legal Times,* 947 F. Supp. 227, 230 (E.D. Va. 1996) ("A publisher properly attributes a report if the average reader is likely to understand that the report summarizes or paraphrases from the judicial proceedings."), *aff'd*, 129 F.3d 116 (4th Cir. 1997).

Montgomery has not – and cannot – plausibly allege that the Book is anything but a fair and "substantially accurate," *White*, 909 F.2d at 527, account of the findings and allegations in the investigative reports, congressional record, and court proceedings.[33]  Indeed, Risen obtained and published Montgomery's comments, making the report more than "fair" for purposes of the privilege.[34]  The Chapter fairly and accurately reports on official governmental actions and proceedings.  Thus, Montgomery's claims are barred by the fair report privilege and the Complaint should be dismissed under Rule 12(b)(6).

> ### 2.    Many of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole Protected by the First Amendment

Statements of opinion that do "not contain a provably false factual connotation" are protected under the First Amendment.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994) ("*Moldea II*").  In addition, an opinion is also not actionable if it cannot be objectively verified as false or cannot "reasonably [be] interpreted as stating actual facts" about the plaintiff.  *Milkovich*, 497 U.S. at 18-20; *Washington v. Smith*, 80 F.3d 555, 556-57 (D.C. Cir. 1996).  Rhetorical language that is "loose, figurative [and] hyperbolic" is also not actionable.  *Milkovich*, 497 U.S. at 21.

---

[33]  *See Yohe*, 321 F.3d at 44 ("'[A]ccuracy' for fair report purposes refers only to the factual correctness of the events reported and not to the truth about the events that actually transpired."); *Coles*, 881 F. Supp. at 31 n.3; *Alpine Indus. Computers*, 57 P.3d at 1187 ("It is not necessary that it be exact in every immaterial detail[.]").

[34]  *See, e.g.*, *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1437, 1440 (9th Cir. 1992) (tabloid "did not exceed the degree of flexibility and literary license accorded newspapers in making a 'fair report'" by reporting that petition filed against entertainer said entertainer had AIDS; last paragraph of report included entertainer' statement that charge was an "utter fabrication").

Whether the allegedly defamatory statements are non-actionable opinion is a question of law for the court.  *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("*Moldea I*"). The court must analyze the challenged statements in their entirety, taking into account both the immediate context and the larger social context in which they appeared.  *See Moldea II*, 22 F.3d at 314; *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 64 (D.D.C. 1988).

Here, Montgomery's allegation that Defendants said that government contractors, including Montgomery, were motivated by "greed"[35] and that "crazy became the new normal in the war on terror"[36] are non-verifiable statements of subjective opinion and rhetorical hyperbole that are non-actionable.  (Compl. ¶¶ 96, 165.)[37]  Moreover, read in its proper context, statements that Montgomery "has been accused of being a con artist" (Compl. ¶ 96) (quoting Book at 32)

[35] *See Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 2d 1220, 1233 (D. Or. 2011) (blogger's statement plaintiff was "greedy," was "figurative, hyperbolic, imaginative, or suggestive"), *aff'd*, 740 F.3d 1284 (9th Cir. 2014); *Fetter v. N. Am. Alcohols, Inc.*, 2007 WL 551512, at \*12 (E.D. Pa. Feb. 15, 2007) (statement "that the plaintiff was greedy, unreasonable, or foolish reflect personal opinion and therefore do not constitute defamation"); *Metcalf v. KFOR-TV*, 828 F. Supp. 1515, 1530 (W.D. Okla. 1992) (statement that organizations were "shams perpetrated on the public by greedy doctors" was protected opinion).

