IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Dennis L. Montgomery,

        Plaintiff,

v.                                     No. 1:16-cv-00126-RC

James Risen, Houghton Mifflin Harcourt
Publishing Co., et al.

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman (Bar No. 444386)
Lisa B. Zycherman (Bar No. 495277)
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
laurahandman@dwt.com
lisazycherman@dwt.com

*Counsel for Defendants*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    ARGUMENT ................................................................................................... 7

    A.    The Plaintiff Fails to Dispute That Many of the Challenged Statements Are Non-Actionable Opinion.................................................................. 7

    B.    The Chapter Cannot Be Reasonably Understood to State or Imply that Montgomery Directed the White House to Order Planes Not to Fly or Consider Shooting Planes Down ............................................................ 9

    C.    Plaintiff Has Failed To Come Forward With Clear And Convincing Evidence of Substantial Falsity.............................................................. 10

    D.    Plaintiff Is A Limited Purpose Public Figure ....................................... 15

    E.    Plaintiff Has Failed to Come Forward With Clear And Convincing Evidence of Actual Malice.................................................................... 17

    F.    The Plaintiff Fails to Dispute That The Fair Report Privilege Bars His Claims............................................................................................. 23

III.    CONCLUSION............................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abbas v. Foreign Policy Grp., LLC,*
  783 F.3d 1328 (D.C. Cir. 2015) ........................................................................................10

*Adventure Outdoors, Inc. v. Bloomberg,*
  519 F. Supp. 2d 1258 (N.D. Ga. 2007), *rev'd on other grounds*, 552 F.3d 1290
  (11th Cir. 2008) ...................................................................................................................8

*Air Wisconsin Airlines Corp. v. Hoeper,*
  134 S. Ct. 852, *reh'g denied*, 134 S. Ct. 1575 (2014) ...............................................11, 17

*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986) ...........................................................................................................17

*Biro v. Condé Nast,*
  807 F.3d 541 (2d Cir. 2015) ..................................................................................21, 22, 23

*CACI Premier Tech., Inc. v. Rhodes,*
  536 F.3d 280 (4th Cir. 2008) ........................................................................................16, 18

*Chapin v. Knight-Ridder, Inc.,*
  993 F.2d 1087 (4th Cir. 1993) .............................................................................................9

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C. Cir. 2003) .............................................................................................7

*Clarke v. Washington Metro. Area Transit Auth.,*
  904 F. Supp. 2d 11 (D.D.C. 2012), *aff'd*, 540 F. App'x 3 (D.C. Cir. 2013) .....................15

*Clyburn v. News World Commc'ns, Inc.,*
  903 F.2d 29 (D.C. Cir. 1990) .............................................................................................16

*Cobb v. Time, Inc.,*
  278 F.3d 629 (6th Cir. 2002) .............................................................................................20

*Dorsey v. Nat'l Enquirer, Inc.,*
  973 F.2d 1431 (9th Cir. 1992) ...........................................................................................23

*Dowd v. Calabrese,*
  589 F. Supp. 1206 (D.D.C. 1984) ......................................................................................24

*Edwards v. Nat'l Audubon Soc'y, Inc.,*
  556 F.2d 113 (2d Cir. 1977) ..............................................................................................22

*Farah v. Esquire Magazine*,
  736 F.3d 528 (D.C. Cir. 2013) ......................................................................7

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) ........................................................................................11

*Harte-Hanks Commc'ns v. Connaughton*,
  491 U.S. 657 (1989) ......................................................................................21

*Haynes v. Alfred Knopf, Inc.*,
  8 F.3d 1222 (7th Cir. 1993) ...........................................................................9

*Herbert v. Lando*,
  441 U.S. 153 (1979) ......................................................................................11

*Klayman v. City Pages*,
  2015 WL 1546173 (M.D. Fla. Apr. 3, 20105) ...............................................22

*Levan v. Capital Cities/ABC, Inc.*,
  190 F.3d 1230 (11th Cir. 1999) ...............................................................11, 20

*Levin v. McPhee*,
  119 F.3d 189 (2d Cir. 1997) ............................................................................9

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
  838 F.2d 1287 (D.C. Cir. 1988) ....................................................................22

*Liberty Lobby v. Anderson*,
  1991 WL 186998 (D.D.C. 1991) ...................................................................20

*Lohrenz v. Donnelly*,
  223 F. Supp. 2d 25 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) ......................23, 24

*Lohrenz v. Donnelly*,
  350 F.3d 1272 (D.C. Cir. 2003) ..........................................................17, 20, 21

*Matthews v. Dist. of Columbia*,
  730 F. Supp. 2d 33 (D.D.C. 2010) ..................................................................7

*McFarlane v. Sheridan Square Press, Inc.*,
  91 F.3d 1501 (D.C. Cir. 1996) ............................................................17, 20, 23

*Milkovich v. Loraine Journal Co.*,
  497 U.S. 1 (1990) ............................................................................................2

*Mirafuentes v. Estevez*,
  2015 WL 8177935 (E.D. Va. Nov. 30, 2015) ..................................................8

iii

*Moldea v. New York Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ..................................................................................17, 18

*Montgomery v. eTreppid Technologies, Inc.*,
    3:06-cv-00056-PMP-VPC, ECF No. 253 (D. Nev. Aug. 29, 2007) ........................................12

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................................... *passim*

*OAO Alfa Bank v. Center for Public Integrity*,
    387 F. Supp. 2d 20 (D.D.C. 2005) .........................................................................21

*Parisi v. Sinclair*,
    845 F. Supp. 2d 215 (D.D.C. 2012) .........................................................................21

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ......................................................................................11

*Projects Mgmt. Co. v. Dyncorp Int'l LLC*,
    734 F.3d 366 (4th Cir. 2013) ..............................................................................14

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ..............................................................................9

*Reeves v. ABC*,
    719 F.2d 602 (2d Cir. 1983)...............................................................................25

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    2015 WL 1344479 (S.D.N.Y. Mar. 23, 2015) ................................................................13

*Ricci v. Venture Magazine, Inc.*,
    574 F. Supp. 1563 (D. Mass. 1983) ........................................................................24

*Rushford v. New Yorker Magazine, Inc.*,
    846 F.2d 249 (4th Cir. 1988) .............................................................................24

*The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.*,
    413 F. Supp. 555 (S.D.N.Y. 1976) .........................................................................24

*Seaton v. TripAdvisor LLC*,
    728 F.3d 592 (6th Cir. 2013) ..............................................................................8

*Secord v. Cockburn*,
    747 F. Supp. 779 (D.D.C. 1990) .......................................................................11, 20

*Silvester v. ABC*,
    650 F. Supp. 766 (S.D. Fla.), *aff'd*, 839 F.2d 1491 (11th Cir. 1988).....................................21

iv

*Silvester v. ABC*,
 839 F.2d 1491 (11th Cir. 1988) ................................................................16, 20

*St. Amant v. Thompson*,
 390 U.S. 727 (1968)..............................................................................................21

*Tavoulareas v. Piro*,
 759 F.2d 90 (D.C. Cir. 1985), *rev'd on other grounds*,
 817 F.2d 762 (D.C. Cir. 1987) (*en banc*)..........................................................23

*Tavoulareas v. Piro*,
 817 F.2d 762 (D.C. Cir. 1987) ...........................................................11, 15, 21

*Telectron, Inc. v. Overhead Door Corp.*,
 116 F.R.D. 107 (S.D. Fla. 1987) ........................................................................15

*Time, Inc. v. Pape*,
 401 U.S. 279 (1971) ..............................................................................................18

*Trulock v. Lee*,
 66 F. App'x 472 (4th Cir. 2003) ........................................................................13

*Waldbaum v. Fairchild Publ'ns, Inc.*,
 627 F.2d 1287 (D.C. Cir. 1980) .........................................................................16

