IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Dennis L. Montgomery,

        Plaintiff,

v.                                                  No. 1:16-cv-00126-RC

James Risen, Houghton Mifflin Harcourt
Publishing Co., et al.

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' REPLY TO PLAINTIFF'S
## ADDITIONAL MATERIAL DISPUTED FACTS

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman (Bar No. 444386)
Lisa B. Zycherman (Bar No. 495277)
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
laurahandman@dwt.com
lisazycherman@dwt.com

*Counsel for Defendants*

62. Disputed. Risen's reporting that Montgomery engaged in a "hoax" offering worthless software to U.S. government officials was based on numerous reliable sources including extensive prior media coverage of Montgomery's fraud in the *Wall Street Journal*, the *Associated Press*, the *Reno Gazette-Journal*, *Bloomberg News*, *Playboy*, *Defense News*, and the *New York Times*, Defs.' Statement of Undisputed Material Facts ("SUMF") ¶¶ 10-21. And, the very words Plaintiff contends are Risen's own defamatory statements were used in previous, widespread reports on Montgomery's con, including: the New York Times (MSJ, Risen Decl. Ex. 3, at 1 ("hoax," "con man"), 5 ("ruse"); NBC News article by Lisa Myers, Aram Roston and NBC Investigative Unit (Ex. 4), at 1 ("bogus analysis led to terror alert in 2003"), 2 ("skeptical" "implausible"); and Defense News (Ex. 13), at 1 ("Obama's Counterterror Czar Gave Bogus Intel to Bush White House"), 1 ("Disseminated to the Bush White House a stream of CIA intelligence from a bogus source"), 1 ("The bogus intelligence nevertheless led…"), 2 ("Bogus CIA intelligence"), 2 (CIA officials viewed the intelligence as "crazy " and "fake"), 3 ("intelligence officials back at the agency were convinced the information was a fraud"); ("we were 'played'"; "the biggest [unsubstantiated intelligence] that make it all the way to the Oval Office"). Risen relied on FBI reports and court documents in support of his assertion that Montgomery had engaged in a "hoax" by rigging demonstrations of his software to U.S. government officials. SUMF ¶¶ 31-43. Official documents included FBI interviews of Warren Trepp, Montgomery's partner in eTreppid, who told the FBI that he later learned Montgomery had no real computer software programming skills, and other eTreppid employees who told the FBI that they believed Montgomery's software was fake and Montgomery had them rig tests of his software for government officials, and statements from John Brennan's confirmation hearing for CIA Director including Senator Saxby Chambliss's written questions titled "Bogus

Intelligence" based on classified documents reviewed by the Senate Intelligence Committee, showed that "CIA officials derided [Montgomery's] information." SUMF ¶¶ 24-31. Risen also relied on interviews with numerous high-placed government sources and other sources close to Montgomery or familiar with his work, including but not limited to William D. Murray, CIA Paris Station Chief in 2003 when Montgomery was offering the CIA software that purported to read coded messages on Al Jazeera broadcasts, and Frances Townsend, a former White House counterterrorism official on the National Security Council who dealt with Montgomery's intelligence at the White House. SUMF ¶¶ 32-43. *See also* Declaration of James Risen ¶¶ 7-37, ECF No. 203 (and exhibits appended thereto). Risen testified that Murray told him that he believed that the subject technology "was a hoax" based on a review by a "French high tech firm" who looked at the technology, and that Murray "was involved in meetings with the CIA and the White House" regarding the findings by the French firm. Risen Dep. Tr. 331:7-332:25. Murray's statements were confirmed by Tyler Drumheller, the CIA European Division Chief. See SUMF ¶ 34; Risen Decl. ¶ 28. Risen relied on Montgomery's former lawyer who said that Montgomery was a "con artist" and his software a fraud, as well as Montgomery's invocation of the Fifth Amendment in answer to the question of whether his software was a "complete fraud." Risen Decl. ¶¶ 22-23.

