## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DENNIS L. MONTGOMERY

                Plaintiff,

v.

JAMES RISEN, et al.,

                Defendants.

Civil Action No. 16-0126 (RJL)

### PLAINTIFF DENNIS MONTGOMERY'S NOTICE OF APPEAL

NOTICE is hereby given that Plaintiff Dennis L. Montgomery ("Plaintiff") appeals to the

U.S. Court of Appeals for the District of Columbia Circuit from the Order Resolving All Pending

Motions and Granting Defendants' Motion for Summary Judgment, **Exhibit 1**, and

Memorandum Opinion in support thereof, **Exhibit 2**, and all other orders and rulings averse to

Plaintiff in this case.

Dated: August 8, 2016

Respectfully submitted,

 */s/ Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW FIRM
2020 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
(310) 595-0800
Fax: (310) 275-4963
Email: leklayman@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of August 2016, a true and correct copy of the

foregoing PLAINTIFF'S NOTICE OF APPEAL was served electronically on all registered

counsel of record via ECF and is available for viewing and downloading from the ECF system.


/s/ Larry Klayman_____
Larry Klayman

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DENNIS L. MONTGOMERY,      :

                                  :

    Plaintiff,               :      Civil Action No.:    16-0126 (RC)

                                    :

    v.                      :      Re Document Nos.:    52, 125, 143, 164,

                                    :                                      166, 181, 201,

JAMES RISEN, *et al.*,         :                                      210, 221, 236,

                                    :                                      239, 253, 256,

    Defendants.            :                                      264, 269, 270

## <u>ORDER</u>

### RESOLVING ALL PENDING MOTIONS AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, it is hereby **ORDERED** that:

1. Defendants' motion for summary judgment (ECF No. 201) is **GRANTED** and **JUDGMENT IS ENTERED** in favor of Defendants on all counts of the Amended Complaint;

2. Defendants' motion to dismiss (ECF No. 52) is **DENIED AS MOOT**;

3. Plaintiff's objections to the magistrate judge's discovery orders (ECF Nos. 125, 143, 164) are **OVERRULED**;

4. Defendants' motion for sanctions (ECF No. 166) is **DENIED**;

5. Plaintiff's motion for an extension of time to complete discovery and to reset the discovery deadline (ECF No. 181) is **DENIED**;

6. Defendants' motion to seal questions for the sanctions hearing and renewed motion to seal questions for the sanctions hearing (ECF Nos. 210, 269) is **DENIED**;

7. Plaintiff's motion for an extension of time to file his opposition to Defendants' motion of summary judgment (ECF No. 221) is **GRANTED** *nunc pro tunc*, and Plaintiff's opposition is accepted as filed;

8. Plaintiff's motion to seal and to remove documents from the Protective Order (ECF No. 236) is **GRANTED IN PART** and **DENIED IN PART** and the documents shall be placed under seal, but shall not be removed from the Protective Order;

9. Defendants' cross-motion to maintain documents under seal (ECF No. 239) is **GRANTED**;

10. Defendants' motion to seal and renewed motion to seal (ECF Nos. 253, 270) are **GRANTED**;

11. Plaintiff's consent motion for a status conference (ECF No. 256) is **DENIED AS MOOT**; and

12. Plaintiff's motion for oral argument (ECF No. 264) is **DENIED AS MOOT**.

It is **FURTHER ORDERED** that, in light of Plaintiff's dissemination of confidential information subject to the Protective Order (ECF No. 81), Plaintiff's opposition to Defendants' motion for summary judgment (ECF No. 233) and Plaintiff's statement of disputed material facts (ECF No. 234) shall be placed under seal. On or before **July 22, 2016**, Plaintiff shall file a substituted version of these documents redacting the confidential information, including the additional confidential information identified in footnote 1 to Defendants' cross-motion to maintain documents under seal (ECF No. 239).

**SO ORDERED**.

Dated: July 15, 2016

RUDOLPH CONTRERAS
United States District Judge

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DENNIS L. MONTGOMERY, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 16-0126 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 52, 125, 143, 164, |
| | : | | 166, 181, 201, |
| JAMES RISEN, *et al.*, | : | | 221, 210, 236, |
| | : | | 239, 253, 256, |
| Defendants. | : | | 264, 269, 270 |

## <u>MEMORANDUM OPINION</u>

### Resolving all Pending Motions and Granting Defendants' Motion for Summary Judgment

## I. INTRODUCTION

The twists and turns of this case could fill the pages of a book.  In fact, much of it already has.  In October 2014 Defendant James Risen authored, and his co-defendants Houghton Mifflin Harcourt Publishing Company and Houghton Mifflin Harcourt Company (collectively, "Defendants")[1] published, *Pay any Price: Greed, Power, and Endless War*.  One of the book's chapters focuses heavily on Plaintiff Dennis Montgomery, who claimed to have developed several technologies that the government subsequently employed in the war on terrorism in the years following the September 11, 2001 terrorist attacks.  One of those technologies, Montgomery claimed, could detect hidden numbers and letters that appeared in Al Jazeera broadcasts.  Government officials purportedly concluded that those strings of letters and numbers identified airline flight numbers or longitudinal and latitudinal coordinates representing targets of

---

[1] Defendants note that Houghton Mifflin Harcourt Company is improperly sued as "HMH Holdings, Inc."  *See* Defs.' Mot. for Summ. J. & Mem. Supp. at 1, ECF No. 201.  Although the Court refers generally to "Defendants" throughout this opinion, for ease of reference the Court will refer to "Houghton Mifflin" when referring only to the publishing company defendants.

anticipated al Qaeda terrorist attacks.  If this sounds too good to be true, you are not alone.  The

relevant chapter in *Pay Any Price* explains how government officials, Montgomery's former

employees, and others came to believe that his technology did not work as billed.  The chapter

repeats others' assertions that Montgomery is a con man and describes his technology as a hoax.

This memorandum opinion is an extended epilogue of sorts, and picks up where *Pay Any*

*Price* leaves off.  Montgomery filed this action claiming, primarily, that Defendants defamed

him in the chapter and in the course of promoting the book.  After a protracted, and largely

unresolved, saga in the United States District Court for the Southern District of Florida, the case

was transferred to this district and assigned to the undersigned.  Before the Court are Defendants'

motion to dismiss and motion for summary judgment and a number of outstanding discovery

related motions.  The tale of the Court's resolution of those motions follows.  For those not

otherwise tempted to skip to the final chapter—spoiler alert—the end result is that the Court will

grant Defendants' motion for summary judgment.

## II.  FACTUAL & PROCEDURAL BACKGROUND

### A.  The Challenged Chapter

Defendant James Risen is the author of *Pay Any Price: Greed, Power, and Endless War*,

which was published on October 14, 2014 by Houghton Mifflin.  *See* Defs.' Stmt. of Undisputed

Material Facts ¶¶ 1, 3 ("Defs.' SUMF"), ECF No. 202.  The nine-chapter book "describes how

the war on terror led to waste, fraud, and abuse by U.S. government officials and the contractors

who stood to gain from it."  *Id.* ¶ 5.  Chapter two of the book ("the Chapter"), entitled "The

Emperor of the War on Terror," claims that in the post-September 11th era government officials

were quick to fund potential counterterrorism efforts.  The Chapter posits that, as Congress

"thr[ew] cash at the FBI, CIA, and Pentagon," a "counterterrorism bubble, like a financial bubble

grew in Washington, and a new breed of entrepreneur learned that one of the surest and easiest

paths to riches could be found . . . in Tysons Corner, Virginia, coming up with new ways to

predict, analyze, and prevent terrorist attacks—or, short of that, at least convincing a few

government bureaucrats that you had some magic formula for doing so." Am. Compl. Ex. A at

31 ("Chapter"), ECF No. 44.[2]

     To illustrate this point, the Chapter presents "the example of [Plaintiff] Dennis

Montgomery." *Id.* at 31.  Risen describes Montgomery as "the perfect case study to explain how

during the war on terror greed and ambition have been married to unlimited rivers of cash to

create a climate in which someone who has been accused of being a con artist was able to create

a rogue intelligence operation with little or no adult supervision." *Id.* at 32.  The Chapter claims

that Montgomery's example "demonstrates how hundreds of billions of dollars poured into the

war on terror went to waste." *Id.* at 33.

     The Chapter focuses on several types of technology that Montgomery developed.  The

Central Intelligence Agency ("CIA") and other federal intelligence and law enforcement

agencies apparently relied on the technology beginning in or around 2003. *Id.* at 37.  The

Chapter claims that the technology did not work as billed.  For example, Montgomery allegedly

created video compression and object recognition technology which the Air Force and other

agencies believed could be helpful in storing and analyzing Predator drone video. *Id.* at 36.  In

particular, the Chapter states that "Montgomery claimed that his facial recognition software was

so good that he could identify individual faces from the video camera flying on a Predator high

---

[2] The entire book Chapter is filed as Exhibit A to Plaintiff's Amended Complaint.  The complaint alleges that a large number of the Chapter's statements are defamatory.  For brevity and ease of reading, this factual background section paraphrases much of the book's assertions.  When the Court cites to or quotes the Chapter, it cites to the specific page number of the book, as indicated by the scanned copy reproduced in Exhibit A.

above the mountains of southern Afghanistan." *Id.* at 37. By 2003, the U.S. Special Operations

Command and the Air Force had awarded government contracts related to the technology to

eTreppid Technologies, the company Montgomery founded along with his financial backer,

Warren Trepp. *Id.* at 34–35, 37.

The Chapter claims that while Montgomery performed field tests of the object

recognition technology for Pentagon officials, former employees now allege that those tests were

fabricated. Specifically, the Chapter reports one occasion on which Montgomery attempted to

show that his technology could detect, from a great distance, a toy bazooka Montgomery carried

in a field outside eTreppid. *Id.* at 37. According to the Chapter, Warren Trepp informed the

Federal Bureau of Investigation ("FBI") that "Montgomery told two eTreppid employees to go to

an empty office and push a button on a computer when they heard a beep on a cell phone." *Id.*

While carrying the bazooka, Montgomery purportedly "used a hidden cell phone to buzz the cell

phone of one of the eTreppid employees, who then pushed a key on a computer keyboard, which

in turn flashed an image of a bazooka on another screen prominently displayed in front of the

military officers standing in another room." *Id.* This course of events "convinced" the military

officials "that Montgomery's computer software had amazingly detected and recognized the

bazooka in Montgomery's hands." *Id.*

The technology most emphasized in the Chapter, however, is technology Montgomery

claimed he had developed "enable[ing] him to decipher al Qaeda codes embedded in the network

banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network." *Id.* at 40.

This software is often referred to as the "noise filtering" software. *See, e.g.*, Decl. of James

Risen ¶ 15 ("Risen Decl."), ECF No. 203; *id.* Ex. 11 at 2, ECF No. 203-11. Risen writes that

"Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally

transmit its plans for future terrorist attacks"—which included "series of hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting." Chapter at 40–41. By late 2003 CIA officials visited eTreppid's offices in Reno, Nevada to observe the software. *Id.* at 40.

The Chapter posits that "Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism." *Id.* Although noting that "Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes," and that the CIA instead came to him, Risen writes that "even if it wasn't Montgomery's idea, he ran with it as fast as he could." *Id.* at 41. Montgomery allegedly informed the CIA that the Al Jazeera broadcasts had hidden letters and numbers embedded in them, which "included the letters 'AF' followed by a series of numbers, or the letters 'AA' and 'UA' and two or three digits." *Id.* Other series of numbers "looked like coordinates for the longitude and latitude of specific locations." *Id.*

The Chapter states that "[t]he CIA made the inevitable connections," and Risen contends in the Chapter that the technology "so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush." *Id.* at 41, 39. Senior CIA officials in the agency's Directorate of Science and Technology began to vouch for Montgomery's work. *Id.* at 39. The Chapter reports that the Directorate's chief, Donald Kerr, believed the claims about the embedded codes, and convinced George Tenet, Director of the CIA, to take the information seriously. *Id.* at 42. "As a result, in December 2003, Tenet rushed directly to President Bush when information provided by Montgomery and his software purported to show that a series of flights from France, Britain, and Mexico to the United States around Christmas were being

targeted by al Qaeda." *Id.* President Bush ordered those flights grounded. *Id.* The Chapter also recounts that "[o]ne former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery," a conversation that included a "brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence." *Id.* at 45.

Eventually, French officials apparently demanded answers from the United States, and the CIA "was finally forced to reveal to French intelligence the source of the threat information." *Id.* at 46. French officials arranged for a French technology firm to "reverse-engineer" the technology. *Id.* The firm concluded that the broadcasts contained too few pixels to contain hidden bar codes or unseen numbers. *Id.* While the Chapter reports Montgomery's claim that "CIA officials continued to work with him for months after Christmas 2003, and that CIA personnel were still showing up at his offices in Nevada until late 2004," Risen writes that once the CIA came to terms with the French findings, the agency "tried to forget all about him." *Id.* Risen claims that "the CIA never investigated the apparent hoax nor examined how it had been handled inside the agency." *Id.*

Given this course of events, the Chapter describes Montgomery as "the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic." *Id.* at 32; *see also id.* at 32–33 (stating that "Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax"). The Chapter concludes that, "once the fever broke and government officials realized that they

6

had been taken in by a grand illusion, they did absolutely nothing about it"; the CIA acted like

the episode had not happened, the Pentagon "just kept working with Montgomery," and the

Department of Justice invoked the state secrets privilege in several lawsuits involving

Montgomery to prevent information from becoming public.  *Id.* at 32.  Risen presents his own

explanation for the government's silence: he posits that "CIA officials were reluctant to tell their

Pentagon counterparts much about their experiences with Montgomery, so Defense Department

officials apparently did not realize that his technology was considered suspect at CIA

headquarters."  *Id.* at 47–48.

The Chapter also describes the apparent aftermath.  Beginning in 2005, Trepp and

Montgomery became embroiled in a series of personal and legal disputes.  Montgomery claimed

Trepp had not adequately provided him with a share of the money flowing from eTreppid's

government contracts.  *See id.* at 49.  Montgomery allegedly absconded with his technology's

source code, and deleted the code and data from eTreppid's computer files, which prompted an

FBI investigation and a lawsuit between the two.  *Id.*  It was during that investigation that many

of the allegations concerning Montgomery's software came to light.  *Id.* at 49–50.  Montgomery

also made several high-profile allegations that former-Nevada Congressman Jim Gibbons, who

had recently been elected as Nevada's governor, accepted bribes from Trepp in exchange for

assisting eTreppid secure defense contracts.  *Id.* at 49.  Those allegations led to a federal

corruption investigation, which eventually cleared Gibbons of any wrongdoing.  *Id.* at 49–50.

Finally, the Chapter detailed Montgomery's work with a subsequent backer, Edra Blixseth, with

whom Montgomery attempted to secure additional government contracts for his noise filtering

and object recognition technologies through a company they created called Blxware.  *Id.* at 50–

51.  These efforts led to a meeting with an aide of Vice President Dick Cheney and efforts to

convince the Israeli government to use his technology. *Id.* at 51. Neither proved successful. *Id.* In part based on these and other events, and drawing from court documents and FBI investigation reports, the Chapter explains that Trepp came to believe Montgomery's work was not what he claimed it was, *id.* at 49, and that Montgomery's former lawyer, Michael Flynn, "concluded that Montgomery was a fraud," *id.* at 36.

The Chapter also published Montgomery's counter-statements, albeit with somewhat less emphasis. In its opening pages, Risen states that "Montgomery strongly denies that he peddled fraudulent technology" and that Montgomery "insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees." *Id.* at 33. Risen also reports that Montgomery claims he "was following direct orders from both the NSA and the CIA, and says that the CIA, NSA, and U.S. military took his technology so seriously that it was used to help in the targeting of Predator [drone] strikes and other raids." *Id.* Specifically, "Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes" and "says that the CIA came to him in late 2003 and asked him to do it." *Id.* at 41. Montgomery claims that "[t]he fact that the government is blocking public disclosure of the details of its relationship with him . . . shows that his work was considered serious and important." *Id.* at 33–34. The Chapter also acknowledges Montgomery's claim that his former employees "lied when they claimed that he had asked them to fix the [object recognition] tests" and that the Air Force "issued a report showing that it had verified the tests." *Id.* at 37. Finally, in its closing paragraph, the Chapter reiterates that "Dennis Montgomery continues to argue that he is not a fraud, that his technology is genuine, and that he performed highly sensitive and valuable work for the CIA and the Pentagon." *Id.* at 53.

In reporting this episode, the Chapter also relies in several instances upon FBI investigation reports, depositions and affidavits filed in various lawsuits, Congressional testimony, and other information in the public domain. For example, the Chapter identifies court documents, which contained Warren Trepp's statements to the FBI, as the Chapter's source of the information regarding Montgomery's purportedly fabricated tests of his object identification software. *See id.* at 37 ("Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI."); *id.* ("Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit."); *id.* (describing the fabricated tests, and the use of Montgomery's hidden cell phone, "according to court documents"). The Chapter also relies on John Brennan's testimony before the Senate Intelligence Committee during Brennan's confirmation as CIA Director in 2013. *Id.* at 47. In 2003, Brennan had been head of the Terrorist Threat Integration Center, which was responsible for distributing intelligence throughout the United States government. *Id.* When asked in a written questionnaire about Montgomery's technology, Brennan wrote that the technology "was determined not to be a source of accurate information." *Id.*; *see also* Risen Decl. Ex. 19 at 10.

## B.  Prior Media Coverage

Media coverage concerning Montgomery's purportedly fabricated technology, specifically, and discussing Montgomery, more generally, predated publication of *Pay Any Price* by nearly a decade.