[36] *See Farah*, 736 F.2d at 531 (affirming Rule 12(b)(6) dismissal of claims challenging satirical speech and statements of opinion); *Weyrich*, 235 F.3d at 624 (statement that plaintiff experienced bouts of "paranoia" was protected opinion); *Lieberman v. Fieger*, 338 F.3d 1076, 1080 (9th Cir. 2003) (statement in Court TV interview that plaintiff, a psychiatric expert, is "crazy," was protected opinion); *Serian v. Penguin Grp. (USA), Inc.*, 2009 WL 2225412, at \*9 (N.D.W.Va. July 23, 2009) (statement in national security book that plaintiff was "very crazy" was non-actionable "subjective opinion[]"); *Rhodes v. Placer Cnty.*, 2011 WL 1302240 (E.D. Cal. Mar. 31, 2011) (calling plaintiff "a 'crazy flute player'" was "[s]tatement[] of hyperbole"); *Rojas v. Debevoise & Plimpton*, 634 N.Y.S.2d 358, 362 (N.Y. Sup. Ct. 1995) (statement that plaintiff was "crazy" protected opinion); *Stepien v. Franklin*, 528 N.E.2d 1324, 1327 (Ohio Ct. App. 1988) (same); *Shaw v. Palmer*, 197 S.W.3d 854, 857-58 (Tex. Ct. App. 2006) (same).

[37] That Plaintiff is an "incorrigible gambler" (Compl. ¶¶ 103-104) is also non-actionable opinion where he was arrested for passing bad checks to a casino in Nevada and had to declare bankruptcy.  This statement is not actionable because the FBI Report shows that he was a gambler and "incorrigible" is a subjective assessment of his motivation that is opinion.  (Gov't's Compliance with Ct. Order of Aug. 17, 2006, FBI Report, Interview of Warren Trepp, No. 06-cv-263, ECF No. 70-5, at 4, 23 (Sept. 11, 2006)); *Fikes v. Furst*, 61 P.3d 855, 864-65 (N.M. Ct. App. 2002) (statement that plaintiff was "pursuing a bizarre obsession" was protected opinion).

are non-actionable opinion based on disclosed facts, including that Montgomery's own former

business partner, employees, and lawyer all accused him in court records of being a con artist

and a fraud.[38]  Thus, Montgomery fails to state a claim based on these opinions.

### 3. The Complaint Should Be Dismissed For Failure to Plausibly Plead Actual Malice or Any Other Applicable Fault

Plaintiff's claim fails for another, independent reason under Rule 12(b)(6):

Montgomery – a limited-purpose public figure – does not and cannot plausibly plead actual

malice (or, indeed, any other applicable standard of fault).[39]  In the wake of *Iqbal* and *Twombly*,

to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead specific facts that

would make such a claim of actual malice plausible.  *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 219

(D.D.C. 2012).[40]  Because the Chapter expressly relies on  previously published unchallenged

articles in reputable publications and statements in official court records, FBI reports, and the

Congressional Record, and includes Plaintiff's denials, Plaintiff cannot possibly meet the

"daunting" standard of actual malice, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C.

---

[38]  *See Spelson v. CBS, Inc.*, 581 F. Supp. 1195, 1203 (N.D. Ill. 1984) (statement that "individuals are 'cancer con-artists' and 'practitioners of fraud,'" were opinion)), *aff'd*, 757 F.2d 1291 (7th Cir. 1985); *Yauncey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989) (acquaintance of suspected murder's statement to newspaper that suspect was a "con artist" was protected opinion); *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 866-67 (Ill. App. Ct. 1995) (employer's evaluation stating that plaintiff was a "con artist" was protected opinion).

[39]  *See* Defs. Special Motion to Dismiss the Complaint Under the D.C. Anti-SLAPP Statute and Memorandum in Support, III.C.

[40]  *See also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (dismissing libel complaint because "none of [plaintiff's] allegations . . . plausibly suggest that, given the articles' reporting," defendant acted with actual malice); *Adelson v. Harris*, 973 F. Supp. 2d 467, 471 (S.D.N.Y. 2013) (dismissing libel claims under Nevada anti-SLAPP law and Rule 12(b)(6) where statements were non-actionable opinion, protected by fair report privilege, and evidence of actual malice was insufficient), *questions certified*, 774 F.3d 803 (2d Cir. 2014); *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279-81, 284-85 (S.D.N.Y. 2013) (dismissing for failure to plausibly allege actual malice) (collecting cases); *Hakky v. Washington Post Co.*, 2010 WL 2573902, at *6-7 (M.D. Fla. June 24, 2010) (dismissing libel claim under Rule 12(b)(6) where plaintiff failed to plausibly allege facts to support negligence or actual malice).