*Washington Post Co. v. Keogh*,
 365 F.2d 965 (D.C. Cir. 1966) ....................................................................17, 20

*Weyrich v. New Republic, Inc.*,
 235 F.3d 617 (D.C. Cir. 2001) ...........................................................................11

*White v. Fraternal Order of Police*,
 909 F.2d 512 (D.C. Cir. 1990) .....................................................................11, 24

*Zeran v. Diamond Broad., Inc.*,
 203 F.3d 714 (10th Cir. 2000) ...........................................................................20

**State Cases**

*DeMary v. Latrobe Printing & Publ'g Co.*,
 762 A.2d 758 (Pa. Super. 2000).........................................................................24

*Doe No. 1 v. Burke*,
 91 A.3d 1031 (D.C. 2014) ...................................................................................11

*Gross v. New York Times Co.*,
 82 N.Y.2d 146 (1993) .............................................................................................9

*Heekin v. CBS Broad., Inc.*,
    789 So. 2d 355 (Fla. App. 2nd Dist. 2001) ..........................................................................25

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*,
    399 N.E.2d 1185 (N.Y. 1979) ..............................................................................................24

*Jews For Jesus, Inc. v. Rapp*,
    997 So. 2d 1098 (Fla. 2008) ................................................................................................11

*Mark v. Seattle Times*,
    635 P.2d 1081 (Wash. 1981) ...............................................................................................24

*Stewart v. Sun Sentinel Co.*,
    695 So. 2d 360 (Fla. App. 4th Dist. 1997) ..........................................................................24

*Woodard v. Sunbeam Television Corp.*,
    616 So. 2d 501 (Fla. App. 3d Dist. 1993) ...........................................................................24

**Federal Statutes**

28 U.S.C. § 1404(a) .......................................................................................................................1

**Rules**

Fed. R. Civ. P.
    37(b) ....................................................................................................................................14
    37(b)(2)(A)(ii) .....................................................................................................................15
    56(a) ......................................................................................................................................1

Fed. R. Evid.
    1002-04 ...............................................................................................................................15
    1004 ....................................................................................................................................15
    1004(a) ................................................................................................................................15

On December 14, 2015, Defendants James Risen, Houghton Mifflin Harcourt Publishing

Company ("HMH"), and Houghton Mifflin Harcourt Company  ("HMHC"), improperly sued as

HMH Holdings, Inc. (together "Defendants"), moved for an Order granting Defendants' motion

for summary judgment under Fed. R. Civ. P. 56(a) and dismissing the Amended Complaint with

prejudice.  Defs.' Mot. for Summ. J. ("MSJ"), ECF No. 201.  Plaintiff Dennis Montgomery

submitted a brief in opposition to Defendants' motion on January 13, 2016.  Pl.'s Opp. to Defs.'

Mot. for Summ. J. ("Opp."), ECF No. 233.  By order issued January 25, 2016, the U.S. District

Court for the Southern District of Florida (Martinez, J.) granted Defendants' motion to transfer

pursuant to 28 U.S.C. § 1404(a).  Order, ECF No. 247.  With the instant reply, Defendants'

summary judgment motion is now fully briefed and submitted for the Court's review.

## I.    PRELIMINARY STATEMENT

Plaintiff's Opposition to Defendants' Motion for Summary Judgment offers only self-

serving assertions and repeated misrepresentations of the record; it is totally devoid of disputed

material facts supported by any evidence, much less credible evidence, and controlling case

authority.  Plaintiff fails to meet his burden to defeat summary judgment and come forward with

"concrete" "affirmative evidence" that would allow a reasonable jury to find that Defendants

published substantially false statements of fact that Defendants knew were false when they

published or had serious doubts as to the truth but published anyway.[1]

Instead, Plaintiff's argument focuses almost exclusively on the Chapter's characterization

of Montgomery as the "maestro behind what many current and former U.S. officials and others

familiar with the case now believe was one of the most elaborate and dangerous hoaxes in

American history."  Chapter at 32.  That characterization is clearly protected, non-actionable

---

[1] Plaintiff effectively gives up any attempt to move forward on his other tort claims, none of which are addressed in his opposition brief, other than to say only that, if his defamation claim survives, so should his other claims.  Opp. 35.  *Cf.* MSJ § III.F.

opinion based on facts set forth in the Chapter, none of which are effectively disputed.  Risen

based his opinion on statements – not by three sources as Plaintiff states – but by five CIA

officials, two White House officials, a Senator and a Congressional staffer, Air Force and

SOCOM officials, the former head of Homeland Security, two former business partners, former

employees, a potential investor, a former chief of staff for the Israeli Prime Minister, and

Plaintiff's own former lawyer.  These statements, made either directly to Risen or published in

official records or news reports, concluded that the software "was not an accurate source of

information," was "crazy," "bogus intelligence," a "fraud," and that government officials had

been "played" by a "con artist" who had his employees rig tests to dupe government officials and

claimed to read coded messages in Al Jazeera broadcasts when there were none; "it's fair to say

it's the biggest [unsubstantiated intelligence] that makes it all the way through the system" to the

Oval Office, said a White House official.  Defs.' Statement of Undisputed Material Facts

("SUMF") ¶¶ 10-44, ECF No. 202; Decl. of James Risen ("Risen Decl.") ¶¶ 7-37, ECF No. 203.

"Maestro" of "one of the most elaborate and dangerous hoaxes," "The Emperor of the War on

Terror," is exactly the kind of "loose, figurative and hyperbolic" language and "imaginative

expression" that the Supreme Court has said "has traditionally added much to the discourse of

our Nation."  *Milkovich v. Loraine Journal Co.*, 497 U.S. 1, 20-21 (1990).

Perhaps the best evidence that Plaintiff's software is a fraud is what has happened in this

case.  Despite multiple court orders, Plaintiff has failed to produce his software, a pattern that has

occurred in prior litigations.  Plaintiff has offered a variety of excuses for why he cannot produce

his own software, and the issue has been the subject of proceedings before the Southern District

of Florida (Goodman, Magistrate) on Defendants' Motion for Sanctions for bad faith spoliation.[2]

To succeed in his defamation suit, Plaintiff has the burden of coming forward with credible facts

that the Chapter's report that his software did not exist or did not work is false.  He repeats in his

latest affidavit, without any documentary support, "I reported to my government contacts the

hidden data that we found," Third Montgomery Decl. ¶¶ 33, 49-55, 57, ECF No. 233-7, but

offers nothing but his say-so – no documents, no testimony, and, most importantly, no software.

Having "sequestered" the "critical evidence" in the case,[3] Plaintiff cannot prove that his software

produced hidden data.  He thus cannot prove falsity – a required element of his claim.  Summary

judgment should be granted on this ground alone.

Plaintiff has not cited one example of where the Chapter's report of the judicial, official,

and congressional proceedings was materially inaccurate.  Thus, based on a comparison of the

records submitted with Defendants' motion (Risen Decl. ¶¶ 19-25 & Exs. 15-19), and what the

Chapter attributes to these records, the fair report privilege applies and is another ground for

summary judgment, a question of law routinely decided by the court on a pretrial motion and ***not***

a question for a jury.  That Plaintiff would have liked more included in the Chapter does not take

it out of the ambit of the fair report privilege and, in fact, the Chapter included many of

Plaintiff's responses to the proceedings.