   63. Undisputed that Risen interviewed Montgomery by phone and email for the Chapter and included Montgomery's point of view and denials in the Chapter. SUMF ¶¶ 7, 44. The cited testimony by Mr. Risen does not confirm that Risen *believed* that Montgomery "could be telling the truth," but only that he wanted Montgomery's "side of the story," Risen Dep. Tr. 337:18-24, because, as he also testified, Risen wanted to obtain Montgomery's version of events "which I thought was the real contribution that I was adding to the book pas[t] what … many of

2

the previous reporters who had written extensively about this whole episode had never gotten, his voice into their stories." Risen Dep. Tr. 77:13-78:5.  As for Montgomery's credibility, Risen *did not believe* Montgomery's version of events.  Plaintiff "made assertions and I kept telling him please provide the evidence and he never did.  And that is what I point out at the end of the chapter that he made assertions about operations that government officials had asked him to do but that he had never provided the evidence that he said he had and that he said he wanted to give to me."  Risen Dep. Tr. 80:9-16.

64. Undisputed that Risen believed that the CIA was mistaken in believing that Montgomery's software could decode hidden messages in Al Jazeera broadcasts.  Disputed that "Defendants knew it was not a fraud or hoax by the Plaintiff," or "knowingly transformed comments that Plaintiff's work may have produced information unhelpful to decision-makers or inaccurate into false accusations that the Plaintiff committed fraud, a crime against the government, a con and/or a hoax," because Risen states that, during the course of gathering information for and writing the *New York Times* Article and the Chapter and up to the time HMH published the Book, he did not have any doubts about the truth of the statements he wrote about Montgomery.  Risen Decl. ¶ 6.  Risen's extensive research led to his conclusion that Montgomery's claims were knowingly false.  *See* SUMF ¶¶ 9, 24-43.  The deposition testimony cited by Plaintiff does not support Plaintiff's assertion that the Chapter makes "false accusations that the Plaintiff committed fraud…," but rather concerns Risen's belief that government officials can be disingenuous in public statements regarding matters of national security, Risen Dep. Tr. 102:7-107:12, and Risen's belief that Montgomery's role in misleading government officials about his software had been publicly disclosed in news reporting, court and congressional records before the Book was published.  *Id*. at 215:1-217:10.  Defendants dispute

that they "knew the Plaintiff's work was to search for whatever data or communications might be hidden, with no warranty or promise that decision-makers would necessarily find the data uncovered useful," which Montgomery asserts in his Second Declaration without any documentary or other evidentiary support, *see* Second Decl. of Pl. Dennis Montgomery ¶ 17, ECF No. 234-4, and is contradicted by his claim, also unsupported, "My software and technology did work, does work, and is still being used successfully by the U.S. Government today."  First Decl. of Pl. Dennis Montgomery ¶ 7f, ECF No. 234-11.

65.   Disputed that "Defendants produced email communications between Montgomery and Eric Lichtblau and James Risen as early as 2011 demanding retraction."  The document cited by Plaintiff is an October 2012 email string between Risen and Montgomery wherein Montgomery does not point out ***any*** factual errors in Risen's *New York Times* February 19, 2011 article, but instead makes suggestions for other sources Risen could speak with.  *See* Pl.'s Statement of Disputed Material Facts ("SDMF"), Ex. 9, ECF No. 234-9.  Plaintiff has not come forward with a single document evidencing that he made any retraction demand to the *New York Times*, nor has he put forward any testimony from any witness at the *New York Times* to confirm his claim.  Risen maintains that the *New York Times* Article has not been retracted or been the subject of any defamation lawsuit, and that Risen did not receive any demand for a correction and, to his knowledge, no one at the *New York Times* received a demand for a correction.  Risen Decl. ¶ 5.

66.   Disputed. Risen testified that characterizing Montgomery's actions as a "hoax" was his "phraseology based on having talked to a lot of people at the CIA and elsewhere about this operation" and "describing what they said."  Risen Dep. Tr. 291:9-292:14; *see also id.* at 292:19-297:1.  For example, Risen testified that William D. Murray, CIA Paris Station Chief in