On June 27, 2005, NBC News published an article authored by Lisa Myers and Aram Roston discussing the 2003 grounding of several flights. The article reported that "senior U.S.

officials now tell NBC News that the key piece of information that triggered the holiday alert was a bizarre CIA analysis, which turned out to be all wrong," although the article did not name Montgomery as the source of the technology.  Risen Decl. Ex. 4.  The article reported that CIA officials believed that they had found secret messages in the crawl bar of Al Jazeera news broadcasts, and quoted Tom Ridge, who had been the Secretary of the Department of Homeland Security in 2003.  Secretary Ridge "confirm[ed] there were no secret terror messages," but maintained it was not a mistake to raise the threat level, and acknowledged that the analysis was not the only factor in raising the threat level.  *Id.*

In the interim, the Jim Gibbons bribery allegations broke.  Media reports indicated that the allegations' source was sworn testimony Dennis Montgomery provided in the context of his lawsuit with Trepp concerning the rights to his software code.  *See, e.g.*, Risen Decl. Ex. 5 at 3.  Montgomery's allegations led to a series of articles in the media, and culminated in Dennis Montgomery sitting down for an interview with Lisa Myers of NBC news to discuss his allegations.  *Id.* Ex. 6, Ex. 7 (transcript of NBC news interview).  During the course of Montgomery and Trepp's legal battle, documents concerning eTreppid and Montgomery's software were unsealed and media outlets described the contents of those documents while simultaneously rehashing the allegations against Jim Gibbons.  *See, e.g.*, *id.* Ex. 8.  The software was even discussed in the context of Edra Blixseth's divorce proceedings, and a 2008 *Bloomberg News* article fully canvassed Trepp's allegations that Montgomery stole eTreppid's computer code, Flynn's charge that the "software was a sham," and the allegations found in the FBI interview reports—which were unsealed as part of the legal proceedings.  *Id.* Ex. 10.  That article also discussed how United States intelligence agencies had asked that certain information in the various lawsuits remain sealed.  *Id.*

The focus eventually shifted to Montgomery's software.  Aram Roston, who had written the 2005 story for NBC News with Lisa Myers, wrote a much more expansive article on the Montgomery saga in 2010 for *Playboy* Magazine, entitled "The Man Who Conned the Pentagon."  *See* Risen Decl. Ex. 11.  The article states that Montgomery "apparently convinced the Bush White House, the CIA, the Air Force, and other agencies that Al Jazeera—the Qatari-owned TV network—was unwittingly transmitting target data to Al Qaeda sleepers."  *Id.* at 2.  And in 2011 Risen and Eric Lichtblau wrote an article for the *New York Times* canvassing much of the same information.  The article, entitled "Hiding Details of Dubious Deal, U.S. Invokes National Security," was published on February 19, 2011.  *See id.* Ex. 3.  The article explained that the Department of Justice had secured protective orders in two cases to shield details of Montgomery's technology from the public.  *Id.*  The article canvassed many of the allegations that would be repeated in the Chapter, including that Montgomery's technology appeared to be a hoax, that Montgomery's former lawyer now viewed him as a "con man," that former employees believed Montgomery had fabricated demonstrations of his technology for government officials, and that Montgomery's technology prompted President Bush to ground several airliners.  *See id.* at 1–3.  The article also stated that "[s]enior administration officials even talked about shooting down planes identified as targets . . . , according to a former senior intelligence official who was at a meeting where the idea was discussed."  *Id.* at 4.

Risen claims that, in writing his book, he relied on these articles and other media coverage.  *See* Risen Decl. ¶¶ 7–18; *see also id.* Exs. 13, 14.  In a footnote of the Chapter, Risen explicitly acknowledges both Aram Roston's *Playboy* article, and Risen's own *New York Times* article.  *See* Chapter at 53.  None of the articles have ever been retracted.

### C.  Procedural History

On February 24, 2015, following publication of *Pay Any Price*, Montgomery filed this action in the Southern District of Florida.  *See generally* Compl., ECF No. 1.  The operative, Amended Complaint asserts a multitude of claims for defamation, defamation *per se*, and defamation by implication based on forty-three allegedly defamatory statements.  *See* Am. Compl. ¶¶ 96–239, ECF No. 44.  The Amended Complaint also alleges additional claims of intentional infliction of emotional distress, tortious interference with prospective advantage, and assault.  *See id.* ¶¶ 240–256.  The allegedly defamatory statements include statements made in the Chapter, *see, e.g., id.* ¶¶ 106, 109, 111, as well as statements Risen made in interviews when promoting the book, *see, e.g., id.* ¶¶ 139–141, 145, 149.  The latter statements, in many respects, repeat allegations made in the Chapter or the Chapter's characterization of Montgomery. *Compare, e.g., id.* ¶ 149 (asserting in interview that "when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it"), *with* Chapter at 32 ("Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it.  The Central Intelligence Agency buried the whole insane episode and acted like it had never happened.").  In large part, the Amended Complaint asserts that Defendants' statements or implied assertions that Montgomery's technology was a hoax or fraudulent are defamatory.  *See, e.g.*, Am. Compl. ¶¶ 107, 108, 112, 113, 120.[3]

On April 9, 2015, Defendants filed a motion to dismiss or transfer for lack of personal jurisdiction.  *See* Defs.' Mot. to Dismiss or Transfer at 12–17, ECF No. 25.  In the alternative,

---

[3] *See also, e.g.*, Am. Compl. ¶¶ 122, 124, 126, 127, 129, 131, 133, 135, 136, 138, 142, 143, 144, 146, 147, 148, 150, 152, 154, 155, 158, 169, 182, 184, 185, 187, 190, 194, 200, 202, 204, 206, 208, 210, 212, 216, 218, 220, 222, 224, 230, 232, 234, 236.

Defendants also moved to transfer for improper venue under 28 U.S.C. § 1391, to transfer venue

for the convenience of the parties and in the interest of justice under 28 U.S.C. § 1404(a), or to

dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim.[4]  *See id.* at 17–30.  After Montgomery filed his Amended Complaint, the district court

denied Defendants' initial motion to transfer or dismiss as moot.  *See* Paperless Order, ECF No.

42.  Thereafter, Defendants filed a renewed motion to transfer or dismiss in response to the

Amended Complaint.  *See* Defs.' Mot. to Dismiss or Transfer, ECF No. 52.

   Shortly after filing his complaint, Montgomery also raised issues concerning his poor

health, and sought to expedite consideration of his claims.  *See, e.g.*, Emergency Pl.'s Mot. for

Status Conf., ECF No. 9.  The Court set an initial discovery deadline of September 16, 2015,

with trial slated to begin on November 30, 2015.  *See* Order Setting Civil Trial Date & Pretrial

Schedule, ECF No. 48.  Defendants argued that no discovery should occur before their initial

motions were resolved, and filed a formal motion to stay discovery pending resolution of

Defendants' motion to dismiss on May 19, 2015.  *See* Defs.' Mot. to Stay Disc. Pending

Resolution of Mots. to Dismiss, ECF No. 55; Pl.'s Opp'n to Defs.' Mot. to Stay Disc., ECF No.

68.  On September 10, 2015—nearly four months later, and after most of the discovery period

had already run—the district court summarily denied that motion.  *See* Paperless Order, ECF No.

130.  On that same day, the Court also granted in part and denied in part Defendants' motion to

---

[4] Defendants also filed a motion to dismiss the complaint under the District of Columbia's Anti-SLAPP statute, which they renewed after Montgomery filed his Amended Complaint.  *See* Defs.' Special Mot. to Dismiss the Compl., ECF No. 26; Defs.' Renewed Special Mot. to Dismiss, ECF No. 53.  Defendants withdrew that motion after the Washington Supreme Court held Washington state's anti-SLAPP statute unconstitutional, presumably because the motion relied on Washington state's statute in addition to D.C.'s.  *See* Notice of Suppl. Auth. & Withdrawal of Defs.' Anti-SLAPP Mot., ECF No. 61.

modify the scheduling order.  The Court rescheduled trial for March 21, 2016, and extended

discovery until November 19, 2015.  *See* Paperless Order, ECF No. 131.

Several discovery disputes arose throughout this period, and were considered by

Magistrate Judge Jonathan Goodman.  Of most relevance to the merits of Montgomery's claims

is Defendants' request that Montgomery produce the software that is the subject of the Chapter.

As explained in more detail below, after initially objecting to that request, Montgomery

eventually claimed that he had turned over the only copy of his software to the FBI, along with a

large volume of other computer drives and electronic information, in connection with an

unrelated criminal investigation.  Magistrate Judge Goodman ordered Montgomery on more than

one occasion to produce the software and to coordinate with the FBI in locating the software,

using his self-described right of continued access to the software.  *See* Aug. 22, 2015 Post-Disc.

Hr'g Order ¶ 6, ECF No. 107; Oct. 19, 2015 Post-Disc. Hr'g Order ¶¶ 2–4, ECF No. 154.

Montgomery filed objections to those orders with the district court.  *See* Pl.'s Obj. to Portions of

Magistrate Judge's Order of Aug. 22, 2015, ECF No. 125; Pl.'s Obj. to Magistrate Judge's Order

of Oct. 19, 2015 & Req. to Stay, ECF No. 164.  In addition, Defendants eventually filed a motion

for spoliation sanctions, arguing that Montgomery's Amended Complaint should be dismissed,

and Defendants should be awarded attorneys' fees, as a consequence of his failure to produce the

software.  *See* Defs.' Mem. of Law Supp. Mot. for Sanctions, ECF No. 166; Pl.'s Praecipe, ECF

No. 170.  On January 5, 2016, Magistrate Judge Goodman held a lengthy hearing on the

sanctions motion.  *See* Tr. of Misc. Mot. Hr'g ("Sanctions Hr'g Tr."), ECF No. 230.

In the interim, discovery closed (although Montgomery filed a motion to extend that

deadline, which also remains pending).  *See* Paperless Order, ECF No. 131; *see also* Pl.'s Mot.

for Extension of Time to Reset Disc. Deadline, ECF No. 181.  On December 14, 2015, consistent

with the deadline set by the district court, and even though their motion to dismiss or transfer remained pending, Defendants filed a motion for summary judgment.[5]  *See* Paperless Order, ECF No. 131; Defs.' Mot. for Summ. J. & Mem. Supp. ("Defs.' Mem. Supp. Summ. J."), ECF No. 201.

On January 25, 2016, the district court ruled in part on Defendants' motion to dismiss or transfer.  In a four-page order, the district court granted in part Defendants' motion to dismiss or transfer, concluding that the convenience of the parties and the interests of justice warranted transfer under 28 U.S.C. § 1404(a) to the United States District Court for the District of Columbia.  *See generally* Order Grant'g Mot. to Transfer, ECF No. 247.  The district court noted that Defendants' motion to dismiss for failure to state a claim remained pending, *id.* at 4, and the court did not otherwise resolve the various objections to the magistrate judge's discovery rulings, Plaintiff's motion to extend the discovery deadline, or the parties' motions to file various documents under seal.[6]  The magistrate judge also was unable to rule on Defendants' motions for sanctions prior to transfer.

This action was transferred to this district, and randomly assigned to the undersigned. Since transfer, the parties have completed briefing Defendants' motion for summary judgment. That motion—which the Court concludes subsumes the pending motion to dismiss—is now ripe

---

[5] Montgomery's motion for an extension of time to file his response to Defendants' motion for summary judgment remains outstanding, despite the fact that he later filed that opposition.  *See* Pl.'s Mot. for Extension of Time to File Opp'n, ECF No. 221; *see also* Pl.'s Mem. Opp'n to Defs.' Mot. for Summ. J., ECF No. 233.  The Court grants the motion *nunc pro tunc* and accepts his opposition as filed.

[6] After this Court ordered the parties to file certain sealed documents that were omitted from the docket as transferred from the Southern District of Florida, Montgomery withdrew his requests to seal.  The Court therefore denied those motions as moot.  *See* June 15, 2016 Minute Order.

for determination along with all of the other, outstanding motions.[7]  After review of the lengthy

record in this case, the pleadings, the relevant transcripts of proceedings, and the parties' various

motions, the Court is prepared to rule.

## III.  ANALYSIS

The Court will first resolve the outstanding discovery issues before turning to

Defendants' motion for summary judgment.

### A.  A Note Concerning Choice of Law

At the outset, the Court clarifies the substantive law it will apply in this case.  As will

become clear, the question is relevant to both the summary judgment motion and the outstanding

discovery disputes, because Montgomery claims that the software is wholly irrelevant to this

action.

"[T]here is no federal cause of action for defamation," *Bartel v. FAA*, 725 F.2d 1403,

1405 n.2 (D.C. Cir. 1984), and Montgomery's substantive claims depend on the application of

---

[7] After this action was transferred, the Court issued an order requesting that the parties submit a joint status report addressing, among other things: the history of the litigation; any impending events or proceedings that might affect the course of the litigation; which motions and issues remained pending; whether any party sought to withdraw any pending motions; whether any pending motions had become moot, subsumed by other motions, or required additional briefing; and whether any pending motions should be consolidated.  *See* Feb. 3, 2016 Order, ECF No. 257.  In their response, Defendants did not seek to withdraw their motion to dismiss, but conceded that "[t]o the extent the motion to dismiss tracks the summary judgment motion, the court can deem it subsumed by the subsequent summary judgment motion."  S*ee* Joint Status Report at 13, ECF No. 258.  Having reviewed both motions, the Court concludes that Defendants' summary judgment motion addresses issues identical to the outstanding issues addressed in Defendants' motion to dismiss.  Therefore, the Court will deny Defendants' motion to dismiss as moot.  In addition, the Court notes that Montgomery also represented in the parties' joint status report that he would be moving for leave to file a surreply to address certain arguments made in Defendants' reply in support of their motion for summary judgment.  *See* Joint Status Report at 8–9, 13.  Montgomery never sought leave to file a surreply, and the Court will decide the motion on the basis of the memoranda that have been filed to date.

state law.  Montgomery's Amended Complaint repeatedly invokes Florida law.  *See, e.g.*, Am.

Compl. ¶¶ 103–05, 173.  In their motion to dismiss, Defendants briefly asserted that District of

Columbia law, and not Florida law, would most likely apply to this case, and they provided a

more lengthy argument for applying D.C. law in the context of their motion to dismiss under

various states' applicable anti-SLAPP statutes.  *See* Defs.' Mot. to Dismiss at 26, ECF No. 52;

Defs.' Renewed Special Mot. to Dismiss under the Applicable Anti-SLAPP Statute at 2–5, ECF

No. 53.  In his opposition to Defendants' motion to dismiss, Montgomery argued that Florida law

applies.  *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 24–29, ECF No. 63.  Defendants'

motion for summary judgment discusses the issue only in a passing footnote, however, *see* Defs.'

Mem. Supp. Summ. J. at 16 n.6, and Montgomery's opposition fails to discuss the choice of law

issue at all.  *See generally* Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No.

233.  Finally, Defendants' reply in support of their motion for summary judgment asserts in a

passing footnote that "[n]ow that the case has been transferred to the District of Columbia, D.C.

law clearly applies."  Defs.' Reply at 7 n.4, ECF No. 250.  Yet, the district court's order did not

resolve, let alone discuss, which jurisdiction's substantive law was most likely to apply to this

action.  Instead, its decision to transfer venue was grounded on other considerations.

    In sum, the issue remained unresolved upon transfer, and the parties have not adequately

briefed the issue in the context of Defendants' motion for summary judgment.  Nevertheless, the

Court believes that the question is immaterial.  All but one of Defendants' arguments for

granting summary judgment in their favor depend upon the application of a federal constitutional

limitation on state defamation claims.[8]  *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501

---

[8] The exception is the common law privilege for fair reporting of official government
reports.  The law in each state on this question is substantially similar.  *See infra* note 41.

U.S. 496, 510 (1991) (explaining that "[t]he First Amendment limits California's libel law in various respects"); *Garrison v. Louisiana*, 379 U.S. 64, 67 (1964) (explaining that "the Constitution limits state power" in defamation cases).  For example, a plaintiff's inability to assert defamation based on a statement of opinion, a plaintiff's burden to demonstrate falsity (at least in circumstances like these), and the requirement that a limited-purpose public figure show actual malice, each emanate from the Constitution.  *See, e.g.*, *Masson*, 501 U.S. at 510; *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20–21 (1990); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).  These limitations apply with equal force to causes of action arising under D.C. as well as Florida law, and the Court has found no meaningful difference among those jurisdictions' law in faithfully applying those principles.  Indeed, Defendants assert that the jurisdictions' law are the same on the issues relevant to their motion, and Montgomery's opposition does not claim otherwise.  *See* Defs.' Mem. Supp. Summ. J. at 16 n.6.  As a result, the Court cites to both D.C. and Florida cases as appropriate.  Ultimately, the Court's holdings are the same regardless of whether D.C. or Florida law applies.

## B.  Outstanding Discovery Issues

As the Court's description of this case's procedural history makes clear, several discovery issues remain outstanding.  Most of the motions involve the software that is at the center of the Chapter's claims.  Montgomery had filed several objections to the magistrate judge's orders that he produce that software, and has moved to extend the discovery deadline to allow the search for the software to continue.  Defendants have filed a motion for spoliation sanctions based on Montgomery's failure to provide the software.  Before proceeding to consider Defendants' motion for summary judgment, the Court must resolve these motions.