Cir. 1996): that Defendants knew what they published was false or "in fact entertained serious

doubts as to the truth of [the] publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).[41]

### 4.   Montgomery's Other Tort Claims Fail on the Same Grounds

Because Montgomery's "defamation claim fails, so do [his] other tort claims based upon

the same allegedly defamatory speech."  *Farah*, 736 F.3d at 540.  "[A] plaintiff may not use

related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea II*,

22 F.3d at 319-20 (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).  "The First

Amendment considerations that apply to defamation therefore apply also to" Montgomery's

claims for tortious interference, intentional infliction of emotional distress, and assault.  *Farah*,

736 F.3d at 540; *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988).  In addition, Montgomery

fails to state facts to plausibly plead these claims.[42]

## IV.   CONCLUSION

For the foregoing reasons, defendants HMH Companies and Risen respectfully request

that the Court grant their motions: (1) to dismiss or transfer for lack of personal jurisdiction over

Risen and HMHC; (2) dismiss or transfer for improper venue; (3) transfer for convenience; or

(4) dismiss the complaint with prejudice under Fed. R. Civ. P. 12(b)(6).

---

[41]  *Parisi*, 845 F. Supp. 2d at 219 (finding failure to plead actual malice when plaintiff cited defendant's book showing defendant took steps to verify the statements and relied on multiple sources); *Diario El Pais, S.L. v. Nielsen Co., (US), Inc.*, 2008 WL 4833012, at *6-7 (S.D.N.Y. Nov. 6, 2008) (finding failure to plausibly plead actual malice when complaint showed defendant took actions to ensure accuracy and thus it did not possess a subjective belief of falsity).

[42]  For example, in *Forras v. Rauf*, a libel claim brought by Mr. Klayman, the court dismissed claims reminiscent of those here, arising from allegations that "Defendants' statements were read by 'radical Muslims,' Defendants put a de facto Fatwah on Plaintiffs and that Plaintiffs now fear for their safety."  The court granted dismissal because plaintiffs could not show intent or that the statements were threats of civil assault and could not show "extreme and outrageous" behavior" as to IIED.  39 F. Supp. 3d 45, 56-57 (D.D.C. Apr. 18, 2014), *appeal pending*, No. 14-7070 (D.C. Cir. May 21, 2014).  *See also Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (dismissing for failure to state a claim because "plaintiff must show that the interference was intentional and that there was resulting damage" to state a tortious interference claim).

**CERTIFICATE OF GOOD-FAITH CONFERENCE; CONFERRED BUT
UNABLE TO RESOLVE THE ISSUES PRESENTED IN THE MOTION**

In accordance with Local Rule 7.1(a)(3)(A), the undersigned certifies that counsel for

Defendants has conferred with all parties or non-parties who may be affected by the relief sought

in this motion in a good-faith effort to resolve the issues but has been unable to resolve the

issues.

<u>s/Sanford L. Bohrer</u>

Dated: April 9, 2015

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: <u>s/ Sanford L. Bohrer</u>
    Sanford L. Bohrer
    Brian W. Toth
    701 Brickell Avenue, Suite 3300
    Miami, Florida  33131
    Tel.: (305) 374-8500
    Fax: (305) 789-7799


DAVIS WRIGHT TREMAINE LLP

By: <u>s/ Laura R. Handman</u>
    Laura R. Handman (*pro hac vice*
    pending)
    Micah J. Ratner (*pro hac vice* pending)
    1919 Pennsylvania Ave., NW, Suite 800
    Washington, D.C.  20006
    Tel.: (202) 973-4200
    Fax: (202) 973-4499

    *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on April 9, 2015, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.


s/Sanford L. Bohrer