Plaintiff raises red herrings that simply are not at issue here.  Defendants never contended

that the Chapter is not defamatory, *i.e.*, harmful to Plaintiff's reputation.  But a reasonable reader

could not understand the Chapter to state or imply that Montgomery himself advised or ordered

---

[2] Defs.' Mot. for Sanctions ("Sanctions Mot."), ECF No. 166; Defs.' Reply in Support of Sanctions Mot. ("Sanctions Reply"), ECF No. 184.  Magistrate Goodman conducted a four-hour hearing on Defendants' Motion for Sanctions on January 5, 2016.  *See* Opp. Ex. 1, Jan. 5, 2016 Hr'g Tr., ECF No. 233-1.
[3] Stay Order 6, ECF No. 122.

planes to stop flying from Europe or the White House to consider shooting down planes.  The Chapter can only be reasonably read as stating that his alleged intelligence prompted officials to take or consider those actions.  The Chapter blames the government for falling for Plaintiff's con as one of many examples of how the government has wasted taxpayer money.

Plaintiff does not – and cannot – dispute the facts that confirm, under at least three independent, alternative grounds, that he is a limited purpose public figure with regard to his software and the government; as such, to defeat summary judgment, he must come forward with affirmative evidence that would allow a reasonable jury to conclude by clear and convincing evidence that Defendants published with actual malice.  His status as a limited purpose public figure is a result of:  *One*, nearly 10 years of national media coverage about his software fraud that has made Montgomery the subject of public controversy, whether or not he sought out the media attention.  *Two*, Montgomery's persistent attempts to voluntarily seek out the media, going on NBC News in 2007 to make explosive (and ultimately discredited) charges that his former partner tried to bribe a government official to get contracts involving *his* software, and, even as recently as 2014, trying to get on Fox News.  *Three*, Montgomery invited comment by seeking government contracts on the government's national security efforts, knowing that such work invites public scrutiny of the expenditure of taxpayers' money.  The question of public figure status based on these undisputed material facts is a threshold question of law for the court to decide, not a jury, as Plaintiff argues.

As for clear and convincing evidence, Risen's extensive reliance on reputable prior publications as a matter of law negates fault, whether the applicable standard is negligence or actual malice.  Similarly, Risen's reliance on government officials and official records, as a matter of law, negates fault, under either standard.  The Chapter went out of its way to disclose

4

potential bias or self-interest of certain sources and to include Montgomery's viewpoint throughout in ten sometimes lengthy passages in the 22-page Chapter, including Montgomery's claim that he could not discuss these matters because of their alleged classified status.  That his denials were included further negates actual malice, not the opposite as Plaintiff contends.

Plaintiff's argument on actual malice is that Defendants should have done further investigation and fact-checking, but that, again, as a matter of law, does not constitute actual malice.  In any event, Plaintiff points to no factual error that fact-checking would have found and he does not dispute that Risen had the co-author of his *New York Times* article and the author of the *Playboy* article look over the Chapter for factual error.  Plaintiff makes much of the fact that the Book was originally under contract with Simon & Schuster ("S&S"), where Risen's editor Bruce Nichols worked before he moved to HMH.  Plaintiff omits that the S&S editor who inherited the Book liked the Montgomery chapter, raising no editorial or legal questions, but had a different vision for the rest of the book that would require further writing and delay publication, so Risen chose to move the Book to HMH where his former editor was now working.  Plaintiff presents no evidence that S&S rejected the Book and, to the contrary, the evidence confirms that Risen and the publisher reached an impasse and went their separate ways. *See* Defs.' Reply to Pls.' Statement of Additional Material Disputed Facts ("Reply SMDF") ¶ 68.

The only other argument Montgomery advances is that, if it was such a big hoax, why was he never charged with fraud and the government did not attempt to get its money back?  A fair question, which Risen raises and answers with his own speculation, again based on facts set forth in the Chapter, that the agencies were in their secrecy silos and did not want it known that they had been duped. *See* Reply SMDF ¶¶ 82, 91.  Risen faults the government for the lack of any investigation or negative consequences for those who passed on this fake intelligence. *See*

*id.* Such criticism and hypotheses are themselves protected opinion.

Finally, Plaintiff attempts to argue ill will which, itself, is ***not*** a substitute for actual malice.  Nor can he cite any evidence of ill will, other than his outlandish theory that Risen was trying to blackmail him to get his whistleblowing data with threats of a negative book.  Of course, the undisputed facts do not support this – Risen had already written his critical story years before and the emails show that Risen was now trying to get Montgomery's side to flesh out his book.  *See* Reply SMDF ¶¶ 65, 103.  It was Montgomery who was trying to peddle his whistleblowing allegations to Risen and the Fox News reporter, who concluded Montgomery had been "lying about a lot of things," including producing this data.  Handman Decl. to MSJ Exs. 7, 8.  Similarly, a post-publication refusal to retract does not evidence actual malice, as federal courts from the Supreme Court on down have held, particularly when, as here, Defendants did not – and do not – believe there was anything to retract.

In sum, Plaintiff has failed to show that the statements he complains of are ***one***, outside the protected opinion based on disclosed facts; ***two***, substantially false; ***three***, published with actual malice; and ***four***, outside the fair report privilege.  Any one of those grounds requires summary judgment be entered in favor of Defendants.

Courts recognize that actual malice is a "daunting" standard and intentionally so when the subject matter is as important as the conduct by our government of the war on terror.   This is exactly when courts dispose of these cases at the earliest moment, routinely granting pretrial motions because libel cases lie in a "different category."  Indeed, as the U.S. Supreme Court recognized in *New York Times Co. v. Sullivan*, burdensome civil litigation has as much or more of a chilling effect on public debate as criminal prosecution.  376 U.S. 254, 277 (1964) ("The fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal

statute."). *Accord Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (Rogers, J.) (affirming grant of motion to dismiss) ("[I]f a [libel] suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if defendant ultimately prevails.") (quoting *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)).[4]

## II.   ARGUMENT

### A.   The Plaintiff Fails to Dispute That Many of the Challenged Statements Are Non-Actionable Opinion

Plaintiff complains that "no one actually said" that Montgomery "was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate hoaxes in American history," Opp. 16, but the challenged statement is non-actionable opinion based on disclosed facts and whether any source actually used these exact words is irrelevant.[5]  His own lawyer called him a "con artist" – and his software a "fraud." Risen's language that Montgomery engaged in "one of the most elaborate hoaxes in American history" is a non-verifiable, subjective ranking that depends on the author's viewpoint and viewpoints of the officials Risen describes later in the Chapter, rather than a statement of

---

[4] Because Plaintiff chose to bring this suit in what the court in Florida has now concluded was an inconvenient forum, where neither the Plaintiff nor any of the Defendants are located, the "chilling effect of such litigation" has already been exacerbated.  Defendants have always contended that D.C. law applies, but cited both D.C. and Florida law in support of their summary judgment motion.  *See* MSJ 5-6 n.6.  Now that the case has been transferred to the District of Columbia, D.C. law clearly applies.

[5] Plaintiff's opposition makes no mention of his claim that the characterization that he is an "incorrigible gambler" is defamatory and should be deemed waived.  "'Where a plaintiff [does not address] some ... arguments raised in a defendant's motion to dismiss, courts in this district may treat such arguments as conceded.'"  *Matthews v. Dist. of Columbia*, 730 F. Supp. 2d 33, 39 (D.D.C. 2010) (quoting *Payne v. Dist. of Columbia*, 592 F. Supp. 2d 29, 37 (D.D.C. 2008); *see also City of Waukesha v. EPA*, 320 F.3d 228, 254 (D.C. Cir. 2003) (stating that courts need not address "asserted but unanalyzed contention[s]").  The statement, however, is also non-actionable opinion where the FBI Report confirms Montgomery was a gambler and he was arrested for passing a million dollars in bad checks to a casino.  *See* MSJ 21 n.17.

objective fact.[6]  *See* Reply SMDF ¶ 66.