2003 when Montgomery was offering the CIA software that purported to read coded messages on Al Jazeera broadcasts, told him that Murray believed that the subject technology "was a hoax" based on a review by a "French high tech firm" who looked at the technology, and that Murray "was involved in meetings with the CIA and the White House" regarding the findings by the French firm. Risen Dep. Tr. 331:7-332:25. Murray's statements were confirmed by Tyler Drumheller, the CIA European Division Chief. *See* SUMF ¶ 34; Risen Decl. ¶ 28. In addition, Frances Townsend, a former White House counterterrorism official on the National Security Council, told Risen that "[w]e understood we may have been played" by Montgomery and "[t]here was stupid sh[**] reported to the [CIA] for variety of reasons" but "it[']s fair to say it's the biggest one that makes it all the way through the system." SUMF ¶ 37. Risen also relied on a 2012 article by Aram Roston in *Defense News*, "*Obama's Counterterrorism Czar Gave Bogus Intel to Bush White House*," in which the then-head of the CIA's Counterterrorism Center, Jose A. Rodriguez, Jr., said the Counterterrorism Center was "very skeptical" of Montgomery's intelligence and viewed it as "crazy." SUMF ¶ 20. And, Risen relied on statements from John Brennan's confirmation hearing for CIA Director including Senator Saxby Chambliss's written questions titled "Bogus Intelligence" based on classified documents reviewed by the Senate Intelligence Committee showing that "CIA officials derided [Montgomery's] information" and Brennan's testimony that Mongtomery's software "was determined not to provide accurate information." SUMF ¶ 30. *See supra* ¶ 62.

67.     Disputed. Bruce Nichols testified that the Chapter's description of Montgomery's actions as a "hoax" was Risen's "statement characterizing" the "account" he reports "over the course of several pages" based on "many sources, including some from eTREPPID, the

5

company, and including others within the government that the software did not work, and that yet flights were grounded." Nichols Dep. Tr. 80:14-82:2. *See also supra* ¶ 66.

68. Disputed. Simon & Schuster did not reject the Book for publication and the email cited by Plaintiff concerns the scope and focus of the book, and does not reflect any decision regarding whether Risen's manuscript would be published by Simon & Schuster. *See* SDMF, Ex. 10, ECF No. 234-10. The documents produced by Simon & Schuster that Plaintiff omitted reveal that, from initial meetings in January 2013 to discuss the scope of the book through subsequent drafts in July 2013, Priscilla Painton, the Simon & Schuster editor reviewing Risen's manuscript, viewed the chapter on Montgomery as the Book's strongest and raised no editorial or legal concerns. *See* S&S-005 (Jan. 23, 2013 memorandum, the Montgomery chapter is ▮

▮ ); S&S-011 (July 17, 2013 memorandum, ▮

▮

▮

▮ ). The documents do not support Plaintiff's contention that Simon & Schuster rejected Risen's book, but instead suggest that an impasse was reached regarding whether Risen would agree to write additional chapters, and delay publication. *See* S&S-015 (email from Risen's agent, Tina Bennett, to Painton: ▮

▮

▮

▮

▮ ). *See also* Nichols Dep. Tr. 23:6-25:18; 26:23-29:14 (discussing an "impasse" between

Risen and Simon & Schuster regarding "how to structure" the Book and "when to publish it"). Plaintiff thus offers no documents or testimony in support of his thesis that Simon and Schuster rejected the Book and, instead, the documents on their face show that the Book was not rejected by the publisher and that the publisher had no significant editorial or legal concerns regarding the Montgomery Chapter.

69. Disputed. While Risen's editor at Simon & Schuster commended the manuscript chapter concerning Montgomery, *see supra* ¶ 68, none of the documents Plaintiff relies on indicate that the manuscript chapter concerning Montgomery "was the primary new material" and "the primary appeal of the Book for publication and sales."

70. Disputed that "[a] major appeal for sensationalizing and selling the Book was the claim that it was based upon confidential sources." The testimony cited by Plaintiff instead confirms that Risen and his publisher included a "Note on Sources" in the Book "because the issue of confidential sources had become controversial and [Risen] wanted to defend the use of them." Nichols Dep. Tr. 48:23-53:9. Nichols repeatedly rejected Plaintiff's counsel's contention that the "Note on Sources" was intended to "help … sell books." *See, id.*, at 52:18-53:9 (testifying "[w]hat would be the most compelling is the actual news, whether it is from confidential or on the record sources. That's what gets the attention."). Risen denied that the Note on Sources was a "selling point," for the Book, but rather that "[i]t was a general statement for the entire book … about the use of confidential and anonymous sources." Risen Dep. Tr. 168:10-20; 170:1-13.