## 1. Background

Some background regarding this dispute is necessary to understand the parties' motions and the Court's ultimate ruling.  In their first set of production requests, Defendants requested that Montgomery produce his software.  *See* Defs.' First Set of Interrogs. & First Set of Requests for Prod. of Docs. to Pl. at 12, ECF No. 90-1 at 13 (request number eight).  In response to that request, Montgomery asserted a blanket objection "to any interrogatories or document request regarding a copy of his software," on grounds of "confidentiality, intellectual property rights, legal restrictions on the Plaintiff responding, that the individual document request by its nature is unreasonably burdensome and oppressive, that the total number of document requests is unreasonably burdensome, oppressive and harassing, and also on the grounds that the request is neither relevant nor reasonably calculated to lead to admissible evidence."  Pl.'s Resps. to Defs.' First Set of Doc. Reqs. to Pl. at 7, ECF No. 90-2 at 34.  Based on those grounds "and other considerations," Montgomery asserted that he "[would] not produce a copy of any software."  *Id.*  Notably, Montgomery *did not* claim that he did not possess or have control over the software.

Defendants eventually noted a discovery dispute with the court, and Magistrate Judge Goodman scheduled a hearing for August 21, 2015.  In their papers, Defendants cited and reproduced a Nevada federal district court's orders from Montgomery's lawsuit against eTreppid in which the software had been excluded from a government-endorsed Protective Order.  In that case, Montgomery had been ordered to produce, and then held in contempt for not producing, his software.  *See* Defs.' Pre-Hearing Mem. at 2–3, ECF No. 94; *id.* Exs. 2–6.  On August 19, two days prior to the discovery hearing before Magistrate Judge Goodman, Montgomery apparently turned over what he would later claim is his only copy of the software to the FBI, along with a large volume of other computer drives and electronic information, in connection with an

unrelated criminal investigation.[9]  At his deposition, which was held on August 20, he confirmed

this series of events.  *See* Montgomery Dep. at 127:12–133:19, ECF No. 166-2.  And at the

motion hearing the next day, Montgomery's counsel, Mr. Klayman, represented to the court that

the software had been turned over to the FBI.  *See, e.g.,* Tr. of Disc. Hr'g at 6:25–7:10, ECF No.

110.  Mr. Klayman also conceded that Defense counsel was not given advanced warning of the

transfer, but he did represent that Montgomery had arranged to have "continuing access to

documentation which is not classified."  *Id.* at 16:21–17:4.

Following the hearing, Magistrate Judge Goodman ordered Montgomery to "use his self-

described right of continued access to non-classified information . . . and produce the software to

Defendants" by September 4, and to advise FBI General Counsel James Baker and Assistant

U.S. Attorney Deborah Curtis of the order.  Post-Disc. Hr'g Order at 2–3, ECF No. 107.

Montgomery moved to stay that order pending resolution of his objection to the order before the

district court, but Magistrate Judge Goodman denied that motion.  *See* Pl.'s Mot. to Stay

---

[9] Both in their filings and throughout the course of the discovery dispute, Montgomery
and his counsel repeatedly invoke this purported whistleblower investigation concerning illegal
government surveillance on American citizens, legislators, judges, and other persons.  Beyond
the fact that Montgomery claims that the software relevant to this case was bound up among the
material he provided to the FBI to substantiate his allegations, he never meaningfully explains
any connection between those allegations and the subject of the Chapter.  Therefore, the Court
will not discuss it further.  In his Amended Complaint, Montgomery does allege that Defendants'
"tortious actions alleged herein were furthered and aided and abetted by the CIA and the NSA,
who want to destroy Plaintiff Montgomery to prevent him from disclosing as a whistleblower the
full extent of their unconstitutional and illegal Government surveillance on American citizens to
the Congress, the Inspector General, and to the courts."  Am. Compl. ¶ 256.  Beyond the fact that
Risen admits he spoke with certain CIA officials and officials from other government agencies,
Montgomery has provided no evidence supporting this allegation.  He also suggests that
government officials are "falsely discrediting me to cover up wrong-doing."  Am. Compl. Ex. C.
¶ 61.  To the extent this allegation is relevant to Montgomery's claims that government officials'
potential for bias should have provided Risen with reason to doubt the allegations made in the
Chapter, the Court considers those assertions in the actual malice context, below.

Implementation of Para. 5 of Magistrate's Order of Aug. 22, 2015, ECF No. 112; Order Den.

Pl.'s Mot. to Stay One Para. of Disc. Order, ECF No. 122.

Montgomery failed to produce the software, and instead filed an objection to the

magistrate judge's order, which remains pending. *See* Pl.'s Obj. to Portions of Magistrate

Judge's Order of Aug. 22, 2015, ECF No. 125.  His primary argument was that the software is

"nothing more than a red herring" and irrelevant to the litigation because Risen admits he never

reviewed or had access to the software when writing his book. *Id.* at 3–6.  In addition,

Montgomery argued that Defendants had not properly designated an expert witness to analyze

the software, because they had only provided the name of the expert and not the additional

information required by Federal Rule of Civil Procedure 26.1. *Id.* at 7.

On September 8, 2015, James Baker, the FBI's General Counsel, responded by letter,

disputing Mr. Klayman's representations concerning Montgomery's continued access to the

software and stating that Montgomery "did not associate potential retrieval of this information

[certain personal information] with any pending civil litigation."  Letter from James A. Baker,

Gen. Counsel, FBI, to Larry Klayman (Sept. 8, 2015), ECF No. 126.  Mr. Baker also wrote that

the government "resolved to treat the materials under review as presumptively classified for

security purposes," and "neither agreed to undertake, nor understood any obligation to conduct, a

classification review of any of these materials for the purpose of any civil litigation." *Id.*

Nevertheless, the government stated that it would be "prepared to facilitate Mr. Montgomery's

reasonable access to unclassified information resident on the drives" but noted the burden that

the government would undertake if it were to search for the software, without specific

instructions, among the 51.6 million files and 600 million pages of documents Montgomery

represented were contained on the hard drives. *Id.*  As a result, the government requested that

Montgomery provide several pieces of information necessary to identify the software, and said that if the software was located "appropriate U.S. Government agencies and/or departments will conduct a classification review of the software." *Id.* Mr. Klayman and his paralegal thereafter filed declarations reiterating that they *did* inform the government that Montgomery was involved in civil litigation and that Defendants had asked for access to the software. *See* Notice of Filing of Decls., ECF No. 127.

Magistrate Judge Goodman held a second hearing on October 16, 2015. At that hearing, Mr. Klayman argued that he was not certain whether the software was in fact contained among the materials turned over to the FBI. Tr. of Disc. Hr'g at 10:17–22, ECF No. 163. He also claimed that he did not know whether or not the software was classified. *Id.* at 15:20–16:9. Following the hearing, Magistrate Judge Goodman ordered Montgomery to turn over to the FBI a comprehensive set of instructions as to how to pinpoint the software, and to produce the software to the Defendants by October 26, 2015. He also instructed Montgomery to produce all of his correspondence with the FBI up until that point. *See* Post-Disc. Hr'g Admin. Order, ECF No. 154.

On October 21, Montgomery then filed an affidavit contending, for the first time, that "upon searching my memory, I do not believe that I have had access to any of the subject software, nor did I provide it to the [FBI] when I turned over the drives." Montgomery Decl., ECF No. 158-1. Nevertheless, he claimed that he would provide additional information to the FBI that would enable the agency to locate the software, if it existed, on his drives.

On October 23, in an e-mail to Mr. Klayman, FBI Assistant General Counsel Ted Schwartz informed Mr. Klayman that Montgomery had not provided the information the agency requested in its September 8, 2015 letter. *See* E-mail from Ted Schwartz, Assistant Gen.

Counsel, FBI, to Larry Klayman (Oct. 23, 2015, 3:44 PM), ECF No. 166-4.  Mr. Schwartz also

pointed out that Montgomery had now represented that he does not believe the software was

located on the drives.  *Id.*  Therefore, Mr. Schwartz stated that "the FBI will not search the drives

to locate software requested in the *Risen* litigation."  *Id.*

On October 26, 2015, Montgomery filed another objection to Magistrate Judge

Goodman's most recent order that he produce the software, claiming that he had made a good

faith effort to facilitate the search of the software.  *See* Pl.'s Obj. to Magistrate Judge's Order of

Oct. 19, 2015 & Req. Stay, ECF No. 164.  Despite Mr. Schwartz's October 23 representation to

the contrary, Montgomery claimed that the "FBI is working with due speed to search through the

millions of files in order to determine whether such software does exist in the documents

provided by Plaintiff," and again reiterated his contentions that the software was not relevant and

that Defendants had failed to properly designate an expert to analyze it.  *Id.* at 6, 10–11.  Shortly

thereafter, Defendants filed a motion for spoliation sanctions, arguing that Montgomery had

spoliated the software by providing his only copy to the FBI.  *See* Defs.' Mem. Supp. Mot. for

Sanctions, ECF No. 166.  Defendants sought dismissal of the case and attorneys' fees.  *See id.* at

1.

On December 11, 2015, Mr. Schwartz informed Mr. Klayman, by e-mail, that because

Mr. Montgomery had not provided the necessary information and no longer believed that the FBI

was in possession of the software, the agency's October 23 position—that they would not search

for the software—remained unchanged.[10]  *See* E-mail from Ted Schwartz, Assistant Gen.

Counsel, FBI, to Larry Klayman (Dec. 11, 2015, 10:43 PM), ECF No. 196-1.

---

[10] Although Montgomery initially moved to file Mr. Klayman's communications with the
FBI regarding the search for the software under seal, he has since withdrawn that request.  The
communications can be found on the docket at ECF No. 273.  Those filings include several e-

Nevertheless, Mr. Klayman represented at the January 5, 2016 sanctions hearing that officials on the "criminal side" of the FBI continue to search for the software, at least incidentally.  He argued that Mr. Schwartz and those on the "civil side" of the FBI were not involved in that process.  He claimed that they were searching everything on Montgomery's drives as part of the criminal investigation and that Mr. Klayman continued to advise them to keep the software relevant to this litigation in mind.  *See* Sanctions Hr'g Tr. at 54:4–58:15.[11]

### 2. Montgomery's Objections to the Magistrate Judge's Orders

With this history in mind, the Court overrules Montgomery's objections to Magistrate Judge Goodman's orders.  A district court will only set aside a magistrate judge's order with respect to a non-dispositive matter, like a discovery order, if the order "is clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a); *see* D.D.C. Local Civ. R. 72.2(c).  The magistrate judge's decision is "entitled to great deference," and "the court will affirm the magistrate judge's determination unless on the entire evidence the court is left with the definite and firm conviction that a mistake has been committed."  *Beale v. District of Columbia*, 545 F. Supp. 2d 8, 13 (D.D.C. 2008) (internal quotation marks and citations omitted).  The magistrate judge's orders that Montgomery produce the relevant software were not clearly erroneous and, to explain why, it is not necessary to discuss in detail every minute contention among the parties regarding the software issue.  A few observations suffice.

---

mails from Mr. Klayman to General Counsel James Baker in November 2015 raising concerns about Mr. Schwartz's responses, but there is no indication in the record of Mr. Baker's response, if any.

[11] In response to Magistrate Judge Goodman's invitation, Defendants filed five specific questions for the court to ask Montgomery's counsel during the sanctions hearing, requesting that the document be sealed, at a minimum, through the conclusion of the hearing.  *See* Defs.' Mot. to Seal, ECF No. 210; *see also* Defs.' Renewed Mot. to Seal, ECF No. 269.  That hearing having concluded, the Court will deny the motion to seal.

Most importantly, although Montgomery claims that the software is irrelevant, he is wrong.   In making that argument, Montgomery has conflated the distinct inquires for actual malice and falsity.   *See* 3 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* § 23:6 (2016) ("Wholly aside from the *fault* requirements that have been engrafted upon modern defamation law by the First Amendment, the First Amendment does not permit liability for defamation unless *the plaintiff also demonstrates* that the defamatory statement was a false statement of fact." (second emphasis added)).   Actual malice focuses on the *subjective* state of mind of the defendant.   Falsity, by contrast, focuses on the *objective* truth of the defendant's assertions.   Therefore, it does not matter "if the defendant doesn't know the truth of the matter when he makes the defamatory statement"; "[s]o long as what he says turns out to be true, he is free from liability."   *Bustos v. A&E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011). "[T]ruth, whenever discovered, serves as a complete defense."   *Id.*

Montgomery cites three reasons why the software is irrelevant.   First, he repeatedly emphasizes that Defendants did not raise the defense of truth as a ground for dismissal in their motion to dismiss.   *See, e.g.*, Pl.'s Obj. to Portions of Magistrate Judge's Order of Aug. 22, 2015 at 3–6.   That omission has no bearing, however.   Defendants do not have an obligation to raise every anticipated defense in a motion to dismiss.[12]   They did not waive a potential evidence- or merits-based defense of falsity by failing to raise it in their motion to dismiss.   Indeed, falsity is the sort of defense that one might think, in many cases, depends on examination of factual evidence.   For example, it might have been difficult to argue at the motion to dismiss stage that Montgomery's allegation the software worked was *implausible*.   Once armed with evidence at

---

[12] And, of course, Defendants never filed an Answer in this case because their motion to dismiss remained unresolved throughout discovery and summary judgment briefing.

the summary judgment stage, though, it is possible to argue, as Defendants do now, that the evidence does not support that allegation.  Nor is Montgomery's repeated assertion that Risen never reviewed the software or other governmental materials either relevant or well-taken.  *See, e.g.*, *id.* at 6.  Regardless of what Risen *subjectively believed* or relied on to form that belief, Montgomery still has the basic burden to show that the Chapter's assertions were false.

Second, Montgomery contends that the software is irrelevant because he can succeed on a defamation claim solely by showing actual malice or ill will.  *See, e.g.*, Sanctions Hr'g Tr. at 22:25–26:15; *see also* Pl.'s Opp'n at 22–23.  As a matter of law, he is wrong.  "[W]here discussion of public affairs is concerned," the "truth may not be the subject of either civil or criminal sanctions," *Garrison*, 379 U.S. at 74, and the plaintiff must "show the falsity of the statements at issue to prevail in a suit for defamation," *Phila. Newspapers, Inc.*, 475 U.S. at 775. This is particularly so when the plaintiff is a public figure, the issue concerns public affairs, or the plaintiff must show actual malice.  In direct contradiction to Montgomery's argument, the Supreme Court has "long held that . . . actual malice *entails falsity*."  *Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 861 (2014) (emphasis added).[13]

The handful of cases Montgomery cites are not to the contrary.  *See* Pl.'s List of Auth. Pursuant to Order of Jan. 6, 2016, ECF No. 226.  He cites two cases describing the Florida Constitution which could be read, when taken out of context, to permit a plaintiff to succeed on a

---

[13] To be sure, the Court has also "carefully eschewed" a categorical rule that there are absolutely no circumstances in which a truthful statement could be actionable, "mindful that the future may bring scenarios which prudence counsels [the Court] not resolving anticipatorily." *The Fla. Star v. B.J.F.*, 491 U.S. 524, 532 (1989).  Even if that question remains open, it is viewed as "largely academic" because "[o]nly in the rarest cases have courts permitted liability in a defamation action based on a true and defamatory statement."  1 Robert D. Sack, *Sack on Defamation* § 3:3.2[A], at 3-10 (4th ed. 2015).  If a plaintiff is not a private figure *or* the speech is of public concern, there is no doubt that falsity is a constitutionally required element of a defamation claim.  *Id.* at §§ 3:3.1, 3.3.2[A].

defamation claim based on a true statement.  The Florida Constitution provides, in relevant part, that "[i]f the matter charged as defamatory is true *and* was published with good motives, the [defendant] shall be acquitted or exonerated."  *Fla. Const.* art. I, § 4 (emphasis added).  Yet, the Supreme Court held in *Garrison* that "[t]ruth may not be the subject of either criminal or civil sanctions where discussion of public affairs is concerned," and held these types of provisions unconstitutional in most circumstances.  379 U.S. at 74; *see also* 1 Robert D. Sack, *Sack on Defamation* § 3:3.2[A], at 3-6 & n.19 (4th ed. 2015) (citing Florida constitution, among others, and explaining that the "qualification is unconstitutional, at least in most cases").  In line with this limitation, the Florida Supreme Court regularly recites the cause of action for defamation as requiring the plaintiff to show falsity.  *See, e.g.*, *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (proving defamation requires "(1) publication, (2) *falsity*, (3) [that the] actor must [have actual malice or act negligently]; (4) actual damages; and (5) [that the] statement must be defamatory" (emphasis added)).  "A plethora" of Florida cases "exist which proclaim that a required element of defamation is a false statement made about another."  *See Cape Publ'ns, Inc. v. Reakes*, 840 So. 2d 277, 279–80 (Fla. Dist. Ct. App. 2003) (footnote omitted).  The outcome is not different under District of Columbia law, where a plaintiff must show "that the defendant made a *false* and defamatory statement concerning the plaintiff," among other elements.  *Doe No. 1 v. Burke*, 91 A.3d 1031, 1044 (D.C. 2014) (emphasis added) (quoting *Rosen v. Am. Isr. Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012)).

To be sure, a few cases interpreting Florida law—including the two that Montgomery cites—continue to recite that truth is not a complete defense to defamation unless accompanied by a good motive.  As other Florida decisions note, these cases "create confusion," *Cape Publ'ns*, 840 So. 2d at 279 n.2, particularly when presented as a broad principle and not cabined

to their proper context.  For example, one case cites the relevant Florida constitutional provision in a footnote but *expressly* clarifies that whether truthful defamation is actionable "depend[s] upon whether a 'public interest' is involved."  *Lewis v. Evans*, 406 So. 2d 489, 492 (Fla. Dist. Ct. App. 1981).  In the other case, *Finch v. City of Vernon*, the Eleventh Circuit briefly noted that the Florida Constitution permits liability in defamation for a statement, even if true, that was made "with ill will."  *See* 877 F.2d 1497, 1504 (11th Cir. 1989).   But, the discussion is dicta and the court's analysis was limited.  The court was resolving a defendant's argument that the district court had erred in denying the admission of character evidence to prove the truth of the defendant's statements.  *Id.*  The court first noted that the defendant had not identified what evidence he would have introduced, and thus the court was unable to determine "whether the district court abused its discretion in excluding it."  *Id.*  In the alternative, the court merely stated, without analysis, that because publication of a true statement with ill will can be defamatory, and the defendant did not argue the evidence was insufficient to show ill will, his argument would not have prevailed in any event.  *Id.*  Neither of these cases support Montgomery's broad proposition.