Risen's opinion is based on facts disclosed later in the Chapter that the White House seriously considered its authority to shoot down passenger jets over the Atlantic based on Montgomery's intelligence.  SUMF ¶ 33.  Moreover, it is disingenuous for Plaintiff to suggest that Risen's characterization of Montgomery's actions lacked any factual support because "no one actually said this," Opp. 16.  To the contrary, among other evidence, Risen reviewed published reporting on Montgomery's false claims, SUMF ¶¶ 10-23; Risen Dep. Tr. 101:14-22, court documents wherein eTrepid employees stated that Montgomery had them "participate in falsifying tests for the military," Risen Dep. Tr. 285:8-288:14, numerous sources who said there were no coded messages in Al Jazeera broadcasts, *e.g.*, *id.* at 340:8-342:10, confirmation from the CIA that the software did not perform as Montgomery and eTrepid promised, *id.* at 383:3-385:13, Congressional testimony about the "Bogus Intelligence," Risen Decl. ¶ 25, a CIA Director's acknowledgment that the software "was determined not to be a source of  accurate information," Risen Decl. Ex. 19 at 9, and a White House official who said "we were 'played,'" Risen Decl. ¶ 30.[7]

Moreover, to the extent the challenged statements indicate that Risen was engaging in

---

[6] *See Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258 (N.D. Ga. 2007) (describing plaintiff and other gun dealers as "worst of the worst," "a scourge on our society," "rogue," and "immoral and corrupt" statements of non-actionable opinion), *rev'd on other grounds*, 552 F.3d 1290 (11th Cir. 2008); *Mirafuentes v. Estevez*, 2015 WL 8177935, at *3 (E.D. Va. Nov. 30, 2015) (assertion that plaintiff "among the most corrupt Mexicans in 2013" non-actionable opinion); *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 600 (6th Cir. 2013) (TripAdvisor's placement of Grand Resort on "2011 Dirtiest Hotels list" statement of opinion).

[7] And, the very words Plaintiff contends are Risen's own defamatory statements were used in previous, widespread reports on Montgomery's con, including: the *New York Times* (MSJ, Risen Decl. Ex. 3 at 1 ("hoax," "con man"), 5 ("ruse"); NBC News article by Lisa Myers, Aram Roston and NBC Investigative Unit, *id.* Ex. 4 at 1 ("bogus analysis led to terror alert in 2003"), 2 ("skeptical" "implausible"); and *Defense News*, *id.* Ex. 13 at 1 ("Obama's Counterterror Czar Gave Bogus Intel to Bush White House," "Disseminated to the Bush White House a stream of CIA intelligence from a bogus source," "The bogus intelligence nevertheless led…"), 2 "Bogus CIA intelligence," CIA officials viewed the intelligence as "crazy " and "fake"), 3 ("intelligence officials back at the agency were convinced the information was a fraud").

speculation and conjecture, that also is protected as opinion.[8]  The Chapter is written in the language of hypothesis, *e.g.*: "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode al Qaeda's invisible messages."  Chapter at 44.  And, it includes at various points Montgomery's counterpoints, *e.g.*: "Montgomery strongly denies that he peddled fraudulent technology.  He insists that the charges have been leveled by critics with axes to grind, including his former lawyers and former employees."  Chapter at 33.  Thus, the Chapter's characterization of the controversy obviously signals that the Chapter's conclusions are statements of opinion, and are therefore not actionable.

**B.      The Chapter Cannot Be Reasonably Understood to State or Imply that Montgomery Directed the White House to Order Planes Not to Fly or Consider Shooting Planes Down**

Tacitly conceding that the actual statements in the Chapter are true, Plaintiff instead contends that the Chapter falsely implies that Montgomery told government officials to act on the intelligence that he purported to provide via his software technology.  Opp. 22-23.  To state a claim for a defamatory implication, the "defamatory implication must be present in the plain and natural meaning of the words used," and "[t]he language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference."[9]

---

[8] *See, e.g.*, *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("differing accounts" of mysterious fire incident are "opinion based on speculation without any implication of fact"); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 154 (1993) ("proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture"); *Haynes v. Alfred Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, C.J.) (where speaker is "expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable"); *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995) ("When, as here, an author writing about a controversial occurrence fairly describes the general events involved and offers his personal perspective about some of its ambiguities and disputed facts, his statements should generally be protected by the First Amendment.").

[9] *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993) (citing *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) ("[I]f a communication, viewed in

A fair reading of the Chapter demonstrates that Risen only reported that Montgomery provided intelligence purporting to decode messages in Al Jazeera broadcasts to government officials and that those officials then relied on the intelligence, going so far as to pass it on to the White House.  Chapter at 32, 45; Risen Decl. ¶ 30.  A reasonable reader could not understand the Chapter to state or imply that Montgomery advised or ordered planes to stop flying from Europe or the White House to consider shooting down planes.  And, even if the Chapter could reasonably be understood as giving rise to any of those implications (and it cannot) and even if these were not otherwise protected as opinion (which they are), *see supra* § II.A, Plaintiff must show, based on the Chapter itself, that Defendants intended or endorsed the inference – a difficult hurdle that Plaintiff has made no attempt to meet.[10]  Plaintiff can cite to *no* evidence in the Chapter that Defendants intended to convey that Montgomery had instructed the government how to respond to the intelligence that he purported to provide from his bogus software.  In fact, the Chapter clearly faults the government for taking these steps based on Montgomery's fake intelligence, including Montgomery's contention that "Montgomery let the CIA draw its own conclusions based on the information he gave them."  Chapter at 41.

**C.      Plaintiff Has Failed To Come Forward With Clear And Convincing Evidence of Substantial Falsity**

The crux of the Chapter and Plaintiff's Complaint reported that Montgomery's software did not work as he claimed it did, but Plaintiff has not come forward with what Magistrate Judge

---

its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established.  But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that [defamatory] meaning.")).

[10] *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1339 (D.C. Cir. 2015) ("[T]o make out a defamation by implication claim even in cases involving affirmative statements, D.C. law requires an 'especially rigorous showing.'") (affirming 12(b)(6) dismissal) (citing *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000); *Chapin*, 993 F.2d at 1092-93).

Goodman called the "critical evidence" about "whether in fact the software worked" – or indeed

any evidence to suggest substantial falsity and, accordingly, it is admitted.  Rather than even attempt

to meet his constitutional burden of proving that the speech at issue was materially false, Plaintiff

claims that he does not need to prove falsity in this defamation case.  Opp. 22-23.  A defamation

plaintiff *must* show falsity, regardless of whether recklessness is demonstrated or whether

defamation by implication has been asserted.[11]  And where, as here, the publication involves a

public figure and a matter of public concern, a defamation plaintiff is *required* to prove not only that

the statements alleged were defamatory and false, but also that the defendant acted with actual

malice.[12]  This standard applies whether District of Columbia or Florida law applies to Plaintiff's

claims,[13] and whether or not Montgomery's claim is viewed as defamation by implication.[14]

---

[11] *Air Wisconsin Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 861 ("[W]e have long held … that actual malice entails falsity."), *reh'g denied*, 134 S. Ct. 1575 (2014); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986) ("[A] public-figure plaintiff must show the falsity of the statements at issue."); *Herbert v. Lando*, 441 U.S. 153, 176 (1979) ("[T]he plaintiff must focus on the editorial process and prove a false publication attended by some degree of culpability."); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) ("We held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was false.").

[12] *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001) (district court may limit discovery to "threshold issue of falsity" before discovery on actual malice); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1238-39 (11th Cir. 1999) (where "public figure plaintiff, and the broadcast was a matter of public concern, [the plaintiffs] are required to prove not only that the statements alleged were defamatory and false, but also that [the defendant] acted with 'actual malice.'") (internal citations omitted); *Secord v. Cockburn*, 747 F. Supp. 779, 783 (D.D.C. 1990) (defamation plaintiff "must demonstrate that the statements complained of are (1) defamatory, (2) false, (3) statements of fact (and not opinion), and (4) made with the requisite degree of fault"); *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) ("[D]efamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement.").