71. Disputed. *See supra* ¶ 68.

72. Disputed. Statement is argument, not fact, and not supported by any documentary or other evidentiary support.

7

73. Disputed. *See supra* ¶¶ 62, 64.

74. Undisputed that Nichols testified that it is an industry standard not to fact-check book authors. *See, e.g.*, Nichols Dep. Tr. 89:20-91:2. Plaintiff's contention that conforming to that industry standard is "[a]cting with reckless disregard for the truth" is a statement of law, not fact, and is disputed. Plaintiff has admitted and does not dispute that Risen relied on prior news reports and had reporters Eric Lichtblau and Aram Roston review the Chapter for accuracy. SDMF ¶ 8. Plaintiff has failed to identify *any* error of fact that fact-checking would have caught before publication. Moreover, it was entirely reasonable for HMH to rely on their reputable author, Risen, who has been awarded the Pulitzer Prize twice, among other awards of distinction. Risen Decl. ¶ 4. *See also* Nichols Dep. Tr. 54:20-55:4 ("We take our reputation very seriously and we have to make a decision who to publish and who do we trust. And when Jim Risen who is one of the best investigative reporters in the country, reports a story and has multiple sources and makes a decision on what that story should be, we tend to trust him."). There was also a legal review performed. *Id.*

75. Disputed that "Defendants fabricated accusations against the Plaintiff because they believed they can say whatever they wish." The statement is unfounded and unsupported by any evidence of record. The testimony of Mr. Nichols cited by Plaintiff that prior to Montgomery's suit he has never been involved in publishing a book, including the previous book by Risen *State of War*, that was subject to a libel action does not support Plaintiff's unfounded statement. Nichols Dep. Tr. 22:21-25.

76. Undisputed that Risen was aware from an Air Force spokesman that "they ended the contract" with Montgomery's company "because the software didn't work out," Risen Dep. Tr. 297:21-298:14, notwithstanding "[e]arly reports from the Air Force" that the software "was

8

performing very well." Risen Decl. Ex. 25, ECF No. 203-25. Risen and Lichtblau reached out to and obtained comment from an Air Force spokesperson, Todd Spitler. *Id.*; Risen Decl. ¶ 33. Risen relied on the spokesperson's statement that the Air Force awarded a contract to Montgomery's company in 2009 but that "the contractor did not perform in accordance with the terms of the contract." Risen Decl. ¶ 33; Risen Decl. Ex. 26, ECF No. 203-26. *See also* SUMF ¶ 40.

77. Disputed. Risen relied on numerous sources and court, official, and congressional records for the Chapter. SUMF ¶¶ 24-43; *supra* ¶¶ 62, 64. Risen accurately described the contents of these records and source information as a basis for the statements Risen wrote about Montgomery. *Id.* Montgomery's position that his "work may have produced information unhelpful to decision-makers or inaccurate," and his denial that he engaged in fraud were included in the Chapter. *Id.* ¶ 44. The deposition testimony cited by Plaintiff does not support the fact asserted and instead pertains to Risen's perception that the details reported in the Chapter were less sensitive to the government because they were older news, Risen Dep. Tr. 102:7-107:12; that Montgomery's role in providing dubious intelligence to the government was "well published and publicized," *id.* at 215:1-217:10; and that he included Montgomery's claims that his intelligence was valuable in the Book, *id.* at 339:5-19; 340:16-342:10.

78. Disputed because the hypothetical statement that "Defendants knew that if information from Montgomery's work was merely wrong or unhelpful to decision-makers, that does not mean he perpetrated a hoax, committed fraud, or was a con man" is argument and not fact. The statement is also disputed because the testimony cited does not support the asserted statement and instead concerns Risen's review of prior publications concerning the facts discussed in Chapter 2, 101:14-22; Risen's review of court documents wherein eTreppid

9

employees stated that Montgomery had them "participate in falsifying tests for the military," 285:8-288:14; Risen's reliance on Frances Townsend, a former White House counterterrorism official on the National Security Council who dealt with Montgomery's intelligence for reporting that the CIA was deceived by Montgomery, 314:1-328:24; Risen's reporting from congressional records concerning statements from John Brennan's confirmation hearing for CIA Director to confirm that Montgomery's software was fake, 335:2-337:25; Risen's reporting that the Israeli officials rejected Montgomery's offer to share the dubious technology, 338:6-339:19; Risen's reliance on sources who said that Montgomery's technology was not valuable and did not provide valuable intelligence, 340:8-342:10; Risen's efforts to seek comment from the U.S. Department of Justice, 346:5-20; Risen's reporting that the CIA confirmed to him that the software did not perform as Montgomery and eTreppid promised, 383:3-385:13. *See also supra* ¶¶ 62, 64.