And the other cited cases involve claims that a defamatory impression could be inferred from true statements.  So-called defamation by implication, as the Florida Supreme Court has recognized, has "a longstanding history in defamation law."  *Jews for Jesus,* 997 So. 2d at 1106.  Even in such cases, though, courts focus not on whether an injury arises from the *true* statements themselves, but rather on the "*false impression* given by the juxtaposition or omission of facts."  *See id.* at 1108 n.13 (emphasis added).  Accordingly, "truth remains an available defense," and

all of the "protections [that] defamation law . . . afford[s] to the media . . . extend[] to the tort of

defamation by implication." *Id.* at 1108 & n.13.[14]

As the Court explains below, Montgomery is a limited-purpose public figure and the

Chapter's statements are undoubtedly of public concern. *See infra* Part III.C.4.a.  Thus, falsity is

an element Montgomery must establish in order to succeed on his defamation claims, and

evidence demonstrating falsity is of critical relevance.  At the same time, the issue would be no

less relevant even if Montgomery anticipated that a court would conclude he is merely a private

individual (and if Defendants were found to be non-media defendants).  In those circumstances,

at least under Florida law, truth operates as a *defense* to a plaintiff's claim, rather than an element

the plaintiff must prove.  *See, e.g.*, *In re Standard Jury Instructions in Civil Cases-Report No.*

*09-01 (Reorganization of the Civil Jury Instructions)*, 35 So. 3d 666, 729–30 (Fla. 2010).  *But*

*see Hepps*, 475 U.S. at 776 (holding that, in a case where a "private figure" brings a defamation

claim based on a matter "of public concern," the "common law's rule on falsity—that the

defendant must bear the burden of proving truth—must . . . fall . . . to a constitutional

requirement that *the plaintiff* bear the burden of showing falsity" (emphasis added)).  Whether in

---

[14] The final case Montgomery cites, *Noonan v. Staples, Inc.*, involved a pure matter of private concern and a private individual.  *See* 556 F.3d 20 (1st Cir. 2009).  Even there, the First Circuit explained—in line with Supreme Court precedent—that "in the public-figure context, the 'actual malice' test applies to statements of public concern, an area in which defamatory true statements are not actionable at all."  *Id.* at 29.  The court explained that Massachusetts' "exception to the truth defense is not constitutional when applied to matters of public concern."  *Id.* at 28 n.7.  On a motion for rehearing, Staples later raised the broader constitutional question of whether an exception to a defense of truth is ever constitutional, but the First Circuit declined to consider it because the "argument was not developed now and was never raised in the initial briefing."  *Id.*; *see also* Order denying rehearing, *Noonan v. Staples*, 556 F.3d 20 (1st Cir. Mar. 18, 2009) (No. 07-2159).  Commentary treats the decision as an "anomaly."  1 Sack, *supra*, § 3:3.2[A], at 3-10.

an effort to rebut Montgomery's *prima facie* case or to establish their own affirmative defense, Defendants must be afforded an opportunity to probe the issue of truth during discovery.[15]

As a third ground for finding the software irrelevant, Montgomery claims that the software's workability forms only a small part of his defamation claim, and that "the majority of the defamatory statements have nothing to do with the software or whether it worked in whole or in part." Pl.'s Opp'n at 2; *see also* Sanctions Hr'g Tr. at 80:20–21. It is not clear to the Court why more limited emphasis on the software would excuse Montgomery from producing it, so long as some of his claims were based on the software. Regardless, even a cursory review of Montgomery's Amended Complaint show that his argument is dramatically at odds with the claims he presses. Nearly *all* of Montgomery's claims that the asserted statements are defamatory involve contesting Defendants' statements that his work is a hoax or fabrication, the implication that the CIA had been conned by Montgomery, or the assertion that the technology was worthless. *See* Am. Compl. ¶¶ 107, 108, 112, 113, 120, 122, 124, 126, 127, 129, 131, 133, 135, 136, 138, 142, 143, 144, 146, 147, 148, 150, 152, 154, 155, 158, 169, 182, 184, 185, 187, 190, 194, 200, 202, 204, 206, 208, 210, 212, 216, 218, 220, 222, 224, 230, 232, 234, 236.

---

[15] For these reasons, the Court places no reliance on the CIA's response to Defendants' *Touhy* requests for documentary evidence and testimony, which Montgomery claims reinforce his argument that the software is irrelevant. In the agency's initial response—before a determination had been made about producing any information—the agency preserved a boilerplate objection that Defendants had failed to satisfy their burden to show the information is relevant to their defenses because "[t]he validity of th[ose] defenses turns . . . on what the defendants knew or should have known at the time of the challenged statements, not on what the government knew." *See* Letter from Raphael O. Gomez, Senior Trial Att'y, U.S. Dep't of Justice, to Laura R. Handman (Oct. 16, 2015), ECF No. 273-1 at 25. Respectfully, for the reasons just explained, the Court believes this legal conclusion is erroneous. *See* 3 Smolla, *supra*, § 23:6 ("*Wholly aside from the fault requirements* . . . the First Amendment does not permit liability for defamation *unless the plaintiff also demonstrates* that the defamatory statement was a false statement of fact." (emphasis added)).

Having confirmed that the software is relevant, the Court also rejects Montgomery's contention that Defendants forfeited their right to the software by failing to disclose information regarding their named expert witness by the August 3, 2015 deadline.  *See, e.g.*, Pl.'s Obj. to Portions of Magistrate Judge's Order of Aug. 22, 2015 at 7–8.  As Magistrate Judge Goodman concluded, this argument is "circular and unconvincing," because Defendants could not produce an expert report without the underlying software the expert was to analyze.  Order Den. Pl.'s Mot. to Stay One Para. of Disc. Order, ECF No. 122.  In addition, Defendants have since served Montgomery with a partial report including the expert's qualifications, so any omissions were harmless.  *See* Fed. R. Civ. P. 37(c)(1).

Nor does Montgomery's or his counsel's alleged uncertainty about the location or classification of the software provide grounds for excusing his ability to produce it or for finding that he had no duty to preserve the evidence.  Montgomery now invokes Federal Rule of Civil Procedure 34, which states that a party may only request production of items "in the responding party's possession, custody, or control."  Fed. R. Civ. P. 34(a)(1); *see, e.g.*, Pl.'s Obj. to Magistrate Judge's Order of Oct. 19, 2015 & Req. to Stay at 6.  But it is revealing that Montgomery *never* objected initially on the ground that he did not possess or control the software.  *See* Pl.'s Resps. to Defs.' First Set of Doc. Reqs. to Pl. at 7, ECF No. 90-2 at 34.  Montgomery's belated change in position is difficult to credit, and it is likely he waived his eleventh-hour claim that he never in fact had possession of the software.

Moreover, in turning over several drives to the FBI at a time when they *did believe* Montgomery had possession of the software, Montgomery and his counsel took action which they should have reasonably understood would place a requested document out of Defendants'

reach.[16]  And they did so *without* informing Defendants and *without* seeking leave of the Court.

This fact is all the more problematic because Mr. Klayman indicates that it took a significant

amount of time to coordinate turning over the information to the FBI—coordination that

included negotiation of a production immunity agreement for Montgomery and extensive efforts

to set up a meeting at which the physical hard drives would be turned over.  *See, e.g.*, Tr. of Disc.

Hr'g at 33:2–4, ECF No. 110 (asserting that the process "has been under way for many, many

months before the lawsuit was even filed").   Therefore, Montgomery and Mr. Klayman had more

than an adequate amount of time to look for and sequester the software in the nearly three

months that passed between Defendants first requested production of the software and when

---

[16] Mr. Klayman now asserts that he was more equivocal at the August 21 discovery
hearing about the software's inclusion among the drives.  *See* Sanctions Hr'g at 28:23–40:17;
Pl.'s Notice of Filing Related to Alleged Software, ECF No. 228.  While a few of his statements
during that hearing were couched in uncertainty, the vast majority were expressed without
qualification.  For example, the following exchange occurred:

| | |
|---|---|
| THE COURT: | The FBI has the software? |
| MR. KLAYMAN: | They have the software, yes. |
| THE COURT: | How did they get it? |
| MR. KLAYMAN: | Because Mr. Montgomery provided it to them. |
| THE COURT: | When? |
| MR. KLAYMAN: | He provided it to them three days ago.  It has been |

in the process to provide that to them and he provided them a lot of other
information too, which they are looking at because it is classified information and
he is a whistleblower.

Tr. of Disc. Hr'g at 6:25–7:10, ECF No. 110; *see also id.* at 7:25–8:18 (representing that
"relative to this case the software is included" in what was turned over to the FBI).  For his part,
Mr. Klayman now states that he has never even seen or reviewed the software that forms the
basis of Montgomery's complaint—and partially offers that as an explanation for why he does
not know if the software was ever turned over.  *See, e.g.*, Sanctions Hr'g Tr. at 31:24–32:3; *id.* at
50:20–25; *id.* at 65:24–66:3; *id.* at 114:20–21.  This assertion implies that Mr. Klayman filed this
lawsuit without a rigorous attempt to verify the claims that the software did in fact work—claims
he asserted were false and defamatory.  The Court is not insensitive to Mr. Klayman's assertion
that the software is classified (despite the absence of any real evidence showing it is), but his
admissions nevertheless raise serious questions about whether he conducted the investigation
necessary to meet his obligations as counsel under Rule 11.

Montgomery allegedly turned it over to the FBI.  Having filed a defamation lawsuit in which the working nature of Plaintiff's software is a critical issue, it was Montgomery's and his counsel's obligation to retain a copy for purposes of the litigation—particularly in light of the fact that Montgomery and his counsel were aware that a request for production had been made in that regard.  And, as explained below in the context of resolving Defendants' motion for summary judgment, failure to produce or retain the software, for whatever reason (including that it might be classified), leaves Montgomery unable to provide evidence supporting an essential element of his claim.  Excusing Montgomery's failure to provide that evidence would overlook the fact that he never asserted in his initial objections to the production request that he did not possess the software, and would encourage litigants to file lawsuits without reviewing or retaining critical evidence necessary to prove their claims.

The Court also has serious reason to doubt that the software is, in fact, classified, and would not be subject to production.  For one thing, orders issued in a Nevada case between Montgomery and eTreppid specifically noted that the government had *not* deemed the software classified or subject to the state secrets privilege in that proceeding.  That privilege "is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security." *In re United States*, 872 F.2d 472, 474 (D.C. Cir. 1989).  The privilege "belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." *United States v. Reynolds*, 345 U.S. 1, 7 (1953) (footnotes omitted).  In the Nevada case, the Government intervened and asserted the state secrets privilege over certain documents—but the Protective Order entered explicitly *did not preclude* the parties "from serving or taking any discovery from other parties or third parties relating to, or questioning . . . [t]he computer source code, software, programs, or technical specifications relating to any

technology owned or claimed by any of the Parties." *See* ECF No. 94-2.  A magistrate judge

handling that case subsequently rejected Montgomery's claims that he could not defend the case

without violating his "secrecy oath and compromising national security," noting that the "clear

understanding in drafting and issuing th[e] protective order was that the parties would be

discussing the nature and capabilities of the technology, and the type of work each party

performed for the government." *See* Order Regarding Source Code Disc., ECF No. 94-3.  The

United States, which participated in aspects of that litigation, did not take a contrary position.

Other than Mr. Klayman's unsubstantiated say-so, the Court perceives no reason to doubt

the Nevada court's conclusion and find that the software is classified.[17]  The Government has not

attempted to intervene in this case, despite the fact that it is well aware of the ongoing dispute

over the software.  Moreover, the CIA's response to Defendants' *Touhy* requests indicated that

they did affirmatively search for a copy of Montgomery's software and represented that they

were unable to locate it.  The CIA explicitly did *not* decline to conduct a search at all on the

ground that the material was likely to be classified, as the agency did with respect to the other

documents requested.  *See* Letter from JoDean Morrow, Assistant Gen. Counsel, CIA, to Laura

R. Handman (Nov. 13, 2015), ECF No. 178-3.  The same is true for the Air Force's *Touhy*

response.  *See* Letter from Robert F. Booth, Chief, Gen. Litig. Div., U.S. Air Force, to Laura R.

Handman (Mar. 10, 2016), ECF No. 263.

---

[17] Mr. Klayman asserted that he did not read those orders that way, *see* Tr. of Disc. Hr'g at 40:7–22, ECF No. 110, but as Defendants point out, Montgomery, represented by the same counsel, appears to have argued before the Ninth Circuit that the software and all other documents at issue in the prior Nevada case were determined to be not classified, *see* Emergency Mot. for Stay on Appeal, ECF No. 103-1 at v.  At the August 21, 2015 motions hearing, Mr. Klayman argued that he did not write that brief.  *See* Tr. of Disc. Hr'g at 42:11–43:12, ECF No. 110.  Later in that same hearing, however, Mr. Klayman admitted he was not aware of any Nevada opinion holding that the software was classified.  *Id.* at 45:25–46:25.

Finally, to the extent Montgomery relies on the FBI's continued efforts to search for the

software as reason to object to the magistrate judge's orders, the Court rejects those grounds for

failing to comply with Magistrate Judge Goodman's orders.  Nothing indicates that a search

remains ongoing.  To date, over five months since the sanctions hearing, seven months since

discovery closed, and ten months since Montgomery turned his hard drives over to the FBI, the

Court is unaware of anything in the record to indicate that the FBI continues to look for the

software.  And neither party has informed the Court that the agency has found it.[18]

For all of the foregoing reasons, the Court overrules Montgomery's objections to the

magistrate judge's discovery orders concerning the production of the software.

### 3.  Motion for Spoliation Sanctions

The fact remains that Montgomery never produced his software despite Defendants'

request and several court orders to do so.  And that leaves Defendants' motion for spoliation

sanctions.[19]  A party has a duty to preserve potentially relevant evidence once litigation is

---

[18] Montgomery also filed a motion to extend discovery on this ground, even after Mr. Schwartz's October 23 e-mail stated that the FBI would *not* continue to search for the software. *See* Pl.'s Mot. for Extension of Time to Reset Disc. Deadline, ECF No. 181.  To the extent the motion has not been mooted by the Southern District of Florida's failure to act on the motion before summary judgment briefing was concluded, the Court will deny it.  As explained above, the FBI's representations that are in the record state that because Mr. Montgomery had *failed* to provide then necessary information to conduct that search, the FBI would no longer expend resources to look for it.  There is no need to extend discovery for the FBI to undertake a search it has definitively represented it will not conduct, and there is no other indication that a search remains ongoing.  The other reasons pressed for an extension—the pendency of two motions to compel—are now moot because those motions have been rejected or otherwise decided, or the documents Mr. Montgomery sought have been produced, so far as the Court is aware.  *See* Pl.'s Suppl. to Mot. for Extension of Time to Reset Disc. Deadline, ECF No. 182; *see* Sanctions Hr'g Tr. at 6:20–7:9, 71:21–72:2.  To the extent any motions to compel remain pending, Montgomery's opposition to Defendants' summary judgment motion does not claim that he was prejudiced by any outstanding discovery.

[19] Montgomery also filed an objection to Magistrate Judge Goodman's September 15, 2015 order prohibiting him from asking Houghton Mifflin's officers and directors about Houghton Mifflin's net worth or about officers' alleged failure to disclose this lawsuit in SEC

anticipated.  *Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011).  A party that

does not do so may be accused of spoliation—"the destruction or material alteration of evidence

or the failure to preserve property for another's use as evidence in pending or reasonably

foreseeable litigation"—and be subject to sanctions.  *Id.* (quoting *D'Onofrio v. SFX Sports Grp.,*

*Inc.*, No. 06-687, 2010 WL 3324964, at *5 & n.5 (D.D.C. Aug. 24, 2010)).  A court may impose

several possible sanctions for spoliation, including the assessment of fines or attorneys' fees and

costs, the preclusion of certain lines of argument, an adverse inference instruction, or a default

judgment and dismissal of a party's case.  *Id.*  The Court's authority "must be exercised with

restraint and discretion." *Id.*

      Defendants seek dismissal of Montgomery's complaint both because of his failure to

preserve and produce the software and because he violated the court's repeated orders to produce

the software.  Such a punitive sanction is only justified when:

> (1) the other party has been so prejudiced by the misconduct that it would be
> unfair to require [the party] to proceed further in the case; (2) the party's
> misconduct has put an intolerable burden on the court by requiring the court to

---

filings and purported insider trading that arose out of that omission.  *See* Pl.'s Obj. to Limited
Portions of Magistrate Judge's Post-Disc. Hr'g Order, ECF No. 143; *see also* Post-Disc. Hr'g
Order at 2, ECF No. 136 (addressing deposition topics 8 and 9); Pl.'s Suppl. to Obj. to Limited
Portions of Magistrate Judge's Post-Disc. Hr'g Order, Ex. 1, ECF No. 144 (reproducing notices
of deposition).  Magistrate Judge Goodman concluded that the net worth line of questioning was
premature because it related to punitive damages, and that the insider trading and SEC
allegations were an improper subject for deposition and irrelevant to the defamation claims made
in this case.  *See* Tr. of Mot. Hr'g at 21:2–18, ECF No. 145.  Montgomery does not raise any
SEC or insider trading-related claims for relief in this litigation.  And Montgomery's opposition
on the net worth issue does not even acknowledge that the magistrate judge ruled that inquiry
was premature at this time, a ruling that is amply supportable.  *See Kubicki ex rel Kubicki v.*
*Medtronic*, 307 F.R.D. 291, 298 (D.D.C. 2014) (explaining that discovery of a defendant's
financial condition, as relevant to the issue of punitive damages, is premature until the court
concludes that the issue of punitive damages is properly before it); *accord Haaf v. Flagler Const.*
*Equip., LLC*, No. 10-62321-CIV, 2011 WL 1871159, at *2–3 (S.D. Fla. May 16, 2011).  Thus,
the magistrate judge's conclusions were not clearly erroneous, and Montgomery's objection is
overruled.  In any event, neither issue appears relevant to resolving Defendants' pending motion
for summary judgment.