[13] *Doe No. 1 v. Burke*, 91 A.3d 1031, 1044 (D.C. 2014) (elements of defamation include falsity and "[i]f the plaintiff is a public figure, [] the fault component embodied in the third defamation element is heightened" to require actual malice); *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (elements of defamation include falsity).

[14] *White*, 909 F.2d at 520 ("But if [a] communication, by the particular manner or language in which true facts are conveyed, supplies additional, affirmative evidence suggesting that the

Plaintiff's desperate attempt to evade his burden of proving falsity stems from his failure to produce the software necessary to assess the truth or falsity of the challenged statements, which compels the conclusion that he cannot meet his burden to prove falsity as a matter of law.  MSJ 22-24; Sanctions Mot. 17-18 n.22.  To date, Plaintiff has violated three court orders and spoliated "what could be the most important evidence in the entire case," the software central to his burden to prove falsity.[15]  Defendants have fully briefed a motion for the sanction of dismissal because in spoliating the subject software Montgomery has deprived them of a fair defense.

Defendants have demonstrated, and the court has found, that Plaintiff's software is ***not*** classified – yet he repeatedly refuses to produce it.  In a case in which Montgomery's former employer, eTreppid, sued Montgomery for allegedly misappropriating the subject software, the U.S. government moved for and obtained a protective order under the state secrets privilege to protect certain classified information from discovery.[16]  However, the protective order specifically ***excluded*** Montgomery's software from its scope.[17]  Magistrate Goodman credited the Nevada court's finding that the software was not classified,[18] and, at a January 5, 2016 hearing on Defendants' motion for sanctions, rejected Plaintiff's contention that the CIA had

---

defendant intends or endorses the defamatory inference, the communication will be deemed capable of bearing that meaning.").

[15] Stay Order 6, ECF No. 122.

[16] *Montgomery v. eTreppid Technologies, Inc.*, 3:06-cv-00056-PMP-VPC, ECF No. 253 (D. Nev. Aug. 29, 2007), Defs.' Pre-Hearing Mem. Ex. 2, ECF No. 94-2.

[17] *Id*. at 2-3, ¶ 4(c) (stating that "[t]his Order does not preclude the Parties from serving or taking any discovery … relating to … [t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties.").  The Nevada court fined Montgomery $2500 a day until he produced it.  Rather than producing the software, Montgomery entered into a $25 million confession of judgment, went bankrupt, and when he did not produce the software, the bankruptcy discharge was denied.  Defs.' Pre-Hearing Mem. Ex. 5, ECF No. 94-5.  *See also* SUMF ¶¶ 48-61.

[18] Aug. 21 Hr'g Tr. 30:18-23; 40:7-47:1; 79:24-80:1 (relying on Montgomery's counsel's representation that they gave the FBI the software, and "order[ing] Mr. Montgomery to turn over that software and to take advantage of his right of continued access to nonclassified information."), ECF No. 111-1.

determined that the software was classified.[19]

Montgomery initially refused to produce the software, which Defendants had requested since June 1, 2015.[20]  Montgomery then testified under oath on August 20, 2015,[21] and his counsel represented to the Court the next day,[22] that Montgomery gave the only copy of the software to the FBI that week.  Apparently, without telling Defendants or seeking leave of court, Montgomery gave his software to the FBI in a massive document dump from which the agency could not retrieve the software.[23]  On August 22, 2015, the court ordered Montgomery to "use his self-described right of continued access to non-classified information (in relation to his turning over the subject software to the FBI) and produce the software to Defendants."[24]  The court thereafter issued an order denying Montgomery's motion to stay the part of the August 22 Order requiring him to produce the software[25], wherein the court reiterated that Montgomery was obligated to produce the software which the Magistrate found to be "highly relevant," because *"Plaintiff's burden to prove falsity does not hinge on whether he [Risen] ever had a copy of the software" but rather "the critical fact is whether in fact the software worked."*[26]

---

[19] Jan. 5, 2016 Hr'g Tr. 72:3-73:4, ECF No. 233-1.  Even if the software was classified as Plaintiff has claimed (although uncontroverted evidence suggests it is not) – the case would have to be dismissed.  *See, e.g.*, *Trulock v. Lee*, 66 F. App'x 472, 476-77 (4th Cir. 2003) (per curium) (affirming dismissal of libel action brought by former official Mr. Klayman represented because classified information subject to state secrets privilege was central to proving falsity); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 2015 WL 1344479, at *5-8 (S.D.N.Y. Mar. 23, 2015) (dismissing libel action on accusations plaintiff violated Iran sanctions where case would disclose state secrets).

[20] Mot. for Sanctions Ex. 1, ECF No. 1661 (Pl.'s July 1 Resp. & Objections to Defs.' Interrog. 9 & Req. for Produc. 8); Pl.'s July 15 Resp. & Objections to Interrog. 9, ECF No. 90-2.

[21] Sanctions Mot. Ex. 2, ECF No. 166-2 (Montgomery Dep. Tr. 127:12-16; 128:1-25; 129:1-4; 131:12-22; 132:21-23).

[22] Aug. 21 Hr'g Tr. 6:25; 7:1-10; 8:7-18, ECF No. 111-1.

[23] *See* ECF No. 126 (Sept. 8, 2015 letter from James Baker, FBI General Counsel, to Montgomery's counsel).

[24] Aug. 22 Order ¶ 6, ECF No. 107.

[25] ECF No. 112.

[26] Stay Order, ECF No. 122.

"Accordingly, Defendants have a right to inspect and test the software," the Court concluded; "It is highly relevant and Montgomery must produce it."  "In fact," the Court found, the software "is critical" evidence and Montgomery's efforts "to, in effect, seek to sequester what could be the most important evidence in the entire case," were unfounded.  Montgomery continued to resist producing the software, and at a hearing on October 16, 2015, the court issued a third order, requiring Montgomery to produce the software to Defendants, as well as his communications with the FBI, and to give the FBI comprehensive instructions on how to locate the software within the hard drives he turned over to the agency.[27]  Montgomery then changed his tune again and filed a declaration, swearing under oath that he "believes" he did not have access to his own software and did not give it to the FBI.[28]  To date, Plaintiff has not produced the subject software to Defendants and the FBI, citing his failure to provide adequate identifying information, has stopped looking.[29]

Because Montgomery spoliated the software and violated three discovery orders in bad faith, no lesser sanction than dismissal will suffice to cure the extreme prejudice he caused Defendants. Plaintiff has failed to produce what the court considered the "critical" evidence, dooming any chance for him to carry his burden of proving substantial falsity and warranting dismissal.[30]

Moreover, absent the software, Montgomery cannot testify "My software and technology did work, does work, and is still being used successfully by the U.S. Government today." Montgomery's 1st Decl. ¶ 7f, ECF No. 234-11.  Such testimony would be inadmissible under the

---

[27] ECF No. 154.
[28] Pl.'s Decl., ECF No. 158-1.
[29] Sanctions Mot. Ex. 4, ECF No 166-4; Defs' Suppl. Auth. Ex. A, ECF No. 196.
[30] *See, e.g.*, *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 374 (4th Cir. 2013) (dismissal due to abuse of discovery process).  Defendants have also sought attorney's fees and costs against Montgomery and his counsel, under Rule 37(b), as a monetary sanction for their egregious conduct.  Sanctions Mot. 20.

best evidence rule.  Fed. R. Evid. 1002-04.  But, even beyond that, the court should exclude

secondary evidence through Montgomery's testimony because he lost, sequestered, or destroyed

the original software in bad faith.[31]  He has offered only his bare assertions without the software,

without tests, without the alleged videos, and witnesses he claims will testify that the "software

and technology does indeed work."  Montgomery 1st Decl. ¶¶ 28, 34, ECF No. 234-11.  ***None***

have been submitted to carry his burden on this motion.