79. Disputed. This is argument, not a statement of fact and not supported by any document or other evidentiary support.

80. Disputed. *See supra* ¶ 64.

81. Undisputed that Risen had reason to believe, based on "the article in *Playboy* … that the Plaintiff had a top secret security clearance," at one time. Defendants dispute that Risen knew that Montgomery "would have lost" his security clearance if Montgomery "released or disclosed classified national security information or committed the biggest hoax in American history," and further dispute that "Plaintiff did not lose his security clearance." Although counsel for Plaintiff made numerous, unsubstantiated statements at the January 5, 2016 sanctions hearing that Montgomery has retained his security clearance, *e.g.*, Hr'g Tr. 30-31; 126-128, Plaintiff has never put forward any evidence that he has such clearance and because his clearance

was dependent on his employment, it is unlikely that he actually retains such privileges, even if he had them at one time.

82. Undisputed that Risen believes that "the U.S. Government has never requested nor received any refund, repayment or return of any funds paid to any company for any work performed by Montgomery." Defendants dispute the argumentative statement – not fact - that this "is logically because [Montgomery's company] did work and was not a fraud and the biggest hoax in American history," because, as Risen testified, it was the "point of the story" that "this intelligence was a fake" and the government "didn't want to make this public … because it was embarrassing to a lot of people…. Everybody wanted to forget about this." Risen Dep. Tr. 282:9-284:7. *See supra* ¶¶ 62, 64, 66, 73.

83. Undisputed that Risen relied, in part, upon interviews with sources for both the 2011 *New York Times* article and the Book in which he took notes. *See, e.g.*, Risen Dep. Tr. 149; Risen Dep. Ex. 5, Notes, ECF No. 234-3. Disputed that Risen "produced few notes from his interviews," because Defendants have produced various notes relevant to Risen's research for the Book. *See* Risen Dep. Tr. 149:3-152:9 (describing collection of notes for production to Plaintiff); Risen Decl. Exs. 20 (Drumheller), 21 (Youngblood), 22 (Townsend), 23 (Ravich), 24 (Dubee), 25 and 26 (Spitler).

84. Undisputed that Risen testified that Montgomery told him that he "gave the CIA letters and numbers" that he claimed to discover using his software technology, and that Risen further testified that government officials then took "[Montgomery's] information to the President and us[ed] it to ground flights." Risen Dep. Tr. 305:16-307:9.

85. Undisputed that the quote is an accurate quote from the article "Hiding Details of Dubious Deal, U.S. Invokes National Security," *New York Times*, Feb. 19, 2011, and Warren

11

Trepp, on behalf of Montgomery and Trepp's business, eTreppid, was making deals with the government to license Montgomery's software, on the belief that the software would perform as Montgomery promised.

86. Undisputed that page 38 of the Chapter contains the quoted statement, but Defendants dispute that the statement is in any way "perverse."

87. Disputed because the Chapter does not report that Warren Trepp, Montgomery, or eTreppid received $30 million in government contracts licensing Montgomery's software; Plaintiff provides no documentary or other evidence about the purported "reality" that "Trepp actually received the $30 million" or the remaining argumentative statements in this paragraph.

88. Undisputed that pages 38-39 of the Chapter summarize actions taken by Trepp on behalf of eTreppid, the company he formed with Montgomery to market the software technology, and undisputed that page 39 of the Chapter contains the quoted statement, but Defendants dispute that the quoted statement is a summary of "Trepp's efforts," but rather summarizes the facts that follow on page 39: that Montgomery "had the backing of two wealthy investors, had one of the nation's most influential lobbyists scouring the federal budget for earmarks on his behalf, and had the support of a key member of the CIA's oversight committee."