> modify its own docket and operations in order to accommodate the delay; or (3) the court finds it necessary to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future.

*Clarke v. Wash. Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 21 (D.D.C. 2012) (citing *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998)).  Circuit law also "establishes that the Court may only grant a motion for punitive spoliation sanctions if the moving party demonstrates by *clear and convincing* evidence that the opposing party destroyed relevant evidence in *bad faith*."  *Landmark Legal Found. v. EPA*, 82 F. Supp. 3d 211, 220 (D.D.C. 2015) (emphasis in original) (citing *Shepard v. ABC, Inc.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995)).

Although the Court is substantially troubled by Montgomery's and his counsel's conduct in this case, the Court will deny Defendants' motion.  As explained below, the Court ultimately finds summary judgment warranted in favor of Defendants on the merits of this case.  In favorably resolving Defendants' motion for summary judgment, the Court provides Defendants in practical terms much of the result they seek in their spoliation motion—judgment in their favor—albeit by a different route.  As Magistrate Judge Goodman's pre-hearing order indicated, a number of factual and legal questions are raised in the particular context of this case which would make resolution of the spoliation issue labor intensive.  *See generally* Order Scheduling Hr'g on Defs.' Spoliation Sanctions Mot. (with Specific, Add'l Requirements), ECF No. 191.  Despite Montgomery's and his counsel's actions, the Court is hesitant to allocate additional judicial resources to this discovery dispute, beyond the considerable resources already expended, for little additional gain.  Therefore, in light of the Court's entry of summary judgment in favor of Defendants, the Court will deny Defendants' motion for spoliation sanctions.[20]

---

[20] If the judgment in this case were ever reversed, thereby removing the basis for the Court's denial of Defendants' motion for spoliation sanctions, the Court would entertain a renewed motion.

## C. Defendants' Motion for Summary Judgment

Defendants also move for summary judgment on several grounds. As explained below, the Court agrees that summary judgment is warranted here for several reasons. First, the Court agrees with Defendants that several statements Risen made in the Chapter or in ensuing interviews are non-actionable statements of subjective opinion or loose, hyperbolic language that is protected as a matter of law. Second, without record evidence demonstrating that Montgomery's technology actually worked, Montgomery is unable to show that there is a genuine dispute of material fact regarding the material truth of the Chapter's assertions, and therefore cannot support the element of falsity. Third, even assuming, *arguendo*, that Montgomery could show falsity, he fails to point the Court to sufficient evidence from which a rational jury could conclude by clear and convincing evidence that Defendants published the Chapter with actual malice; in fact, the record contains overwhelming evidence to the contrary. Finally, because summary judgment is warranted on Montgomery's defamation claims, his related tort claims also fail.

### 1. Legal Standard

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See id.* at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See id.* at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## 2. Non-Actionable Statements of Opinion

Defendants first move for summary judgment on the ground that several of the statements contained in the Chapter are non-actionable statements of opinion. *See* Defs.' Mem. Supp. Summ. J. at 19–21. While the First Amendment does not categorically immunize from liability all statements that are framed as opinion, *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–21 (1990), "to be actionable under the First Amendment" a statement must nevertheless "at a minimum express or imply a verifiably false fact" about the plaintiff, *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001). A statement of opinion that "does not contain a provably false factual connotation" is not actionable under the First Amendment, and receives

"full constitutional protection." *Milkovich*, 497 U.S. at 20.  Similarly, statements that are

"'loose, figurative, or hyperbolic' . . . generally are not actionable in defamation." *Moldea v.*

*N.Y. Times Co.*, 15 F.3d 1137, 1143 (D.C. Cir.) ("*Moldea I*"), *rev'd in part on reh'g*, 22 F.3d 310

(D.C. Cir. 1994) (quoting *Milkovich*, 497 U.S. at 21).  Whether a statement "asserts actionable

facts or implies such facts is a question of law for the court to determine as a threshold matter."

*Id.* at 1144.  To make that determination, a court must consider the statement's context, "because

it is in part the *settings* of the speech in question that makes [its] hyperbolic nature apparent."

*See Moldea v. N.Y. Times Co.*, 22 F.3d 310, 314 (D.C. Cir. 1994) ("*Moldea II*") (emphasis in

original); *see also Weyrich*, 235 F.3d at 624.

Several of the Chapter's statements are non-actionable statements of opinion or

hyperbole.[21]  For example, the Chapter states that:

> [Montgomery] provides the perfect case study to explain how during the war on
> terror greed and ambition have been married to unlimited rivers of cash to create a
> climate in which someone who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision. Crazy
> became the new normal in the war on terror, and the original objectives of the war
> got lost in the process.

Chapter at 31–32.  Defendants argue that several of this passage's statements are non-actionable.

*See* Defs.' Mem. Supp. Summ. J. at 20–21.  The Court agrees.  The assertion that Montgomery

was motivated out of greed or ambition is a subjective judgment that is not verifiable.  *See, e.g.*,

*Underwager v. Channel 9 Austl.*, 69 F.3d 361, 367 (9th Cir. 1995) (concluding that statements

concerning the plaintiff's "motivations and personality" were opinion); *Greenberg v. Western*

*CPE*, No. SACV 12-02074, 2013 WL 1628905, at *4 (C.D. Cal. Apr. 15, 2013) (finding "pure

---

[21] Montgomery concedes that there are "a few statements that might qualify as opinion or hyperbole," but, unhelpfully, he does not specify which ones.  Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 35.

speculation on the part of the author regarding Plaintiff's possible feelings or motivations behind his actions" non-actionable statement of opinion); *Fetter v. N. Am. Alcohols, Inc.*, No. 06-4088, 2007 WL 551512, at *12 (E.D. Pa. Feb. 15, 2007) ("The alleged statements to the effect that the plaintiff was greedy, unreasonable, or foolish reflect personal opinion and therefore do not constitute defamation."). In addition, Risen's assertion that "[c]razy became the new normal" is also a loose, rhetorical turn of phrase, and a statement of Risen's subjective opinion. The statement, when considered in context, refers generally to the war effort, and not specifically to Montgomery. Even if it could be construed as describing Montgomery himself as "crazy," however, *that* assertion would also be a non-actionable statement of opinion. *Cf., e.g., Cook-Benjamin v. MHM Corr. Servs., Inc.*, 571 F. App'x 944, 947 (11th Cir. 2014) (statement that plaintiff was "'stupider' and 'crazy' constitute [the speaker's] opinion and thus cannot be proven false"). Indeed, Montgomery's Memorandum in Opposition does not respond to either of these arguments.[22]

In several instances the Chapter also refers to the fact that others had accused Montgomery of being a con artist or a fraud. For the most part, Defendants attributed those

---

[22] Other purely subjective or hyperbolic statements which appear in Montgomery's complaint but which he does not discuss or refers to only perfunctorily in his opposition include: Risen's hyperbolic reference in the book's prologue, generally and without referencing Montgomery, to "hustlers and freebooters" who "continue to take full advantage" of the war on terror, Am. Compl. ¶ 195; Risen's colorful and metaphoric reference to Montgomery as the "Emperor of the War on Terror," *id.* ¶¶ 106, 199; and Risen's subjective assessment that "Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror and went to waste," *id.* ¶ 213.

Defendants also contend that the assertion that Montgomery created a "rogue intelligence operation with little or no adult supervision" is a non-actionable assertion of opinion. *See* Defs.' Mem. Supp. Summ. J. at 20–21. Montgomery does contest this point in a passing and conclusory manner in his recitation of the facts, and claims that the statement implies the factual assertion that Montgomery engaged in "criminal activity." Pl.'s Opp'n at 10. For the reasons explained in Part III.C.4.b, below, the Court concludes that Risen's assertion that Montgomery's operation was "rogue," was not made with actual malice—whatever its implication.

statements to Trepp, Flynn, and others.  *See, e.g.*, Chapter at 32, 36, 37, 46.  In those circumstances, and as discussed below, Montgomery has failed to show that those statements are false (indeed, having factually reported the statements of others from their sources, it is hard to understand how Risen could have published those statements with actual malice, either).  During one television news interview, however, Risen himself appeared to agree with an interviewer's assertion that Montgomery was "revealed as a con man."  Am. Compl. ¶ 151.  Montgomery claims that this statement was defamatory because Risen adopts, "without qualification that Montgomery is a 'con man.'"  Pl.'s Opp'n at 8–9.  But Risen's own subjective opinion that Montgomery is a con artist is also a non-actionable opinion, particularly given the surrounding context of the Chapter and the information disclosed therein.  *See, e.g.*, *Spelson v. CBS, Inc.*, 581 F. Supp. 1195, 1203 (N.D. Ill. 1984) (finding statements that individuals were "'cancer con-artists' and 'practitioners of fraud'" non-actionable expressions of the "rational conclusion gleaned from defendant's opinion").

The greatest point of dispute between the parties involves the Chapter's statement that:

> Montgomery was the maestro behind *what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history*, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic.

Chapter at 32 (emphasis added).  Defendants argue that the statement is an inherently subjective ranking of events that is not factually verifiable and consists of the author's (and the other officials') own subjective opinion based on disclosed facts throughout the Chapter.  *See* Defs.' Mem. Supp. Summ. J. at 21.

Montgomery disagrees.  In fact, he relies upon this statement innumerable times in his opposition and it seems to form the cornerstone of his defamation claims.  *See, e.g.*, Pl.'s Opp'n at 3, 4, 8, 12, 14.  Montgomery's argument is unavailing, however.  A person's opinion

concerning which events rank among the greatest hoaxes in American history is a quintessential

example of a subjective opinion.  There is simply no method to objectively verify where an event

ranks among the greatest hoaxes in American history—or whether a particular event even makes

the list.  As a result, the statement fails to "express or imply a verifiably false fact" about the

plaintiff.  *Weyrich*, 235 F.3d at 624.[23]

Montgomery nevertheless seems to argue that the statement contains a verifiable

assertion that particular individuals specifically referred to Montgomery's actions as among the

"most elaborate and dangerous hoaxes in American history."  He claims that there is no

demonstrated record of any official specifically telling Risen that he or she believed

Montgomery's technology constituted "one of the most elaborate and dangerous hoaxes in

American history."  *See, e.g.*, Pl.'s Opp'n at 14–16.  In other words, Montgomery appears to

claim that even if the officials' underlying *assertion* constitutes a non-verifiable opinion, whether

individuals in fact expressed that assertion is provably true or false.

Yet, this alternative interpretation also fails for two reasons.  First, Montgomery

overlooks that the Chapter explicitly refers to officials' *beliefs*, not any particular statement.  *See*

---

[23] Montgomery's Amended Complaint also includes a statement by Risen that, Montgomery claims, implies Montgomery should be in jail.  *See* Am. Compl. ¶¶ 151, 156. Montgomery references this statement in a perfunctory manner in his opposition's factual background section, without developing an argument for why the statement should survive summary judgment.  *See* Pl.'s Opp'n at 8.  Regardless, the full context of the interview shows that the *interviewer* asked Risen whether Montgomery was "in jail for that [the alleged fraud]," to which Risen answered "Well, no, he's not in jail."  Am. Compl. ¶ 151.  The same is true for the other statement in Montgomery's complaint in which an interviewer remarks that "you'd think he would end up in prison," *id.* ¶ 157, which Montgomery never references in his opposition to Defendants' motion for summary judgment.  This context casts serious doubt on whether a reasonable viewer could even conclude that Risen adopted the assertion or intended to imply that Montgomery should be in jail.  Even if one could, the implication is a purely subjective conclusion that expresses the speaker's opinion or belief based on the facts that were disclosed about Montgomery's work throughout the interview.

Chapter at 32 (stating that officials "now *believe* [the circumstances surrounding Montgomery's technology] was one of the most elaborate and dangerous hoaxes in American history" (emphasis added)).   Contrary to Montgomery's argument, the Chapter never asserts that particular individuals expressed that exact turn of phrase, and Risen's own deposition describes the statement as his own articulation of the views he heard others express.   *See* Risen Dep. at 290:16–292:14, ECF No. 234-3 (asserting that "I believe . . . many people do believe that," and explaining that the statement is "my language, not a direct quote" and "my phraseology based on having talked to a lot of people at the CIA and elsewhere about this operation . . . describing what they said").   Moreover, an assertion that officials perceived Montgomery a particular way depends, again, entirely upon those officials' particular viewpoints; it is difficult to prove false the assertion that someone *thought or believed* a particular thing, as opposed to an assertion that an individual affirmatively said or expressed a particular viewpoint.   *See, e.g.*, *Mirafuentes v. Estevez*, No. 1:15-cv-610, 2015 WL 8177935, at *3 (E.D. Va. Nov. 30, 2015) (concluding that an article's "assertion that [the plaintiff] was perceived to be among the most corrupt Mexicans in 2013 is not actionable because it is not objectively verifiable and instead amounts to a subjective assertion").

Second, and in any event, even if it were possible to infer a provably false assertion from the statement, Montgomery is unable to show that Defendants made that assertion with actual malice.   For the reasons explained below in Part III.C.4.b, Montgomery has not shown that Defendants published the Chapter with knowledge that Montgomery's technology worked or with reckless disregard to the truth or falsity of the Chapter's assertions.   Instead, there is a plethora of evidence showing that officials and others who worked with Montgomery *do believe* his work to have been a hoax—evidence that Montgomery fails to dispute with concrete

opposing evidence from which a jury could find actual malice by clear and convincing evidence. As a result, even if this assertion did not constitute non-actionable opinion, the Court holds that Montgomery's defamation claims fail to the extent they are based on it.

### 3. Falsity

Defendants also argue that summary judgment should be granted in their favor because no reasonable jury could find on the basis of this record that the Chapter's statements concerning Montgomery's technology were false. If a plaintiff fails to present evidence from which a reasonable jury could find that the defendant's statements are false, summary judgment is warranted. *See Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1294 (D.C. Cir. 1988).[24] As the Court has already explained above in the context of the parties' discovery dispute, Montgomery cannot succeed on his claim by showing actual malice, alone. To meet his burden on summary judgment, he must also show that the Chapter's statements were false. In his opposition to Defendants' motion for summary judgment, Montgomery again asserts that he need not prove substantial falsity to succeed on his defamation by implication claims. *See* Pl.'s

---

[24] There is a split of authority and an "ongoing debate" concerning whether a plaintiff must prove by clear and convincing evidence or by a preponderance of the evidence that the allegedly defamatory statements are false, and whether the higher clear and convincing standard should apply for public officials and public figures even if a private figure can satisfy her burden by only a preponderance. *See* 3 Smolla, *supra*, § 23:7.50. The D.C. Circuit has interpreted District of Columbia law as requiring a plaintiff to demonstrate the falsity of a defendant's statements by only a preponderance of the evidence. *See Moldea I*, 15 F.3d at 1142; *Liberty Lobby*, 838 F.2d at 1294. More recent D.C. Court of Appeals decisions are more equivocal, however, and definitively confirm only that the preponderance standard is appropriate for private figures, without expressing a definitive position concerning public figures. *See, e.g.*, *Ayala v. Washington*, 679 A.2d 1057, 1069, 1063 n.3 (D.C. 1996) (concluding plaintiff, as a private figure, need only establish falsity by a preponderance, and including chart showing that Supreme Court had not resolved the issue with respect to public figures); *Solers, Inc. v. Doe*, 977 A.2d 941, 956 n.12 (D.C. 2009) (emphasizing that the plaintiff in *Ayala* was "not a public figure"). The Court need not resolve this issue here, however. Given the dearth of evidence in the record from which a jury might be able to conclude that Montgomery's technology worked, he cannot even meet the preponderance of the evidence standard.

Opp'n at 22–23.  The case he cites says exactly the opposite: defamation by implication arises

when "literally true statements . . . *create a false impression*."  *Jews for Jesus*, 997 So. 2d at

1106.  Thus, although Montgomery does not have to show that the challenged *statements* were

literally false to succeed on a defamation by implication claim, he still must show that the

challenged *implication* or *meaning* that a reader might reasonably derive from those true

statements is false.   Even Montgomery admits that a defamation by implication claim requires

stating a fact or opinion that "create[s] an overall impression *that is false*."  Pl.'s Opp'n at 22.

And the false implication the Amended Complaint claims many of the Chapter's statement

creates is that he "is a fraud and that his work is a scam and a hoax."  Am. Compl. ¶ 208; *see*

*also, e.g.*, *id.* ¶¶ 216, 230.  To prove defamation by implication he would have to show that this

implication was, itself, false.[25]

Without the software, he cannot do so.   Whether because the information is classified or

because Montgomery gave it away to the government without retaining a copy, the simple fact is

that the software, and therefore any ability to confirm whether or not it works, is absent from the

record.  This absence is fatal to any claim Montgomery's complaint asserts based on Defendants'

statements or statements by implication that the software did not work or did not exist.