**D.      Plaintiff Is A Limited Purpose Public Figure**

Plaintiff also attempts to evade dismissal by maintaining, incorrectly, that he is merely a

private citizen and not a limited-purpose public figure subject to the formidable actual malice

fault standard.  Opp. 23-25.  Plaintiff's gambit must fail, however, because Montgomery has

"inject[ed]" himself into and been "drawn into a particular public controversy" centered on

widely-publicized allegations that he committed fraud in contracting work he performed for the

U.S. government involving national security.  *Tavoulareas*, 817 F.2d at 772.  Plaintiff is thus a

limited purpose public figure, and consequently must establish sufficient evidence with clear and

convincing clarity, as a matter of law, for a reasonable fact finder to find that Defendants acted

with actual malice.  *See* MSJ 25-28.

---

[31] Fed. R. Civ. P. 37(b)(2)(A)(ii); Fed. R. Evid. 1004(a).  *See also Clarke v. Washington Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 20 (D.D.C. 2012), *aff'd*, 540 F. App'x 3 (D.C. Cir. 2013) ("A party that fails to preserve evidence runs the risk of being justly accused of spoliation … and find itself the subject of sanctions.").  In *Clarke*, the Court (Contreras, J.) described the three-step analysis governing a default judgment punitive sanction, which is warranted when: "(1) the other party has been so prejudiced by the misconduct that it would be unfair to require [the party] to proceed further in the case; (2) the party's misconduct has put an intolerable burden on the court by requiring the court to modify its own docket and operations in order to accommodate the delay; or (3) the court finds it necessary to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future."  *Id.* at 21 (citing *Webb v. Dist. of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998).  *See also Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 127 (S.D. Fla. 1987) (prohibiting party from offering testimony to describe the contents of "highly relevant" documents that party spoliated in bad faith under Fed. R. Evid. 1004 and entering dismissal sanctions).  *See* Sanctions Mot. 16-20; Sanctions Reply 10; Defs.' Suppl. Auth., ECF No. 196.

*First*, Montgomery is the subject of nearly 10 years of national media reporting about his software fraud.  Notwithstanding Plaintiff's attempt to downplay the cumulative evidence in numerous published reports that he was the contractor whose software provided inaccurate intelligence about Al Qaeda codes on Al Jazeera broadcasts and rigged tests of his software to the government, SUMF ¶¶ 10-22, this is the same controversy that is the subject of in-depth reporting in the Risen Book.  The 2010 *Playboy* article, "The Man Who Conned the Pentagon," even appears on Plaintiff's Wikipedia page to this day and the cover image was on his Twitter page.  SUMF ¶ 22.

*Second*, Montgomery voluntarily sought out the media, going on NBC News in 2007 to make explosive – and ultimately discredited – charges that his former partner tried to bribe a government official to get contracts involving *his* software.  Even as recently as 2014, he was trying to get on Fox News.  SUMF ¶ 23.  By voluntarily creating a public controversy and engaging in a course of conduct that was likely to receive – and did receive – widespread media attention, Montgomery became a public figure.  *See Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 32 (D.C. Cir. 1990) (public controversy, in which plaintiff became embroiled as public figure, because associated with mayor and lied to press about involvement in death of friend).

*Third*, Montgomery "invited comment" by seeking government contracts on the government's national security efforts, *Silvester v. ABC*, 839 F.2d 1491, 1496 (11th Cir. 1988) (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1298 (D.C. Cir. 1980)); *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 304 (4th Cir. 2008), knowing that such work invites public scrutiny of the expenditure of taxpayers' money.

The question of public figure status based on these undisputed material facts is a threshold question of law for the court to decide, not a jury, as Plaintiff argues.  *Waldbaum*, 627 F.2d at 1294 n.12.  Here, any one of these three grounds establishes Montgomery is a limited purpose public figure.

**E.      Plaintiff Has Failed to Come Forward With Clear And Convincing Evidence of Actual Malice**

Even if Plaintiff had met his burden on falsity – and he has not – the undisputed facts here conclusively demonstrate the absence of actual malice, as a matter of law, compelling summary judgment on this ground as well.  The Chapter relies on previously published articles in reputable publications, statements in official court records, FBI reports, congressional documents, interviews with government officials and Montgomery's own former lawyer, and includes Plaintiff's denials.  Plaintiff has attempted, and failed, to come forward with "concrete" "affirmative" evidence that would allow a reasonable jury to conclude "with convincing clarity" that Defendants actually entertained serious doubts as to the truth of the statements or published them with a high degree of awareness of their falsity.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 257 (1986).

Actual malice cannot be proved in the abstract.  Where the plaintiff focuses on several specific statements, he must demonstrate actual malice as to each statement separately before he can recover on that statement.  This is why, given the high level of proof necessary to show actual malice by clear and convincing evidence, courts routinely grant summary judgment dismissing libel claims that fail to meet this exacting standard.[32]  Here, Plaintiff's failure to come forward with evidence that the software works or worked leads to the conclusion that he cannot meet his burden of coming forward with clear and convincing evidence that would allow a jury to find that the Defendants knew at the time of publication that claims that the software did not work were false or had serious doubts as to its truth.  *See Air Wisconsin*, 134 S. Ct. at 861 (confirming need to prove material falsity in defamation claims).  If Risen's conclusion that the

---

[32] *See, e.g.*, *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) (affirming summary judgment); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996) (affirming summary judgment); *Moldea v. New York Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) (affirming summary judgment); *Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966) (affirming summary judgment).

software did not work was "reasonable," then the fact that Risen reached that conclusion could hardly amount to a knowing falsehood.[33]

Plaintiff effectively concedes that neither Risen nor any of the editorial staff at HMH, either in depositions or documents produced, provided any "smoking gun," *i.e.*, "direct evidence" that they knew what Risen wrote was false or had serious doubts at the time of publication. Hence, Plaintiff resorts to "circumstantial evidence" to establish actual malice. To the extent circumstantial evidence can ever be proof of actual malice, it must bear on Defendants' subjective state of mind at the time of publication. Any effort by Plaintiff to establish that any Defendant subjectively doubted the truth of the challenged statements, however, fails. To take but one of many examples, Plaintiff repeatedly cites a reference in his Amended Complaint to an interview Risen gave about the Book where he said "it is very difficult to tell what is actually true," Opp. 12, 27 (citing Am. Compl. ¶¶ 71, 72). But, as Risen pointed out in his deposition, *see* Reply SMDF ¶ 107, and as review of the interview makes clear on its face, *see* Am. Compl. Ex. B, ECF No. 44 at 104, Risen was referring to a totally different chapter in the Book, which had nothing to do with Montgomery.