89. Disputed insofar as this statement is conclusory and argument and not a statement of fact. As to Plaintiff's assertion that Defendants put forth no supporting facts, *see, e.g.*, SUMF ¶¶ 10-43.

90. Disputed. Plaintiff provides no record evidence that the quoted statements from Mr. Risen's deposition testimony are false. Moreover, Risen included many passages of Montgomery's denials in the Book. *See* Chapter 33-34, 37, 51, 53; Risen Dep. Tr. 77:8-78:22;

79:13-81:13; 113:19-114:15; 206:16-208:13; 304:25-312:2; 337:7-338:19; 339:8-341:18; SUMF ¶ 7.

91.     Undisputed that page 33 of the Chapter contains the quoted statement, but disputed that the Chapter "did not report that neither the Plaintiff nor any of the companies he was working under were ever sanctioned" or that Risen was required as a matter of law to include such a statement.  Risen points out, at page 46 of the Chapter: "Once the CIA officials finally accepted the truth, however, and agreed with the French findings, George Tenet and others at the CIA who had been Montgomery's advocates tried to forget all about him.  They never talked about the operation again.  Within the CIA, it was as if Dennis Montgomery had never existed," and that "[t]he CIA never investigated the apparent hoax nor examined how it had been handled inside the agency."  Risen further states, at page 49 of the Chapter, that when Trepp "told the FBI that Montgomery had stolen the software" federal investigators "moved in to investigate the alleged theft" but "largely ignor[ed] the evidence that [Montgomery] had perpetrated a hoax."  Also disputed that "Defendants did not publish and withheld material facts that Plaintiff conveyed to Defendant Risen" because this argument presents a question of law not fact and fails to identify any "material" fact with specificity or evidentiary support.

92.     Undisputed that the documents referenced contain the quoted statements.  *See* SMDF Ex. 12, ECF No. 234-12.  Risen responds to Montgomery: "I have tried to talk to Warren Trepp.  If you have any information about his role, I would like to talk to you about it."  "Well, I would like to write more about him and everyone else in my book now."  *Id*.

93.     Disputed.  The Chapter does not report that "Montgomery received $30 million," or that Trepp was paid that amount through eTreppid's government contracts.

13

94. Disputed. Undisputed that the quote is an accurate quote from the *New York Times* Article and do not dispute that Edra Blixseth was selling Montgomery's software.

95. Disputed because this is not a statement of fact, but a legal argument. Defendants' grounds for asserting the Plaintiff is a limited purpose public figure can be found at pages 25-28 of their Motion for Summary Judgment, SUMF ¶¶ 10-23, and § II.D of Defendants' Reply In Support of Their Motion for Summary Judgment and include many news reports in other media that predated and postdated the *New York Times* Article but all predate the Book.

96. Undisputed that the document referenced contains the quoted statements and Risen relied on statements to the FBI of a prior partner, Warren Trepp, and former employees who questioned whether Montgomery's software even existed and recounted how they were told to rig tests to dupe government officials indisputably negates actual malice. While the FBI search itself was found unconstitutional, *see In the Matter of the Search of 12720 Buckthorn Lane, Reno, Nevada, et al.*, Case No. 3:06-cv-00263-PMP-VPC, Order at 31 (Nov. 28, 2006), the reasons for the court's holding were unrelated to the truthfulness of Trepp and the former employees' statements regarding whether Montgomery's software exists and whether the tests were rigged. Moreover, the court's order found no probable cause because the documents and software subject to the search warrant were not classified information. *Id.* (noting that "the Government conceded that 'nine Secret hard drives' were not, in fact, classified and that the material 'was not properly classified by an Original Classification Authority within the U.S. Air Force'").

97. Undisputed that the document referenced contains the quoted statements. *See* Defs.' Mot. for Sanctions 3-4, ECF No. 166.

98. Undisputed that the document referenced contains the quoted statements. In addition, Plaintiff never produced any "information" alluded to in this statement to Risen. Risen Dep. 80:9-16.

99. Undisputed that the document referenced contains the quoted statements. Risen testified that the assertions provided by Montgomery were too vague to call any government sources. Risen Dep. Tr. 80:2-81:12 ("[Montgomery] made vague assertions … and never provided any foundation or basis in fact to follow them up.")