Montgomery's opposition asserts in far more definitive terms than his discovery filings that he

could not produce the software "even if he had it in his possession, as it is highly classified, as

confirmed in the context of this case by the Central Intelligence Agency ('CIA') and its counsel

---

[25] Montgomery also claims that malice and damages are *presumed* in *per se* defamation
cases.  *See* Pl.'s Opp'n at 22–23.  As courts have explained, however, such statements involve
the *common law* concept of malice (ill will or spite), which "does not incorporate, and thus
cannot subsume, any fault standard."  *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122,
135 (1st Cir. 1997).  In any event, Montgomery does not explain how the presumption of
common law malice or damages would at all affect the Court's *falsity* analysis.

the U.S. Department of Justice."[26]  Pl.'s Opp'n at 2.  Assuming this is accurate, the fact that the

information is classified does not absolve Montgomery of his burden.  The state secrets doctrine

would nevertheless require the entry of summary judgment.  "Once successfully invoked, the

effect of the privilege is completely to remove the evidence from the case."  *In re United States*,

872 F.2d at 476.  The effects flowing from the absence of secret or classified evidence depend

upon the evidence's relevance.  If the evidence or information "is essential to establishing

plaintiff's prima facie case, dismissal is appropriate."  *Id.*; *accord Kasza v. Browner*, 133 F.3d

1159, 1166 (9th Cir. 1998).  If the evidence is instead relevant to a defense, "summary judgment

against the plaintiff is proper if the district court decides that the privileged information, if

available to the defendant, would establish a valid defense to the claim."  *In re United States*, 872

F.2d at 476.  As one Fourth Circuit panel held,[27] dismissal in a defamation case is necessary

where "basic questions about truth, falsity, and malice cannot be answered without the privileged

information."  *Trulock v. Lee*, 66 F. App'x 472, 476 (4th Cir. 2003).  In a defamation case, this

result is consistent with First Amendment law more generally: as a consequence of the

Constitution's guarantees, the law inevitably "insulate[s] from liability some speech that is *false,

but unprovably so.*"  *Hepps*, 475 U.S. at 778 (emphasis added).

　　　The only evidence in the record that Montgomery points to which might create a genuine

issue of fact are his own, vague representations that the technology worked.  *See, e.g.*, Pl.'s

Opp'n at 28.  A plaintiff's own, even self-serving testimony will often suffice to defeat summary

judgment—particularly where he has firsthand knowledge of a fact or observed an event, and

---

[26] Recall that the Court already concluded that the government has not been so definitive, and orders from the district of Nevada indicate otherwise.

[27] In a case in which Montgomery's counsel here, Mr. Klayman, represented the plaintiff-appellant.

where the case depends on the jury's resolution of competing testimony and witness credibility. *See Johnson v. Perez*, --- F.3d ----, 2016 WL 2941965, at *7 (D.C. Cir. May 20, 2016) (explaining that "[t]o the extent the testimony of a witness who is also a party may be impaired by [a] party['s] self-interest, it is ordinarily the role of the jury—not the court on summary judgment—to discount it accordingly"); *see also Desmond v. Mukasey*, 530 F.3d 944, 965 (D.C. Cir. 2008).  Yet, in other circumstances, a witness may lack personal knowledge concerning the matter about which he attempts to offer testimony, or may make a statement that is so conclusory—and presented without any supporting facts in the record—that it leaves the jury "in no position to assess" the veracity of his statement.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (holding that the plaintiff's conclusory statement that the student who was hired instead of her had "less experience and education" could not defeat summary judgment because, "[a]bsent supporting facts[,] . . . a jury would be in no position to assess her claim of superiority").  *Compare Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009) (discussing *Greene* and further noting that a court need not assume the truth of conclusory allegations lacking a factual basis in the record), *with Geleta v. Gray*, 645 F.3d 408, 412 (D.C. Cir. 2011) (distinguishing *Greene* and finding the plaintiff's allegation that his new position lacked "supervisory responsibilities" sufficed to survive summary judgment because the lack of supervisory responsibilities was "a fact known personally to" the plaintiff and his supervisor, who testified to the same information, and thus "[n]o further factual background [was] necessary to support these claims").

Here, while Montgomery of course has personal knowledge concerning whether or not the software worked, his generalized, conclusory assertion nevertheless fails to place the trier of fact in a position to assess whether the Chapter's claims about the software were false.  As

Montgomery's own counsel hypothesized at the sanctions hearing, it could turn out that certain portions of the software did not work as represented. *See, e.g.*, Sanctions Hr'g Tr. at 81:18–23, 181:25–182:6. Providing the jurors with evidence that would allow them to measure the size of any gulf between fully operational technology and technology that works only in certain respects is critical to Montgomery's burden to show falsity. Montgomery would have to show that any falsity was "material," because "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [can] be justified." *Masson*, 501 U.S. at 517 (internal quotation marks and citation omitted); *see Air Wis. Airlines Corp*, 134 S. Ct. at 861. Thus, without background information concerning the software, how it operated, and to what extent it worked, the jury will be unable to assess Montgomery's conclusory claim.

And there is reason to believe that such additional background information, if it did exist, was available in the record. At the August 21, 2015 discovery hearing, there was some discussion of the government's own tests confirming the validity of Montgomery's software. Montgomery claims to have produced that information to the Defendants (although the evidence appears to have consisted of one, single-page document). *See* Tr. of Disc. Hr'g at 74:9–77:3, ECF No. 110. Tellingly, however, no document confirming that the government tested and confirmed the validity of Montgomery's software has been presented on summary judgment. There is no mention of this evidence in Montgomery's opposition to Defendants' motion for summary judgment.[28] Indeed, the Air Force's recent response to Defendants' *Touhy* request

---

[28] In his statement of undisputed material facts, Montgomery claims that "Defendants knew that the government tested the Plaintiff's technology to confirm that it worked." Pl.'s Stmt. of Disputed Material Facts ¶ 76 ("Pl.'s SDMF"), ECF No. 234. But none of the documents he cites confirm either Defendants' knowledge or that the government conducted successful tests. He cites to his own declaration, which again contains only his conclusory assertions that the government independently confirmed his technology. *See* Montgomery 2d Decl. ¶¶ 9, 20, ECF No. 234-4. He also cites to Risen's deposition which briefly discusses the testing of the

asserts the opposite; it reports that "[w]hile the Air Force attempted to conduct a validation of Montgomery's software, *it was not able to execute that validation* because Blxware failed to provide a copy of the software." *See* Letter from Robert F. Booth, Chief, Gen. Litig. Div., U.S. Air Force, to Laura R. Handman (Mar. 10, 2016), ECF No. 263.

Without any evidence beyond Montgomery's general representation that the software worked, a reasonable jury would not be in a position to assess his claim that the Chapter's assertions that the software was fraudulent or a hoax were false. As a result, Montgomery is unable to make a *prima facie* case on any defamation claim based on the statement or implication that his software did not work, and Defendants' motion should be granted for the bulk of Montgomery's claims on this ground alone. And even if his general statement is sufficient to create a triable fact on falsity, he has failed to identify evidence that would allow a reasonable jury to find actual malice by clear and convincing evidence, as the Court explains below.

Montgomery similarly is unable to show that the Chapter's claims that Trepp and Flynn now believed Montgomery to be a con or fraud were false, to the extent those statements can even be considered actionable as statement of non-opinion. *See, e.g.*, Am. Compl. ¶ 110 (referring to Chapter's assertion that Montgomery "has been accused of being a con artist"); *id.* ¶ 119 (quoting statement that "Michael Flynn, Montgomery's former lawyer—who later

---

software, but does not state the outcome of those tests or whether Risen believed or knew that the government had confirmed it worked. *See* Risen Dep. 297:7–299:23. Finally, he cites an e-mail containing questions from Mr. Risen's colleague, Eric Lichtblau, to an Air Force spokesman. Pl.'s Ex. 25, ECF No. 203–25. One of those questions states that "[e]arly reports from the Air Force about the data provided by Blxware indicated that the company had turned over 24 boxes of archive data and was performing very well in the early testing of its product," *but then asks* "[w]as this true at the time and, if so, when did the Air Force begin to have doubts about the product?" *Id.* The Air Force's *Touhy* response indicates that those tests were never completed. *See* Letter from Robert F. Booth, Chief, Gen. Litig. Div., U.S. Air Force, to Laura R. Handman (Mar. 10, 2016), ECF No. 263. Needless to say, none of this evidence actually supports Montgomery's contention that the software, in fact, worked.

concluded that Montgomery was a fraud . . ."); *id.* ¶ 121 (referring to statement that "Trepp later

told the FBI that he eventually learned that Montgomery had no real computer software

programming skills, according to court documents that include his statements to the FBI"). The

record indicates that these assertions are literally true. During Montgomery's deposition in his

bankruptcy proceeding, Flynn stated that "I know you conned me and you conned the U.S.

Government . . . You're a computer hacker and you're a fraud, Mr. Montgomery." Montgomery

Dep. at 230:2–5, ECF No. 203-16. Flynn also filed an affidavit in which he wrote that Blxware's

valuation "is fraudulent" because "the technology as represented does not exist." Aff. of

Michael J. Flynn ¶ 13, ECF No. 203-17. Similarly, Trepp's statement to the FBI reads: "recently

Trepp has found out that Montgomery's skills may not be what he has purported them to be."

Risen Decl. Ex. 15 at 5, ECF No. 203-15.[29] Montgomery points to no evidence that these

statements—drawn directly from court or government documents repeating them—were false.

### 4. Actual Malice

Defendants prevail on much, if not all, of their motion because Montgomery's claims are

based on statements that are either non-actionable or that he cannot show are false.

Nevertheless, even if Montgomery's assertions sufficed to create a triable fact on falsity,

summary judgment is also warranted for the independent reason that Montgomery cannot show

the level of fault necessary to prevail on his claims. As explained below, this is true *even if*

---

[29] Montgomery also alleges that Defendants' publication that he was arrested in 2010 for bouncing more than $1 million in bad checks is defamatory *per se*. *See* Am. Compl. ¶ 178. In their statement of undisputed material facts, Defendants assert that "Montgomery's gambling and other debts led to bankruptcy and his arrest for passing $1 million in bad checks," and that "[t]he prosecution for passing bad checks is still pending . . . ." Defs.' SUMF ¶ 29. Although Montgomery generally disputes the entire paragraph in which this fact is included, he does not respond to or discuss the prosecution at all. The Court therefore treats the fact as conceded. *See* Pl.'s SDMF ¶ 29; *see also* D.D.C. Local Civ. R. 7(h)(1). That being the case, he cannot show falsity.

Montgomery had been able to produce his software.  The Court first explains why Montgomery is a limited-purpose public figure, and therefore must make a showing of actual malice, and then explains why he cannot meet that showing on this record.

### a.  Limited-Purpose Public Figure

As a constitutional matter, the level of fault a plaintiff must prove to prevail in a defamation case depends on the plaintiff's status as a public official or public figure, on the one hand, or a private figure on the other.  A more circumscribed group of public figures also exists: as the Supreme Court explained in *Gertz v. Robert Welch, Inc.*, an individual might "voluntarily inject[] himself or [be] drawn into a particular public controversy and thereby become[] a public figure for a limited range of issues."  418 U.S. 323, 351 (1974).  Such individuals are commonly referred to as "limited-purpose public figures."  *Jankovic v. Int'l Crisis Grp.*, --- F.3d ----, Nos. 14-7171, 14-7178, 2016 WL 2640526, at *3 (D.C. Cir. May 10, 2016).  Like their public official and general-purpose public figure counterparts, the Constitution requires that a limited-purpose public official show actual malice by clear and convincing evidence to succeed on a defamation claim.  *See Gertz*, 418 U.S. at 342; *see also Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 31 (D.C. Cir. 1990).   A different rule applies for "private individuals," however.  *Gertz*, 418 U.S. at 343.  So long as states "do not impose liability without fault," the Supreme Court has held that states "may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."  *Id.* at 347.

"Whether the plaintiff is a public figure is a question of law to be resolved by the court." *Dameron v. Wash. Magazine*, 779 F.2d 736, 740 (D.C. Cir. 1985).  In *Waldbaum v. Fairchild Publications, Inc.*, the D.C. Circuit developed a three-prong test for determining whether an individual is a limited-purpose public figure.  *See* 627 F.2d 1287, 1296–98 (D.C. Cir. 1980).  A

court must: (1) "identify the relevant controversy and determine whether it is a public controversy"; (2) determine whether the plaintiff "played a significant role in that controversy"; and (3) determine whether the allegedly defamatory statement is "germane to the plaintiff's participation in the controversy." *Jankovic*, 2016 WL 2640526, at *4 (citing *Waldbaum*, 627 F.2d at 1296–98); *see also Tavoulareas v. Piro*, 817 F.2d 762, 771–75 (D.C. Cir. 1987) (en banc).[30]

Defendants claim that Montgomery is a limited-purpose public figure and thus must show actual malice to prevail on his defamation claims. *See* Defs.' Mem. Supp. Summ. J. at 25–28. The Court agrees. Montgomery's participation in the controversy depicted in the allegedly defamatory Chapter at issue here satisfies all three prongs set forth in *Waldbaum*.

First, the Court concludes that the relevant public controversy in this case encompasses all of the circumstances surrounding eTreppid and Montgomery's creation and testing of the noise filtering and object recognition software, the government's subsequent use of that technology, and the company's attainment of government contracts for that technology. So defined, the relevant public controversy in this case is multi-faceted. It includes Montgomery's allegations that then-Representative Jim Gibbons of Nevada may have accepted gifts in exchange for securing government contracts for Trepp and eTreppid. The controversy also includes the software at issue in some of those contracts, whether that software worked, and whether government actions were taken in reliance on it. A public controversy must be "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not

---

[30] The Court notes that, on occasion, both the Eleventh Circuit and Florida state courts have expressly applied the *Waldbaum* test when determining whether a particular plaintiff has attained the status of a limited-purpose public figure. *See, e.g.*, *Silvester*, 839 F.2d at 1494; *Della-Donna v. Gore Newspapers Co.*, 489 So. 2d 72, 77 (Fla. Dist. Ct. App. 1986).

direct participants." *Waldbaum*, 627 F.2d at 1296; *see also Clyburn*, 903 F.2d at 32 (explaining

that "[t]here must be 'foreseeable and substantial ramifications for nonparticipants'" (quoting

*Waldbaum*, 627 F.2d at 1296–97)).  And there is no dispute that the public controversy at issue

here has ramifications for nonparticipants.  The allegations concerning Representative Gibbons

questioned whether elected officials had improperly taken official acts, and potentially awarded

government contract funds from the public fisc, based not on the efficacy of the contractor's

technology, but out of personal gain.  Moreover, whether eTreppid and Montgomery's

technology was effective, and how it was used, raised questions concerning national security that

clearly involved third parties.

Admittedly, the relevant public controversy involves several angles.  Montgomery

contends that there are in fact two separate controversies at issue: one involving the efficacy and

use of his software, and the other involving "a different controversy about Congressman

Gibbons."  Pl.'s Opp'n at 23; *see also id.* at 24 (referring to "two different controversies").

Despite the somewhat discrete issues, however, the Court views the controversy as an

undifferentiated whole.  Courts "often define the public controversy in expansive terms," and a

court "may find that there are multiple potential controversies, and it is often true that 'a narrow

controversy may be a phase of another, broader one.'"  *Jankovic*, 2016 WL 2640526, at *5

(quoting *Waldbaum*, 627 F.2d at 1297 n.27).  In this case, Montgomery's allegations about

Congressman Gibbons's relationship with Trepp raised questions about the government contracts

eTreppid had secured, and the government's use of the technology more generally.  Gibbons and

Trepp both claimed that the government contracts had been secured based on the technology's

merit.  *See, e.g.*, Risen Decl. Ex. 5.  And that line of inquiry eventually connected Montgomery's

software to the pre-existing reporting, from as early as 2005, that the decision to ground

airplanes in December 2003 was based on noise filtering software that government officials had come to believe was wrong.  *See id.* Ex. 4 (reproducing Lisa Myers and Aram Roston article).  Indeed, the Court finds it instructive that, like the Chapter at issue in this case, some of the news reports that pre-dated the Chapter canvassed multiple of these angles in a single story.  *See, e.g.*, Risen Decl. Exs. 8, 10, 11; *cf. Jankovic*, 2016 WL 2640526, at *5 (noting that the D.C. Circuit has on occasion even "defined controversies as being *broader* than the narrower discussion contained in the defamatory document" (emphasis added)).  Ultimately, the Court is unconvinced that the controversy can so easily be divided into distinct, constituent parts.  Montgomery's bald assertion to the contrary—that Defendants' argument "that two different controversies are actually the same is entirely unpersuasive"—amounts to no more than *ipse dixit*.  *See* Pl.'s Opp'n at 24.  He has not meaningfully explained why his claims about Congressman Gibbons and the circumstances surrounding the use and efficacy of his software should be considered standalone public controversies.  The reporting that pre-existed the Chapter only confirms the opposite.

Second, Montgomery "achieved a 'special prominence' in the debate" and purposely attempted "to influence the outcome" or could be expected "to have an impact on its resolution." *Waldbaum*, 627 F.2d at 1297.  Montgomery first came forward with the allegations concerning Representative Gibbons and eTreppid's government contracts.  NBC News then interviewed Montgomery as part of a news report concerning his allegations.  *See* Risen Decl. Ex. 7.  During that interview, Montgomery claimed that he saw Trepp give Gibbons more than $100,000.  *Id.* Although he says the only television appearance he did was a "short blurb" done only at the advice of counsel, Pl.'s Opp'n at 25, he strongly understates the content of the interview, and ignores that the interview—albeit perhaps his most high-profile statement—was only the culmination of his participation in this aspect of the controversy, which began with a sworn

affidavit Montgomery filed in a lawsuit he had filed against Trepp regarding the software.  *See, e.g.*, *id.* Ex. 5.  In addition, his allegations led Gibbons and Trepp to claim that the contracts were awarded on their merits.  *See id.*  The lawsuit naturally invited scrutiny of the technology that was the subject of some of those contracts.  As the D.C. Circuit has explained, "[t]hose who attempt to affect the result of a particular controversy have assumed the risk that the press, in covering the controversy, will examine the major participants with a critical eye."  *Waldbaum*, 627 F.2d at 1298.  Montgomery can hardly be heard to complain that the focus of the inquiry shifted from his dispute with Gibbons and Trepp to the validity of his technology, itself.