The "circumstantial evidence" Plaintiff points to begins and ends with his attacks on the credibility of Risen's sources. Plaintiff's counsel devotes page after page attacking Risen's sources. *E.g.*, Opp. 4 ("None of these so-called sources provided credible information about Risen's wild, unsubstantiated claims. . . ."). But, Plaintiff does not address the elephant in the

---

[33] *See Time, Inc. v. Pape*, 401 U.S. 279, 289, 291 (1971) (noting *New York Times Co. v. Sullivan's* "constitutional zone of protection for errors of fact caused in negligence," as well as "errors of interpretation"); *CACI*, 536 F.3d at 304 (where government reports suggested contractors were responsible for a range of atrocities, defendant radio talk show host "would not have been speaking with reckless disregard for the truth if she had suggested that [plaintiff government contractor] was responsible for murder"); *Moldea v. New York Times Co.*, 22 F.3d 310, 315 (D.C. Cir. 1994) (no actual malice where book review was a "rational assessment").

room – Risen did not rely on any one source's versions of events, he relied on documents which were matters of public record or published in news accounts, and which remain uncontroverted to this day, including:  FBI reports, court documents, and Congressional records including FBI interviews of Warren Trepp, Montgomery's partner in eTreppid, who told the FBI that he later learned Montgomery had no real computer software programming skills, and other eTreppid employees who told the FBI that they believed Montgomery's software was fake and he had them rig tests to dupe government officials,[34] and statements from John Brennan's confirmation hearing for CIA Director including Senator Saxby Chambliss's written questions titled "Bogus Intelligence" based on classified documents reviewed by the Senate Intelligence Committee showing that "CIA officials derided [Montgomery's] information," SUMF ¶¶ 24-31; and interviews with numerous high-placed government sources and other sources close to Montgomery or familiar with his work, including but not limited to William D. Murray, CIA Paris Station Chief in 2003 when Montgomery was offering the CIA software that purported to read coded messages on Al Jazeera broadcasts, Frances Townsend, a former White House counterterrorism official on the National Security Council who dealt with Montgomery's intelligence at the White House, Samantha Ravitch, Cheney's aide, who met with Montgomery in the White House, but said government validation of the software was never forthcoming, CIA, Air Force and SOCOM spokesmen and Montgomery's former lawyer who called him a "con artist."  SUMF ¶¶ 32-43.  *See also* Risen Decl. ¶¶ 7-37, ECF No. 203 (and exhibits appended thereto).

---

[34] To try and diminish these FBI interviews, Plaintiff notes that the FBI search was found unconstitutional, *see In the Matter of the Search of 12720 Buckthorn Lane, Reno, Nevada, et al.*, Case No. 3:06-cv-00263-PMP-VPC, Order at 31 (Nov. 28, 2006).  But the reasons for the court's holding were unrelated to the truthfulness of these statements, but rather because the court was unaware that the documents and software subject to the search warrant were part of an ongoing civil suit between Montgomery and his former partner and because they did not involve classified information and, thus, did not establish probable cause to search.  *Id.* (noting that "the Government conceded that 'nine Secret hard drives' were not, in fact, classified …'").

Even if some sources were self-interested or of questionable credibility, reliance on them would not amount to actual malice. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003 (fact that defendants "acted on the basis of a biased source and incomplete information" did not establish actual malice). It is thus unsurprising that Plaintiff does not address the numerous cases where reliance on sources of more dubious credibility did not amount to actual malice.[35]

Plaintiff suggests that his version of events should have supplanted the overwhelming contrary information Risen obtained from numerous well-placed sources and that failure to do so constituted actual malice. Opp. 28. However, Plaintiff's denials do not establish actual malice.[36] Indeed, Plaintiff's *own* repeated invocation of the Fifth Amendment at a 2010 deposition to the question if his software was a "complete fraud" provides further support for Risen's conclusion not to credit Montgomery's version of events. Risen Decl. ¶ 22. Plaintiff tries to downgrade the significance of his testimony by claiming that to answer the question posed would have revealed classified information, but the question, on its face, does not ask for classified information, government lawyers had specifically excluded disclosure of his software from a protective order, a Nevada federal court had already held the software was not classified, and government lawyers were at the deposition and did not object to the question. Sanctions Mot. 3-4; *see also supra* § II.C.

---

[35] *See, e.g., Cobb v. Time, Inc.*, 278 F.3d 629, 637-38 (6th Cir. 2002) (reliance on source with "sketchy" past who failed to disclose recent arrest and told reporters a detail they found "bizarre"); *Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 720 (10th Cir. 2000) (reliance on unverified Internet posting); *McFarlane*, 91 F.3d at 1513-14 (author "had reason to be wary" of his source); *Silvester*, 839 F.2d at 1498 (evidence that source was unreliable); *Keogh*, 365 F.2d at 971 (evidence writer was "persistently inaccurate").

[36] *Liberty Lobby v. Anderson*, 1991 WL 186998, at *8 (D.D.C. 1991) ("[D]efendants' knowledge of the existence of contradictory source, without more, does not constitute clear and convincing evidence of actual malice."); *Secord*, 747 F. Supp. at 793 ("[T]he mere fact that divided opinion exists among reporters as to the credibility of an individual does not reflect on the defendant's state of mind and actual malice."). Failure to speak to favorable sources prior to publication does not establish actual malice. *Levan*, 190 F.3d at 1243 (defendant "was not required to continue its investigation until it found *somebody* who would stand up for [plaintiff]").

Nor were Defendants obligated, as Plaintiff suggests, to engage in more investigation and a "fact-checking" process before publishing the Book. [37]  Opp. 18.   Failure to investigate is not evidence of actual malice, since "a plaintiff will always be able to point to ways in which the defendant could have pursued another lead or sought another piece of corroborating evidence."[38] *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 53 (D.D.C. 2005).

In any event, Risen did disclose differing accounts, including Montgomery's.  "Reporting perspectives at odds with the publisher's own 'tends to rebut a claim of malice.'"  *Lohrenz*, 350 F.3d at 1286 (quoting *McFarlane*, 748 F.3d at 1304).  Where, as here, Risen extensively interviewed Montgomery, there is affirmative evidence of the absence of actual malice.  *See Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218-19 (D.D.C. 2012).  And Montgomery's general denials do not establish knowledge or serious doubts as to falsity.  *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (affirming dismissal, author's decision to ignore positive information

---

[37] Plaintiff's assertion that not fact-checking the Book is circumstantial evidence of actual malice lacks merit.  Opp. 30 (quoting *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 657, 693 (1989)).  *Harte-Hanks* is distinguishable because the newspaper in that case conducted an investigation for a story that yielded several sources but relied on a single source that was "consistently and categorically" contradicted by six other witnesses interviewed by its journalists.  Under those circumstances, the Supreme Court concluded that evidence of obvious reason to doubt the veracity of the source for a story and the newspaper's failure to listen to contrary sources suggested a "deliberate effort to avoid the truth" that was sufficient to support a jury's finding of actual malice.  *Id.* at 684-85, 692.  This is wholly different from Risen's extensive sourcing for the Chapter.  While fact-checking is not typically done in book publishing, Risen did have two knowledgeable reporters review the Chapter before publishing. *See* Reply SMDF ¶ 74; SUMF ¶ 8.

[38] *See also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (actual malice requires more than a departure from reasonable standards of journalism; "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."); *Tavoulareas* 817 F.2d at 798 ("allegation of insufficient investigation" does not "constitute the very proof of the 'serious doubts' that is separately required"); *Silvester v. ABC*, 650 F. Supp. 766, 779 (S.D. Fla.) ("[T]he lack of a specific source for the [reporter's] arson hypothesis does not offend the Constitution.  Members of the news media may spin their own theories so long as those propositions are not so unreasonable under the circumstances as to demonstrate malice"), *aff'd*, 839 F.2d 1491 (11th Cir. 1988).

about plaintiff "could not plausibly suggest that [author] 'entertained serious doubts as to the truth of his publication.'"); *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977).

Plaintiff does not – and cannot – dispute that Risen relied on articles in reputable publications, from NBC News, Bloomberg News, the *Wall Street Journal*, *Playboy*, as well as the *New York Times*, that published the basic allegation that Plaintiff's software was a fraud without correction, retraction or lawsuit.  Plaintiff cites his email, nearly two years after *The Times* article when Risen had contacted him for an interview for the Book, but, even then, Montgomery did not demand a retraction, but cited only who Risen should have talked to or what he should have included, not any specific errors of fact. [39]  Reliance on reputable publications as a matter of law negates fault, whether negligence or actual malice.  *See, e.g.*, *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *Biro*, 963 F. Supp. 2d at 279.  *See also* MSJ 31.  Similarly, Risen's reliance on statements to the FBI, contained in court records, of a prior partner and former employees who questioned whether Montgomery's software even existed and recounted how they were told to rig tests to dupe government officials, negates fault, whether negligence or actual malice.  *See, e.g.*, *Klayman v. City Pages*, 2015 WL 1546173, at *16-17 (M.D. Fla. Apr. 3, 20105).