100. Undisputed that the document referenced contains the quoted statements. *See supra* ¶ 99.

101. Undisputed that the document referenced contains the quoted statements. In addition, Risen was highly critical of Tenet, Brennan, and other CIA and government officials in the Book. *See, e.g.*, Chapter at 32-33, 38-48, 52. *See, also, supra* ¶ 99.

102. Defendants dispute that Plaintiff's denials were not reflected in the Chapter, *see* Defs' Reply in Support of MSJ § II.A & C, and the unfounded assertion that Defendants engaged in "planned defamation." Risen interviewed Montgomery by phone and email for the Chapter and included Montgomery's point of view and denials in the Chapter. SUMF ¶¶ 7, 44. *See supra* ¶ 90.

103. Defendants dispute that the documents referenced show that "Risen threatened to publish defamatory statements about Montgomery unless Montgomery broke the law by providing emails with John Brennan and others that Montgomery understood to be classified communications." Instead, the documents confirm that Risen repeatedly sought an interview with Montgomery, on the record, to obtain Plaintiff's version of events. Once Risen interviewed

15

Montgomery on the record, Plaintiff's denials and account were included in the Chapter. SUMF ¶¶ 7, 44. *See supra* ¶ 90.

104. Disputed. *See supra* ¶ 65.

105. Disputed. On January 14, 2015, Plaintiff, through counsel, demanded that HMH identify how it fact-checked the Book. Nichols Dep. Tr. 97:17-99:10. *See also* SMDF Ex. 15, ECF No. 234-15. Thereafter, on February 13, 2015, Plaintiff, through counsel, sought corrections to the Book, which HMH refused. *Id*. at 124:15-125:4. *See also* SMDF Ex. 16, ECF No. 234-16.

106. Defendants dispute this statement because it is a legal argument and not a statement of fact. Defendants further dispute this statement because undisputed factual evidence of record confirms that Montgomery was subject to extensive media coverage years before publication of the Chapter, SUMF ¶¶ 10-23, and that Montgomery sought media coverage by giving an exclusive interview to Lisa Meyers of NBC News, *id.* ¶ 14, seeking to publicize his whistleblower allegation to Fox News, *id.* ¶ 23, and to Risen, SMDF Exs. 9, 12-14.

107. Defendants dispute that the quoted statement is an "admi[ssion]" by Risen. Moreover, the quoted statement refers to a different Chapter in the Book, and this is thus misleading and taken out of context, as Risen explained at his deposition. Risen Dep. Tr. 365:1-366:11.

108. Disputed. Risen discussed more than three sources at his deposition, including William D. Murray, CIA Paris Station Chief, Risen Dep. Tr. 288:2-297:1; 330:23-334:4; George Little and Jennifer Youngblood, CIA Office of Public Affairs officials, *id.* at 248:16-250:12; 380:2-384:13; Frances Townsend, a former White House counterterrorism official on the National Security Council, *id.* at 282:23-284:7; 313:12-326:25; Samantha Ravich, former advisor

16

to Vice President Dick Cheney, *id.* at 93:19-21; 282:23-284:7; 328:2-330:22; Michael Flynn, Montgomery's former lawyer, *id.* at 58:7-12; 254:5-10; 267:19-24; and Tim Blixseth, the ex-husband of Montgomery's boss at Blxware, *id.* at 254:11-14.  Risen identified additional sources, but Plaintiff declined to depose any of them or ask Risen questions regarding them.

      109.    Disputed.  *See supra* ¶ 62.

Dated: January 27, 2016                            Respectfully submitted,

                                                DAVIS WRIGHT TREMAINE LLP

                                                By: /s/ Laura R. Handman
                                                Laura R. Handman (Bar No. 444386)
                                                Lisa B. Zycherman (Bar No. 495277)
                                                1919 Pennsylvania Avenue, NW
                                                Suite 800
                                                Washington, DC 20006
                                                Telephone: (202) 973-4200
                                                Facsimile: (202) 973-4499
                                                laurahandman@dwt.com
                                                lisazycherman@dwt.com

                                                *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on January 27, 2016, I filed this document with the Clerk of Court using CM/ECF, which will serve this document on all counsel of record.

/s/ Lisa B. Zycherman
Lisa B. Zycherman