Moreover, even if the relevant public controversy was cabined solely to the efficacy of Montgomery's software and the government's actions taken in reliance upon it, Montgomery remains a limited-purpose public figure with respect to *that* distinct controversy.  Whether a particular plaintiff injected himself into the controversy is not the "be-all and end-all of public figure status."  *Dameron*, 779 F.2d at 741.  Although the second prong of the *Waldbaum* analysis often considers "the plaintiff's voluntary actions that have caused him to become embroiled in a public controversy," the Supreme Court "has recognized that it is possible, although difficult and rare, to become a limited-purpose public figure *involuntarily*."  *Id.* at 741–42 (emphasis in original); *see also Waldbaum*, 627 F.2d at 1298 (explaining that when "someone is caught up in [a] controversy involuntarily and, against his will, assumes a prominent position in its outcome," he has "'invited comment' relating to the issue at hand," unless "he rejects any role in the debate").  In *Dameron*, for example, the D.C. Circuit concluded that an air traffic controller— who had been on duty at Dulles International Airport on the day that a plane crashed into Mt. Weather, Virginia—became a limited-purpose public figure in the ensuing controversy about the accident's causes.  The accident was discussed as part of an article concerning safety problems at

Washington National Airport and air traffic controllers' contributions to crashes, more generally. *See Dameron*, 779 F.2d at 738, 742.

In this case, newspaper coverage regarding the government's use of Montgomery's software well predated publication of the Chapter. NBC News first reported on the software's use in 2005. *See* Risen Decl. Ex. 4. As part of their reporting on Montgomery's dispute with Trepp, a number of publications discussed the various ways the government had allegedly used the software. Then, in 2008, that software was first connected to the December 2003 terrorism threat that led to the grounding of several flights. *See id.* Ex. 10. From there, a number of publications, including *Bloomberg*, *Playboy*, and the *New York Times* discussed allegations that Montgomery's software did not work. *See id.* Exs. 3, 10, 11. That controversy raised questions regarding John Brennan's role in relaying that intelligence, which became the subject of further press coverage and Congressional testimony. By virtue of his stature as the creator of the technology at issue, Montgomery quite naturally became embroiled in the debate and was a central figure in its discussion. The dispute raised important public issues concerning the government's activities, national security, and the public fisc. Thus, Montgomery became a limited-purpose public figure even if one might conclude that his voluntary participation in the Gibbons-related allegations was related to a separate public controversy.[31]

---

[31] Defendants also press another ground for concluding that Montgomery is a limited-purpose public figure: they claim that "Montgomery reconfirmed his public figure status by seeking and obtaining U.S. government contracts involving national security even after he was subject to extensive media scrutiny, thus assuming the risk of further public scrutiny about his alleged contracting fraud." Defs.' Mem. Supp. Summ. J. at 27; *see* Defs.' Reply at 16. Defendants rely primarily on a Fourth Circuit case in which the Court wrote that a government contractor that supplied civilian interrogators at Abu Ghraib "surely knew when it accepted the interrogation work that it was potentially exposing itself to the inhospitable climate of media criticism—criticism that could be emboldened by the actual malice standard." *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 295 (4th Cir. 2008); *see also McDowell v. Paiewonsky*, 769 F.2d 942, 949–51 (3d Cir. 1985) (similarly concluding that architect who undertook government

Finally, there is no dispute that the Chapter's statements—which discuss the

government's use of Montgomery's technology and allegations concerning whether it worked—

are germane to the public controversy.  Montgomery does not argue otherwise.  Accordingly, the

Court concludes that Montgomery is a limited-purpose public figure and proceeds to consider

whether he can meet the actual malice standard.

### b.  Actual Malice

As the Supreme Court has explained, an "erroneous statement is inevitable in free debate,

and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that

they 'need . . . to survive.'"  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271–72 (1964) (quoting

*NAACP v. Button*, 371 U.S. 415, 433 (1963).  Thus, the Court has held that, as a constitutional

matter, a public official or public figure cannot prevail on a defamation claim unless he proves

the defendants' false and defamatory statement "was made with 'actual malice'—that is, with

knowledge that it was false or with reckless disregard of whether it was false or not."  *Id.* at 279–

80; *see also Gertz*, 418 U.S. at 334–36.  The actual malice standard is not to be confused with the

common law concept of "malice," and the standard "is not satisfied merely through a showing of

ill will or 'malice' in the ordinary sense of the term."  *Harte-Hanks Commc'ns, Inc. v.*

*Connaughton*, 491 U.S. 657, 666 (1989).  The proper injury focuses on what the defendant knew

---

construction project in the face of public controversy over the project was a limited-purpose
public official).  Yet, in that case, CACI (the contractor) did not contest its status as a public
figure, so the Court's analysis is both brief and conclusory.  *CACI Premier Tech.*, 536 F.3d at
295.  In addition, Defendants' argument in this case suffers from the more basic obstacle that the
record does not reveal *when* Montgomery entered into later contracts with the government.  That
gap in the record is concededly due to the vagueness of Montgomery's own claims about those
later contracts.  But it nevertheless leaves the Court unable to determine whether those
subsequent contracts post-dated the public *criticism* of his work—which began around 2008
when FBI records and media reports first linked Montgomery to the noise filtering technology
that led to the December 2003 grounding of flights.

about the veracity of the statements, not the defendant's motivation, and "only those statements made with [a] high degree of awareness of their probable falsity . . . may be the subject of either civil or criminal sanctions." *Garrison*, 379 U.S. at 74.  And that showing must be made by clear and convincing evidence, *see, e.g.*, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984), which serves as "an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander," *Gertz*, 418 U.S. at 342.

Moreover, the inquiry also focuses on the subjective beliefs of the particular defendant at issue.  The yardstick is *not* whether "a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Rather, a court must ask whether a particular defendant "*in fact entertained* serious doubts as to the truth of his [or her] publication." *Id.* (emphasis added).  Relying on the examples the Court set forth in *St. Amant*, the D.C. Circuit has further fleshed out this inquiry, holding that to establish actual malice a plaintiff "must show, by clear and convincing evidence, that when the defendants published the alleged defamation[] they were subjectively aware that it was highly probable that the story was '(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that appellees had obvious reasons to doubt.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (alterations in original) (quoting *Tavoulareas*, 817 F.2d at 790 (en banc)); *see also St. Amant*, 390 U.S. at 732.

The clear and convincing evidence standard of proof is also of critical importance, even at summary judgment.  The court "must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*." *Anderson*, 477 U.S. at 254.  A plaintiff

cannot survive summary judgment—and there is no genuine issue of material fact—"if the evidence presented in the opposing affidavits," or otherwise present in the record "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Id.* To be sure, and as the D.C. Circuit has acknowledged, there is some "facial appeal" to the argument that issues of actual malice should not be decided at summary judgment. *Lohrenz*, 350 F.3d at 1283. Considering whether a speaker knew or had serious reason to believe that his speech was false necessarily entails mining the speaker's "subjective state of mind," and turns to a large degree on questions of "credibility and nuance." *Id.* Yet, the "heavy burden" of clear and convincing evidence that the Supreme Court has established makes that facial appeal misplaced. *Id.*; *see also Anderson*, 477 U.S. at 256. A plaintiff cannot defeat a properly supported motion for summary judgment "by merely asserting that the jury might . . . disbelieve the defendant's denial . . . of legal malice." *Anderson*, 477 U.S. at 256. Instead, the plaintiff must present "affirmative evidence" beyond "mere allegation or denials of his pleading" that demonstrate a genuine issue of fact for trial. *Id.* at 256–57.

Here, Defendants point to an abundance of evidence in the record tending to show that Risen and Houghton Mifflin neither knew nor had reason to suspect that the Chapter's assertions regarding Montgomery, his technology, and the surrounding circumstances were false. Of most relevance is the plethora of other news articles, court documents, and government records, pre-dating the Chapter, which align with and corroborate the Chapter's general thrust: that Montgomery's technology did not work as billed.[32] For example, the Chapter expressly

---

[32] Montgomery claims—without any legal citation—that these documents are hearsay and would be inadmissible at trial. *See* Pl.'s Opp'n at 19. But to the extent they would be introduced for the non-hearsay purpose of showing the Defendants' subjective knowledge or state of mind regarding the veracity of the Chapter, they would be admissible. Courts regularly rely on media publications, government reports, arrest records, and other purportedly hearsay

acknowledged Aram Roston's prior article in *Playboy* magazine and Risen and Eric Lichtblau's prior article in the *New York Times*, which both made substantially similar claims regarding Montgomery's technology.  *See* Chapter at 53; *see also* Risen Decl. ¶¶ 5, 15; *id.* Exs. 3, 11.  Risen also asserts in a declaration that he also relied on a number of additional articles, which he attaches.  *See* Risen Decl. ¶¶ 8–18; *id.* Exs. 4–14.  Each of those articles make similar factual claims, and none have been retracted or otherwise called into dispute.  Indeed, Risen asserts that "[t]o my knowledge, up to the time of publication and today, none of the articles I reviewed and relied [upon] were subject to a correction, retraction, or lawsuit."[33]  Risen Decl. ¶ 7.  Generally, a defendant's "good faith reliance on previously published reports in reputable sources . . . precludes a finding of actual malice as a matter of law."  *Liberty Lobby, Inc.*, 838 F.2d at 1297.

Risen also testified that he relied on statements made by Trepp, Flynn, Montgomery's former employees, and others in FBI interview reports and court documents.  *See, e.g.*, Risen Decl. ¶¶ 20–25; Risen Dep. at 109:19–110:5.  For example, the FBI's report of its interview with Warren Trepp states that Trepp had "recently learned that Montgomery would require eTreppid employees to falsify the results of live demonstrations for it's [sic] customers."  Risen Decl. Ex.

---

documents when considering defendants' motions for summary judgment in defamation cases. *See, e.g.*, *Liberty Lobby*, 838 F.2d at 1296–97 (substantively discussing several articles upon which the defendant had relied).

[33] Montgomery claims in his statement of material facts that he "produced email communications between Montgomery and Eric Lichtblau and James Risen as early as 2011 demanding retraction"—presumably referring to the *New York Times* articles Risen and Lichtblau authored.  Pl.'s SDMF ¶ 65.  But, as Defendants point out, he offers no documentary support for that assertion.  Montgomery cites to Exhibit 9.  That exhibit shows email traffic from 2012 (not 2011), sent only to Risen (and not both Risen and Lichtblau), and contains no discussion of a retraction.  *See* Pl.'s SDMF Ex. 9, ECF No. 234-9.  He also cites to his deposition, during which he claimed he sent e-mails to Risen and an editor seeking a retraction. *See* Montgomery Dep. at 191:4–197:19, ECF No. 234-5.  No such e-mails have been identified to the Court.

15 at 5.[34]   An Air Force Office of Special Investigation Inquiry report also reproduces the

statement of Jesse Anderson, an employee of eTreppid, who recalled a demonstration of

Montgomery's object recognition software during which Anderson was asked to strike a

particular computer key whenever a bazooka appeared on the video screen.  *Id.* at 61.  Another

former employee of eTreppid, James Bauder, made similar allegations.  *Id.* at 62.  These

contentions largely corroborated the factual assertions made in media reports.  Moreover, they

were further substantiated by the statements of other sources who were not tied so closely to

Montgomery.  For example, Aram Roston reported in *Defense News* in 2012 that a former CIA

Counterterrorism Center official, Jose Rodriguez, claimed the CTC was skeptical of the

technology, and that other officials also came to view the technology as "bogus."  *See* Risen

Decl. Ex. 13.  Risen asserts that he relied on that article.  *See* Risen Decl. ¶ 17.  In addition, the

Chapter explicitly quotes the written testimony of John Brennan, during the course of his

confirmation hearings to become CIA Director, that the program "was determined not to be a

source of accurate information."  *See* Chapter at 47; Risen Decl. Ex. 19 at 10.

    And Risen also states that he further corroborated these individuals' claims with other

government officials.[35]   *See* Risen Decl. ¶¶ 26–35.  For example, he asserts that CIA Paris

Station Chief William D. Murray told him about the French Intelligence Agency's efforts to

---

[34] Because Exhibit 15 includes a number of separate reports and interview notes in a single document, the Court will cite to the ECF-generated page numbers for ease of reference.

[35] In passing, Montgomery asserts that Risen did not identify some sources at his deposition that were later discussed in his declaration—although Montgomery does not identify the names of any particular individuals.  *See* Pl.'s Opp'n at 16.  The Court's comparison of Risen's deposition and his declaration reveal that, at the very least, Risen disclosed at his deposition the names of CIA Paris Station Chief William D. Murray, former White House counterterrorism official Frances Townsend, CIA Office of Public Affairs officials George Little and Jennifer Youngblood, and former adviser to Vice President Cheney Samantha Ravich.  *See, e.g.*, Risen Dep. at 93:19–21, 282:23–283:18, 292:20–22, 313:12–315:18, 380:2–385:1.  These sources, on their own, are sufficient to show an absence of actual malice.

reverse-engineer Montgomery's software and that the agency's conclusion that the broadcasts contained insufficient pixels to contain hidden messages. *Id.* ¶ 27. Defendants produced the copy of an e-mail Risen received from CIA spokeswoman Jennifer Youngblood, who stated that "the CIA looked at what Montgomery claimed he could do but determined that his threat detection tools weren't exactly as billed." *Id.* ¶ 29; *id.* Ex. 21.

Finally, Risen interviewed Montgomery and published his denials and counterclaims throughout the Chapter. Indeed, the Chapter emphasizes those comments by placing them in the opening pages and the closing paragraph, among other places. *See, e.g.*, Chapter at 33–34, 37, 41, 53. As the D.C. Circuit has explained, "reporting perspectives at odds with the publisher's own, 'tend[] to rebut a claim of malice, not to establish one.'" *Lohrenz*, 350 F.3d at 1286 (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1304 (D.C. Cir. 1996)). Disclosing this contrary narrative in fact shows that Defendants ferreted out conflicting information and examined it, which suggests, in turn, that by the time they published the Chapter they held no serious doubts about its truth.

Collectively, this evidence paints a bleak picture for Montgomery's claims, and Montgomery's effort to rebut it and demonstrate a triable issue of actual malice is unavailing.[36] As an initial matter, Montgomery's inability to show falsity is a persistent stumbling block that

---

[36] This evidence also demonstrates why Montgomery cannot carry his burden to show negligence even if he is properly considered a private figure. To demonstrate negligence, a plaintiff must show "a failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others," or, in other words, "a failure to make a reasonable investigation as to truth." *Kendrick v. Fox Television*, 659 A.2d 814, 822 (D.C. 1995) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1025–26 (D.C. 1990)). Here, Risen interviewed Montgomery and included his denials and counter-points in the Chapter (albeit with less emphasis than Montgomery may have preferred). The evidence also indicates that Risen attempted to corroborate the assertions regarding Montgomery's software across several different sources. For the same reasons that follow, Montgomery has not shown that a reasonable jury could conclude from this record that Risen failed to make a reasonable investigation as to the truth.

runs throughout this case.  Without evidence from which a reasonable fact finder could conclude that Montgomery's software *worked*, a jury would be unable to conclude Risen's statements that the technology was fraudulent were in fact false.  And if the fact finder is unable to determine whether the statements were false, it becomes all the more difficult to show that Risen had reason to doubt the chorus of sources in government, in the media, and personally connected to Montgomery, who all contended that Montgomery's technology was either fabricated or proven not to be a valid source of intelligence.  *Cf. Hepps*, 475 U.S. at 778 ("A jury is obviously more likely to accept a plaintiff's contention that the defendant was at fault in publishing the statements at issue if convinced that the relevant statements were false.").

But even assuming, merely for the sake of argument, that the Chapter's statements turned out to be false, Montgomery has not identified record evidence that would "allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 254.  Although each of Montgomery's assertions will be discussed in detail, the Court pauses to emphasize that the vast majority of his arguments suffer from a basic infirmity.  A party opposing the entry of summary judgment must present concrete "affirmative evidence" beyond "mere allegation or denials" that demonstrates a genuine issue of fact for trial.  *Id.* at 256–57.  For that reason, conclusory statements unaccompanied by supporting facts in the record are insufficient to defeat a motion for summary judgment.  *See, e.g.*, *Greene*, 164 F.3d at 675.  Despite this requirement, much of Montgomery's opposition relies on unsupported assertions and speculation.  And in the few instances he does cite or point to actual record evidence, that evidence does not suffice to show actual malice by clear and convincing evidence.