Finally, that Defendants rejected Montgomery's supposed request for retraction after publication of the Book, Am. Compl. ¶ 44, cannot demonstrate actual malice, again as a matter of law, because it does not prove the wrongful state of knowledge at the time of the initial publication. [40]  Here, where there was evidence of error, the "refusal to retract" only further

---

[39] Montgomery claims that he sent a retraction letter to the editor at the *New York Times* but offers no documentary support and neither Risen nor Lichtblau ever heard of such a demand. Reply SMDF ¶ 65.

[40] *See N.Y. Times*, 376 U.S. at 286 ("[F]ailure to retract upon respondent's demand  ... is [] not adequate evidence of malice for constitutional purposes."); *Klayman*, 2015 WL 1546173, at *15

supports "*no* actual malice."[41]   *Tavoulareas v. Piro*, 759 F.2d 90, 132 n.51 (D.C. Cir. 1985)

("[T]he refusal may show that the publisher believed and still believes that the falsehood was

true."), *rev'd on other grounds*, 817 F.2d 762 (D.C. Cir. 1987) (*en banc*).

**F.      The Plaintiff Fails to Dispute That The Fair Report Privilege Bars His Claims**

Plaintiff contends that Risen "misrepresents the court records, past news reporting, and

government records," in the Chapter, but Montgomery fails to cite ***any*** inaccurate accounts of

official records.  Opp. 32-33.  Instead, Montgomery's actual complaint is that Risen reported on

some statements in court records, congressional records, and government investigative reports

and omitted or did not report on all statements that Montgomery would have liked him to.  *Id.*

Montgomery cannot substitute his editorial judgment for Risen's, especially where, as here, it is

undisputed that Risen repeatedly included Montgomery's denials (SUMF ¶¶ 7, 31, 44), making

the report more than "fair" for purposes of the privilege.  *See, e.g.*, *Dorsey v. Nat'l Enquirer,*

*Inc.*, 973 F.2d 1431, 1437, 1440 (9th Cir. 1992).  Insofar as the Chapter reports on statements in

official records that Montgomery does not like, or disputes, his version of the facts does not

divest Defendants of the fair report privilege.

The fair report privilege is liberally applied.  Courts recognize that it is difficult to

condense complex government and court records into a narrative form – here a book chapter.

There is, therefore, no requirement that the publisher describe the government proceedings

---

(post-publication request for "correction or retraction does not help Plaintiff to establish actual
malice").

[41] *See also Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 56 (D.D.C. 2002) ("no duty to retract or
correct a publication, even where grave doubt is cast upon the veracity of the publication"), *aff'd*,
350 F.3d 1272 (D.C. Cir. 2003); *McFarlane*, 91 F.3d at 1515 ("no authority … for the
proposition that a publisher may be liable for defamation because it fails to retract a statement
upon which grave doubt is cast after publication."); *Biro*, 807 F.3d at 546 (after-the-fact refusal
to retract does not show actual malice as a matter of law).

completely or in detail in order for the privilege to attach.[42]  Journalists, like Risen, typically

quote small portions of the particular government document that are of interest rather than report

the proceedings or documents as a whole.  Provided the proceedings are identified, the report of

such information will be protected under the privilege.[43]  Plaintiff cites to no cases holding

otherwise.  Instead, his reliance on *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502

(Fla. App. 3d Dist. 1993), only confirms that the privilege is liberally applied, holding that there

is "no duty to determine the accuracy of the information contained" in the official records

"before broadcasting it in his report."  *Id*. at 503.  *See also White*, 909 F.2d at 527 (explaining

that privilege "extends broadly to the report 'of any official proceeding, or any action taken by

any officer or agency of the government,'" including not only government proceedings

themselves, but also allegations or findings that prompt such proceedings).

     Plaintiff incorrectly demands that a jury must compare the publication to the official records

before a defendant may obtain fair report privilege protections.  This is a misstatement of the law

and even the Florida cases upon which Plaintiff relies do not support his contention.  *Stewart v. Sun

Sentinel Co.*, 695 So. 2d 360 (Fla. App. 4th Dist. 1997) (affirmed summary judgment in favor of the

---

[42] Nor does such editorial decision-making constitute actual malice.  *Lohrenz*, 223 F. Supp. 2d at
54 ("No inference of malice may be drawn from [defendant's] … 'selective editing'….  It is
generally accepted that media defendants are not compelled to publish the entirety of their
sources and may edit or abridge their sources as they see fit.").

[43] *White*, 909 F.2d at 527-28 (report of D.C. administrative committee); *Rushford v. New Yorker
Magazine, Inc.*, 846 F.2d 249, 254 (4th Cir. 1988) (cross-examination and bench conference);
*Dowd v. Calabrese*, 589 F. Supp. 1206, 1217 (D.D.C. 1984) (report of DOJ investigation); *Ricci
v. Venture Magazine, Inc.*, 574 F. Supp. 1563, 1565-67 (D. Mass. 1983) (threat by accused
directed at witness); *The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.*, 413 F. Supp.
555, 560-61 (S.D.N.Y. 1976) (allegations in complaint); *Mark v. Seattle Times*, 635 P.2d 1081
(Wash. 1981) (suspect information report and affidavit of probable cause); *see also DeMary v.
Latrobe Printing & Publ'g Co.*, 762 A.2d 758 (Pa. Super. 2000) ("[T]he privilege would apply to
material that was determined to be irrelevant and inserted for the sole purpose of sensationalizing
the article."); *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 399
N.E.2d 1185 (N.Y. 1979) (U.S. House of Representatives intelligence documents).

press; court compared publication with public records and found the publication to be an accurate and fair reflection of the contents of the public records); *Accord Heekin v. CBS Broad., Inc.*, 789 So. 2d 355 (Fla. App. 2nd Dist. 2001) (comparison is a task for the "trial court").

Finally, the Amended Complaint implies that the fair report privilege does not apply because the preamble to the Book states that Risen relied on some sources who spoke to Risen on condition of anonymity.  Am. Compl. ¶ 59.  The Book's preamble – a Note on Sources – was "a general statement about the use of confidential and anonymous sources" that applied to the entire nine-chapter Book.  *See* Reply SMDF ¶ 70.  The Montgomery Chapter, on its face, shows that Risen relied upon and attributed the central claims that Montgomery challenges to official records and not only confidential sources, all of whom have now been identified in the course of this litigation.  Risen Decl. ¶¶ 26-37.  Moreover, to the extent the Chapter relies on any source, he or she merely corroborated statements in official records.[44]

## III.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the Amended Complaint with prejudice.

Dated:      January 27, 2016

Respectfully submitted,
DAVIS WRIGHT TREMAINE LLP
By: ___/s/ Laura R. Handman_____
Laura R. Handman (Bar No. 444386)
Lisa B. Zycherman (Bar No. 495277)
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
laurahandman@dwt.com
lisazycherman@dwt.com
*Counsel for Defendants*

---

[44] *See Reeves v. ABC*, 719 F.2d 602, 607 n.3 (2d Cir. 1983) (upholding defendant's exercise of fair report privilege where, although the "story was based partly on undisclosed sources, they were only used to corroborate information obtained from published reports and District Attorney press statements").

**CERTIFICATE OF SERVICE**

I certify that on January 27, 2016, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.


/s/Lisa B. Zycherman
Lisa B. Zycherman