First, Montgomery argues that his own statements to Risen suggesting his story was inaccurate gave Risen reason to know that the Chapter's claims were false.  *See* Pl.'s Opp'n at

27.   The e-mails Montgomery points to largely consist of Montgomery questioning why Risen has not focused his attention on Trepp, Flynn, or government officials, and Risen seeking certain documents to corroborate some of Montgomery's own claims.[37]   *See* Pl.'s Opp'n Exs. 13, 14. Although Montgomery never makes a full-throated denial of the Chapter's claims, in the e-mails he does make some passing assertions that his technology "is still being used against Americans for covert purposes," Pl.'s Opp'n Ex. 14, and that Montgomery could not "ever see [Risen] correcting the record," Pl.'s Opp'n Ex. 13.   Yet, any denial, standing alone, is insufficient to demonstrate actual malice and survive summary judgment.   "[P]ublishers need not accept denials, however vehement," because "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error."   *Lohrenz*, 350 F.3d at 1285 (quoting *Harte-Hanks Commc'ns*, 491 U.S. at 691 n.37).   Denials often do not provide "obvious reasons" to doubt the veracity of a publication, *id.* at 1285, and "[a] denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality," 3 Smolla, *supra*, § 23:3 at 23-31. Montgomery fails to point to anything specific and concrete that accompanied his denial, beyond his vague claim that Defendants "intentionally omitted most of Mr. Montgomery's side of the story and was relegated only to conclusory denials, undercutting Plaintiff's credibility."   Pl.'s Opp'n at 29.   He does not explain what points were omitted.

---

[37] On this latter point, the e-mails contain some vague discussions regarding Montgomery's claims that John Brennan was or continues to be involved in some unspecified program related to Montgomery's software.   Montgomery claims that Risen "blackmailed" him and "attempt[ed] to get Dennis Montgomery to provide classified information and documents, including John Brennan's emails."   Pl.'s Opp'n at 29.   Simply put, the e-mail conversation neither supports Montgomery's assertion of some nefarious intent nor indicates that Risen threatened to publish his Chapter unless Montgomery divulged classified information.

Next, Montgomery claims that the Defendants knew all of the sources they relied upon had either an ongoing feud with Montgomery or a motivation to shift responsibility from their own actions to Montgomery.  *See* Pl.'s Opp'n at 26.  He points specifically to Trepp and Flynn, with whom he claims he was locked in litigation over eTreppid's assets, including his software, and their statements that they now believed Montgomery to be a fraud or a con man.  He also points to the government officials Risen quotes—named and unnamed—who Montgomery argues were simply "shifting the blame for their own bad decisions and failures onto a private individual as a scapegoat."  Pl.'s Opp'n at 28.  It is true that, although a publisher's failure to investigate "does not itself establish bad faith," once "the publisher has obvious reasons to doubt the accuracy of a story, the publisher must act reasonably in dispelling those doubts."  *Lohrenz*, 350 F.3d at 1284 (citing *St. Amant*, 390 U.S. at 733, 731).  But the mere possibility that a source may be biased in some way or hold a subjective viewpoint does not, without more, create obvious reasons to doubt a source's accuracy or establish actual malice.  *Id.* (concluding that evidence that the publishers "were on a mission to reinstate the ban against women being assigned to combat positions in the military does not suffice to show actual malice," and that acting on the "basis of a biased source and incomplete information" does not show actual malice).  Indeed, the D.C. Circuit has affirmed the entry of summary judgment where a speaker had "reason to be wary" of a source but "also had some reason to believe the story, based upon his own research and his conversations with journalists and experts"—research and conversation that "gave him reason to believe that the allegations were not fabricated."  *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1513 (D.C. Cir. 1996).  That is exactly the case here.  Risen does not deny that he was aware of the litigation between Trepp, Montgomery, and Flynn.  Indeed, he draws several of the quotes from documents filed in those cases, and acknowledges in

the Chapter that Montgomery "insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees." Chapter at 33. As in *McFarlane*, here Risen corroborated the Chapter's basic claim across several different sources, undercutting Montgomery's claim of bias. Montgomery does not identify anything other than the possibility of bias that might have otherwise raised serious doubts about these sources' claims.

Montgomery also asserts that Defendants had reason to know that the Chapter's claims were improbable—but he relies on nothing more than speculation and empty assertions unsupported by record evidence. In some instances, he even severely misrepresents the Chapter's contents. For example, he claims that Defendants "knew" that "private citizens cannot order transatlantic airplane flights barred from the United States or shot down," and that Montgomery "did not interpret the data he collected." Pl.'s Opp'n at 26. The Chapter, however, cannot possibly support an implication that Montgomery, himself, ordered or suggested ordering airplanes shot down; it merely states that *President Bush* ordered the grounding of planes "[b]ased on Montgomery's information," and that the information "prompted President Bush" to act. Chapter at 42, 45. And the Chapter explicitly states that "Montgomery let the CIA draw its own conclusions based on the information he gave them," and noted that Montgomery "insists that he did not offer the CIA his own conclusions about what the data meant."[38] *Id.* at 41.

---

[38] Other speculative assertions made without any record evidence (or an attempt to connect those assertions to Defendants' subjective knowledge) include the following: Montgomery's claim that Defendants "knew that the French at that time [that they purportedly reviewed Montgomery's software] were opposed to President Bush's foreign policy"; his claim that "Defendants publish accusations that the U.S. Government shared classified intelligence, sources[,] and method [sic] with a private French firm at a time when France was hostile to George W. Bush's foreign policy and in bed with commercial interests in Iraq and throughout the Middle East"; that the *New York Times* and other media sources refused to publish the Chapter's claims, that Defendants "ignored contradictory information that was readily available"; and that Defendants "went far beyond and exaggerated to the extreme anything that was said in prior publications, public documents, or through any named sources." Pl.'s Opp'n at 26–28. As for

Montgomery similarly points to the fact that the government neither prosecuted him nor asked for its money back. *See* Pl.'s Opp'n at 26.  He claims that "Defendants ignore[d] warning signs that the U.S. Government kept re-hiring Dennis Montgomery and his employers through various contracts and various businesses as evidence that his software and technology was valuable and worked."  Pl.'s Opp'n at 28.  To the contrary—Defendants explicitly acknowledge this fact, and the Chapter states that "[e]ven more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities."  Chapter at 47.  The Chapter drew a different inference from this fact: it asserted that "[t]he secrecy that surrounded [Montgomery's] work once again worked in his favor" and that he was able to secure contracts because "CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery."  *Id.*  An "adoption of one of a number of possible rational interpretations" is "not enough to create a jury issue of 'malice' under *New York Times*," particularly absent warning signs which would have led Risen to doubt his account.  *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971); *see Silvester v. ABC, Inc.*, 650 F. Supp. 766, 779 (S.D. Fla. 1986) ("Members of the news media may spin their own theories so long as those propositions are not so unreasonable under the circumstances as to demonstrate malice.").  And again, the falsity issue becomes a

---

Montgomery's claim that the French did not have access to the dis-encryption technology at issue, that statement is disclosed in the Chapter.  *See* Chapter at 46 (explaining that the French company was hired to "reverse-engineer Montgomery's purported technology").  And Montgomery does not explain why that fact should have given Defendants reason to doubt the ability of the French to verify, without Montgomery's technology, the possibility that secret messages were being transmitted through Al Jazeera broadcasts.

hurdle for Montgomery because he provides nothing other than his own say-so to show that the government is, in fact, still using his software. [39]

Next, Montgomery makes the unsupported claim that Risen's original publisher, Simon & Schuster, refused to publish his book because he could not support the book's claims. *See, e.g.*, Pl.'s Opp'n at 3, 5, 16–18. This assertion is not supported by the record. When one actually looks at the e-mail correspondence Montgomery cites, it becomes clear that the Simon & Schuster editor with whom Risen worked merely raised concerns that several of the chapters might not work in concert to advance a central thesis, and suggested that additional chapters might be written to shift the book's focus. As to the specific Chapter discussing Montgomery, however, the editor never raised a single substantive objection. Instead, she highlighted it as among the strongest in the book and always suggested that it remain. *See* Pl.'s Mot. for Leave to File Under Seal, Ex. A., ECF No. 272-4.[40]

---

[39] Montgomery also latches on to Risen's statement during a podcast interview that it was "difficult to tell what was really going on" or that one could "never tell what was the truth and what was not the truth." Am. Compl. ¶ 149, *see* Pl.'s Opp'n at 27. As Risen explained in his deposition, however, that statement was taken out of context and involved an entirely different chapter of *Pay any Price*, a Chapter on "Rosetta" (a subject that is not further described in the record). *See* Risen Dep. 365:15–366:11 ("I know that you've mischaracterized and taken that out of context because I looked at the actual interview and it was related to a different chapter in my book, not the chapter involving Dennis Montgomery. . . . It had nothing to do with Dennis Montgomery."). The Amended Complaint does not provide the full context or transcript of the interview, but its use of brackets to explain why both the preceding and following portions of the interview were not relevant, and the fact that the quoted portion does not discuss Montgomery at all, cast serious doubt on Montgomery's assertion that Risen was admitting he did not know whether Chapter Two was accurate. *See* Am. Compl. ¶ 149. Indeed, the Amended Complaint *introduces* the assertion by stating that Risen "winds up the Chapter on 'Rosetta' [sic] by saying . . . ." *Id.* And, in any event, the evidence discussed above demonstrates that, at least insofar as the Chapter concerning Montgomery is concerned, there is nothing in the record seriously indicating Risen had doubts about the truth of that Chapter's assertions or the interpretation of events that he finally settled on.

[40] The Court's vague description of these documents' contents is intentional. The documents were obtained from third-parties Simon & Schuster, Priscilla Painton (a Simon & Schuster editor), and Tina Bennett (Risen's literary agent) pursuant to a subpoena. They were

Montgomery also makes two other arguments that deserve only passing mention in light of his failure to show that Defendants held any subjective doubt about the Chapter's accuracy. First, he emphasizes that Houghton Mifflin did not retract the Chapter after Montgomery and his counsel repeatedly asked them to. *See, e.g.*, Pl.'s Opp'n at 13, 18. This fact cannot help him show malice here, given all of the evidence indicating that Defendants actually subjectively believed the accuracy of the Chapter's assertions. *See N.Y. Times*, 376 U.S. at 286–87 ("[F]ailure to retract upon respondent's demand . . . is likewise not adequate evidence of malice for constitutional purposes."); *see also Klayman v. City Pages*, No. 5:13-cv-143, 2015 WL 1546173, at *15 (M.D. Fla. Apr. 3, 2015) ("[T]he fact that Plaintiff alerted Defendants after publication that he believed the statements were false and that he wanted some kind of correction or retraction does not help Plaintiff to establish actual malice."). Second, to establish Houghton Mifflin's own malice he points to the fact that the publishing companies did not independently fact check Risen's work. Given the plethora of other accounts of the same story in reputable

---

marked confidential pursuant to Magistrate Judge Goodman's Protective Order. *See* Protective Order, ECF No. 89. Montgomery filed a motion to remove these documents from the Protective Order relying on little more than a statement by Magistrate Judge Goodman, taken out of context, to support his claim that the documents should not remain confidential. *See* Pl.'s Mot. for Leave to File Under Seal, ECF No. 236. Yet, two days before filing that motion he publicly filed his opposition to Defendants' motion for summary judgment and quoted verbatim from the confidential documents. Defendants claim that the documents contain sensitive editorial information concerning Simon & Schuster's review of Risen's book. *See* Defs.' Resp. Opp'n to Pl.'s Mot. to Remove Docs. from Protective Order at 4, ECF No. 239. The Court agrees and will grant Defendants' motion to retain the documents under seal, deny Montgomery's motion insofar as it requests to remove the documents from the protective order, and grant Defendants' motion to seal their unredacted reply to plaintiff's statement of additional material disputed facts, which discloses this information. *See* Defs.' Mot. to Seal, ECF No. 253; Defs.' Renewed Mot. to Seal, ECF No. 270. To remedy the dissemination of the confidential information, the Court will order Plaintiffs to substitute a redacted version of his brief in opposition and statement of disputed facts. Plaintiff shall also substitute redacted versions of those depositions in which Defendants claim confidential information was disclosed, redacting those portions that Defendants identify as confidential. *See* Defs.' Resp. Opp'n to Pl.'s Mot. at 3 n.1, ECF No. 239. The docket does not reveal any motion to remove that material from the Protective Order.

sources, and Risen's own reputation as a journalist, the publisher's failure to conduct its own fact check cannot establish malice on this record. *See, e.g.*, *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (explaining that "[a] publisher will not be liable for an article later shown to be false if it relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author," and finding no malice where author "was an 'established' writer with a sound reputation" and "[n]either the contents of the article nor any external circumstances suggested that the article contained any falsity").

At bottom, the limited evidence Montgomery has supplied does not show by clear and convincing evidence that Defendants subjectively knew the Chapter's assertions were false or acted with reckless disregard as to those assertions' truth or falsity. The evidence and speculation on which Montgomery relies "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence," *Anderson*, 477 U.S. at 254, and Defendants' motion to summary judgment must therefore be granted.[41]

---

[41] The Court's conclusion also makes it unnecessary to definitively resolve to what extent the common law fair report privilege protects the statements made in the Chapter. The common law privilege, retained in contemporary defamation law, immunizes from liability the fair and accurate reporting concerning official government proceedings and acts as "a recognized exception to the common law rule that the republisher of a defamation is deemed to have adopted the underlying defamatory statement as its own." *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990); *see Restatement (Second) of Torts* § 611 (Am. Law Inst. 1977). The privilege is intended to "encourage[] the media to disseminate official records—whether verbatim or in fair summaries—without fear of liability for any false, defamatory material that their might contain," *Dameron*, 779 F.2d at 739, and its application is a legal question to be decided by the court as a matter of law, *see, e.g.*, *White*, 909 F.2d at 527–28; *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 362 (Fla. Dist. Ct. App. 1997). To qualify for the privilege, the material must have been contained in an official report, which is defined broadly to include "reports of proceedings before any court, or agency of the court, . . . reports of any other proceedings, judicial in character, which take place before administrative, executive or legislative bodies which are by law authorized to perform public duties, . . . as well as report of any official proceeding or action taken by any officer or agency of government." *White*, 909 F.2d at 527 (quoting *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. 1980)); *see also Restatement (Second) of Torts* § 611, cmt. d. It also must be "apparent either from specific

### 5.  The Remaining Tort Claims

Finally, it is hornbook law that "a plaintiff may not use related causes of action to avoid

the constitutional requisites of a defamation claim."  *Moldea II*, 22 F.3d at 319–20.  Where a

plaintiff's "defamation claim[s] fail[], so do [his] other tort claims based upon the same allegedly

defamatory speech."  *Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013); *see also*

*Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (holding that a public official must show a

false publication made with actual malice in order to recover on intentional infliction of

emotional distress claim); *Farah*, 736 F.3d at 540 (affirming dismissal of plaintiffs' tortious

---

attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings," *Dameron*, 779 F.2d at 739, and the author's summarization of the official reports must be reasonably accurate and fair, *see White*, 909 F.2d at 527; *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. Dist. Ct. App. 1993).  If the author's work is a fair and accurate representation of an official report, the work is privileged, regardless of the veracity of the official report and "even if the official documents contain erroneous information."  *Woodard*, 616 So. 2d at 502; *see also Dameron*, 779 F.2d at 739.

The Court does note that, in several instances, the Chapter describes allegations that were contained in FBI interview reports, Congressional testimony, and court documents.  When it does so, Risen attributes the statements to those sources.  In those instances, the statements would be shielded by the fair report privilege.  *See, e.g.*, Am. Compl. ¶¶ 121, 123.  At the same time, however, the Chapter as a whole is not a prototypical example of a work premised entirely on summarizing or discussing an official report; in many respects, extended passages of the Chapter discuss the surrounding events without explicitly referencing the contents of official governmental reports.  In those cases, the Chapter leaves the reader "with the impression that the conclusion is that of the [Chapter's] author based on his own research—which may or may not have included government reports."  *Dameron*, 779 F.2d at 740 (finding the privilege inapplicable where neither the alleged defamatory statement nor the sidebar portion of the article in which it was contained mentioned the official report, and where "nothing in the piece indicates that the statement is intended as a summary" of the official report); *see also id.* (concluding that "nothing in the article gives the reader any reason to believe that the allegedly defamatory statement is intended as a summary of a[] [report]").  To be sure, the Chapter's *content* may be similar to the allegations made in the official reports—and for that reason, the reports strongly support the Court's finding that Montgomery is unable to show actual malice here.  But the mere existence of the reports, themselves, do not immunize Defendants from liability under the fair reporting privilege in those passages where the reports are neither explicitly referenced nor discussed.

interference claim); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990) (concluding that plaintiff could not succeed on a tortious interference claim where summary judgment was properly granted on defamation claims).  Montgomery merely asserts that summary judgment must be denied because his defamation claims survive summary judgment.  *See* Pl.'s Opp'n at 35.  Having concluded otherwise, the Court will also grant summary judgment to defendants on Montgomery's intentional infliction of emotional distress, tortious interference with prospective advantage, and common law assault claims.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 201) is **GRANTED**; Defendants' motion to dismiss (ECF No. 52) is **DENIED AS MOOT**; Plaintiff's objections to the magistrate judge's discovery motions (ECF Nos. 125, 143, 164) are **OVERRULED**; Defendants' motion for sanctions (ECF No. 166) is **DENIED**; Plaintiff's motion for an extension of time to complete discovery and to reset the discovery deadline (ECF No. 181) is **DENIED**; Defendants' motions to seal questions for the sanctions hearing (ECF Nos. 210, 269) are **DENIED**; Plaintiff's motion for an extension of time to file his opposition to Defendants' motion of summary judgment (ECF No. 221) is **GRANTED** *nunc pro tunc*; Plaintiff's motion to seal and to remove documents from the Protective Order (ECF No. 236) is **GRANTED IN PART AND DENIED IN PART**; Defendants' cross-motion to maintain documents under seal (ECF No. 239) is **GRANTED**; Defendants' motion to seal and renewed motion to seal (ECF Nos. 253, 270) are **GRANTED**; Plaintiff's consent motion for a status conference (ECF No. 256) is **DENIED AS MOOT**; and Plaintiff's motion for oral argument

(ECF No. 264) is **DENIED AS MOOT**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 15, 2016                                   RUDOLPH CONTRERAS
                                                        United States District Judge